EXHIBIT 19

DEPOSITION TRANSCRIPT OF AIMEE JONES

# Condensed Transcript of the Testimony of

# **Aimee Jones**
Volume I

**Date:** October 7, 2016

Grecia Echevarria-Hernandez v. Affinitylifestyles.com, Inc.
Case No. 2:16-cv-00943-GMN-VCF

Oasis Reporting Services, LLC
Phone:  702-476-4500
E-mail:  info@oasisreporting.com
Internet:  www.oasisreporting.com

## Page 1

```
1            UNITED STATES DISTRICT COURT
2                DISTRICT OF NEVADA
3
4   GRECIA ECHEVARRIA-HERNANDEZ,    )
                                    )
5              Plaintiff,           )
                                    )
6   vs.                            )    Case No:
                                    )   2:16-cv-00943-GMN-VCF
7   AFFINITYLIFESTYLES.COM, INC.    )
    d/b/a REAL ALKALIZED WATER, a   )
8   Nevada corporation; DOES I-X;   )
    and ROE BUSINESS ENTITIES I-X,  )
9   inclusive,                      )
                                    )
10             Defendants.          )
    _____)
11
12
13
14
15        DEPOSITION OF AIMEE JONES
16       Taken on Friday, October 7, 2016
17            At 12:52 p.m.
18          At Maier Gutierrez Ayon
19          8816 Spanish Ridge Avenue
20            Las Vegas, Nevada
21
22
23
24
25   Reported By:  Ewa Barnes, CCR No. 889
```

## Page 3

```
1                   I N D E X
2   WITNESS                         PAGE
3   AIMEE JONES
4   Examination by Ms. Barraza         4
    Examination by Ms. Ginapp         94
5
6
7
                  E X H I B I T S
8
    NUMBER                          PAGE
9
   "1"   Employment Agreement, Bates stamped   35
10         RW-000016 - RW-000028
11  "2"    Message to Garcia Video Review, Bates  41
           stamped RW-000031 and RW-000032
12
   "3"    The Secret Review, Bates stamped      41
13         RW-000033
14  "4"    The Way to Happiness Video Review,    41
           Bates stamped RW-000034 - RW-000037
15
   "5"    Real Water Course Memo, Bates         52
16         stamped RW-000060 - RW-000064
17  "6"    Basic Study Manual Course, L. Ron     61
           Hubbard, Bates stamped RW-0001409 -
18         RW-000156, RW-000162, RW-000208,
           RW-000249 - RW-000270
19
   "7"    Formulas for Business Success,        73
20         Bates stamped RW-000828 - RW-000831,
           RW-001042 - RW-00f1046, RW-001110,
21         RW-001112 - RW-001115
22  "8"    Speaking from Experience, Illustrated  80
           solutions to the business problems
23         you face every day, Bates stamped
           RW-001306, RW-001309, RW-001312
24
25
```

## Page 2

```
1   APPEARANCES OF COUNSEL:
2
    For the Plaintiff:
3
       MAIER GUTIERREZ AYON
4      By:  Danielle J. Barraza, Esq.
       8816 Spanish Ridge Avenue
5      Las Vegas, Nevada 89148
       (702) 629-7900
6      (702) 629-7925 Fax
       djb@mgalaw.com
7
8   For the Defendant:
9      LEWIS, BRISBOIS, BISGAARD & SMITH
       By:  Kristol Bradley Ginapp, Esq.
10     6385 South Rainbow Boulevard, Suite 600
       Las Vegas, Nevada 89118
11     (702) 893-3383
       (702) 893-3789 Fax
12     kristol.ginapp@lewisbrisbois.com
13
    Also Present:  Melody Risselo
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1         LAS VEGAS, NEVADA; FRIDAY, OCTOBER 7, 2016
2                    12:52 P.M.
3                      -0-
4    Whereupon
5              AIMEE JONES,
6      the witness herein, having been first
7      duly sworn, was examined and testified
8      as follows:
9
10             EXAMINATION
11   BY MS. BARRAZA:
12     Q.  Can you please state and spell your name for the
13   record.
14     A.  Aimee Jones, A-i-m-e-e J-o-n-e-s.
15     Q.  Ms. Jones, have you ever had your deposition
16   taken before?
17     A.  No.
18     Q.  Okay.  I'll just run through a few things for
19   you in case you haven't been told already.  This deposition
20   is under oath, which means you are subject to penalties of
21   perjury just like if you were in a real courtroom.
22         Do you understand?
23     A.  Yes.
24     Q.  All we're asking today is that you tell the
25   truth, that you don't guess or speculate.  Just give your
```

39dc5b31-b60d-4248-a8cf-9cd234483a1f

1  best testimony based on your recollection of the events in
2  question.
3      Do you understand?
4  **A. Yes.**
5      Q. Okay. There's a court reporter here who's
6  writing down everything we say. So in order for her to do
7  that, it's important for us to wait until the other is
8  completely done speaking before we speak. So I'm going to
9  try to wait for you to be completely done before I go on,
10  and I would ask you to do the same. Understood?
11  **A. Sure.**
12     Q. Going with that, it's difficult for the court
13  reporter to note if somebody is nodding or shaking their
14  head. So I'm going to ask that you give verbal responses,
15  and if I see you nodding or shaking your head, I'm going to
16  ask you, "Is that a yes?" or "Is that a no?"
17  **A. Sure. No problem.**
18     Q. And I'm not trying to be rude, I'm just trying
19  to get a clear record. Understood?
20  **A. Sure.**
21     Q. Will you agree that if you answer a question,
22  that you understood the question completely?
23  **A. Yeah.**
24     Q. Okay. Are you currently on any medication that
25  would affect your ability to give accurate testimony today?

1  **A. No.**
2      Q. Is there any other reason why you wouldn't be
3  able to give me your full, complete, accurate testimony
4  today?
5  **A. No.**
6      Q. From time to time, your counsel is going to
7  assert some objections onto the record, and unless she
8  specifically instructs you not to answer the question, I'm
9  still going to expect you to answer.
10     Do you understand?
11  **A. Sure.**
12     Q. Okay. Have you --
13  **A. But if I have questions, I can ask her?**
14     Q. Yeah. We can always take a break if needed. If
15  you need a break, but if there's a question pending I'm
16  just going to ask that you answer the pending question
17  before we go on break --
18  **A. Uh-huh.**
19     Q. -- basically. Okay?
20     Have you ever been arrested for any crimes
21  involving fraud or dishonesty?
22  **A. No.**
23     Q. Where did you go to high school?
24  **A. Four different high schools, actually. I went**
25  **to Silverado High School here, and then I went to Carson**

1  **City High School. I went to Chaparral High School in**
2  **California, and I went to a -- kind of a home school-type**
3  **place in Richfield, Utah -- or in St. George, Utah.**
4      Q. Okay. What year did you graduate high school?
5  **A. That would have been 2003. I didn't really walk**
6  **with my class. It was midyear. So it was 2003.**
7      Q. Did you go to college after high school?
8  **A. I went to Bryman College, and then I did do some**
9  **courses at CSN here locally.**
10     Q. Did you graduate?
11  **A. No.**
12     Q. What kind of courses were you taking?
13  **A. English, history, math, and Bryman College was**
14  **for dental assisting.**
15     Q. Okay. What did you do after that as far as
16  work-wise?
17  **A. Real estate.**
18     Q. Okay. How many years were you in real estate?
19  **A. From the time I was 17. I was going to college**
20  **until -- until I started, basically, working at Real Water.**
21  **So that would have been -- I don't know -- four and a half**
22  **years ago. So like 2012 or 2013. Something like that.**
23     Q. I'm sorry. You said 2000- --
24  **A. So until 2012.**
25     Q. And just to clarify for the record, the

1  defendant in this case is listed as affinitylifestyles.com,
2  Inc., doing business as Real Alkalized Water. I'm going to
3  refer to that as Real Water.
4  **A. Sure.**
5      Q. If you do the same, I'm going to assume you're
6  referring to the defendant. Understood?
7  **A. Sure.**
8      Q. Okay. So you just told me that you started at
9  Real Water in 2012?
10  **A. 2012, 2013. I don't know the exact. It was**
11  **like four and a half years ago.**
12     Q. Okay. How did you get involved with Real Water?
13  **A. Through Brent Jones. I actually -- I first**
14  **interviewed with Blain. I wanted to go and work there**
15  **because I wanted to get out of real estate, and then I had**
16  **an interview with Blain and I was interested. And so then**
17  **I was actually living in California at the time, and then I**
18  **moved out to Las Vegas because this is where my family**
19  **lives. And -- well, the other half of my family anyway.**
20  **And so I moved out here and then began working at**
21  **Real Water.**
22     Q. And so you interviewed with Blain Jones?
23  **A. Correct. And then I met with Brent Jones when I**
24  **came out here and then moved out a couple of weeks later**
25  **and started working for the company.**

39dc5b31-b60d-4248-a8cf-9cd234483a1f

1    Q.  What interested you in working for Real Water?
2    A.  It's a very health-oriented company, and it's to
3    create good effects on people.  When you're in real estate,
4    at the end of the day I looked at what I was producing and
5    the value of it.  You're selling someone a house.  That
6    doesn't do much, but this helps people get healthier
7    (indicating).  So -- and I state that off my own personal
8    experience.
9    Q.  Okay.  Did you start drinking Real Water after
10   you started working there or before?
11   A.  No.  I drank Real Water before.  I'm a runner
12   too.  So I noticed the benefits with that.  The recovery
13   time was a lot shorter, and it made me feel a lot better
14   with a lot more energy as well.
15   Q.  Okay.  And so you first met Brent Jones while
16   you were in the process of coming to work at Real Water;
17   correct?
18   A.  Yes.
19   Q.  Explain to me kind of your history with
20   Brent Jones and how your relationship with him progressed.
21       MS. GINAPP:  Objection.  Form.
22       Go ahead.
23       THE WITNESS:  He's my husband.  I don't know --
24   what do you want me to explain?
25   ///

1    BY MS. BARRAZA:
2    Q.  Just when did he -- did you start dating shortly
3    after you started working at Real Water or was it months
4    after working --
5    A.  No.  It was -- when I met with Blain.  I
6    interviewed with Blain, and then I told him I was
7    interested in a position.  I came out to Las Vegas.  I met
8    Brent and I had talked to him and what have you, and it was
9    then probably pretty immediately after that.
10   Q.  Okay.  Okay.  And what position did you start
11   out at?
12   A.  A demo girl.
13   Q.  What were your responsibilities there?
14   A.  It was to go to stores and do demonstrations.
15   So we would set up a booth and we would put out the cups,
16   and we do the demonstrations with the water and show people
17   that it's alkalized and negative ionized, and then we would
18   educate the staff at the store so they had an understanding
19   of it, because once the staff actually gets an
20   understanding of it, then they push that product because
21   they believe in it and they know -- they see that it works
22   and they like it.
23   Q.  Are we talking about grocery stores?
24   A.  Yeah.  Grocery stores, gyms, all the LVACs out
25   here.  That was mainly where I went and did it.  But I was

1    only in that position for, I would say, maybe a month.  I
2    progressed very quickly.
3    Q.  Okay.  Who was your supervisor when you first
4    started out as a demo person?
5    A.  That would have been Blain at that time.
6    Q.  Okay.  Okay.  And you were in that position, you
7    said, for a month?
8    A.  I don't know.  Somewhere around there.  I'm
9    going to guess a month.
10   Q.  What did you move on to after that position?
11   A.  I was running -- actually, I created the demo
12   team.  So I started running the demos, and I got a team of
13   girls, and we would send them out to go do demos at
14   different stores, but actually out of state.  They were
15   going to California, they were going to Arizona to
16   different stores that we had our water in.
17   Q.  How long did you do that?
18   A.  That was probably -- I don't know.  I would
19   guess to say maybe four or five months.  Something like
20   that.  Six months.
21   Q.  And then were you -- did somebody specifically
22   promote you to that position?
23   A.  Yes.
24   Q.  Who promoted you?
25   A.  Blain.

1    Q.  What position did you move on to after leading
2    the demo team?
3    A.  I went into our production where we manufacture
4    our water, and I started out doing administrative there.
5    Q.  And is this all at Real Water's Las Vegas
6    office?
7    A.  Correct, yeah.
8    Q.  So what were your main responsibilities in that
9    role?
10   A.  Well, it started out I was doing administrative
11   work.  So inputting all the information, like lot numbers
12   and different things of that nature to track our water if
13   we potentially ever ran into having a recall or anything of
14   that nature.  So it's just basically tracking our product
15   making sure that materials were being ordered and things of
16   that nature.
17       I did wind up progressing to the director of
18   production.  I am pretty intelligent and moved along quite
19   quickly and started running all of our production, which
20   was making sure the trucks were getting out, making sure
21   that we had all the materials.  I hired someone to actually
22   start doing that, and then I was running the crews.  Then
23   they got someone to run the crews.  So everybody was able
24   to produce the product and we could do it efficiently and
25   effectively.

Page 13

1  THE WITNESS: Sorry. Do you want me to slow
2  down?
3  MS. GINAPP: Slow down a little bit.
4  BY MS. BARRAZA:
5  Q. Okay. So how long were you in that kind of
6  role, production, manufacture, and then running the
7  production?
8  **A. I was over production up until, literally, I**
9  **think it was like five months, six months ago. Six months**
10 **ago, I would say. And while I was over that, I was also**
11 **doing our division side, which was quality control as well,**
12 **handling any third-party inspectors.**
13 Q. And who did you answer to in that capacity?
14 **A. Blain Jones, Executive Vice President of Real**
15 **Water.**
16 Q. Okay. What position did you do after that?
17 **A. Yeah. No. Well, I helped out for a little bit.**
18 **We had a little bit of -- there needed to be some**
19 **assistance with our Real MMA. We have what's called Real**
20 **Mixed Martial Arts. It's basically mixed martial arts. I**
21 **don't know if you're familiar with that. But anyway, we**
22 **were a promoter and we put on these events. And so I don't**
23 **know -- we didn't have someone to fill that position at the**
24 **time. So I stepped in and I got it figured out so we could**
25 **plan that event, which took about six, seven weeks.**

Page 14

1  **Something like that.**
2  **And then after that event was done and**
3  **everything was good with it, I got moved into helping with**
4  **our sales and our HR department because it was in need of**
5  **assistance. So that's where I'm at currently. I'm a VP of**
6  **sales and distribution, and I also oversee our Sales**
7  **depart- -- or our HR department as well.**
8  Q. Okay. And do you continue to answer to
9  Blain Jones?
10 **A. Correct.**
11 Q. Is Brent Jones your manager in any kind of
12 capacity at Real Water?
13 **A. No. I deal directly with Blain. He's my direct**
14 **manager. I mean, Brent is the CEO of the company, but it's**
15 **not who I deal directly with.**
16 Q. How much interaction do you have with Brent at
17 work?
18 MS. GINAPP: Objection. Form.
19 THE WITNESS: Whenever I want to. He's my
20 husband. I mean, we go to lunch together. So -- and then
21 when we have our Monday meetings, obviously he's in on
22 that, and then if he wants to what we call bypass, his
23 junior, which would be Blain. So you have the president,
24 the executive vice president, and then you have three VPs
25 that are over their areas. Right?

Page 15

1  So Blain is my direct guy, but if there is some
2  kind of issue going on that Blain can't handle or he has a
3  question, which usually doesn't happen too frequently, then
4  we deal with Brent. Then he comes in and, whatever,
5  corrects the situation.
6  BY MS. BARRAZA:
7  Q. Okay. Do you and Brent go to the same church?
8  **A. Yes.**
9  Q. What church is that?
10 **A. Church of Scientology.**
11 Q. Is there a certain location in Las Vegas?
12 **A. We go to different ones. Actually, if you're**
13 **referring if we go to the same location, no. He goes to**
14 **Tampa, and I go to Clearwater, Florida. I do not go to the**
15 **church in Las Vegas, and neither does he.**
16 Q. Okay. When did you personally become involved
17 with the Church of Scientology?
18 **A. About six years ago.**
19 Q. So before you had met Brent; correct?
20 **A. Correct.**
21 Q. Do you know if Blain Jones also practices
22 Scientology?
23 **A. Yes, he does.**
24 Q. Do you know of any other Real Water employees
25 that were in manager positions in 2015 that practice

Page 16

1  Scientology?
2  **A. No.**
3  MS. GINAPP: Objection. Form.
4  BY MS. BARRAZA:
5  Q. Okay. What did you do to prepare for the
6  deposition today?
7  **A. What did I do to prepare?**
8  Q. Right. Did you review any documents?
9  MS. GINAPP: I'm going to object to the extent
10 that the question asks you to talk about anything that we
11 discussed, and I instruct you not to discuss any of that.
12 THE WITNESS: That's fine.
13 BY MS. BARRAZA:
14 Q. I don't want to know anything about what you
15 said with your attorney, but did you review any specific
16 documents?
17 **A. No.**
18 Q. Okay. Have you previously reviewed any of the
19 pleadings in this matter?
20 MS. GINAPP: Objection. Form.
21 THE WITNESS: I have a little bit of a
22 misunderstanding of pleadings. What do you mean by
23 pleadings?
24 BY MS. BARRAZA:
25 Q. I mean, have you read the complaints in this

39dc5b31-b60d-4248-a8cf-9cd234483a1f

1  matter?
2  **A. No. No, I haven't.**
3  Q. Okay. Do you have -- well, I'll ask you. Tell
4  me your basic understanding of what this lawsuit is about.
5  MS. GINAPP: Objection to form. Foundation.
6  Go ahead.
7  THE WITNESS: Okay. So when I first found out
8  about this, we had some reporters show up at our office,
9  and they wanted to do an interview with Brent. And I think
10  it was the Review Journal or something -- someone of that
11  nature. No. Actually, it was Channel 13. I'm sorry. It
12  wasn't the Review Journal.
13  It was Channel 13, and they wanted to do an
14  interview to see what was going on with this disgruntled
15  employee who was claiming religious discrimination, and
16  asking questions along those lines.
17  BY MS. BARRAZA:
18  Q. And do you know approximately when that was that
19  reporters started showing up at Real Water?
20  **A. No. Actually, I can't give you an estimated**
21  **time. It was within this year. I don't know exactly when**
22  **it was. I'm sorry. I'm very busy. I don't keep track of**
23  **it.**
24  Q. Okay. After that happened, did you personally
25  do anything? Did you talk to anybody in the company about

1  "Hey, what's going on with this?"
2  MS. GINAPP: I'm going to object to the extent
3  that calls for attorney/client privilege. I advise you not
4  to answer anything that involved communications with your
5  attorney.
6  THE WITNESS: No, it's fine. Bonnie, who was
7  Grecia's senior was telling us that Grecia had sent some
8  nasty text messages to her, and so she was showing us the
9  text messages, and they were stating that you didn't get in
10  communication with me or something along those lines. How
11  dare you, and you just cost Real Water money. And then
12  said, "This shit just got real."
13  So that was the extent of the text messages that
14  I saw from Bonnie, and that was what Grecia was saying.
15  BY MS. BARRAZA:
16  Q. Okay. Did you talk to Brent or Blain about
17  these allegations?
18  MS. GINAPP: Objection. Form.
19  THE WITNESS: Yes.
20  BY MS. BARRAZA:
21  Q. Do you know if, or did you personally conduct
22  any kind of investigation about whether or not Grecia's
23  claims had any kind of merit?
24  **A. No. I didn't personally.**
25  Q. Do you know if anybody at Real Water personally

1  conducted any kind of investigation?
2  MS. GINAPP: Objection. Form. Foundation.
3  THE WITNESS: I'm sure somebody did, but I don't
4  know who. So --
5  BY MS. BARRAZA:
6  Q. When did you first meet Grecia?
7  **A. I didn't meet her.**
8  Q. You never met her?
9  **A. Never met her.**
10  Q. Okay. Do you --
11  **A. I saw her in the office one time. That was it.**
12  Q. And how much contact did you have with her after
13  she was terminated?
14  **A. None. I never knew her. I didn't have any**
15  **contact.**
16  Q. Okay. What about Facebook contact? Have you
17  ever tried to friend her on Facebook?
18  **A. Absolutely not. I never looked her up or**
19  **anything.**
20  Q. Okay. So let's talk about the videos that
21  employees are required to watch once they are hired at Real
22  Water.
23  **A. Sure.**
24  Q. Can you give me a list of the required videos?
25  **A. Yeah. The Secret is one, Message to Garcia, The**

1  Way to Happiness. And those are the three.
2  Q. And I think there was also a Real Water video,
3  was there not?
4  **A. The culture video, yes. That's what it was.**
5  **It's called the culture video. Yeah. Yeah.**
6  Q. Did you personally have to watch all these
7  videos when you got hired at Real Water?
8  **A. Yes.**
9  Q. Did you find that odd, or do you have no problem
10  watching those videos?
11  **A. No. Actually, when I worked for a company**
12  **called Lennar, it's one the biggest builders nationwide**
13  **here in the United States, my boss strongly encouraged and**
14  **pushed me to watch The Secret, along with my father having**
15  **one of the biggest real estate offices here in Las Vegas**
16  **encouraged and pushed his people to watch The Secret. So I**
17  **didn't find it odd at all. That's just me.**
18  Q. Okay. That's fine. Walk me through -- is there
19  any kind of paperwork that comes with watching these
20  videos?
21  **A. Yeah. You just fill out just a little**
22  **questionnaire, like just to see if you grasped what you**
23  **watched, like if you understood what you watched. Kind of**
24  **like if you take a course, you just get asked questions**
25  **afterwards. And what did you get out of this is the main**

39dc5b31-b60d-4248-a8cf-9cd234483a1f

Page 21

1 thing with The Secret. Like what did you get from this.
2 That's the main point.
3    Q.  Do you know --
4    A.  How did it benefit you.
5    Q.  Do you know who created that -- those
6 questionnaires?
7    A.  I don't, no.
8    Q.  Do you happen to know if the questionnaires have
9 changed over time?
10   A.  I don't.
11   Q.  And do you know who collects these
12 questionnaires and reviews them?
13   A.  They go into the HR files, into their employee
14 file, and it's looked at by our HR person.
15   Q.  Do you know of an HR representative ever saying
16 a certain questionnaire was not adequate?
17   A.  No.
18   Q.  Okay.
19   A.  It's for your own personal benefit. It's what
20 you get from it. We can't really -- we wouldn't do that.
21 Just to know what you got from it. I got nothing or this
22 was amazing, whatever they want to say.
23   Q.  And where does -- do you know where Real Water
24 gets these -- got these videos?
25   A.  WISE.

Page 22

1    Q.  What's WISE?
2    A.  I can't tell you what it stands for, but it's a
3 company that does these managerial courses so you can run
4 your company efficiently and effectively.
5    Q.  Do you know if Real Water ever --
6    A.  But just to clarify this, though, The Secret did
7 not come from WISE. Message from Garcia comes from WISE,
8 but The Secret does not. So that one doesn't come from
9 WISE.
10   Q.  Just Way to Happiness and --
11   A.  Message to Garcia. Correct.
12   Q.  So does WISE send those videos to Real Water for
13 free?
14   A.  I don't know. They were there before I ever got
15 there. Actually, no, I'm not going to say I don't know.
16 I'm pretty sure we have to pay for them because we pay a
17 fee every month. I don't know exactly what it is or
18 anything, but we pay a fee to have a WISE membership.
19   Q.  Okay.
20   A.  So, no, it's not free, actually, to answer your
21 question.
22   Q.  And what -- do you know what comes with that
23 WISE membership? What benefits?
24        MS. GINAPP:  Objection. Form and foundation.
25        THE WITNESS:  I don't know.

Page 23

1 BY MS. BARRAZA:
2    Q.  Okay. Do you know if Real Water informs its
3 employees that WISE provided the Message to Garcia and the
4 Way to Happiness videos?
5        MS. GINAPP:  Objection. Form.
6        THE WITNESS:  I don't -- I don't know if that's
7 actually in our documents. I don't recall. I don't know.
8 BY MS. BARRAZA:
9    Q.  So those four videos that we just mentioned,
10 those are required; correct?
11   A.  Yes.
12   Q.  If an applicant does not want to watch the
13 videos, then they're not going to get hired at Real Water;
14 right?
15   A.  I've never had that situation. So I'm not going
16 to say that. I would go to my senior to get direction from
17 him because I've never ran into that situation.
18   Q.  Okay. But in your experience and to your
19 knowledge, nobody has ever gotten hired at Real Water after
20 declining to watch any of the videos?
21   A.  No one has ever declined to watch the videos.
22        MS. GINAPP:  Objection. Misstates testimony.
23 It's asked and answered, has a form problem and a
24 foundation problem.
25        Go ahead.

Page 24

1        THE WITNESS:  No one has every declined to watch
2 the videos
3 BY MS. BARRAZA:
4    Q.  How do you know that, though?
5    A.  Because since I've been there, no one has ever
6 declined it.
7    Q.  But that would go up to you?
8    A.  No. It would go to Blain, but from Blain, no
9 one has ever declined it.
10   Q.  Okay. Walk me through kind of where these
11 videos -- is there a certain room where these videos are
12 watched? Is there any kind of room? Is it the HR room?
13   A.  Usually we have them go into the HR office, but
14 sometimes they'll go into the office that's right next door
15 to it, whatever computer, between those two offices, are
16 available at the time.
17   Q.  Is there any kind of policy regarding if they
18 watch the videos alone in a room or is somebody else in the
19 room with them while they're watching the videos?
20   A.  There's no policy.
21   Q.  Okay.
22   A.  Usually they watch them alone.
23   Q.  Okay. Let's go through --
24        THE WITNESS:  Can I speak with her real fast?
25        MS. GINAPP:  Can we take a break?

Page 25

1    MS. BARRAZA: You can take a break.
2    THE WITNESS: Can we take a break? Yeah.
3    (A break was taken.)
4  BY MS. BARRAZA:
5    Q. Okay. I'm going to go back a bit to you were
6  giving me kind of the setup of Brent Jones and then below
7  him is --
8    **A. Sure. Blain.**
9    Q. -- Blain Jones. And then you said there was a
10  level of vice presidents, which you're included in that;
11  right?
12    **A. Yes.**
13    Q. Okay. Who are the other individuals on that
14  level?
15    **A. So it's myself that's over Divisions 1 and 2,**
16  **which is our sales and HR, and then we have our treasury,**
17  **production, and qualification department, which is Frank**
18  **Consiglio, and then over our Division 6 is -- actually,**
19  **Blain is holding that position from above because we don't**
20  **have a VP to fill it yet.**
21    Q. Okay. Do you have any knowledge of Real Water
22  getting any kind of compensation from WISE?
23    MS. GINAPP: Objection. Form. Foundation.
24    THE WITNESS: No.
25  ///

Page 26

1  BY MS. BARRAZA:
2    Q. And so am I correct that in addition to those
3  four videos we just discussed, Real Water also offered
4  optional courses in return for raises?
5    **A. Correct.**
6    Q. Okay. Tell me about that.
7    **A. Okay.**
8    MS. GINAPP: I'll object to form. It's overly
9  broad.
10    Go ahead.
11    THE WITNESS: So the courses -- so we have
12  what's called management by statistics. So basically, you
13  can't drive blind, otherwise you're going to hit walls and
14  street signs and pedestrians. That would be a problem.
15    So we don't want to be driving our company
16  blind. So the statistics, we need to see if they're up
17  stat or they're down or down stat or they're just staying
18  level. So we know what actions to do. So we have that
19  course.
20    And then we also have a course -- I'll slow
21  down. Then we have another course, which is our conditions
22  course, which based off of the stats, if they're going up
23  or down or just level, then you'll apply whatever condition
24  you're in because each stat has a condition. No matter
25  what, you apply that condition, and then do the steps in

Page 27

1  the formula to make your stats go up.
2    So, like, for example, if you're slightly going
3  down, you're in an emergency. So what are you going to do?
4  The first step in that formula for that condition is
5  promote. It's a very common thing. So you go out and
6  promote, and then next week, hopefully, your stat will be
7  going up.
8    So that's basically the extent of the courses,
9  and then also what I explained to you about the different
10  positions and where they sit on -- you know, you have the
11  president, vice president, and that. It's called an
12  Organizational Board that's organized. So that's a part of
13  the courses too.
14    So it's kind of like the chain of command. So
15  everybody in the company is on that board. So they know
16  who to go to with what questions, and they know who their
17  senior is. So they know who to communicate with.
18  BY MS. BARRAZA:
19    Q. Did you personally complete any of these
20  courses, these optional courses?
21    **A. Yes.**
22    Q. Which ones have you completed?
23    **A. I've completed Basic Study Manual, Management by**
24  **Statistics, and the conditions -- the conditions course,**
25  **Formulas for Business, I think it's called, and partly**

Page 28

1  **speaking from my experience.**
2    Q. So walk me through the process of your personal
3  process of these courses. Did you have to check out a
4  book? Did you have to do paperwork?
5    **A. Yeah. So what we do is we -- actually, we get**
6  **books in, but we make copies of the books. Like we'll make**
7  **just on a piece of paper and we keep them in our course**
8  **room, and they can review that in the course room. They**
9  **can't take that with them, or they can use the course book**
10  **in the course room because sometimes we have three or four**
11  **people on the same course. So we don't have enough, you**
12  **know, books to do that.**
13    Q. And the employees, they can do this on employee
14  time; right?
15    **A. Correct, yeah.**
16    Q. I mean, like during work hours; right?
17    **A. Correct.**
18    Q. And there's a certain course room?
19    **A. Yes.**
20    Q. And is there a similar kind of questionnaire
21  that they need to fill out when they complete a course?
22    **A. Well, there's questions throughout the thing.**
23  **So when you get to the end of each chapter, you have to**
24  **answer the questions, and then you just do your final essay**
25  **on the course, which is what you got out of the course.**

39dc5b31-b60d-4248-a8cf-9cd234483a1f

1  **How you can apply it to your job.**
2  Q.  And who reviews those?
3  **A.  Our HR representative.**
4  Q.  What does the representative do with those?
5  **A.  She goes through them and makes sure that the**
6  **questions were answered correctly, that they understand,**
7  **you know, what the different conditions and what have you**
8  **are, and then if not, she goes back and helps them.**
9  Q.  And are these -- is the paperwork associated
10 with that stored in the employee's file?
11 **A.  Uh, yeah.**
12 Q.  Do you know if it gets sent out anywhere else?
13 **A.  No.  It goes just in their employee file.**
14 Q.  Do you know if any of those optional courses
15 have any connection to WISE?
16 **A.  They were from WISE.**
17 Q.  Okay.  So WISE provides all the optional
18 courses?
19 **A.  Correct.**
20 Q.  And do you know what kind of raises are
21 associated with completing a certain course?
22 **A.  $0.25 per course.**
23 Q.  Do you know how many courses are available?
24 **A.  We have a total now of 18 courses, I believe.**
25 Q.  Okay.  So is it accurate to say that if the

1  employee doesn't do the course, they don't get the 25 cent
2  raise?
3  **A.  Correct.**
4  Q.  Has there ever been any kind of instance where
5  an employee did complete a course and did fill out the
6  paperwork for it but wasn't given a raise?
7  MS. GINAPP:  Objection.  Calls for speculation.
8  Form.  Foundation.
9  THE WITNESS:  No.  They've always got -- well,
10 since I've been there and from my knowledge, they've always
11 gotten a raise.
12 BY MS. BARRAZA:
13 Q.  Okay.  You've never heard of an employee
14 complaining about completing a course, I did the paperwork
15 but I didn't get any kind of raise?
16 **A.  No.**
17 Q.  Have you ever heard about any kind of employee
18 complaining about not wanting to do these courses?
19 **A.  No.**
20 Q.  Walk me through your understanding of Real
21 Water's policies and procedures regarding discrimination
22 and harassment.
23 MS. GINAPP:  Objection.  Form and foundation.
24 THE WITNESS:  Okay.  Repeat the question.  I'm
25 sorry.

1  BY MS. BARRAZA:
2  Q.  Just walk me through your understanding.  What
3  are Real Water's policies regarding discrimination and
4  harassment?
5  MS. GINAPP:  Same objection.
6  THE WITNESS:  Well, we have a very low tolerance
7  for it.  So if there is anything that's being -- you know,
8  if there were to be anything that was talked about in the
9  office, we would definitely -- you know, our procedure is
10 have a write-up done and have it addressed at that time,
11 but I turn everything in to ADP when that comes up.  So we
12 have someone do a non-opt, and then it would go to ADP, who
13 is our HR company, and it goes to their legal counsel, and
14 they advise, you know, what to do with it when it comes to
15 those touchy type of situations.
16 BY MS. BARRAZA:
17 Q.  When you said non-opt --
18 **A.  Correct.  Non-optimum report.**
19 Q.  Okay.  And what does that mean?
20 **A.  If someone is doing something that wouldn't --**
21 **you know, that would be discriminatory or something that**
22 **would be unethical within the company, it could be**
23 **stealing, it could be, you know, you're -- I don't know,**
24 **taking water out the back door or whatever.  Not performing**
25 **at your job, not showing up to work.  There's all sorts of**

1  **things you can get a non-opt on.**
2  **And then when we get those, when those are**
3  **filled out, then depending on the severity of the**
4  **situation, 99.9 percent of the time it goes to ADP and we**
5  **get their guidance on how we handle a situation.**
6  Q.  So can anybody fill out a non-opt report?
7  **A.  Absolutely.  And we have optimum reports as**
8  **well.  So when people do a good job.**
9  Q.  Okay.  Do you know who is responsible for making
10 sure that all the employees are following the policies and
11 procedures regarding discrimination and harassment?
12 **A.  As of right now, I am.**
13 Q.  Do you know who was in charge of that in 2015?
14 **A.  We had two ladies.  It was first Melissa Nava,**
15 **who is no longer with Real Water, and then it was Christy**
16 **Pantelakis, who is no longer with Real Water.**
17 Q.  I'm sorry.  Christy?
18 **A.  P-a-n-t-e-l-a-k-i-s, I believe.  Pantelakis.**
19 Q.  Okay.  Do you know if Real Water conducts any
20 kind of training of employees about discrimination or
21 harassment?
22 **A.  We have documents that they sign off on.  We**
23 **don't have, like, a specific training, but they definitely**
24 **sign off on it in their hire paperwork.**
25 Q.  Were you given any kind of information as to why

1  Grecia was terminated in October of 2015?

2    **A.  The only thing that I heard from Bonnie was that**

3  **she wasn't showing up to the stores to do the**

4  **demonstrations.  So that was the information I got.**

5    Q.  Do you know what position Grecia held at Real

6  Water?

7    **A.  Yeah.  She was a demo girl.**

8    Q.  Okay.  Can you give me your understanding of

9  what her specific duties were as a demo girl?

10    **A.  Basically to go to different -- well, there's a**

11  **few things.  Merchandising is one thing.  Going and**

12  **checking on the products, making sure it's on the shelf and**

13  **then if it's not, going into the warehouse of the stores,**

14  **because they allow that, and you physically go put the**

15  **product on the shelves provided they have it back there.**

16  **And if it's not, then report back that -- you know, to the**

17  **sales team, we need to get Real Water here because it's not**

18  **here.**

19       **And then the second thing was -- is getting the**

20  **general public educated on our product by doing the**

21  **demonstrations in the stores, and also making sure that she**

22  **gets the staff at the stores educated so they push our**

23  **product, because the more educated they are, the more they**

24  **know about it, the more they like the product and the more**

25  **they'll push it.**

1    Q.  Were you involved in any way in Grecia's

2  termination?

3    **A.  No.**

4    Q.  Do you know who made the decision to terminate

5  Grecia?

6    **A.  I don't.**

7    Q.  Do you know if any non-optimum reports were

8  written about Grecia?

9    **A.  Yes.  I did see them.  I didn't read them, but I**

10  **know there's two that are there.  There's one or two.**

11    Q.  Do you personally -- have you ever had any

12  non-optimum reports filed against you?

13      MS. GINAPP:  Objection.  Relevance.

14  Go ahead and answer.

15      THE WITNESS:  No.

16  BY MS. BARRAZA:

17    Q.  Did you ever hear about Grecia complaining in

18  any way about Real Water while she was employed there?

19    **A.  Did I hear of it?**

20      MS. GINAPP:  Objection.  Form and foundation.

21      THE WITNESS:  Did I hear it?  Is that what you

22  asked?

23  BY MS. BARRAZA:

24    Q.  Right.

25    **A.  No.  Because I never saw her.  I saw her once,**

1  **and that was it.  I never talked to her or anything.  So --**

2    Q.  Okay.  And nobody at Real Water talked to you

3  about any complaints Grecia had been making?

4    **A.  No.**

5    Q.  Okay.

6      (Plaintiff's Exhibit 1 was marked.)

7  BY MS. BARRAZA:

8    Q.  Do you recognize this document?

9    **A.  Yeah.  This is our employee agreement.**

10    Q.  Okay.  And am I correct that the face of this

11  document indicates that this is the employment agreement

12  that Grecia signed?

13    **A.  Yeah.  Well, it looks like it, if that's her**

14  **initials, yes.**

15    Q.  I'm going to point you to Section 3 of the

16  agreement on RW -16.

17    **A.  Okay.**

18    Q.  Can you explain to me what that section is

19  about?

20      MS. GINAPP:  Would you like her to read it

21  first?

22  BY MS. BARRAZA:

23    Q.  Sure.  Go ahead and read it.

24    **A.  Do you want me to read it out loud?**

25      MS. GINAPP:  No.  Just read it to yourself.

1      THE WITNESS:  Yeah.  Okay.

2      MS. GINAPP:  Go ahead and ask the question

3  again, please.

4  BY MS. BARRAZA:

5    Q.  Can you explain to me what Section 3 is about?

6      MS. GINAPP:  Objection.  Form.  Foundation.

7  Go ahead.

8      THE WITNESS:  It's just stating that WISE --

9  well, it doesn't say WISE, but it's -- that LRH is

10  basically -- we're using some technology that he has

11  written, but it's totally secular from the Church of

12  Scientology.

13  BY MS. BARRAZA:

14    Q.  Okay.  LRH is L. Ron Hubbard; correct?

15    **A.  Correct.**

16    Q.  Do you happen to remember if language to that

17  effect was included in the employment agreement you

18  originally signed when you --

19    **A.  Yes.**

20      MS. GINAPP:  I'm going to object to form and

21  foundation, but go ahead.

22      THE WITNESS:  Yes.

23  BY MS. BARRAZA:

24    Q.  Just to complete.

25      -- when you were hired at Real Water?

39dc5b31-b60d-4248-a8cf-9cd234483a1f

1   **A.  Uh-huh.  Yes.**
2   Q.   Did you have any involvement in drafting
3   language in any of the employment agreements?
4   **A.  No.**
5   Q.   Do you know why Section 3 is in here?
6        MS. GINAPP:  Objection.  Form and foundation.
7        Go ahead.
8        THE WITNESS:  Because we have WISE courses and
9   those are written by LRH, L. Ron Hubbard.
10  BY MS. BARRAZA:
11  Q.   Do you know if employees sign these employment
12  agreements their first day or --
13  **A.  Yes.**
14  Q.   Okay.  And do you know when -- approximately
15  when employees view the required -- the four required
16  videos that we talked about?
17  **A.  Uh-huh.  When they watch them?**
18  Q.   Uh-huh.
19  **A.  Usually we try to do it their first day, but if**
20  **it's like a job where we need to get them started right**
21  **away because it's a position that needs to be filled, it**
22  **could happen a week or two weeks down the road, but we try**
23  **to do it the first day, but if it's, like, they need to get**
24  **to work right away, it could be a week or two weeks down**
25  **the road.**

1   Q.   Okay.  And what about the optional courses?
2   Would those be done right away or can employees do that
3   whenever they want?
4   **A.  They can do it whenever they want.**
5   Q.   Okay.
6   **A.  They're made aware of it.  So it's up to their**
7   **determination when they'd like to begin.**
8   Q.   Who told you that Real Water's management
9   technology is purely secular?
10       MS. GINAPP:  Objection.  Form and foundation.
11       THE WITNESS:  I'm familiar with WISE, so I know
12  they are.
13  BY MS. BARRAZA:
14  Q.   Can you please read Section 4 of the
15  agreement to yourself, and let me know when you're done.
16  **A.  (Witness complies.)**
17       **So it's just basically saying --**
18       MS. GINAPP:  There is no question pending.  If
19  you're done reading, just tell her.
20       THE WITNESS:  Okay.  I'm done reading.
21  BY MS. BARRAZA:
22  Q.   Okay.  And so in this section it mentions the
23  summary of L. Ron Hubbard's management technology; correct?
24       MS. GINAPP:  Can you direct us to the line,
25  approximately?

1   BY MS. BARRAZA:
2   Q.   Four.
3   **A.  Okay.  Yes, I see that.**
4   Q.   Do you know if there's a separate summary that
5   is provided to employees that they need to read before they
6   sign this agreement?
7        MS. GINAPP:  Objection.  Form.  Foundation.
8        THE WITNESS:  I'm not tracking with what the
9   question is.
10  BY MS. BARRAZA:
11  Q.   Okay.  Section 4, the employee is agreeing that
12  they have read the summary of L. Ron Hubbard's management
13  technology.  Are you familiar with -- is there a separate
14  document, a separate summary that's provided to employees?
15       MS. GINAPP:  I'm going to object.  It misstates
16  what the document purports -- what the document states, but
17  form in general and foundation.
18       Go ahead.
19       THE WITNESS:  I believe we do have another one.
20  Actually, I can't answer that.  I don't know.
21  BY MS. BARRAZA:
22  Q.   Okay.  That's fine.
23  **A.  I don't know off the top of my head.**
24       MS. GINAPP:  Okay.
25  ///

1   BY MS. BARRAZA:
2   Q.   And so how do you know -- you mentioned to me
3   that you know that the management methods developed by
4   L. Ron Hubbard are purely secular.  How did you come to
5   have that knowledge?
6   **A.  Because I go to the Church of Scientology and**
7   **every time I leave the church, you go and you see the WISE**
8   **people and -- well, I do.  And I go and talk to them.  And**
9   **so the first time I ever went to the church and talked to**
10  **them, they told me that, we are totally secular from the**
11  **church, but we do offer different, you know, things for**
12  **management and managing companies and how to build a**
13  **company and different things of that nature.  So --**
14  Q.   And this was in Tampa that you talked to the
15  WISE people?
16  **A.  No.  That's in Florida, Clearwater.**
17  Q.   Clearwater.  Okay.  Sorry.  So this was in
18  Clearwater that you spoke to a WISE representative outside
19  of your Church of Scientology about the business management
20  courses?
21  **A.  Yeah.**
22  Q.   Okay.  So to your knowledge, is there anything
23  in the employment agreement that advises applicants that
24  they're going to have to watch videos such as The Secret,
25  The Way to Happiness, Message to Garcia?

39dc5b31-b60d-4248-a8cf-9cd234483a1f

Page 41

1      MS. GINAPP: Objection. Form. Foundation.
2      THE WITNESS: No.
3   BY MS. BARRAZA:
4   Q.  Do you know why that is?
5      MS. GINAPP: Objection. Form. Foundation.
6      THE WITNESS: No.
7   BY MS. BARRAZA:
8   Q.  Okay.  Do you have knowledge of any applicant
9   posing any kind of objection to signing an employment
10  agreement based on any of the sections involving
11  L. Ron Hubbard?
12  A.  No.
13     MS. BARRAZA: Okay.  This is Exhibit 2.  This is
14  3.  This is 4.
15     (Plaintiff's Exhibits 2, 3, and 4 were marked.)
16  BY MS. BARRAZA:
17  Q.  Okay.  I just handed you three documents.  I'll
18  let you look over them for a minute.
19  A.  Okay.
20  Q.  So explain to me what your understanding
21  of Exhibit 2 is.
22  A.  Message to Garcia.  Do you want me -- what she
23  wrote or what -- can you be specific?
24  Q.  Am I correct, is this a video review form?
25  A.  Correct.  Yes.

Page 42

1   Q.  Okay.
2   A.  Do you want my input of what the video -- like
3   how the video --
4      MS. GINAPP: Just let her ask her question.
5      THE WITNESS: Okay.
6      MS. GINAPP: Just let her ask a question.
7      THE WITNESS: Okay.
8   BY MS. BARRAZA:
9   Q.  Okay.  Do you -- according to the face of this
10  document, Grecia filled out this video review?
11  A.  Sure.
12  Q.  Do you have any reason to believe that it wasn't
13  Grecia?
14     MS. GINAPP: Objection. Form. Foundation.
15     THE WITNESS: I would have no way of knowing
16  that -- thinking it wasn't or not knowing if it was.
17  BY MS. BARRAZA:
18  Q.  Do you have any knowledge of whether this is the
19  standard Message to Garcia video review form?
20  A.  Yes, it is.
21  Q.  Okay.  The form doesn't change in any kind of
22  way?
23  A.  No.
24  Q.  Do you happen to remember if back when you were
25  first doing this form it was the exact same kind of form?

Page 43

1   A.  Yes.
2   Q.  Okay.  Do you happen to know why Real Water
3   requires its employees to watch this specific Message to
4   Garcia video?
5   A.  No. I can give you my opinion, but no.
6   Q.  Okay.  What's your opinion of the importance of
7   this video?
8      MS. GINAPP: Objection. Calls for speculation.
9   Form. Foundation.
10     THE WITNESS: It's fine.  So this video
11  basically is give your junior a task and don't give me ever
12  a excuse as to why you're not going to do it, just go do
13  it.  So go and produce.  Create value.  Do your job,
14  please.
15  BY MS. BARRAZA:
16  Q.  Do you know if Real Water provides any kind of
17  feedback to the employees after they filled out their video
18  review?
19  A.  If we do what?
20  Q.  Do you happen to know if Real Water after
21  they've reviewed the video -- the completed video review,
22  if they provide any kind of feedback to the employee?
23  A.  No.  No.  They just review them and that's it.
24  Q.  And what will happen if somebody didn't want to
25  watch the Message to Garcia?

Page 44

1      MS. GINAPP: Objection.  Asked and answered.
2      THE WITNESS:  I haven't had that happen.  So I
3   can't tell you.
4   BY MS. BARRAZA:
5   Q.  Okay.  What would happen if an employee gave a
6   negative review of Message to Garcia?
7      MS. GINAPP: Objection. Improper hypothetical.
8   Calls for speculation.  Generally form and foundation.
9      Go ahead.
10     THE WITNESS:  I've never had that happen.  So I
11  can't answer that for you.
12  BY MS. BARRAZA:
13  Q.  Do you understand how some employees might fee[l]
14  compelled to leave a positive review of a flim that their
15  employers are requiring them to watch?
16     MS. GINAPP: Objection. Calls for speculation.
17  Form and foundation.
18     THE WITNESS:  No.
19  BY MS. BARRAZA:
20  Q.  Okay.  Let's move on to Exhibit 3.  Can you tell
21  me what your understanding of this document is?
22  A.  Basically what you put out there is what you're
23  going to get.
24  Q.  And this is -- am I correct that this is --
25  A.  The Secret.  It's The Secret.  So if you look at

39dc5b31-b60d-4248-a8cf-9cd234483a1f

Page 45

1  the mirror and say, "I'm going to do a really bad job
2  today," you're probably going to do a really bad job at
3  whatever you're going to do today.  If you look in the
4  mirror and say, "I'm going to do great today," you're
5  probably going to do great.
6      Q.   Got it.  And to the best of your knowledge, this
7  Secret review form, is this a standard form?
8      A.   Yes.
9      Q.   Okay.  There's no other kind of version of The
10  Secret review form for Real Water?
11     A.   No.
12     Q.   And to the best of your knowledge, this is
13  Grecia's actual review of The Secret; correct?
14          MS. GINAPP:  Objection.  Calls for speculation.
15  Form and foundation.
16          THE WITNESS:  I didn't fill it out with her.  So
17  I can't tell you yes or no, but it's fine.
18  BY MS. BARRAZA:
19     Q.   Okay.  Have you ever heard about an employee
20  leaving a negative review about The Secret?
21     A.   Not to my knowledge, no.
22     Q.   Okay.  And it's your opinion, am I correct, that
23  The Secret, this is a purely secular video; correct?
24     A.   The Secret isn't even a WISE thing.  It's
25  totally its own thing.  It has nothing to do with LRH or

Page 46

1  anybody else.  It's just The Secret that many companies
2  use.  So --
3      Q.   Has anybody at Real Water ever told you that
4  they think that any of these videos are in any way
5  nonsecular?
6      A.   No.
7      Q.   Okay.  Let's move on to Exhibit 4.
8      A.   Okay.
9      Q.   The only thing I want you to look at with
10  Exhibit 4 is the first page.  Do you recognize the
11  document?
12     A.   Yeah.
13     Q.   So what is Exhibit 4?
14     A.   The Way to Happiness.
15     Q.   And this is a standard video review form;
16  correct?
17     A.   Correct.
18     Q.   And Real Water has never changed The Way to
19  Happiness video review form in any kind of way, has it?
20          MS. GINAPP:  Objection.  Calls for speculation.
21          THE WITNESS:  No.
22  BY MS. BARRAZA:
23     Q.   Do you know who reviews the video reviews?  Is
24  it the HR person?
25     A.   Yeah.

Page 47

1      Q.   Okay.  Do you know why Real Water employees are
2  required to watch The Way to Happiness specifically?
3          MS. GINAPP:  I'm going to object.  It calls for
4  speculation.  Form and foundation.
5          Go ahead.
6          THE WITNESS:  My general understanding of it.  I
7  don't know why it's particularly -- I can't tell you why it
8  was required by whoever started this, but my interpretation
9  of this video and as to why is because it basically gives a
10  breakdown as to you treat others with respect.  That could
11  be at home, that could be at work when working with others.
12  Respect others' beliefs, such as religion or anything else.
13  Don't discriminate.
14          So that's why.  So it kind of gives you a
15  breakdown of that, and then you sign off on that too.  And
16  the employee agreement showing you're not going to
17  discriminate, and if there are any discrimination issues,
18  you know, you can refer back to the employee agreement.  So
19  this is something that's actually helpful in that sense, in
20  my opinion.
21  BY MS. BARRAZA:
22     Q.   And in your opinion, is The Way to Happiness a
23  purely secular video?
24     A.   Yes.
25     Q.   Okay.  If I told you that one of the quotes from

Page 48

1  The Way to Happiness is "Men without faith are a pretty
2  sorry lot," would you consider that a secular statement?
3          MS. GINAPP:  Objection.  Form and foundation.
4          THE WITNESS:  Yeah, I would.
5  BY MS. BARRAZA:
6      Q.   Why is that?
7          MS. GINAPP:  Objection.  Form and foundation.
8          THE WITNESS:  What's that?
9  BY MS. BARRAZA:
10     Q.   Why would you consider it a secular statement?
11     A.   Because I don't think that has anything to do
12  with a religion.  It's not referring to a God or anything.
13     Q.   Okay.  So what's your definition of nonsecular?
14          MS. GINAPP:  Objection.  Form.  Foundation.
15          THE WITNESS:  If it's not talking about
16  spiritual beingness, then if there's not a God, if there's
17  not a spirit or something like that, then it doesn't have
18  anything to do with religion.
19  BY MS. BARRAZA:
20     Q.   Okay.  Then in your opinion, that means it's
21  secular; right?
22     A.   In my opinion, what you just said is not
23  correct.
24     Q.   Okay.  I'm just trying to get a clear record.
25  So am I correct that in your opinion if it doesn't mention

39dc5b31-b60d-4248-a8cf-9cd234483a1f

Page 49

1    God specifically, then it is nonreligious; correct?
2            MS. GINAPP:  Objection.  Misstates testimony.
3            THE WITNESS:  Exactly.  You did misstate.  If it
4    does not mention God, if it doesn't mention a spiritual
5    being or anything that has to do with that type of thing,
6    then it's not religious.
7    BY MS. BARRAZA:
8        Q.   Okay.  Got it.  How did you form that opinion?
9            MS. GINAPP:  Objection.  Form and foundation.
10           THE WITNESS:  Based off of my own religious
11   beliefs.
12   BY MS. BARRAZA:
13       Q.   Okay.  Great.  I'm going to move on to -- I
14   think you had mentioned -- we had talked about the
15   non-optimum reports.  Have you personally seen any of the
16   non-optimum reports that were written about Grecia?
17           MS. GINAPP:  Objection.  Asked and answered.
18           THE WITNESS:  I saw them, but I didn't get to
19   read them.
20   BY MS. BARRAZA:
21       Q.   Okay.
22       A.   So I've seen that they're there, but I haven't
23   read through them.
24       Q.   Okay.  Can you walk me through your knowledge of
25   Real Water's policies insofar as any kind of progressive

Page 50

1    disciplinary policy they have?
2            MS. GINAPP:  I'm going to object to form,
3    foundation, and I'm going to lodge a continuing objection,
4    the fact that she's not identified as the corporate
5    representative.
6            Go ahead.
7            THE WITNESS:  Okay.  So specific to what,
8    though?
9    BY MS. BARRAZA:
10       Q.   Just specific to does Real Water have any kind
11   of policy regarding progressive disciplinary actions and
12   any kind of corrective action that needs to take place?
13       A.   Well, you have a non-optimum there.
14       Q.   Uh-huh.
15       A.   If someone is upset or is having a problem and
16   they write up a non-optimum, then there has to be a
17   corrective action done on it.
18       Q.   Okay.  Are corrective actions always listed on
19   non-optimum reports, to your knowledge?
20       A.   Sometimes they're not, no, because it is a
21   process that it was a new thing we've actually added on to
22   them within the last few years.  So it's something we're
23   trying to get integrated for all the people, the VPs,
24   basically, to get used to having their people do when they
25   do the non-optimums.

Page 51

1        Q.   Okay.  Can you walk me through kind of -- what's
2    the difference between a non-optimum report and does Real
3    Water have any kind of policy about verbal warnings, or is
4    there any other kind of report, formal warning, besides the
5    non-optimum report, that gets put out there?
6        A.   I don't know if written up in our documents we
7    have it stated to do a verbal warning or if it goes
8    straight to non-opt, but I do know that since I've been
9    working with ADP a lot since I got into HR, that they
10   usually tell us, do a verbal warning, do a non-optimum, and
11   then you do your final warning at that point.  So that's
12   usually who I go to for guidance on different matters.
13       Q.   Okay.  What's been your experience regarding
14   non-optimum reports.  Is there a certain number of
15   non-optimum reports an employee gets before they're
16   terminated, or does it not matter?
17       A.   It depends on the severity of the non-optimum
18   report.  It's one thing if a guy is stealing, taking ten
19   pallets out the back door.  It's another thing if someone,
20   you know, is a no-call, no-show.  I mean, those are two --
21   you know, it just depends on the severity of it.
22       Q.   And so --
23       A.   And it would depend on what ADP advises us to do
24   as well.
25       Q.   Do you happen to have any knowledge as to

Page 52

1    whether ADP provided any guidance to Real Water regarding
2    Grecia?
3        A.   I don't.
4            (Plaintiff's Exhibit 5 was marked.)
5    BY MS. BARRAZA:
6        Q.   Do you recognize this document?
7        A.   Yeah.
8        Q.   Okay.  What is it?
9        A.   This is just saying what courses we offer at
10   Real Water.
11           MS. GINAPP:  Take a look at the whole thing,
12   will you.
13           THE WITNESS:  Actually, I've never seen the ADP
14   stuff on the back.
15   BY MS. BARRAZA:
16       Q.   Okay.  So you've seen the --
17       A.   Course breakdown, but I haven't seen the
18   paperwork.
19       Q.   You've seen page Real Water -60 and -61?
20       A.   -61.
21       Q.   Okay.  Got it.  And so am I correct that these
22   are the optional courses?
23       A.   Correct.
24       Q.   And these are the -- list of the optional
25   courses that you do and then you get the 25 cent raise for

1  each course; correct?
2     **A.  Correct.**
3     Q.  Okay.  To your knowledge, has this Real Water
4  course memo form always looked like this, or are there any
5  other versions of that memo form?
6     **A.  This in the back is different.  That in the back**
7  **is different.  This front form is the same, -61 is**
8  **different --**
9     Q.  Okay.
10    **A.  -- from what I did at the beginning.  From what**
11 **I signed off on four and a half years ago.**
12    Q.  Okay.  To your knowledge, the last four years,
13 page Real Water -60, the Real Water course memo, that has
14 always stayed the same; right?
15    **A.  I think we've added some courses on, but yeah.**
16    Q.  Do you know who decides which courses get added
17 on?
18    **A.  Blain.**
19    Q.  Blain Jones?
20    **A.  Yeah.**
21    Q.  Is there any kind of meeting that takes place?
22    **A.  No.  It's just if we have money to order more**
23 **courses, and then we do.**
24    Q.  And you order them from WISE; correct?
25    **A.  Correct.**

1     Q.  So do you happen to know why Real Water doesn't
2  provide any information on the Real Water course memo
3  indicating that the courses came from WISE?
4        MS. GINAPP:  Objection.  Form.  Foundation.
5  Calls for speculation.
6        THE WITNESS:  No.
7  BY MS. BARRAZA:
8     Q.  Do you think that would be information that
9  employees would like to know?
10    **A.  They already do.  They sign it in their employee**
11 **agreement.**
12       MS. GINAPP:  And I'm going to object based on
13 speculation.
14       THE WITNESS:  They sign off on their employee
15 agreement.
16 BY MS. BARRAZA:
17    Q.  Okay.  Do you know if the employee agreement has
18 any kind of mention of WISE?
19    **A.  No.**
20    Q.  It does not?
21    **A.  Not that I'm aware of.**
22    Q.  Got it.  And do you know why that is?
23    **A.  No.**
24       MS. GINAPP:  Objection.  Form and foundation.
25 Again, she's not the corporate representative.

1  BY MS. BARRAZA:
2     Q.  Okay.  And so do you happen to know why the
3  employment agreement doesn't specifically mention that
4  there's a Real Water course memo that there's going to be
5  raises available if you complete the courses in that course
6  memo?
7        MS. GINAPP:  Objection.  Form.  Foundation.  Not
8  a corporate representative.
9        THE WITNESS:  No.
10 BY MS. BARRAZA:
11    Q.  Do you have -- I know that you told me the
12 employees get told that there's these Real Water courses
13 available.  Do you happen to know when they get told about
14 that?
15    **A.  It's usually when they're hired.  We let them**
16 **know up front there's room for advancement.**
17    Q.  Okay.  And do you happen to know why Real Water
18 decided -- made the decision to have raises connected with
19 completing a course?
20       MS. GINAPP:  Objection.  Speculation.  Form and
21 foundation.
22       THE WITNESS:  Yeah.  Because usually when you
23 complete a course, so if someone knows how to do their
24 statistics, then they're able to manage their area better
25 because they can see if they're going up stat or they're

1  going down stat or they're not progressing at all, and then
2  they can start applying the conditions.  When they do that,
3  the next course, which is that course, and then usually
4  when you start applying those conditions, you're actually
5  able to manage your area better; therefore, it's more
6  efficient; therefore, if we have more cash flow going in,
7  more trucks going out, and we, of course, prosper a lot
8  better.
9  BY MS. BARRAZA:
10    Q.  So am I correct that it's your opinion that
11 completing a course makes an employee a more efficient
12 employee, and, therefore, they're entitled to a raise?
13       MS. GINAPP:  Objection to form.
14       THE WITNESS:  Absolutely.  Yes.  It's like an
15 accountant.  Accountants take courses so they're more
16 efficient at their job and they know what the heck they're
17 doing.
18 BY MS. BARRAZA:
19    Q.  Okay.  And do you know -- aside from this Real
20 Water course, the optional courses, is there any other kind
21 of system Real Water has in place that's connected to
22 getting raises?
23    **A.  Yeah.  We do a 90-day review.  So we'll meet**
24 **with the employees after they've been there for 90 days and**
25 **go over their stats and what they've produced, and if**

1  they've been doing a good job and they're what we call
2  viable, which means that they're worth more than -- or
3  they're worth as much as, you know, what they're costing
4  us, then we'll definitely, you know, go offer them a raise
5  at that point, regardless of course completions or not.
6      Q. Okay. Are there any other courses, besides the
7  ones listed out on this Real Water course memo, that an
8  employee can complete in order to get raises?
9      A. No.
10     Q. Got it. And do you know who decided that it
11 would be a 25 cent raise?
12     A. No.
13         MS. GINAPP: Objection. Form and foundation.
14         THE WITNESS: No.
15 BY MS. BARRAZA:
16     Q. Okay. And I'll let you review the list.
17 There's 18 different courses listed on here. Can you let
18 me know if you think any of those 18 courses are -- include
19 non-secular material?
20         MS. GINAPP: Objection. Form. Foundation.
21 BY MS. BARRAZA:
22     Q. In your opinion, do you think any of those 18
23 courses include non-secular material?
24         MS. GINAPP: Same objection.
25         THE WITNESS: From the ones that I've done, no.

1  BY MS. BARRAZA:
2      Q. Can you let me know, which ones have you
3  personally viewed on this?
4      A. The BSM, part of the basics, plus the BSM part
5  of Speaking from Experience, Formulas for Success,
6  Improving Business Through Communication, Personal Values
7  and Integrity, Ups and Downs, and How to Get Things Done.
8      Q. So there was nothing on the face of this
9  document that indicates which, if any, of these courses
10 were written by or had anything to do with L. Ron Hubbard;
11 correct?
12         MS. GINAPP: Objection. Asked and answered.
13 Document speaks for itself. Form and foundation.
14         THE WITNESS: Repeat that one more time after --
15 say that one more time.
16 BY MS. BARRAZA:
17     Q. Okay. So there's nothing on the face of the
18 Real Water course memo that shows employees which courses,
19 if any, were written by or had anything to do with L. Ron
20 Hubbard; correct?
21         MS. GINAPP: Same objection.
22         THE WITNESS: It's in our employee agreement.
23 So nothing on the face of this, but it is in our employee
24 agreement.
25 ///

1  BY MS. BARRAZA:
2      Q. The employee agreement details which specific
3  courses are offered, by L. Ron Hubbard?
4      A. Because any of the courses that we offer are
5  written by L. Ron Hubbard.
6      Q. And is it your opinion that the -- we'll start
7  with the Basic Study Manual, which you've told me that you
8  have viewed; right?
9      A. Correct.
10     Q. Okay. Can you just give me a brief summary,
11 what is the Basic Study Manual course?
12     A. Yeah. Three areas of study, misunderstood word.
13 If you don't understand a word, such as yourself being an
14 attorney, I'm sure there's a lot of big words that you guys
15 use, look it up in the dictionary, get the derivation from
16 it, and understand your words so you know what people are
17 talking about and you know what you're reading in books.
18         The second thing would be to seek a gradient.
19 If you're working on an engine and don't understand
20 something, you go back to where you were doing good
21 last, and then you start from there, figure out where the
22 confusion was and then move forward.
23         The third thing would be lack of mass, which is
24 no pictures of anything or you're working on an engine,
25 well, we need an engine there while learning about an

1  engine. You need an engine there to actually look at to
2  give you a reality of what you're working on.
3         Working on the production line or you're
4  learning about the production line, you need to actually be
5  out there looking at the production line so you know what's
6  actually happening. So you have mass on what you're
7  working with.
8      Q. Okay. And in what way do you think that the
9  Basic Study Manual in particular aids brand ambassadors for
10 Real Water?
11     A. Well, lots of ways. Our product is a very
12 scientific type of product. So most of the people that we
13 originally hire, alkalinization, it goes way over their
14 head. They have no understanding of what that is. So they
15 need to understand the words. So naturally, if you know
16 that course, you would look that word up and you would
17 understand it; therefore, you know what you're showing to
18 the consumers and to the people that you're trying to
19 educate on the product.
20         So that's just one thing. And then so they can
21 do the other courses as to how we run our business and
22 understand what they're reading in those courses.
23     Q. Okay. I just want to clarify. The Basic Study
24 Manual, does that come from WISE or ADP?
25     A. WISE.

Page 61

1      Q.  Okay.  Let me touch -- in addition to an
2   employment agreement there's also a Real Water employee
3   handbook?
4      **A.  Yes.**
5      Q.  Do you happen to know if all the employees are
6   given a copy of that handbook?
7      **A.  They should, yeah.  Well, since I've been**
8   **running it, yes, and they should be given a copy of it.**
9      Q.  Okay.  Do you happen to know if in 2015 the
10  employees were required to sign the employee handbook?
11         MS. GINAPP:  Objection.  Form.  Foundation.
12         THE WITNESS:  I don't know.
13         MS. BARRAZA:  We'll do this one.
14         (Plaintiff's Exhibit 6 was marked.)
15  BY MS. BARRAZA:
16     Q.  I'm going to represent to you that this is
17  certain pages of the Basic Study Manual course that Real
18  Water has produced for us.  I did not print out all of the
19  pages that were produced.  This is only certain pages of
20  it.
21     **A.  Okay.**
22         MS. GINAPP:  Certain pages of the basic --
23         MS. BARRAZA:  Exactly.  The Basic Study Manual
24  Course.
25         MS. GINAPP:  All right.  So I'm going to lodge a

Page 62

1   continuing objection to the use of this exhibit in the
2   future because it's not complete.
3         MS. BARRAZA:  Okay.
4   BY MS. BARRAZA:
5      Q.  To your knowledge, is the Basic Study Manual
6   Course, is it an actual book that's presented, like a
7   hardbound book, or is it papers like this?
8      **A.  It's a book, hardbound book.**
9      Q.  I'm going to point you to page Real Water -- I'm
10  going to point you to page Real Water -162.  Okay.  And can
11  I just get a basic understanding, on the right-hand side of
12  this page --
13     **A.  Uh-huh.**
14     Q.  -- there's a bunch of blank lines.  Do you know
15  what that's for?
16     **A.  Initials.**
17     Q.  Okay.  So are the employees supposed to initial,
18  once they've completed the corresponding section that's
19  listed, next to the line?
20     **A.  Correct.**
21     Q.  Okay.  So I'm going to point you to Section 15
22  on that page.  It says "DRILL."
23     **A.  Uh-huh.**
24     Q.  And it says, "Look for the word nonbeliever in a
25  dictionary."  What's your definition of nonbeliever?

Page 63

1         MS. GINAPP:  Objection.  Form.  Foundation.
2         THE WITNESS:  Someone that doesn't believe in
3   something.
4   BY MS. BARRAZA:
5      Q.  In anything?
6      **A.  Yeah.**
7      Q.  Do you understand how some employees might think
8   the term "nonbeliever" has a religious connotation?
9      **A.  No.**
10        MS. GINAPP:  Objection.  Form and foundation.
11        THE WITNESS:  No.
12  BY MS. BARRAZA:
13     Q.  You can't understand why any employees would
14  think that?
15     **A.  No.**
16        MS. GINAPP:  Objection.  Form and foundation.
17  BY MS. BARRAZA:
18     Q.  Have you personally ever heard of the term
19  nonbeliever used in reference to not believing in God?
20     **A.  Yeah.**
21     Q.  Okay.  Have you ever heard of that in your
22  Scientology teachings?
23     **A.  No.**
24        MS. GINAPP:  Objection.  Form.
25  ///

Page 64

1   BY MS. BARRAZA:
2      Q.  Okay.  So this asks the employee to write down
3   the definition of nonbeliever.  Do you happen to know if
4   the HR representative who used the documents makes sure
5   that a certain definition is written down?
6      **A.  No.  They do not do that.  They just make sure**
7   **that all the words are clear, because like the definition,**
8   **I'll just -- any of it, it can have, like, three different**
9   **definitions, and it has probably 20 different definitions.**
10  **Like they have several.**
11        **So we want to make sure that every single**
12  **definition for the word none and believer -- or non and**
13  **believer is completely clear, like they completely**
14  **understand every single definition.  That's the point.  So**
15  **there can be multiple meanings.**
16     Q.  Okay.  I'm going to point you to page Real Water
17  -249.
18     **A.  Okay.**
19     Q.  Okay.  This is referenced as the End Note of the
20  Basic Study Manual Course.  Can you please read section --
21  not section, the second paragraph of that into the record?
22     **A.  There is a further Scientology service available**
23  **which you should now do which is designed to bring your**
24  **greater -- bring you greater success and happiness in your**
25  **work, your social life, your relationships with others or**

39dc5b31-b60d-4248-a8cf-9cd234483a1f

1  **any aspect of your life.**
2      Q.  So explain to me how that sentence isn't an
3  endorsement of Scientology in the work place?
4          MS. GINAPP:  Objection.  Form and foundation.
5          THE WITNESS:  Well, it's just stating that if
6  you wish to get into Scientology there is a further service
7  that you can do if you so desire.
8  BY MS. BARRAZA:
9      Q.  Well, it says you should do; right?
10         MS. GINAPP:  Objection.  Form and foundation.
11         THE WITNESS:  It says that if "you should now,"
12  then you can.  So if you want to, then you can.
13  BY MS. BARRAZA:
14     Q.  Okay.  It's your opinion that there's no problem
15  with this section -- this page being in the Basic Study
16  Manual Course?
17     **A.  No.**
18     Q.  So am I correct in reading that -- that sentence
19  insinuated in order to achieve greater success and
20  happiness, they need to go and seek Scientology; correct?
21         MS. GINAPP:  Objection.  Form and foundation.
22         THE WITNESS:  It can certainly help with that.
23  I think that's what it's insinuating.  It can help.
24  BY MS. BARRAZA:
25     Q.  Right.  Do you happen to know why?

1      **A.  My sister found God, and she's very Christian.**
2  **That helped her.  Everybody has religion anyway.**
3      Q.  Speaking of that.  Do you happen to have any
4  personal knowledge of any Real Water employees going
5  through these courses and then deciding to convert to
6  Scientology?
7      **A.  No.**
8      Q.  Okay.  Do you personally talk about your
9  religion at work?
10     **A.  No.**
11     Q.  Do you have knowledge of Brent Jones talking
12  about his religion at work?
13     **A.  Not at work, no.**
14     Q.  Do you think that would be appropriate or not?
15         MS. GINAPP:  Objection.  Form and foundation.
16         THE WITNESS:  No.
17  BY MS. BARRAZA:
18     Q.  I'm going to point you to Real Water page -251
19  in that same packet.  I'll let you look that over, and then
20  can you tell me your basic understanding of what that
21  document says?
22         MS. GINAPP:  While you're reading, I'll make my
23  objection.  Form and foundation.
24         THE WITNESS:  Okay.
25  ///

1  BY MS. BARRAZA:
2      Q.  What's your basic understanding of what that
3  document is?
4      **A.  It's promoting IAS.**
5      Q.  Promoting what?
6      **A.  The IAS.**
7      Q.  And that's the International Association of
8  Scientologists?
9      **A.  Yeah.**
10     Q.  Okay.  And so explain to me how something that
11  promotes the International Association of Scientologists is
12  not implementing Scientology?
13         MS. GINAPP:  I'm going to object based on form
14  and foundation.  Again, the fact that she is not a
15  corporate representative, and also I'm going to just lodge
16  a general objection based on the Hobby Lobby case.
17         THE WITNESS:  I don't know what your question
18  was.
19  BY MS. BARRAZA:
20     Q.  Okay.  That's fine.  I'll reword it in the same
21  way.
22         Can you explain to me how the International -- a
23  document which promotes, as you said, the International
24  Association of Scientologists does not implement
25  Scientology?

1      **A.  Because it's not giving any teachings of the**
2  **religion itself.**
3      Q.  Okay.  So in order for it to be a religious
4  document, it would have to specifically teach Scientology.
5  Is that what you're saying?
6          MS. GINAPP:  Objection.  Form and foundation.
7  She's not a corporate representative.
8          THE WITNESS:  Yes.  Well, it's not teaching
9  anything that has to do with Scientology.  It's just
10  telling you that Scientology exists.  You can see that on
11  billboards outside too.
12  BY MS. BARRAZA:
13     Q.  Does this packet talk about any other religions
14  that exist?
15     **A.  No.**
16     Q.  Just Scientology?
17     **A.  That's correct.**
18     Q.  And do you think it's appropriate to have this
19  page in this booklet?
20     **A.  Yeah.**
21         MS. GINAPP:  Objection.  Form and foundation.
22         THE WITNESS:  That's fine.
23  BY MS. BARRAZA:
24     Q.  Okay.  Do you personally think that when
25  employees review the Basic Study Manual and review the

39dc5b31-b60d-4248-a8cf-9cd234483a1f

Page 69

1  documents such as Real Water -251, that they might be more
2  inclined to join Scientology after reading it?
3      **A.  I don't know.**
4          MS. GINAPP:  Objection.  Form and foundation.
5          THE WITNESS:  I don't know.
6  BY MS. BARRAZA:
7      Q.  Okay.  And so what -- in your opinion, what --
8      **A.  Just that -- and I actually do want to answer**
9  **more to that last one.  I haven't had anyone that's jumped**
10 **on to talking about it or insinuating that they wanted to**
11 **be a part of Scientology or anything like that, to expand a**
12 **little bit on it.  I don't know, because I've never**
13 **actually had that happen.  So --**
14     Q.  Okay.  Just you're saying you've never had --
15 heard of any Real Water employee reading any of the
16 documents in the Basic Study Manual and then saying, "Okay.
17 Now I want to be a Scientologist?"
18     **A.  Yeah.  None have been brought to my attention.**
19     Q.  Okay.  Going on to the next page, Real Water
20 -252, it looks like -252 through -264 is a list of books.
21 Is that your basic understanding?
22     **A.  Yeah.  There's a list of books here.**
23     Q.  Okay.  On -252 it states this is Basic
24 Scientology Books; is that correct?
25     **A.  Yeah.**

Page 70

1      Q.  Okay.  So do you see any kind of problem with
2  including a list of a bunch of Scientology books in an
3  employment booklet?
4      **A.  No.**
5      Q.  And why is that?
6      **A.  I just don't see a problem with it.  It's not**
7  **giving any training of the religion itself.  So I go back**
8  **to my last statement.  I don't see a problem.**
9      Q.  What about page Real Water -265 through -270?
10 It's my understanding that this is a list of Scientology
11 churches and organizations; is that correct?  Is that your
12 understanding?
13         MS. GINAPP:  Objection.  The document speaks for
14 itself.
15         THE WITNESS:  Yeah.  Yeah.
16 BY MS. BARRAZA:
17     Q.  Okay.  Do you see any kind of problem just
18 including a list of all the Scientology churches and
19 organizations in an employment booklet?
20         MS. GINAPP:  Objection.  Form and foundation.
21         THE WITNESS:  No, I don't.  This is a course,
22 Basic Study Manual Course.  You say an employment booklet,
23 but it's not an employment agreement.  This is a course
24 that they do.  So if they want to seek more --
25 ///

Page 71

1  BY MS. BARRAZA:
2      Q.  And if they want a 25-cent raise; right?
3      **A.  No.  If they want --**
4          MS. GINAPP:  Objection form and foundation.
5          THE WITNESS:  If they want to seek more
6  information on what they learned, then this is where they
7  can go to.
8  BY MS. BARRAZA:
9      Q.  Oh, okay.  So if they want more information on
10 the Basic Study Manual Course?
11         MS. GINAPP:  Objection.
12         THE WITNESS:  And if they want --
13 BY MS. BARRAZA:
14     Q.  Great.  So this helps them understand it more;
15 correct?
16         MS. GINAPP:  Objection.  Form and foundation.
17         THE WITNESS:  No.
18 BY MS. BARRAZA:
19     Q.  Okay.  So you see no issue with having a list of
20 churches and organizations, whether or not Scientology
21 related --
22         MS. GINAPP:  Objection.  Asked and answered.
23 BY MS. BARRAZA:
24     Q.  -- in this book?
25         MS. GINAPP:  Form and foundation.

Page 72

1          THE WITNESS:  No.  I don't see a problem with
2  it.  It's not teaching them the religion.  So --
3  BY MS. BARRAZA:
4      Q.  Okay.  Do you happen to know why the Basic Study
5  Manual Course was never redacted in any way to redact any
6  kind of non- ---
7      **A.  Can you use a word that actually communicates?**
8  **I don't know your legal redacted terms.**
9      Q.  That's fine.  Do you know -- happen to know why
10 Real Water never took out certain sections of the Basic
11 Study Manual Course that specifically said Scientology
12 things?
13         MS. GINAPP:  Objection.  Calls for speculation.
14 Form and foundation.
15         Go ahead.
16         THE WITNESS:  Yeah.  I don't know.
17 BY MS. BARRAZA:
18     Q.  And in your opinion, you don't think any of
19 these pages needed -- need to come out?
20         MS. GINAPP:  Objection.  Form and foundation.
21         THE WITNESS:  That's not up to me to say.
22 BY MS. BARRAZA:
23     Q.  Okay.  Am I correct that employees are required
24 to go through the entire Basic Study Manual Course and
25 answer corresponding questions in order to get the 25-cent

39dc5b31-b60d-4248-a8cf-9cd234483a1f

Page 73

1   raise; right?
2       A.  They can get raises, like we discussed earlier,
3   in other capacities, if they're producing really well, but
4   specific to the courses, we offer that as an additional
5   raise.  So we talked about doing the 90-day review, and if
6   they're producing well, if their stats goes through the
7   roof and it just continues that way, we offer raises and
8   incentives that way.  Our demo girls, they get incentives
9   based off of how many case stacks they get in the store.
10  So if they're actually producing value in doing something,
11  actually working and doing their job, then they get raises
12  that way as well.
13      But specific to the courses, yeah, they complete
14  a course, they get a 25-cent raise, and it should make them
15  start operating a little more efficiently.
16      Q.  Right.  Okay.  And you've never heard of anybody
17  complaining to you about this Basic Study Manual Course;
18  right?
19      A.  No.
20      MS. GINAPP:  Objection.  Asked and answered.
21      THE WITNESS:  No.
22      (Plaintiff's Exhibit 7 was marked.)
23  BY MS. BARRAZA:
24      Q.  Go to my next exhibit.
25      I'm going to represent to you these are certain

Page 74

1   pages Real Water has produced to us, Formulas for Business
2   Success.
3       A.  Yeah.  Can I take a break?
4       Q.  Yeah.  No problem.
5       A.  Okay.  Cool.
6       Q.  There's no question.
7       (A break was taken.)
8       (Ms. Risselo did not rejoin the proceedings.)
9   BY MS. BARRAZA:
10      Q.  Going back, I think you had mentioned that you
11  were already a Scientologist by the time you came to work
12  at Real Water; correct?
13      A.  Yeah.
14      Q.  So how did you personally get involved in
15  Scientology?
16      A.  Boyfriend.
17      Q.  When was that?  What year was that,
18  approximately?
19      A.  I think 2011 or 2012.  Somewhere in there.
20      Q.  Were you practicing a different religion at the
21  time or --
22      MS. GINAPP:  Objection.  Form.  Foundation.
23      THE WITNESS:  I was born -- I was a -- not born.
24  When I was born, I was baptized as a Christian and grew up
25  Christian, and still do have, you know, a lot of the

Page 75

1   Christian beliefs, but I am a Scientologist.  So --
2   BY MS. BARRAZA:
3       Q.  Okay.  And so the boyfriend you had in
4   2011/2012, he was a Scientologist; correct?
5       A.  Correct.
6       Q.  And he kind of helped you understand some of the
7   Scientology beliefs?
8       MS. GINAPP:  Objection.  Form.
9       THE WITNESS:  He explained Scientology to me,
10  and he was about the happiest guy I ever met, and I said
11  "How the hell can I get that happy?  Why are you so happy?
12  This is awesome.  I want to be that happy all the time."
13      (Ms. Risselo rejoined the proceedings.)
14  BY MS. BARRAZA:
15      Q.  Okay.  And was this in Florida?
16      A.  No.  This was in, actually, California.
17      Q.  And so how did you come to practice at the
18  Florida location of Scientology?
19      MS. GINAPP:  Objection.  Form.
20      THE WITNESS:  That's the headquarters for the
21  church.
22  BY MS. BARRAZA:
23      Q.  And we're talking about Clearwater?
24      A.  Yes.
25      Q.  And did your boyfriend at the time also go to

Page 76

1   that location?
2       A.  No.  We actually went to a location in Southern
3   California.
4       Q.  So what made you want to go to the headquarters?
5       A.  Because that's where you do different things
6   that they don't offer at that church.
7       Q.  Did they teach you about suppressive people in
8   the Church of Scientology?
9       A.  Yes.
10      Q.  So what do the Scientologists define suppressive
11  people are?
12      A.  I don't know the exact definition off the top of
13  my head, but I can give the idea.  A suppressive person
14  would be someone that is just trying to create problems and
15  cause ill will towards you directly and destroy you and
16  harm you or anything that you're involved with.
17      If you're trying to build a company and make it
18  better, and that person is destroying it or harming it or
19  that they're -- that's what they're trying to do.  It could
20  work on many levels.
21      Q.  Okay.  I've just handed you our next exhibit,
22  which is what Real Water has produced as Formulas for
23  Business Success.  This is certain pages of it.
24      A.  Sure.
25      Q.  And I think you mentioned to me that you

39dc5b31-b60d-4248-a8cf-9cd234483a1f

Page 77

1  personally have gone through the Formula for Business
2  Success?
3      **A.  Correct.  Sure.**
4      Q.  So this indicates that it's based on L. Ron
5  Hubbard's work; correct?
6      **A.  Yes.**
7      Q.  Can you give me a brief overview of -- I'm not
8  sure, maybe you don't remember.  But if you can remember
9  what this specific course is about.
10     **A.  Yeah.  This course, basically, to give you just**
11  **a real quick rundown of it.  This is the conditions and**
12  **then it goes over -- so like on your stats, if you're going**
13  **up stat then you're going like an affluent or you can be in**
14  **power or you can be in the normal.  It's just different**
15  **levels of how well you're doing.**
16     **And then if you're going down stat, you could be**
17  **an emergency, danger, or nonexistence, meaning your**
18  **position just doesn't exist anymore, basically, because**
19  **there's no production being done.  So you have that**
20  **condition.  And then based off of that condition you would**
21  **do the formula for whatever condition you're in.**
22     Q.  Explain, in your opinion, how this particular
23  course aids brand ambassadors.
24     **A.  Oh, my gosh.  It's like the lifeline of it.  So**
25  **if you see that you're in emergency, then what you need to**

Page 78

1  **do, you need to go promote, promote, promote.  Well, that's**
2  **one of the most important things and one of the main things**
3  **that, of course, a brand ambassador does do is promotion.**
4  **That's the main thing.**
5     **And if you're up stat, then you need to continue**
6  **doing the same thing, which is promoting, and there's some**
7  **other steps to it that are along the same lines that I**
8  **don't know off the top of my head.  So it applies**
9  **tremendously.**
10     Q.  Do you recall if the Formula for Business
11  Success mentions or talks about suppressive persons?
12     **A.  Not to my recollection.**
13     Q.  If it did, would you have had any problem with
14  that?
15     **A.  No.**
16     Q.  Do you think that if it mentions suppressive
17  persons there should be a disclaimer indicating where that
18  term comes from?
19     MS. GINAPP:  Objection.  Form and foundation.
20     THE WITNESS:  I mean, I can't -- I mean, no, not
21  really because to suppress someone, that's a general
22  suppress and person.  Like if you look up both definitions
23  in a normal dictionary and clear definition as to what
24  suppress means and what person means, and then put the two
25  and two together, and that's going to tell you what's going

Page 79

1  on, to make less of.
2  BY MS. BARRAZA:
3      Q.  But there's no doubts that the term is used in
4  Scientology practices; right?
5      **A.  Both in normal --**
6      MS. GINAPP:  Objection.  Form foundation.
7      THE WITNESS:  -- life and in Scientology.
8  BY MS. BARRAZA:
9      Q.  Do you understand how any Real Water employees
10  might see that term and think that it has a connection to
11  Scientology?
12     MS. GINAPP:  Objection.  Speculation.  Form and
13  foundation.
14     THE WITNESS:  No.  But if they had a problem
15  with it, then I wouldn't use it.
16  BY MS. BARRAZA:
17     Q.  Okay.
18     **A.  If they expressed any concern or anything like**
19  **that.**
20     Q.  Do you personally use the term "suppressive
21  person"?
22     **A.  No.  Because I don't know too many suppressive**
23  **people.**
24     Q.  Right.  That's good.  Do you -- have you heard
25  that term used at Real Water by any employees?

Page 80

1      **A.  No.**
2      Q.  I think we had mentioned that one of the
3  required videos, besides Message to Garcia, The Secret, and
4  The Road to Happiness, is the Real Water Culture; right?
5      **A.  Right.**
6      Q.  Do you have any recollection of what that video
7  says?
8      **A.  I know KRC, which is knowledge, responsibility,**
9  **and control.  So the more knowledge you have and the more**
10  **responsible you can be for your area, the more control you**
11  **can run on that specific area.  That's what it's about,**
12  **which is taught in one of the courses.  So -- that we offer**
13  **through us.**
14     Q.  And you didn't get the Real Water culture
15  video -- that has no connection to WISE, does it?
16     **A.  No.**
17     (Plaintiff's Exhibit 8 was marked.)
18  BY MS. BARRAZA:
19     Q.  Okay.  I've just handed you pages from what
20  Real Water has produced as to the Speaking from Experience
21  course.
22     **A.  Uh-huh.**
23     Q.  Have you -- I'm sorry.  Have you personally done
24  this?
25     **A.  Part of it.  I haven't finished the whole thing.**

39dc5b31-b60d-4248-a8cf-9cd234483a1f

Page 81

1    MS. GINAPP:  Is that a complete copy?
2    MS. BARRAZA:  No.
3    MS. GINAPP:  I'll lodge a continuing objection,
4  the fact that it's not complete.
5  BY MS. BARRAZA:
6    Q.  Okay.  I'm going to point you to -- actually,
7  before we do that, can you give me from what you've
8  completed, if you have any kind of recollection, what this
9  course is about?
10    A.  Yeah.  So basically, the things that I've gone
11  over is our organizational board, which is the word -- you
12  have your president, your VP right below him, and then we
13  have our VPs, and then the juniors below them.  So the
14  chain of command.  So everybody knows who to communicate to
15  for what.
16    And then also a term that I use is develop
17  traffic, which means that it's something that is being done
18  twice or something that is unnecessary to do.  But mostly
19  something that's being done twice, or something that
20  someone is not doing so it's creating someone else to have
21  to do their job for them.
22    Q.  I'm going to point you to page Real Water -1312.
23  Can you please read the very last paragraph into the
24  record?
25    A.  "Mr. Hubbard was a man of amazing

Page 82

1  accomplishment.  Although many of his years were spent in
2  the development of Scientology, it was only one facet of
3  his incredible contribution to mankind.  His researches led
4  him to the discovery of fundamentals in many, many areas of
5  life, from education and drug rehabilitation to self-help
6  and personal improvement.  Many corporations, businesses,
7  and individuals have benefitted from his technologies."
8    Q.  Do you see any kind of problem with that
9  paragraph being in a booklet that employees read?
10    MS. GINAPP:  Objection.  Form.  Foundation.
11    THE WITNESS:  No.  It's showing that businesses
12  and corporations have progressed or done well from it.
13  BY MS. BARRAZA:
14    Q.  Okay.  Would you agree with me that it's
15  implying that one of L. Ron Hubbard's incredible
16  contributions to mankind was Scientology?
17    MS. GINAPP:  Objection.  Form and foundation.
18    THE WITNESS:  Yes.
19  BY MS. BARRAZA:
20    Q.  Okay.  Do you understand how some employees
21  might read that and be inclined to take that -- to view it
22  as endorsement of Scientology?
23    MS. GINAPP:  Objection.  Speculation.  Form and
24  foundation.
25    THE WITNESS:  No.  I've never experienced anyone

Page 83

1  commenting on this or having any issue with it that have
2  completed a course before.
3  BY MS. BARRAZA:
4    Q.  Do you think employees always comment or express
5  if they have a problem with --
6    A.  Absolutely not.
7    MS. GINAPP:  I'm going to object -- hold on --
8  to speculation.  Well, first of all, let's start again.
9  Can you finish your question, and then don't jump on it.
10  Give me a chance to object so that we can do this.
11    THE WITNESS:  Okay.
12  BY MS. BARRAZA:
13    Q.  Do you think that -- I'm sorry.  Do you think
14  that employees always express when they have complaints
15  about one of these courses?
16    MS. GINAPP:  Objection.  Speculation.  Form and
17  foundation.
18    THE WITNESS:  Yeah.  They do.  So we make it
19  clear in our employment agreement that if you have any
20  issues with anything, whether it be religious or the
21  courses you're doing or whatnot, you can always let your
22  senior know, write it up, or whatever it says in there.  It
23  does say that, though.
24  BY MS. BARRAZA:
25    Q.  Would you be surprised if an employee after

Page 84

1  going through the Basic Study Manual and Speaking from
2  Experience, came up to you and said, "Hey, I think this
3  kind of implicates or promotes Scientology"?
4    MS. GINAPP:  Objection.  Speculation.  Form and
5  foundation.
6    THE WITNESS:  Yes.  I would be surprised, but
7  I've never experienced that.  And if I did, then we would
8  correct that and take the pages out per their request.
9  BY MS. BARRAZA:
10    Q.  Okay.  So it's your opinion that an employee
11  would have to, you know, express a complaint so you guys
12  know about it, and then you would remove pages that
13  reference Scientology?
14    A.  Yes.  Because there's -- I don't see a problem
15  with it, and I've never had anyone complain about it that's
16  done these courses, ever.
17    Q.  Okay.  Has Real Water been involved in a book
18  called The 10X Club?
19    A.  Yeah.  They have a book called The 10X Club.
20    Q.  Is that a book written by Grant Cardone?
21    A.  Correct.
22    Q.  Okay.  Do you know if he's a practicing
23  Scientologist?
24    A.  No, he is not.
25    Q.  So what is The 10x Club?  Am I saying this

Page 85

1  right, The 10X Club?
2     A.  Correct.
3     Q.  Okay.  What is that book about?
4     A.  It's basically put in ten times the amount of
5  effort and that's what you'll get back.  So you put in ten
6  times the amount of work, you set your goals ten times
7  higher, and if you fall short, at least you're falling
8  short.  So if you've got a goal to make $20 million and you
9  only come in at one, well, it was better than setting it at
10 one and making $10.  Just to give -- and Grant Cardone used
11 to be a Scientologist, but he's not currently anymore.
12    Q.  All right.  Do you know why he's not?
13    A.  I don't know.
14    Q.  Do you know why Real Water has -- tell me
15 about -- does Real Water require employees to read the
16 book?  Is it an option to read the book?  It's just
17 available.
18    A.  Our executives.  We do require our executives to
19 read it, absolutely, because it teaches them to set their
20 goals higher and aim for the highest goal you can set.  So
21 then when you fall short, you're still accomplishing a lot
22 more.
23    Q.  What about brand ambassadors?  Are they required
24 or are they given the option to read it?
25    A.  Yeah.  If they want to read it, they're more

Page 86

1  than welcome to read it, but they're not required, no.
2     Q.  Does Real Water offer any kind of incentive for
3  reading the book?
4     A.  No.
5     Q.  Did you ever become --
6     A.  Oh, I take that back.  Yes, we do.  We give a --
7  if they read it within like a week or something like that,
8  they get a -- they get some bonus, and then if they read it
9  within two weeks, they get a little bit less than that
10 amount, and then if they read it within three weeks, it's a
11 little bit less.  So, yes.
12    Q.  Are we talking about --
13    A.  10x.
14    Q.  -- within a week of them getting employed?
15    A.  No.  Within a week of them being -- you know,
16 here, if you want to read this book, then go for it.  For
17 the executives.  And then for the juniors, if they say,
18 "Hey, what's that book.  I want to read that," then from
19 that point, okay, if you read it within a week, you get
20 this amount.  If you read it within two weeks -- to give
21 them more motivation to get through it.
22    Q.  Okay.  Have you ever heard of anyone besides
23 Grecia lodging any kind of complaints based on Real Water
24 allegedly imposing religion in the workplace?
25    MS. GINAPP: Objection.  Form.  Foundation.  And

Page 87

1  I will also instruct you that to the extent that any of
2  this is part of a conversation with attorneys, I'll object
3  to attorney/client privilege.
4     THE WITNESS:  Okay.  No.
5  BY MS. BARRAZA:
6     Q.  Okay.  Have you ever heard of Lisa Marie Bailey?
7     A.  Yes.
8     Q.  She -- what was her position at Real Water?
9     A.  She was in HR.
10    Q.  Did she ever -- have you ever heard about her
11 complaining about Real Water imposing religion?
12    MS. GINAPP:  Objection to the extent that if
13 she's required to testify about attorney/client privilege,
14 I instruct her not to answer.
15    THE WITNESS:  No.
16 BY MS. BARRAZA:
17    Q.  What about Matt Nappy?  Have you ever heard of
18 him?
19    A.  Yeah.
20    Q.  Have you ever heard of him ever complaining
21 about Real Water imposing religion in the workplace?
22    MS. GINAPP:  Again, objection to the extent that
23 it calls for an attorney/client privileged communication, I
24 would instruct her not to answer.
25    THE WITNESS:  Yeah.

Page 88

1  BY MS. BARRAZA:
2     Q.  Okay.  And so you -- am I correct, did you
3  participate in providing responses to Real Water requests
4  for interrogatories and request for admissions?
5     MS. GINAPP:  Our responses.
6     THE WITNESS:  Yeah.
7  BY MS. BARRAZA:
8     Q.  Okay.  You verified that all those responses
9  were accurate; right?
10    A.  Yes.
11    Q.  Okay.  I think in Real Water's responses to
12 interrogatories there's mention of a Dan Maddox who
13 oversees operations in Tennessee?
14    A.  Correct.  He owns part of the plant in
15 Tennessee --
16    MS. GINAPP:  Wait until she asks a question.
17    THE WITNESS:  Okay.
18 BY MS. BARRAZA:
19    Q.  And so he became involved in Real Water in 2009,
20 and how did he become involved with Real Water?
21    A.  I don't know.
22    Q.  What's his position?  How did he come to oversee
23 operations in Tennessee?
24    A.  I don't know.  You'd have to ask Brent or Blain
25 that.

39dc5b31-b60d-4248-a8cf-9cd234483a1f

Page 89

1    Q. So where else, besides Las Vegas, does Real
2  Water have employees?
3    **A. In California.**
4    Q. Okay. Where else do they have operations? What
5  other states?
6    **A. That's it.**
7    Q. Do you know -- Interrogatory No. 22 asked a
8  total number of individuals employed by Real Water, and the
9  response was 48. Do you know if that's the total also
10  including California employees or is that just Las Vegas?
11    **A. That would be Las Vegas and California.**
12    Q. Okay.
13    **A. Yeah. That should be Las Vegas and California.**
14  **Actually, I'm going to retract. I don't know.**
15    Q. So brand ambassadors, they don't actually sell
16  the product, do they?
17    **A. Like collect money for it, no.**
18    Q. Okay.
19    **A. I mean, they pitch them on it. I don't know.**
20  **You'd have to be more specific.**
21    Q. They're not like salespeople, though. That's
22  not their job. They're not going out to try to sell?
23    **A. Well, they're selling. The guys who are -- so**
24  **if they're at a Vons -- a Vons grocery store, they're**
25  **pitching the people that work at Vons to pitch our product.**

Page 90

1    Q. Right.
2    **A. So in a sense they are selling, but they're not**
3  **called salesmen, no.**
4    Q. Okay. Do you have any knowledge of whether or
5  not anybody from Real Water spoke to the media after Grecia
6  filed her lawsuit?
7    **A. After she filed, yeah. Well, Brent did, yeah.**
8    Q. Do you know who Brent spoke to? We're talking
9  about Brent Jones; correct?
10    **A. Correct. I think it -- I think it was Channel**
11  **13, I'm not sure, or Channel 8. I can't remember which**
12  **one.**
13    Q. Do you know basically what he said?
14    MS. GINAPP: Object to form. Foundation.
15    THE WITNESS: Yeah. It was just basically that
16  we had an employee that was filing a suit, and they were
17  asking him if -- I don't know -- we were discriminatory at
18  our office or what have you, and absolutely not.
19  BY MS. BARRAZA:
20    Q. What about -- do you have knowledge of Bonnie
21  Mercado talking to the media?
22    **A. No. No.**
23    Q. Does Real Water have any -- to your knowledge,
24  have any policies about its employees speaking to the
25  media?

Page 91

1    **A. No.**
2    Q. Do you think it would be appropriate if a Real
3  Water employee spoke to the media and revealed another
4  employee's medical condition?
5    MS. GINAPP: Objection. Incomplete
6  hypothetical. Calls for speculation. Form. Foundation.
7    Go ahead.
8    THE WITNESS: If it's not confidential. I mean,
9  I don't -- I don't see what the problem is.
10  BY MS. BARRAZA:
11    Q. Okay. To your knowledge, do you or Brent Jones
12  receive any kind of compensation whatsoever from WISE?
13    **A. No.**
14    Q. Do you or Brent Jones have your own individual
15  memberships with WISE?
16    **A. No.**
17    Q. The membership is just Real Water's membership;
18  correct?
19    **A. I believe so. I believe so. I don't know for**
20  **sure.**
21    Q. And you don't even know what WISE stands for;
22  correct?
23    **A. No, I don't.**
24    Q. You don't think it would be important to maybe
25  know what it stands for, do you?

Page 92

1    MS. GINAPP: Objection. Argumentative.
2    THE WITNESS: No. I've never had any complaints
3  about the courses or anything with WISE. So --
4  BY MS. BARRAZA:
5    Q. Okay. I am about to wrap up. Do you have any
6  information that you wanted to give me that you don't think
7  we've covered here so far?
8    **A. No.**
9    Q. Okay. Have you ever seen Grecia's charge of
10  discrimination?
11    **A. No.**
12    Q. And do you have any kind of knowledge if Real
13  Water conducted any kind of investigation after receiving
14  notice of her charge of discrimination?
15    MS. GINAPP: Objection. Asked and answered.
16    THE WITNESS: Just what I told you before.
17  BY MS. BARRAZA:
18    Q. I think before we were talking about the notice
19  of her lawsuit. Maybe not. But just to clarify.
20    **A. It goes to ADP. Anything we get goes to ADP,**
21  **but I didn't personally send it. Whoever -- Christy**
22  **Pantelakis, I would imagine. Actually, I don't know if she**
23  **was there when we got served with it. I wasn't a part of**
24  **it. So I don't know for sure how that was handled.**
25    Q. And you had mentioned that I think one of your

39dc5b31-b60d-4248-a8cf-9cd234483a1f

1  previous employers had you watch The Secret?
2  **A.  Yeah.  Lennar Homes.**
3  Q.  Any other previous employers?
4  **A.  No.**
5  Q.  And it was just The Secret?
6  **A.  They had us memorize a poem called The Little**
7  **Red Hen.  It was their culture, and you had to get up and**
8  **memorize it and recite it in front of everybody.  The**
9  **corporations do things like that.**
10  Q.  And so did anybody at Real Water, did you ever
11  hear anybody discussing their religion at work?
12  **A.  No.  Not that I've heard.**
13  Q.  Just to clarify, you had no involvement in,
14  number one, why Grecia was terminated and, number two, who
15  decided to terminate her?
16  **A.  Correct.**
17  MS. GINAPP:  Objection.  Compound.  Asked and
18  answered.
19  THE WITNESS:  Correct.
20  BY MS. BARRAZA:
21  Q.  Okay.  That wouldn't have to go through you;
22  right?
23  **A.  Not at that time, no.**
24  Q.  Not at that time.  Okay.  And does Bonnie
25  Mercado still work at Real Water?

1  **A.  Yup.**
2  Q.  Is her position the same as she -- a manager
3  over Brand and Beverage?
4  **A.  Yes.**
5  Q.  Okay.  I don't have anything else.
6  MS. GINAPP:  I have a few follow-up questions.
7
8  EXAMINATION
9  BY MS. GINAPP:
10  Q.  So counsel had pointed out a number of pages in
11  the course manuals that reference Scientology and the
12  Scientology church and Mr. Hubbard.  Were you aware that
13  those pages were in the book?
14  **A.  No.**
15  Q.  And those pages, do you know where they're
16  located?  Are they located after the course work or within
17  the course work?
18  **A.  I don't know for sure because that was,**
19  **actually, the first I noticed them at all, considering not**
20  **all the pages are included in those sections.**
21  Q.  Has anyone at Real Water, any employee ever
22  complained about these pages pursuant to the terms of their
23  employment agreement?
24  **A.  No.**
25  Q.  Has anyone at -- any Real Water employee ever

1  complained about these pages pursuant to the policies of
2  the employee handbook?
3  **A.  No.**
4  MS. BARRAZA:  Objection.  Calls for speculation.
5  THE WITNESS:  Never.
6  BY MS. GINAPP:
7  Q.  If someone had complained, what would Real
8  Water's course of action be, to your knowledge?
9  **A.  I would remove it from the course.**
10  MS. GINAPP:  Thank you.
11  MS. BARRAZA:  I don't have any follow-ups.
12  THE COURT REPORTER:  Counsel, do you need a
13  copy?
14  MS. GINAPP:  I do.
15  (At the hour of 3:04 p.m.
16  the deposition was concluded.)
17  ***

1  REPORTER'S DECLARATION
2
3  STATE OF NEVADA    )
)  ss.
4  COUNTY OF CLARK    )
5
6  I, Ewa Barnes, CCR No. 889, declare as follows:
7  That I reported the taking of the deposition of the
8  witness, AIMEE JONES, commencing on Friday, October 7,
9  2016, at 12:52 p.m.
10  That prior to being examined, the witness was by
11  me duly sworn to testify to the truth, the whole truth and
12  nothing but the truth.
13  That I thereafter transcribed my said shorthand
14  notes into typewriting and that the typewritten transcript
15  of said deposition is a complete, true and accurate
16  transcription of said shorthand notes taken down at said
17  time.
18  I further declare that I am not a relative or
19  employee of any party involved in said action, nor a person
20  financially interested in the action.
21  Dated at Las Vegas, Nevada this 19th day of
22  October, 2016.
23
24  _____
25  Ewa Barnes, CCR No. 889

96

REPORTER'S DECLARATION

1

2

3    STATE OF NEVADA      )
                          )    ss.
4    COUNTY OF CLARK      )

5

6            I, Ewa Barnes, CCR No. 889, declare as follows:

7    That I reported the taking of the deposition of the

8    witness, AIMEE JONES, commencing on Friday, October 7,

9    2016, at 12:52 p.m.

10           That prior to being examined, the witness was by

11   me duly sworn to testify to the truth, the whole truth and

12   nothing but the truth.

13           That I thereafter transcribed my said shorthand

14   notes into typewriting and that the typewritten transcript

15   of said deposition is a complete, true and accurate

16   transcription of said shorthand notes taken down at said

17   time.

18           I further declare that I am not a relative or

19   employee of any party involved in said action, nor a person

20   financially interested in the action.

21           Dated at Las Vegas, Nevada this 19th of October,

22   2016.

23

24                                  _____
                                    Ewa Barnes, CCR No. 889
25