# EXHIBIT 1

Deposition of Jeramy Edgel

# Condensed Transcript of the Testimony of

# **Jeramy Edgel**
Volume I

**Date:** February 13, 2017

Grecia Echevarria-Hernandez v. Affinitylifestyles.com, Inc.
Case No. 2:16-cv-00943-GMN-VCF

Oasis Reporting Services, LLC
Phone:  702-476-4500
E-mail:  info@oasisreporting.com
Internet:  www.oasisreporting.com

## Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF NEVADA
 3   GRECIA                    )
     ECHEVARRIA-HERNANDEZ,     )
 4   Individually,            )
                               )
 5              Plaintiff,    )
                               )
 6         vs.                ) No. 2:16-cv-00943-GMN-VCF
                               )
 7   AFFINITYLIFESTYLES.COM,   )
     INC. d/b/a REAL ALKALIZED )
 8   WATER, a Nevada          )
     corporation; DOES I-X; and)
 9   ROE BUSINESS ENTITIES I-X,)
     inclusive,                )
10                             )
                Defendants.   )
11   _____)
12
13
14          DEPOSITION OF JERAMY EDGEL
15        Taken on Monday, February 13, 2017
16          By a Certified Court Reporter
17               At 10:11 a.m.
18        At 8816 Spanish Ridge Avenue
19              Las Vegas, Nevada
20
21
22
23
24   Reported by:  MARY COX DANIEL, FAPR, RDR, CRR, CCR 710
25   Job No. 20417
```

## Page 2

```
 1   APPEARANCES:
 2   For Plaintiff:
 3       MAIER GUTIERREZ AYON
         BY:  JOSEPH A. GUTIERREZ, ESQ.
 4       8816 Spanish Ridge Avenue
         Las Vegas, NV 89148
 5
     For Defendants:
 6
         LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
 7       BY:  KRISTOL BRADLEY GINAPP, ESQ.
         6385 South Rainbow Boulevard
 8       Suite 600
         Las Vegas, NV 89118
 9
10   Also Present:  David Gardner
```

## Page 3

```
 1                   I N D E X
 2   WITNESS: JERAMY EDGEL
 3                                  PAGE
 4   Examination By Mr. Gutierrez        5
     Examination By Ms. Ginapp          83
 5   Further Examination By Mr. Gutierrez  123
 6
 7            INDEX TO EXHIBITS
 8   Exhibit                     Page
 9    1   Subpoena to Testify at a   43
         Deposition in a Civil Action,
10       To: Jeramy Edgel
11    2   Intake paperwork for Grecia  44
         Echevarria, Bates labeled
12       RW-000001-15
13    3   Employment Agreement, Bates  47
         labeled RW-000016-28
14
      4   "Message to Garcia" Video   52
15       Review, Bates labeled
         RW-000031-32
16
      5   "The Secret" Review        52
17
      6   "The Way to Happiness" Video  52
18       Review
19    7   Real Water Course Memo, Bates  19
         labeled RW-000060-61
20
      8   Non-Optimum Reports, Bates   67
21       labeled PLTF00001-6
```

## Page 4

```
 1           (Exhibits Continued)
 2    9   Final Paycheck Receipt      67
         Acknowledgment; Separation
 3       Certificate; List of Prior
         Inventions and Original Works
 4       of Authorship; Nevada Labor
         Code Section 2870, Bates
 5       labeled RW-000046-49
 6   10   Real Water Product         67
         Demonstration Reports, Bates
 7       labeled RW-002424-2435
 8   11   E-mails, Bates labeled     67
         RW-002437-2455
 9
10   12   Notice of Charge of        67
         Discrimination, Bates labeled
11       RW-000066-68
12   13   Printout of text messages,  67
         Bates labeled PLTF00185-200
13   14   Excerpts from Basic Study  29
         Manual Course, beginning with
14       Bates label RW-000149
```

Electronically signed by Mary Cox Daniel (101-361-287-3117)          e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 5

1 (A discussion was held off the record between the court
2 reporter and counsel, wherein counsel present agreed to
3 waive the reporter requirements as set forth under NRCP
4 Rule 30(b)(4) or FRCP Rule 30(b)(5), as applicable.)
5           JERAMY EDGEL,
6 having been first duly sworn to testify to the truth,
7 the whole truth and nothing but the truth, was examined
8 and testified as follows:
9
10           EXAMINATION
11 BY MR. GUTIERREZ:
12    Q    Good morning.  Can you state and spell your
13 name for the court record?
14    **A    Jeramy Edgel.  J-E-R-A-M-Y.  Last name Edgel,**
15 **E-D-G-E-L.**
16    Q    Have you ever had your deposition taken
17 before?
18    **A    I never have.**
19    Q    Have you ever testified in court?
20    **A    I have at my own court hearing.**
21    Q    What was that for?
22    **A    Criminal case in 2004.**
23    Q    I just want to go over some of the ground
24 rules of the deposition --
25    **A    Wait.  Actually, I didn't testify at that.**

Page 6

1    Q    You did not?
2    **A    I did not, now that I think about it.**
3    Q    So you never stood in front of a judge and
4 raised your right hand to give an oath?
5    **A    Right.**
6    Q    Okay.  I just want to go over some of the
7 ground rules of depositions so you're familiar with the
8 process and we're on the same page.
9        The oath you just took is the same oath that
10 you would take if you were in a court of law and you
11 were testifying in front of a judge and a jury.  Okay?
12 Do you understand that?
13    **A    I have a lot of friends that are in law**
14 **enforcement, and they've explained this to me.**
15    Q    Perfect.  So another rule that we have is
16 because the court reporter is taking down my questions
17 and your answers, it's important for you to let me
18 finish each question before you respond to we can have
19 a clean deposition transcript.  Do you understand that?
20    **A    Got you, yeah.**
21    Q    It's also important to wait because counsel
22 for Real Water may have an objection.  If she objects,
23 it's for the court record.  And we still have expect
24 you to answer the question.  Okay?
25    **A    Okay.**

Page 7

1    Q    If any questions I ask you don't make sense,
2 or you need me to rephrase it, just let me know.  What
3 we're trying to do here is just get your testimony
4 about your time working at Real Water.  Okay?
5    **A    (Witness nods head).**
6    Q    And that's another rule, too.  You can't nod.
7    **A    Yes, she can't notate the nod.**
8    Q    She can't take your nodding of the head, or
9 "uh-huh."  So make sure all your answers are verbal.
10    **A    No worries.**
11    Q    I don't think we'll be here too long, but if
12 you need a break, just let me know.  Okay?
13    **A    Okay.**
14    Q    Can you give us an overview of your
15 educational background?
16    **A    I attended high school at Cheyenne High**
17 **School, and then dropped out when I was a junior.  And**
18 **then I finished high school at Adult High, which is**
19 **through Clark County School District; and then attended**
20 **college at College of Southern Nevada.**
21    Q    What did you study at the College of Southern
22 Nevada?
23    **A    GA, just a general associate's degree, but**
24 **mostly marketing and entrepreneurship.**
25    Q    Did you get any degrees there?

Page 8

1    **A    I did not.**
2    Q    Did you go to any other colleges or
3 universities?
4    **A    No.**
5    Q    Tell us about your work experience prior to --
6 or, following college.
7    **A    Mostly it's been sales, sales and politics.  I**
8 **got my real estate license in 1999, and started selling**
9 **timeshares at Polo Towers and worked for a number of**
10 **developers.  Was very successful at that.  That's what**
11 **I'm doing now, working for Hilton Grand.  So, mostly**
12 **sales.  And politics is very closely related to sales,**
13 **just sales on a bigger sale.**
14    Q    You said you're working currently for Hilton?
15    **A    Hilton Grand Vacation Club.**
16    Q    What's your position there?
17    **A    In-house sales.**
18    Q    How long have you been in that position?
19    **A    Just started.**
20    Q    A few weeks?  A month?  How long has it been?
21    **A    I start boot camp this week.**
22    Q    Prior to working at Hilton Grand Vacation
23 Club, you worked at Real Water; correct?
24    **A    Yes.**
25    Q    What was your position at Real Water?

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 9

1      A   I started in sales, and then became director
2    of sales, and then became the vice president of sales
3    and distribution.  At one point, I was a vice president
4    of sales, distribution, and human resources.  And that
5    was quite a headache, in which case we, I think, put
6    Aimee over human resources managing Shawna.  I don't
7    recall Shawna's last name.
8      Q   Is that Aimee Jones?
9      A   Yeah.
10     Q   When did you start working at Real Water?
11     A   Right after the election.  The election was on
12   the 10th.  And so I took a week off because during the
13   election, you're going seven days a week, a million
14   hours a day.  So it would have been November of 2014.
15   An exact date, I don't have off the top of my head, but
16   probably like the 17th, would make sense.
17     Q   Were you working for Brent Jones on his
18   campaign at that time?
19     A   Yeah.  I ran his ground game.
20     Q   For when he ran for State Assembly in 2014; is
21   that correct?
22     A   Correct.  I ran his ground game in the
23   primary.  And then also ran his ground game in the
24   general as well.
25     Q   How did you get the job at Real Water?  Did

Page 10

1    Brent offer you the position following your work with
2    him in politics?
3      A   Yeah.  He saw how I could manage other human
4    beings on the campaign, and the sales ability, and
5    thought it would be a good fit.
6      Q   So from 2014 to -- well, when did you leave
7    Real Water?
8      A   January 7th of 2017.
9      Q   What was the reason you left the company?
10     A   A lot of crazy stuff, man.  We just weren't
11   vibing anymore.
12     Q   What does that mean?
13     A   I worked for Brent for a long time.  And it
14   just -- we were just having a conflict that didn't make
15   sense.  He's kind of a "my way or the highway" type of
16   guy.  And just didn't make sense.  I had better
17   financial opportunities elsewhere.  At Hilton, I can
18   make more a month than I made a year there.
19     Q   Did you take a leave of absence at all prior
20   to you leaving the company?
21     A   Yeah.
22     Q   What was that for?
23     A   I was sent to Florida to go to what's called
24   Narconon.
25     Q   I'm sorry.  What is it?

Page 11

1      A   It's called Narconon --
2      Q   Okay.
3      A   -- which is a rehab facility that is
4    supposedly non-denominational, but is Scientology, is
5    like a Scientology boot camp.  It's like an
6    introductory to Scientology.
7      Q   Who sent you to that boot camp?
8      A   The Joneses.
9      Q   When you say "the Joneses," you're talking
10   about Aimee and Brent Jones; is that correct?
11     A   Yeah.
12     Q   Now, during the deposition of Brent Jones on
13   December 28th, 2016, he testified that you were in
14   rehab, that you were on a leave of absence, you were in
15   rehab.  That's the rehabilitation he was talking about?
16        MS. GINAPP:  Objection.  Form.  Foundation.
17   BY MR. GUTIERREZ:
18     Q   You can answer.
19     A   I wasn't there at that point in time.  I left
20   on Christmas Eve, on December 24th.
21     Q   Tell me about the circumstances of the Joneses
22   sending you to this rehabilitation facility.
23        MS. GINAPP:  Objection.  Form.
24   BY MR. GUTIERREZ:
25     Q   How did it come about?  What did they say?

Page 12

1    "Hey, Jeramy, we want you to travel to Florida and take
2    this rehab"?
3        MS. GINAPP:  Objection.  Form.
4    BY MR. GUTIERREZ:
5      Q   You can answer.
6      A   I don't understand what that means.
7      Q   So what that means -- let me just be clear.
8    When counsel objects to my question, it's for the
9    transcript so that when we go to court later, we can
10   discuss whether it was a proper question before the
11   judge.  So when you get a booklet to read, my questions
12   and your answers afterwards, there will be an
13   objection, that we can argue on later.  But we still
14   expect you to answer the question.
15     A   Gotcha.
16     Q   So unless someone tells you not to answer, we
17   still expect you to answer the question.  Both of us
18   will have objections to each other's questions as this
19   deposition goes on.  It's just for the court record.
20     A   Gotcha.
21     Q   So I'll ask the question again.
22        What were the circumstances around the Joneses
23   sending you to this rehabilitation facility in Florida?
24        MS. GINAPP:  Same objection.
25        THE WITNESS:  They ultimately said I had to go

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 13

1  there or I was fired.  And until it got into the
2  brainwashing type stuff, I was fine with it.
3  BY MR. GUTIERREZ:
4    Q   Okay.  What does that mean?
5    **A   So there's a thing in Scientology called**
6  **objectives.  And what that means is taking commands.**
7  **So you'll spend eight hours a day in a room this size**
8  **where a person will tell you to stand up, thank you,**
9  **and then sit down, thank you, and then stand up, thank**
10 **you, sit down, thank you.  And the next day will be**
11 **putting your nose in a corner.  Then the next day will**
12 **be touching a table.  Don't touch a table.  Thank you.**
13 **Now touch a table.  Don't touch a table.  Thank you.**
14 **Then the next day will be touching a wall.  Then don't**
15 **touch the wall.  Then touch the wall.  Then don't touch**
16 **the wall.  The purpose of it is -- I don't really**
17 **know -- but it seemed like a whole bunch of**
18 **brainwashing to me, and I couldn't vibe with it**
19 **anymore.  I couldn't do it.**
20   Q   Did you voice this objection to the Joneses?
21   **A   They wouldn't be heard.  So I left.**
22   Q   You left what?
23   **A   The rehabilitation facility in Florida.**
24   Q   Did that ultimately lead to you leaving the
25 company?

Page 14

1    **A   Yeah.**
2    Q   Were you officially terminated, or did you
3  quit?
4    **A   No, I officially quit.**
5    Q   Okay.  You just felt that you could not return
6  to that work environment based upon the Joneses'
7  actions with you, or interactions with you?
8        MS. GINAPP:  Objection.  Form.
9        THE WITNESS:  Yes.
10 BY MR. GUTIERREZ:
11   Q   Did you feel, based upon you not completing
12 this rehabilitation which was religious based, that you
13 could not work in Real Water anymore?
14        MS. GINAPP:  Objection.  Form.  Misstates
15 testimony.
16        THE WITNESS:  Yes.  I knew that if I didn't
17 finish it, I would be fired for one reason or another.
18 BY MR. GUTIERREZ:
19   Q   Explain that.  So do you feel that the Joneses
20 would be come up with some sort of alternative reason
21 to fire you?
22        MS. GINAPP:  Objection.  Form.  Foundation.
23        THE WITNESS:  They would have tried.  When I
24 started with Real Water, they had one direct sales
25 distribution distributor, which is here in Las Vegas,

Page 15

1  is Nevada Beverage, Budweiser.  After my tenure there,
2  they had the entire network of Southern California that
3  I closed myself.  So when you have statistics like that
4  to go from distribution for conventional channels of 2
5  million people in Las Vegas -- and there seven years --
6  to fast forward two years, now you have direct
7  distribution to 20 million people -- it's pretty hard
8  to find a valid reason to fire somebody.  But from my
9  experience in politics, I keep eyes and ears
10 everywhere.  And so I got intel that Aimee was telling
11 people in the company that I was already gone prior to
12 having them having a reason to fire me.
13 BY MR. GUTIERREZ:
14   Q   What was Aimee telling people?
15   **A   That I was no longer working with the company.**
16   Q   This was before you had completed this
17 rehabilitation that they sent you to?
18   **A   No.  This was after I left.**
19   Q   Okay.  So you believe, as you sit here today,
20 that you would have been fired or set up to be fired
21 for some alternative reason?
22   **A   Absolutely.**
23        MS. GINAPP:  Objection.  Form.  Foundation.
24 BY MR. GUTIERREZ:
25   Q   Do you believe that based on your experience

Page 16

1  at Real Water and watching them do that to other
2  people?
3        MS. GINAPP:  Same objection.
4        THE WITNESS:  It depends.  I mean, I've seen
5  people be terminated for being fat.  I've seen people
6  be terminated for other reasons.  There really
7  aren't -- so there's two different types of
8  Scientology; right?  There's what's called
9  Administrative Tech, which is basically business study
10 that's written by the same guy that wrote all the stuff
11 for Scientology, L. Ron Hubbard, that is non-secular.
12 And then there is religious stuff.
13      And I did Scientology in June for a period of
14 time, and I still couldn't find the religion in it.
15 I'm a Christian.  And I still couldn't find the
16 religion in it.  But maybe for purposes of their
17 charity to maintain a tax exempt status, they call it a
18 religion, but I really couldn't even find the religion
19 in the religious stuff that you did.
20      But at Real Water, we would use Administrative
21 Tech, which is non-secular.  Basically people would
22 come to us -- we would hire people from Hope for
23 Prisoners that couldn't read, didn't know how to learn.
24 And so we would have them do the basic study text.  The
25 Basic Study Manual really teaches people how to learn

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 17

1  and how to read, but really isn't religious. So I
2  don't know very many people that worked there that did
3  the religious stuff. I mean, we had a Purif on site,
4  but there really aren't that many people that even
5  participated in that.
6  BY MR. GUTIERREZ:
7    Q  I'm sorry. What was that? A Purif?
8    A  Yeah. A Purif is -- the first step in
9  Scientology is to get all the toxins out of your body.
10  So you go into a sauna. The part that I completed at
11  the rehab that I found to be advantageous was to -- you
12  take certain oils and supplements, and run for half
13  hour every day, and then go sit in a sauna for four and
14  a half hours and sweat out all the toxins, residual
15  toxins in the fat of your cells, and get all of the
16  toxins out of your body. It's like the first step
17  of Scientology. It's called the Purif. But, I mean,
18  there was one gal that did that and quit. But she
19  wasn't terminated.
20    Q  You said you did a Purif on site at
21  Real Water?
22    A  They have a sauna, yeah.
23    Q  Is the purpose of the sauna to go through this
24  process that you just described that's called the
25  Purif?

Page 18

1    A  Yeah.
2    Q  It was accessible for various employees who
3  wanted to do that, to go through this process on site at
4  Real Water; is that correct?
5    A  Yeah, as an elective thing. That was not a
6  required thing.
7    Q  At some point, did Real Water start moving
8  some of the elective materials into mandatory
9  materials?
10    MS. GINAPP: Objection. Form.
11    THE WITNESS: Absolutely, yeah. Not the
12  religious stuff. Again, there's a difference --
13  according to them, there's a difference between -- and
14  I do see some distinction between the Administrative
15  Tech and the secular stuff. Again, I still don't know
16  where the God is in all of this stuff, making it
17  religious. But the Admin Tech was mandatory for
18  everybody.
19  BY MR. GUTIERREZ:
20    Q  Okay. But the optional courses that you
21  received a 25-cent-an-hour raise by taking were
22  optional?
23    A  Yes -- no, no, those are mandatory for
24  everybody. Everybody has to do those.
25    Q  Okay. Let me back up. I probably have the

Page 19

1  wrong understanding as to what was mandatory. So
2  you're saying the courses where you take and get a
3  25-cent-an-hour raise were mandatory as well?
4    A  Yes.
5    Q  Who made those mandatory?
6    A  Aimee Jones.
7    Q  In what way did she make those mandatory?
8    A  They were mandatory, man.
9    MR. GUTIERREZ: Let me give you some
10  documents, that will help you look through some of the
11  Real Water material for what they've disclosed in this
12  case as potentially --
13    Let's attach this as Exhibit 7. I'll go
14  through in order and back up.
15    (Exhibit 7 marked)
16  BY MR. GUTIERREZ:
17    Q  Jeramy, what I've attached as Exhibit 7 is a
18  Real Water Course Memo that has been disclosed in this
19  case. Have you seen this document before?
20    A  Yeah.
21    Q  Now, is this document a list of courses that
22  Real Water gives that you're saying is actually
23  mandatory?
24    A  Yeah.
25    Q  Okay.

Page 20

1    A  But nobody really does it. I mean, it is
2  mandatory. What most people get through is Basic Study
3  Manual, which is what I was telling you about, that
4  just teaches you really how to read. It's like a
5  cartoon book. For those that have an education above
6  the third grade, it's kind of offensive.
7    "Speaking From Experience," it's kind of the
8  same. "How to Increase Efficiency in Your Company," is
9  good. "Formula for Success" is good. The
10  communication course is good. "Ups and Downs" is good.
11  "Management by Statistics," everyone has to operate off
12  of.
13    So not everybody does these, but it is
14  mandatory.
15    Q  What are the consequences of not doing these?
16    A  Getting yelled at.
17    Q  Anything else?
18    A  It's a constantly overturning wheel. One of
19  the biggest arguments -- one of the things we did was
20  throw fights. And the biggest argument that we had
21  from Sam's Town and the Silverton that no one ever
22  stayed there for any period of time. So it's a
23  revolving wheel of employees. Besides Anthony
24  Randolph, I believe there was no one there that's been
25  there for as long as I had been there.

Page 21

1    Q    At Real Water?
2    A    **Correct, other than Blain Jones.  Blain Jones**
3    **is a majority stockholder.**
4    Q    And he's Brent's son?
5    A    **He's Brent's oldest son.**
6    Q    So one of the conversations you had at Real
7    Water was the fact that there is a revolving wheel of
8    employees; correct?
9    A    **Yeah.**
10    Q    What was the reason for that?
11    A    **I think pay, lack of education, better**
12    **opportunities elsewhere.**
13    Q    Do you think any of the Scientology material,
14    whether it was secular or non-secular, had a factor in
15    some of the employees not wanting to stay there?
16        MS. GINAPP:  Objection.  Form.  Foundation.
17        THE WITNESS:  People have said that.  More
18    people have said it was the craziness that has gone on
19    between Brent and Aimee screaming in the office, and
20    things like that.
21    BY MR. GUTIERREZ:
22    Q    Is that screaming based upon -- you talked
23    about it earlier -- people not doing these mandatory
24    courses on the Real Water Course Memo?
25    A    **No --**

Page 22

1        MS. GINAPP:  Objection.  Form.  Foundation.
2        THE WITNESS:  No, no, that's just their deal.
3    BY MR. GUTIERREZ:
4    Q    Okay.  That's how they run the company?  Okay.
5        Now, this Real Water Course Memo has 18
6    different courses on it.  You're familiar with all 18;
7    is that correct?
8    A    **I have not done all 18, no.  I have done "Ups**
9    **and Downs," PV and I, which is "Personal Values and**
10    **Integrity."  I've done portions of "Management by**
11    **Statistics" enough to use it.**
12        **So we have what are called statistics that are**
13    **due every Monday that -- I think most corporations use**
14    **one form of statistics or another.  It's just a way to**
15    **judge and gauge how effective each department has been.**
16    **So every department head is required to do -- to turn**
17    **in statistics every week.  Every employee is required**
18    **to turn in their statistics.  So, for example, my**
19    **salespeople would have to notate, Monday through**
20    **Friday, I hit "X" amount of community stores, liquor**
21    **stores, health food stores, I sold "X" amount; I sold**
22    **"X" amount of cases, and then turn it in.  So everyone**
23    **has to have at least some grasp of how to use**
24    **statistics in order to be employed there.**
25        **Most employees that stay there finish the**

Page 23

1    Basic Study Manual, "Speaking From Experience," and
2    statistics.
3    Q    Okay.  Now --
4    A    **I mean, in all sincerity, besides Brent and**
5    **Aimee or Blain, I don't know anybody who has done all**
6    **18 courses.  I didn't.  I did Basic Study Manual,**
7    **"Speaking From Experience."  The last course I was on**
8    **was "Formula for Success."  But I did "Ups and Downs"**
9    **through the Church of Scientology, and "Personal Values**
10    **and Integrity" through the church of Scientology.**
11    Q    Brent Jones, Blain Jones, and Aimee Jones have
12    all been deposed in this case.  They've all testified
13    that these courses are optional.  Is that accurate?
14    A    **No.**
15    Q    Would the company treat employees differently
16    who did not take these courses?
17        MS. GINAPP:  Objection.  Form.  Foundation.
18        THE WITNESS:  Yeah.  You'd get a round of
19    applause if you finished your coursework.  Brent and
20    Aimee don't commonly have, at least in my experience,
21    hands-on experience with the employees.  They have
22    hands-on experience with employee heads.
23        I didn't give a crap if somebody had done
24    their coursework or not.  I care if somebody was an
25    effective employee, because that affects my statistics

Page 24

1    and whether I'm in a good or a bad zone in my
2    statistics.
3        And I was the person that would deal the
4    employees, whether they were merchandisers, demo girls,
5    salespeople.  And so most salespeople don't have a lot
6    of interaction with ownership.  They deal with the
7    buffer between ownership and the front lines, which
8    would be myself and my junior, Ryan Moodley, that I
9    would delegate really to have him deal with people more
10    so I could focus on expansion.
11    BY MR. GUTIERREZ:
12    Q    Who else would be considered an employee head
13    that would have the supervisory capacity that would
14    report to Brent or Aimee?
15    A    **At this point, I don't know what Anthony**
16    **Randolph's role is.  He was my boss prior to me**
17    **replacing him, and him moving over to more like a**
18    **broker role.  Prior to my tenure, I don't know.  I know**
19    **that Frank -- and I don't know Frank's last name -- has**
20    **assumed my position.**
21    Q    Is it Consiglio?
22    A    **Something like that, yeah.**
23    Q    What about Bonnie Mercado, did she have any
24    supervisory capacity?
25        MS. GINAPP:  Objection.  Form.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 25

1      THE WITNESS:  Sort of.  She was like my lead
2   demo girl.  Bonnie is a fricking superstar, just a ton
3   of enthusiasm, and was like the lead demo person for a
4   period.  Now she's in a different department.  But she
5   was the lead demo/merchandiser girl that would go on
6   trips for me, and then also merchandise the stores here
7   in Las Vegas.
8   BY MR. GUTIERREZ:
9      Q   Okay.  Now, these optional courses -- or
10   they're labeled as optional, you testified that they're
11   mandatory.  If somebody does not take it, they do not
12   get any raises; is that correct?
13      A   Correct.
14      Q   That's even a discretionary raise?  If someone
15   has not taken these courses, they're not even going to
16   get a discretionary raise outside of this
17   25-cent-an-hour raise; correct?
18      MS. GINAPP:  Objection.  Form.  Foundation.
19      THE WITNESS:  I think it depends.  Like, my
20   biggest motivation to leave Real Water wasn't because
21   of the Administrative Tech.  And a lot of this stuff
22   teaches you some common sense stuff.  Even "Ups and
23   Down," and "Personal Value and Integrity," which these
24   may not be Dif 6 courses, I did the Dif 6 course not
25   the -- I don't know what versions of "Ups and Downs"

Page 26

1   and "Personal Values and Integrity" these are.  In
2   Narconon, they also did "Ups and Downs" and "Personal
3   Value and Integrity," and it wasn't Dif 6.
4      Dif 6 is the religious version of this book.
5   These may be the admin version, I don't know,
6   through -- not WISE, but through -- I can't think of
7   the name.  They are separate corporations for the
8   Church of Scientology.  So one is secular, one is
9   non-secular.  So these courses may have the same name,
10   but may be a different version of the same course.
11   Maybe the name will come to me.
12      But, I mean, I got a lot out of them
13   personally.  But the reason I left was -- I mean, I had
14   threatened to leave before, and Brent offered me more
15   money to stay because I have a very unique skill set
16   for closing multi-million-dollar deals.  And it doesn't
17   make sense to me to just settle for craziness if I can
18   have a simpler life and make more money elsewhere.
19      But I believe in -- I also had a stock option
20   agreement.  If I would have lasted another year, I
21   would have had 150,000 shares, which on an IPO would
22   turn into a lot of money.  But I ultimately believe
23   that the IPO would never come, because things aren't
24   done the right way.  You have to put money in
25   marketing.  You have to -- there are just things that

Page 27

1   you have to do, man, to get enough market share to have
2   a decent evaluation and IPO.
3      MS. GINAPP:  I'm going to object to this
4   testimony as it's not responsive to any question.
5   BY MR. GUTIERREZ:
6      Q   You can finish.  Go ahead.
7      A   So that's the reason I left, not because of
8   Scientology, was that I wanted to make more money
9   elsewhere.
10      Q   Okay.  Had you gone to one of these
11   rehabilitation facilities before you went there in
12   December?
13      A   No.
14      Q   Had anyone else at Real Water, that you know
15   of, gone to one of those rehabilitation facilities?
16      A   To Narconon?
17      Q   Yeah.
18      A   I don't know if Blain did or not.  I don't
19   know.
20      Q   How many days were you there?
21      A   November 20th to December 24th -- no.  I left
22   the night of the 23rd, and arrived back in Vegas on the
23   24th.  So, a month and a couple days.
24      Q   Where was it located at?
25      A   In -- I have the exact address -- in

Page 28

1   Clearwater, very close to what's called Flag, which is
2   the Scientology mecca of the country.  1390 Sunset
3   Point Road in Clearwater, Florida 33755.
4      Q   Now, Narconon, is that through the Church of
5   Scientology, as far as its rehabilitation facility?
6      A   It is Scientology, period.  The first things
7   you do in Scientology is do a Purif, do your "Ups and
8   Down" course, do "Personal Values and Integrity," do
9   objectives, and do ethics.  It is exactly as any new
10   start of Scientology would go through.
11      In fact, the reason that Narconon has such a
12   bad name -- if you go online, it looks horrific -- and
13   the reason that some people drop out of it is because
14   it's not presented as Scientology, and then once you
15   get into it, all they do is talk L. Ron Hubbard the
16   entire time.  And then once you get into the meat of
17   it, it's founded on the principles of L. Ron Hubbard.
18   It's Scientology, man.
19      Q   How is that different from some of the tech
20   materials that are L. Ron Hubbard based that Real Water
21   claims is secular?
22      MS. GINAPP:  Objection.  Form foundation.
23      THE WITNESS:  Business.  So the Basic Study
24   Manual, "Speaking from Experience," "How to Increase
25   Efficiency in Your Company," "Formula for Success,"

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                        e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 29

1  "Improving Business through Communication," "Executive
2  Basics" -- these are all things of how to run your
3  business. "Ups and Downs" is something we did at
4  Narconon. "Personal Values and Integrity" is something
5  we did at Narconon. "Statistics" is something you did
6  at Narconon. I mean, the difference is one is for
7  business, and one is for yourself.
8        MR. GUTIERREZ: Okay. I want to attach this
9  as Exhibit 14.
10        (Exhibit 14 marked)
11  BY MR. GUTIERREZ:
12    Q   Jeramy, is this a copy of the Basic Study
13  Manual that you've reviewed?
14    A   Uh-huh.
15    Q   That's a "yes"?
16    A   Oh, I'm sorry. Yes.
17    Q   Okay. This is part of their, quote, optional,
18  unquote, course that you just testified that were
19  mandatory. But this is supposed to be purely secular
20  in nature; is that correct?
21    **A   I have a misunderstood on the word "secular."**
22  **I think this means it's non-secular, or it's -- that's**
23  **just a different word. This is supposed to mean**
24  **non-religious. I think that this particular course is**
25  **non-religious.**

Page 30

1    Q   Okay. And that's what I meant. So
2  non-religious, it's supposed to be non-religious, and
3  just a business base?
4    **A   This version is not the version that we used**
5  **at the office. We used a book. So I'm not familiar**
6  **with this book.**
7    Q   This version right here has -- if you skip to
8  the back -- and I want to call your attention to these
9  numbers at the lower right-hand corner which are called
10  Bates numbers where you see "RW."
11    **A   Yeah.**
12    Q   If you go to RW-265 --
13    **A   Okay.**
14    Q   -- it has a list of Scientology Churches and
15  Organizations, where somebody who was looking at this
16  could presumably inquire more into Scientology as a
17  religion. Do you see that?
18    **A   Uh-huh.**
19    Q   That's a "yes"?
20    **A   Oh, I'm sorry. Yes.**
21    Q   Okay.
22        MS. GINAPP: I'm going to lodge a continuing
23  objection to this exhibit based upon it being
24  incomplete.
25  /////

Page 31

1  BY MR. GUTIERREZ:
2    Q   Go to page 249 as well.
3    A   Okay.
4    Q   The second paragraph of this end note states
5  that, quote, "There is a further Scientology service
6  available which you should now do which is designed to
7  bring you greater success and happiness in your work,
8  your social life, your relationships with others, or
9  any aspect of your life," unquote.
10        Have you seen that before?
11    **A   Like I was saying, this is a different version**
12  **than what we used. I've never seen this Basic Study**
13  **Manual Course, of this version. We had books, and I**
14  **was given on a zip drive to give to employees that were**
15  **not in the city of Las Vegas and on the road to do this**
16  **course. And that version looks different than this.**
17  **I've never seen that course.**
18    Q   This was produced by Real Water. So this is
19  the version that they gave to us when we requested
20  documents.
21    A   Okay.
22    Q   I don't know if there's another version out
23  there. But this is what we've been referring to in the
24  course of this litigation.
25    A   Okay.

Page 32

1    Q   But based on your experience at Real Water, in
2  looking at something like this, wouldn't you agree that
3  this is almost promoting or introducing somebody to
4  Scientology as a religion?
5        MS. GINAPP: Objection. Form. Foundation.
6        THE WITNESS: "The Way to Happiness" is the
7  Scientology moral code. And I can't tell you the
8  number of employees I had to sit and monitor and make
9  sure that they watched it.
10  BY MR. GUTIERREZ:
11    Q   "The Way to Happiness" is one of the four
12  videos that's mandatory when an employee starts at
13  Real Water; correct?
14    A   Yeah.
15    Q   And that's been referred to as the "Gateway to
16  Scientology"; is that correct?
17        MS. GINAPP: Objection. Form. Foundation.
18        THE WITNESS: Sort of. It's like -- it's a
19  moral code. So, Christianity has the Ten Commandments.
20  Scientology has "The Way to Happiness." It's like more
21  commonsense ways to live your life. If you cheat on
22  your wife, you run the risk of getting a
23  sexually-transmitted disease and/or she would get
24  jealous and kill you, rather than God will strike you
25  down and you'll end up in hell. It's more like common

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 33

1  sense, pro-survival solutions to living life and being
2  successful.
3  BY MR. GUTIERREZ:
4    Q   Right, which -- to each their own, and anyone
5  who has their own religious beliefs.  But when it comes
6  to the workplace and Title VII and freedom of religion,
7  do you believe that Real Water was forcing their
8  religious beliefs down their employees' throats by
9  forcing them to watch these videos?
10      MS. GINAPP:  Objection.  Form.  Foundation.
11  Calls for a legal opinion.
12      THE WITNESS:  Until you get into the higher
13  levels of Scientology, it's pretty fluffy.  I mean,
14  it's pretty -- I mean, in my introduction to
15  Scientology, they told me I could be a Christian and a
16  Scientologist.  That's absolutely not the case.  But
17  when I was being introduced to it, that's what I was
18  told.  And so by having people watch "The Way to
19  Happiness," I don't think it would violate the Ten
20  Commandments or violate any of their religious beliefs.
21  The further you get into Scientology, yeah, absolutely.
22  BY MR. GUTIERREZ:
23    Q   And that's --
24    A   But "The Way to Happiness" -- I mean, I didn't
25  notice anybody get offended by "The Way to Happiness."

Page 34

1  I got offended the number of times I had to watch it,
2  you know, because it got so boring, but --
3    Q   That's sort of -- there's an overlap,
4  obviously, if somebody has moral beliefs based on
5  whatever their religion is.  But like you stated, at
6  some point as you get further into Scientology, it
7  starts to veer and pull people more into that
8  direction.  Is that what you believe?
9    A   Yeah.
10      MS. GINAPP:  Objection.  Form.  Foundation.
11  BY MR. GUTIERREZ:
12    Q   And these courses and the way they're set up
13  are designed for that; isn't that correct?
14      MS. GINAPP:  Objection.  Form.  Foundation.
15      THE WITNESS:  Ultimately, yes.  Like I stated,
16  I hadn't done all of these courses, and was really more
17  focused on expanding the company than getting
18  coursework done.  I felt that coursework was a waste of
19  my time, and that I already had all the tools to expand
20  the company.  So having to do statistics every day
21  slowed me down.  Having to do coursework every day
22  slowed my down.  My gift was closing and expanding the
23  marketplace.
24      So I really -- I've seen this memo before,
25  Exhibit No. 7, but I really hadn't given it -- it was

Page 35

1  in a big stack on my desk of additional memos that I
2  paid no mind to.  I did as much coursework as I needed
3  to get through the day, you know, to navigate through
4  the company.  But coursework really wasn't my priority.
5  Expanding the company's empire was my priority.  But it
6  is interesting that "Ups and Downs" and "Personal
7  Values and Integrity" is on here.
8  BY MR. GUTIERREZ:
9    Q   Why is that?
10    A   Because those are straight-up Scientology
11  courses.
12    Q   So there's nothing non-religious about those
13  courses; correct?
14    A   That's true.
15    Q   They're strictly Scientology based?  Okay.
16    A   I did them at the Mission in Orange County.
17    Q   What was the Mission in Orange County?
18    A   So you have different levels.  So you have --
19  like here in Vegas we have what's called an Org, which
20  stands for an organization, which is a big church.
21  Then you have like Flag in Florida, which is a massive
22  church.  Then you have Missions, which are like a
23  smaller church.  It's still the Church of Scientology,
24  but it's -- you may only have one or two case
25  supervisors, and a Mission.  In an Org, you might have

Page 36

1  a bigger number than that.  At Flag, you'll have
2  hundreds of case supervisors doing auditing and
3  different drills.  So I did "Ups and Downs," "Personal
4  Values and Integrity" -- a bunch of other courses that aren't on
5  this list -- but I did "Ups and Downs" and "Personal
6  Values and Integrity" at the Mission in Orange County,
7  California.
8    Q   Did you do those as part of your employment
9  with Real Water, or based on you looking into the
10  Scientology religion?
11    A   Brent sat me down in June and told me that I
12  needed to go do my Purif if I wanted to continue with
13  the company.  So at that same time, I was also -- I had
14  just closed, or was in the process of closing Budweiser
15  called Straub, which is the most profitable Budweiser
16  in California, the Budweiser of Orange County, which is
17  one of the most affluent parts of California.
18    Q   So Brent Jones sat you down in June 2016 and
19  said your employment was contingent upon you going to
20  do these Scientology courses?
21      MS. GINAPP:  Objection.  Form.
22      THE WITNESS:  And doing a Purif.
23  BY MR. GUTIERREZ:
24    Q   And a Purif?

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 37

1     **A   Yeah.**
2     Q   And this is after this lawsuit had been filed;
3  is that correct?
4         MS. GINAPP:  Objection.  Form.
5         THE WITNESS:  I don't know when the lawsuit
6  was filed.
7  BY MR. GUTIERREZ:
8     Q   The lawsuit was filed in April of 2016, and
9  Mr. Jones --
10    **A   This would be June of 2016.**
11    Q   So right around the time he had his primary?
12    **A   Yeah.  I did disaster relief for -- you know,**
13    **once this hit the press, I had to do damage control,**
14    **and get our side of the story out.  So I reached out to**
15    **my contacts at Channel 13 and got us some on-air time**
16    **right before the primary hit.**
17    Q   Okay.  What was that --
18    **A   Well, there was so much press about this**
19    **particular case.  And I had to spin it some way.  I had**
20    **to at least get our version of the story out.  And not**
21    **all media gives you fair coverage, certainly.  They'll**
22    **take one word and spin it -- I mean, if you change one**
23    **word in a sentence, it changes the whole meaning of the**
24    **sentence.  And a lot of reporters are known for doing**
25    **this.  As Brent Jones' Chief of Staff in Carson City, I**

Page 38

1  **learned which reporters I could trust, and which**
2  **reporters I couldn't trust, which ones would quote me**
3  **verbatim if they were writing an article in the**
4  **newspaper and going to quote me or quote the**
5  **Assemblyman.  And so I had a relationship with Riley**
6  **Snyder of the Associated Press who is also a**
7  **correspondent at Channel 13 News, and so I reached out**
8  **to Riley because I knew that his team would give us**
9  **fair coverage and quote us verbatim.**
10    Q   What was the spin that the company put on this
11  case?
12    **A   That really -- so "spin" is a word that we**
13    **use.  It doesn't necessarily mean change the truth.  It**
14    **just means get your side of the story out.  All the**
15    **news coverage up to that point was looking really bad.**
16    **And so I wanted to get Brent on air to get his version**
17    **of the story out in the media.  Even though it wouldn't**
18    **get as much coverage as the negative stuff, I had to**
19    **get it out in the media so we could have our**
20    **constituents see that there's another side of the**
21    **story.**
22    Q   And what was Brent's position on air?
23    **A   I don't have it memorized.  Just that it was**
24    **an attack from the Governor more so than anything of**
25    **substance.  We opposed the Governor in his tax increase**

Page 39

1  **openly.  The Governor is kind of a powerful guy, and**
2  **kind of runs the state.**
3     Q   They usually do.
4     **A   So we were the sharp end of the stick in**
5     **opposition to him.  So we felt at that time that he was**
6     **using Grecia to make Brent look bad.  So we wanted to**
7     **get our version of just that out, that it was a**
8     **political attack more than it was a -- the timing of it**
9     **is what we wanted to get out, that, why this story is**
10    **breaking right now a week before early voting is**
11    **starting rather than any other time.**
12    Q   Did Brent have any proof, or was he just
13  basing this on speculation to get some sort of
14  political spin on it?
15        MS. GINAPP:  Objection.  Form.  Foundation.
16        THE WITNESS:  I mean, getting proof on the
17  Governor is, like -- yeah, good luck with that, man.
18  So, no, it was all speculation.
19  BY MR. GUTIERREZ:
20    Q   What about some of the attacks on Grecia that
21  came about in the media?
22        MS. GINAPP:  Objection.  Form.  Foundation.
23  BY MR. GUTIERREZ:
24    Q   Where did that come from?
25    **A   I ran human relations.  We used a couple of**

Page 40

1  **different consultants to do different things for our**
2  **campaign.  I wasn't responsible or involved with any of**
3  **the attack pieces.  In some cases, I would green light**
4  **or red light a negative mailer or an attack piece,**
5  **because I do have some experience with negative**
6  **campaigning.  But in the negative attacks on Grecia, I**
7  **wasn't involved in that.**
8     Q   Bonnie had reported to a news organization
9  about Grecia's prior health issues, prescription drug
10  use, and financial condition, which was publicly
11  reported.  Who was behind that?
12        MS. GINAPP:  Objection.  Form.
13        THE WITNESS:  We did do a mailer, but I don't
14  know who was -- in all sincerity, I don't know who was
15  behind the motivation for that.
16  BY MR. GUTIERREZ:
17    Q   Did you have any conversations with Brent or
18  Aimee regarding Grecia's lawsuit at the time it was
19  filed?
20    **A   Just that they felt it was frivolous.**
21    Q   Anything else that they discussed about Grecia
22  specifically?
23    **A   I mean, I hired Grecia.  I fired Grecia.  She**
24    **got in a car accident which further inflamed -- if**
25    **that's the word you want to use -- some pre-existing**

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 41

1  medical conditions that she had. I think she had
2  either Crohn's or colitis, and I think another
3  condition, which it's my understanding is just
4  intestinal stuff. I don't really know. And so it made
5  it harder for her to actually work.
6      At one point in time, she couldn't lift -- the
7  majority of her job is setting up -- is merchandising.
8  And what merchandising means is that they create case
9  stack displays in stores, grocery stores, end caps.
10  And they have to build that themselves. And a case of
11  water is like 30 pounds, 30 to 33 pounds, depending on
12  the skew. Skew is a bar code.
13      And so there was a portion of time that she
14  couldn't lift a case of water. So I was rather
15  frustrated with her because she couldn't do her job
16  duties. I understand there's medical restrictions, and
17  whatnot, but I just want my statistics to look good. I
18  just want my job to get done. Regardless of liking
19  somebody or not, I just want the end result.
20   Q   So Grecia was doing her job at the time she
21  worked for Real Water up until this car accident when
22  she was injured? Is that fair to say?
23   A   I think -- yeah, she was injured to some
24  degree. To what degree, I don't really know. I know
25  that those little Smart Cars are like lawnmowers with

Page 42

1  sides on them. So any accident you get into -- I'm not
2  a doctor, but you're probably going to get pretty
3  banged up.
4   Q   So you were the one who hired Grecia; is that
5  correct?
6   A   Uh-huh.
7   Q   That's a "yes"?
8   A   Yes.
9   Q   When you hired her, did she have to go through
10  the mandatory coursework as well?
11   A   She had to start. I don't think that she got
12  past the Basic Study Manual. I didn't do a very good
13  job of forcing people to do coursework because I wanted
14  people out in the field being productive. I
15  didn't do a very good job of doing the coursework
16  myself, because I wanted to work and be productive.
17   Q   Did -- first of all, who did you report to?
18  Who were your supervisors?
19   A   Brent Jones.
20   Q   So did Brent ever talk to you about, "Hey,
21  you're not doing a good enough job making sure people
22  are doing their coursework, we need to stay on top of
23  some of this"?
24   A   Oh, yeah.
25   Q   Your response was, "I want to run the company

Page 43

1  and make sure we're productive, and we need employees
2  out there"; correct?
3   A   Yeah.
4      MR. GUTIERREZ:  Let me back up real quick.
5  Let's start going through some of these exhibits.
6  Attach this as Exhibit 1.
7      (Exhibit 1 marked)
8  BY MR. GUTIERREZ:
9   Q   Jeramy, this is a copy of the subpoena that we
10  sent to you to compel your appearance here today. Have
11  you seen this document?
12   A   Yeah. I was served it.
13   Q   You were served, and you are here today based
14  upon that subpoena; is that correct?
15   A   Yeah.
16   Q   Okay. Other than coordinating dates of this
17  deposition, did you have any conversations with our
18  office regarding your testimony today or the case?
19   A   No.
20   Q   Okay.
21   A   I've been contacted by your law firm and by
22  Real Water's law firm, and haven't taken anybody's
23  phone calls. I have texted David Gardner about this
24  all being bullshit that I have to spend my time dealing
25  with this. And that's the extent of attorneys I've

Page 44

1  communicated with.
2   Q   Fair enough. Okay.
3      Did you review any documents to prepare for
4  your deposition today?
5   A   No. I woke up, took a shower, had a cup of
6  coffee, and got here.
7      MR. GUTIERREZ:  All right. This is Exhibit 2.
8      (Exhibit 2 marked)
9      THE WITNESS:  After consulting an attorney
10  friend of mine and a couple members of law enforcement,
11  they told me that regardless of what paperwork I
12  signed with Real Water and my quitting paperwork, that
13  I should just come here and tell the truth.
14  BY MR. GUTIERREZ:
15   Q   And that's what you're doing today? You're
16  telling the truth; correct?
17   A   I'm just telling you how it is.
18   Q   Okay.
19   A   It's going to create an enemy of
20  Assemblyman -- or -- former Assemblyman Brent Jones
21  that I like as a human being. But the truth is the
22  truth.
23   Q   Why do you believe it would create an enemy?
24   A   Because it just will, man.
25   Q   If telling the truth was beneficial to Brent

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8f b53ff-da05-4ec6-8440-d50a67a3a141

Page 45

1  Jones, why would it create an enemy?
2      MS. GINAPP:  Objection.  Form.  Foundation.
3      THE WITNESS:  It's going to cost him a lot of
4  money.
5  BY MR. GUTIERREZ:
6      Q   Why is that?
7      A   Because I was personally forced to do
8  Scientology, and contingent upon my job.  I'm not suing
9  Real Water.  I'm got getting involved in that.  I'm not
10  going to spend my energy in lawsuits and things that I
11  consider to be negative energy when I can spend my
12  energy closing multi-million-dollar deals making money,
13  that's positive.  But Grecia is.
14      And I was absolutely forced to do Scientology.
15  That was a part of my job.  I'm not saying that she was
16  necessarily, or that any other employees were.  But in
17  any mind, I think that my testimony is going to be bad
18  for them, but -- and he will think that makes me
19  vindictive, or whatever, and I don't have those
20  negatives feelings.  Otherwise, I would be suing him
21  directly.
22      Q   Okay.  So you're here today in response to a
23  subpoena, and you're telling the truth about your
24  experience at Real Water?  That's correct?
25      A   Yes.

Page 46

1      Q   Exhibit 2 that I've handed you is Grecia's
2  intake paperwork with Real Water.  It's dated March
3  11th, 2015?  Do you see that?
4      A   Yeah.
5      Q   Page 2 lists you as her manager.  Do you see
6  that?
7      A   Yeah.
8      Q   And that's correct; right?
9      A   Yeah.  And it's even spelled right.
10      Q   Okay.  When you give an employee this type of
11  intake, describe how that process goes for hiring.
12      A   So at this point, we had a really competent
13  gal running human resources, Melissa.  I don't remember
14  her last name.  So really, I just drop them off with
15  human resources, make sure the front desk -- which at
16  that time was Mimi -- had copies of all the DVDs they
17  had to watch -- "The Way to Happiness," "Letter to
18  Garcia," a video we'd pull off of YouTube called "Just
19  Do It," and then the "Culture" videos which are videos
20  that Brent made himself that just go over the type of
21  culture that it is there.
22      And so I would just hand -- I would get this
23  packet from HR, and then pretty much just hand it to
24  them and say, "This is pretty common sense, fill it
25  out.  If you have questions on the tax paperwork, come

Page 47

1  see me.  Otherwise, it's pretty self-explanatory
2  stuff."  I mean, as far as, like, direct deposit forms
3  and stuff like that, that's beyond my skill.
4      MR. GUTIERREZ:  Okay.  Attach this as
5  Exhibit 3.
6      (Exhibit 3 marked)
7  BY MR. GUTIERREZ:
8      Q   This Employment Agreement, which we've
9  attached as Exhibit 3, is this also part of the intake
10  paperwork for each employee?
11      A   There's a ton of paperwork, but I believe so.
12      Q   Now, do you know the purpose of this
13  Employment Agreement?
14      MS. GINAPP:  Objection.  Foundation.
15      THE WITNESS:  Not really.  I mean, I'm one of
16  those people that actually do read everything you sign.
17  But I don't know what -- I can't pretend to know what
18  they created this form for.
19  BY MR. GUTIERREZ:
20      Q   Look at Section 3 at the bottom of the page.
21      A   Okay.
22      Q   It's entitled, "L. Ron Hubbard."  It discusses
23  use of L. Ron Hubbard's Management Technology in
24  operating the company, but states that the employee is
25  acknowledging that the use of the material for

Page 48

1  Mr. Hubbard is separate and distinct from any religious
2  aspects of Scientology.  Do you see that?
3      A   Yeah.
4      Q   Now, employees are effectively forced to sign
5  off on that; is that correct?
6      A   If you want to get a job.
7      Q   So if they don't sign that, they don't get a
8  job; correct?
9      A   Yeah.  But you got to think about how eager
10  people are when you're looking to get a new job, man,
11  you'll sign about anything.
12      Q   And that's the unfortunate part of why these
13  cases, when they go forward -- and that's why we have
14  Title VII.  So we're looking at this -- you're forced
15  effectively, if you don't sign this, you're not
16  working; correct?
17      MS. GINAPP:  Objection.  Form.  Foundation.
18      THE WITNESS:  In my experience, yeah.  I mean,
19  I've never had a new hire that wasn't willing to sign
20  this Employment Agreement.  But I know when I was
21  handed it, I went out of the HR room and sat down in
22  the front office and read every single line myself.
23  Most people just sign, sign, sign, and don't even --
24  they just want to go to work.
25  /////

Page 49

1  BY MR. GUTIERREZ:
2      Q   When somebody is signing this Employment
3  Agreement, is this before they even had the opportunity
4  to review the mandatory videos?
5          MS. GINAPP: Objection. Form. Foundation.
6          THE WITNESS: This is before you watch the
7  videos, yeah.
8  BY MR. GUTIERREZ:
9      Q   So the employee doesn't even have the
10  opportunity to see exactly what they're being forced to
11  watch as part of their employment; correct?
12          MS. GINAPP: Objection. Form.
13          THE WITNESS: Yeah, but the videos aren't --
14  they're not the crazy brainwashing I was talking to you
15  about earlier. They're not the higher levels of
16  Scientology at all. They're pretty fluff.
17  BY MR. GUTIERREZ:
18      Q   But when it comes to giving the employee a
19  full opportunity to review what they're signing, does
20  the employee get an opportunity to take this document
21  home, or consult an attorney, or it's, "Hey, you're
22  hired, sit in that room and fill all this out"?
23          MS. GINAPP: Objection. Foundation.
24          THE WITNESS: I've sent people home with the
25  paperwork. You got to think of the scope of people

Page 50

1  that we would hire. They're not people that have
2  attorneys commonly, so not one on retainer. You may
3  have a friend. When I sat down and read every single
4  line, Melissa commented that I was the first person
5  ever to sit down and read every single line. But
6  coming from a background in politics -- my dad was a
7  labor boss -- I'm a rather skeptical human being -- I
8  wanted to make sure that everything I was going to sign
9  my name to, I understood.
10  BY MR. GUTIERREZ:
11      Q   Okay. Turn to the third page of this,
12  Section 8.
13      A   Section 8, okay.
14      Q   This is entitled, "Freedom of Religion." Have
15  you seen this section before?
16      A   Yeah.
17      Q   What was the purpose of this explanation?
18          MS. GINAPP: Objection. Form. Foundation.
19          THE WITNESS: I didn't write the document, so
20  I don't really know. It sounds like -- I mean, it's
21  kind of funny, but --
22  BY MR. GUTIERREZ:
23      Q   Why is that?
24      A   Because you're signing off that your freedom
25  of religion amendment is not going to be violated right

Page 51

1  before you are going to watch some Scientology videos.
2      Q   Now, on this next page of this document,
3  that's your signature; correct?
4      A   It doesn't look like a signature, but it is my
5  signature.
6      Q   Okay.
7      A   And the reason I write my name out is because
8  I was a rocker in my youth, so my autograph became
9  that, and you can't read what it is. So I write my
10  name out next to my signature because no one can tell
11  what it is.
12      Q   Makes sense. So that's definitely you, you
13  acknowledge that Grecia signed that?
14      A   That's me.
15      Q   In your position at Real Water, had Grecia not
16  initialed every single page, would you have been able
17  to sign off on this?
18      A   No.
19      Q   So as a condition of her employment, she would
20  have to sign off on this, and initial every single
21  page; correct?
22      A   Yes.
23      Q   The same with the Employment Agreement, which
24  is on the next page of this. This looks like a
25  separate Employment Agreement, but it's approximately

Page 52

1  nine pages. Your signature looks to be at the very
2  end. Do you see that?
3      A   Yeah. Same thing. My signature, and then
4  printed out because you can't read that it is an actual
5  signature, but it is.
6      Q   Again, if Grecia would not have initialed
7  every single section of this Employment Agreement or
8  signed off at the end, you would not have signed off as
9  a witness; correct?
10      A   Correct.
11      Q   Okay.
12          MS. GINAPP: Can we take a quick break?
13          MR. GUTIERREZ: Yes.
14      (Recess taken from 11:15 a.m. to 11:22 a.m.)
15          MR. GUTIERREZ: We can go back on the record.
16          (Exhibits 4-6 marked)
17  BY MR. GUTIERREZ:
18      Q   Jeramy, what I've handed you as Exhibit 4 is
19  Grecia's video review of "Message to Garcia."
20  Exhibit 5 is her review of "The Secret." And Exhibit 6
21  is her video review of "The Way to Happiness."
22          Tell me about these specific reviews in
23  general. Are they mandatory for employees to fill out
24  following their reviewing the videos?
25      A   Yes.

Page 53

1     Q   What happens if an employee does not fill
2   these out?
3     A   I never had an employee not fill them out.  So
4   I don't really know.
5     Q   Now, in your experience in reviewing these
6   videos in Scientology, which of these, if any, are
7   based on Scientology religion?
8     A   "The Secret" certainly isn't.  "The Secret" is
9   a popular book that Oprah put as one of her favorite
10  books, or whatever.
11    Q   Okay.
12    A   "Message to Garcia" is a portion from -- of
13  the ethics book, which is not in the coursework.
14    Q   Okay.
15    A   And "The Way to Happiness" is the
16  non-religious moral code that Scientology is based
17  around.
18    Q   Okay.
19    A   Why they make that distinction, in Narconon
20  Center that is non-religious -- quote, unquote -- we
21  had to watch the same video that I forced a million
22  employees to watch.  And so I asked Mike Hoyt, one of
23  the staff members there who was an OT8 -- that's as
24  high as you can go in the Church of Scientology -- why
25  we were watching this, and he explained to me how it's

Page 54

1   not religious.  But I did not think that was the case.
2         So "The Secret" is not Scientology at all.
3   That's just like self-actualization stuff.  "The Way to
4   Happiness" is the moral code.  And "Message to Garcia"
5   is kind of a story about persistence.  The only place
6   I've ever found it is in the ethics book.  But it's not
7   in any of the other courses that I did, which was --
8   where is that now?
9     Q   You're looking at Exhibit 7, the Real Water
10  Course Memo; correct?
11    A   Correct.  It's not in, to my understanding,
12  any of these 18 courses.
13    Q   Which one, "The Way to Happiness"?
14    A   No, "Message to Garcia."  That's pulled from
15  the ethics book.
16    Q   Okay.  But "The Way to Happiness," based on
17  your experience and based on what you've been told from
18  people in Scientology, is a Scientology-based book?
19    A   It's the moral code.  It's like the Ten
20  Commandments of Christianity.
21    Q   Now, Narconon, when you went there, did
22  Real Water pay for you that, or did you pay for that on
23  your own?
24    A   That's a complicated answer.  Ultimately, it
25  ended up that Real Water paid for it.

Page 55

1     Q   You were forced to watch "The Way to
2   Happiness" at this rehabilitation center?
3     A   Uh-huh.
4     Q   That's a "yes"?
5     A   Yes.  Somehow it's State approved as a
6   treatment center because they do a group chat every
7   day.  And so the topic of the group chat was "The Way
8   to Happiness," among other Scientology propaganda, but
9   the majority of the group is "The Way to Happiness".
10    Q   Okay.  That rehabilitation center, it's State
11  approved, but it's not a State-run center; correct?
12        MS. GINAPP:  Objection.  Foundation.
13        THE WITNESS:  No, it's not State run.  It's
14  ran --
15  BY MR. GUTIERREZ:
16    Q   The Church of Scientology; correct?
17        MS. GINAPP:  Foundation.
18        THE WITNESS:  ABLE, it's ran by ABLE.  And
19  ABLE is an offshoot of the church, but it's a separate
20  entity than Division 6, which is the religious part of
21  Church of Scientology.
22  BY MR. GUTIERREZ:
23    Q   Now, ABLE is an offshoot of the church.  And
24  WISE is another offshoot of the church; correct?
25    A   Yes.

Page 56

1         MS. GINAPP:  Objection.  Foundation.
2   BY MR. GUTIERREZ:
3     Q   What does "WISE" stand for?
4     A   I do not know.
5     Q   Does World Institute of Scientology
6   Enterprises refresh your memory at all?
7     A   No, but that acronym would make sense.
8     Q   What's your understanding as to what WISE
9   does, or provides for businesses?
10        MS. GINAPP:  Objection.  Form.  Foundation.
11        THE WITNESS:  It provides this Admin Tech, how
12  to run your company.
13  BY MR. GUTIERREZ:
14    Q   Did anyone at Real Water ever talk to you as
15  to why these videos are mandatory?
16    A   No, just that they are.
17    Q   Did Brent or anyone else at Real Water ever
18  talk to you about any sort of financial benefit that
19  the company receives for having employees watch these
20  videos?
21    A   Oh, like a subsidy from the Church of
22  Scientology, or something?
23    Q   Yes.
24    A   No.  In my experience, the church doesn't help
25  anybody.  The church takes money from everybody.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

1    Q   So it's my understanding that each business,
2  including Real Water, licenses the technology from WISE
3  and pays a fee --
4    **A   Pays them.**
5    Q   -- pays them a fee per month in order to use
6  this technology.  Have you ever been told that?
7    **A   I don't have any experience with that.**
8    Q   Okay.
9    **A   But that would make sense because it's not --**
10  **certainly, WISE wouldn't pay them.  The Church of**
11  **Scientology, it doesn't exist because it pays other**
12  **people; it exists because other people pay them.**
13    Q   Do you know if there's any credit or subsidy
14  given to companies like Real Water on these licensing
15  fees if a certain number of people watch these videos?
16       MS. GINAPP:  Objection.  Form.  Foundation.
17       THE WITNESS:  I don't.
18  BY MR. GUTIERREZ:
19    Q   Do you know what happens -- what's done
20  ultimately with each of these video reviews, where
21  they're sent to, or what's done with them?
22       MS. GINAPP:  Objection.  Form.  Foundation.
23       THE WITNESS:  I don't.  To my understanding,
24  they stay on site at Real Water and are filed
25  someplace.

1  BY MR. GUTIERREZ:
2    Q   You don't have any understanding if they're
3  sent anywhere else, or kept in a separate file, other
4  than the employee file?
5       MS. GINAPP:  Objection.  Asked and answered.
6       THE WITNESS:  I don't.
7  BY MR. GUTIERREZ:
8    Q   Okay.
9    **A   I know that when I did Scientology, you sign**
10  **just an immense amount of paperwork, a release for them**
11  **to keep every single document you write.  And they have**
12  **you write it in your handwriting rather than on a**
13  **laptop, for some inefficient reason.  But, so I know**
14  **the church will hold on to all your stuff for -- I**
15  **think I signed off on allowing them to hold on to it**
16  **for three years, or something.  But I can't imagine**
17  **Real Water sending employee reviews to Flag or to the**
18  **Church.  I don't know what the Church would want with a**
19  **non-Scientologist.  The Church doesn't really -- if**
20  **you're not a Scientologist, they don't care.**
21    Q   How is that viewed, at least within the
22  company, with Scientology having -- looking down on
23  almost outsiders of the church?  How did the business
24  look at employees who were non-Scientologists?
25       MS. GINAPP:  Objection.  Form.  Foundation.

1       THE WITNESS:  Before I agreed to go to the
2  Mission in Orange County, it had an attitude of
3  openness.  And then once I started to get back into
4  Christianity, I saw that that wasn't the case.  Like,
5  when I was going to the Mission in Orange County, they
6  told me you would be Buddhist Scientologist, you could
7  be a Christian Scientologist, you could be a Greek
8  Orthodox, Catholic Scientologist, and that's fine.  And
9  then once I got into Narconon, which is like a
10  controlled environment of -- ran by Scientologists --
11  you have L. Ron Hubbard's bust and statues all over the
12  place, his name is on everything -- I learned that
13  that's not the case -- that you could be a
14  Scientologist only.
15  BY MR. GUTIERREZ:
16    Q   Within the company, you can be a Buddhist
17  Scientologist, you can be a Christian Scientologist.
18  Can you just be a Buddhist or a Christian?
19    **A   Yeah, certainly.**
20    Q   Are there going to be any sort of
21  ramifications from the company, or does the company
22  still look to impose some of these mandatory courses
23  down the employees?
24       MS. GINAPP:  Objection.  Form.  Foundation.
25       THE WITNESS:  I don't think that the courses

1  would change anybody's religious beliefs.  But I was an
2  executive.  I was at one point -- the only person I
3  reported to was Brent.  There was no one else above me
4  but Brent.  I was his Chief of Staff in Carson City.
5  We ate together breakfast, lunch, and dinner, when we
6  lived in the vacuum of the Legislative Session of 2015.
7  So we became very close.  And my experiences are very
8  different than what an employee would have experiences,
9  because the employee would only see Brent maybe once or
10  twice in their entire time working there.  Whereas, I
11  lobbied for him, I ran damage control, I ran his ground
12  game on his campaigns.  We had a different relationship
13  than your average employee would.
14       So for the average employee, you can be
15  whatever religion you want.  For those close to him,
16  he'd want you to be a Scientologist.
17  BY MR. GUTIERREZ:
18    Q   But for the average employee, there would be
19  almost a fear of Brent or Aimee because they didn't
20  have that close relationship that you did; correct?
21       MS. GINAPP:  Objection.  Form.  Foundation.
22       THE WITNESS:  Absolutely.
23       MS. GINAPP:  Argumentative.
24  BY MR. GUTIERREZ:
25    Q   You said, "Absolutely"?

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 61

1      A    "Absolutely."
2      Q    Would you agree that the average employee can
3  look at some of this coursework and think that it
4  infringes on their religious beliefs?
5           MS. GINAPP: Objection. Form. Foundation.
6           THE WITNESS: I can't pretend to know what
7  other people think. So I don't know how to answer
8  that. Some of it seems pretty weird, dude. The Basic
9  Study Manual, again, this is not the version that we
10  use. We use a book. But some of this stuff that I
11  read today in the Basic Study Manual is pretty
12  Scientology-based. But, again, this is not the course
13  I did. I did a book. And, again, I don't know, other
14  than myself, any employee there that has done "Ups and
15  Downs," "Personal Values and Integrity." Ryan Moodley,
16  who has done a ton of courses, has done the first six.
17  He hasn't done "Ups and Downs" himself, and he's been
18  there for a year longer than I had, and he hadn't got
19  into what can be considered the religious courses on
20  here.
21  BY MR. GUTIERREZ:
22      Q    Now, for you in particular, you said you're a
23  Christian?
24      A    Yeah.
25      Q    At what point did you start looking into the

Page 62

1  Scientology religion?
2      A    In June when I was told that I had to go do a
3  Purif, otherwise, you know, I couldn't continue to work
4  with Brent.
5      Q    By working with Brent, that also meant you
6  couldn't work on his campaign; correct?
7      A    Yeah.
8      Q    So if you didn't do this Purif and go down to
9  Orange County, you would have lost your job at
10  Real Water and --
11      A    Political ties.
12      Q    And all political ties? Okay. And that was
13  told to you by Brent directly?
14      A    Uh-huh. Yes.
15      Q    What exactly did he tell you?
16      A    Just that. I mean, I ended up having to
17  leave, I think, the next day or the day after.
18      Q    How long was that course?
19      A    I was in Orange County for months, man. I was
20  in Orange County for, like, three months. I escaped
21  the heat of Las Vegas last summer.
22      Q    And it was strictly Scientology
23  religious-based education that you were getting?
24      A    Yes. And I was working full-time during the
25  daytime, and then doing -- going to do -- going to the

Page 63

1  course, course room at the Mission in the evenings.
2      Q    Who paid for you to be out there?
3      A    Real Water.
4      Q    When you came back -- actually, what month did
5  you come back to Las Vegas full-time?
6      A    I mean, I would come back on the weekends to
7  see my kid, and have my kid come out and visit me
8  sometimes. But it was pretty much June to September, I
9  want to say.
10      Q    And then from September to November, were you
11  going to Scientology courses in Las Vegas?
12      A    No. I blew out of the church -- all right --
13  so that's a term you're not going to understand. So I
14  stopped doing Scientology. The church wouldn't allow
15  me to actually complete my Purif because of some of the
16  political affiliations I've had. And that pissed me
17  off. And so I decided I didn't want anything to do
18  with the church because it made me mad.
19      Q    Is that one of the reasons that you were
20  forced to do this rehabilitation?
21      A    I was drinking maybe three days a week. And
22  my attitude had changed. And Brent and I were close,
23  so he could sense my attitude had changed. The reality
24  is, he placed Aimee ahead of me, not as in -- it's his
25  wife, of course, she's supposed to be ahead of me in

Page 64

1  his mind -- but he placed her as my supervisor. She
2  had zero experience in sales. And so I was being
3  micromanaged by her, and having to not only do my job
4  but explain my job to her at the same time. And so I
5  had an attitude because I was very frustrated and
6  wanted to quit on multiple occasions -- and my
7  girlfriend at the time talked me out of quitting a
8  number of times -- because of the way that Aimee
9  handled me.
10      Q    Okay.
11      A    So ultimately, I feel that I was sent to
12  Narconon because my attitude had changed towards the
13  company. I had a crappy attitude.
14      Q    When you came back from Narconon, that's when
15  you spoke to Brent about giving your notice?
16      A    No. I never spoke to Brent. I haven't spoken
17  to Brent since I left on November 20th. I mean, we've
18  had conversations over the phone. We've had a couple
19  heated conversations over the phone. I was trying to
20  get all of our chain accounts turned on. I completed
21  the Southern California distribution network which --
22  the goal of which is to get the chains turned over.
23  For example, here in Vegas, we have Smith's,
24  Albertsons, things like this, where the volume is
25  really high. And so we would have conversations in

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

1  reference to business.  And we didn't see eye to eye on
2  getting the chains turned over.  So we had a couple of
3  heated conversations while I was in Narconon.  But I
4  haven't spoken to him since.
5        When I was held against my will at Narconon
6  when I wanted to leave and they wouldn't allow me to
7  leave, they tried to get Brent on the phone to talk me
8  out of it.  And I told them that, "I don't care if I
9  get fired for leaving here, I'm not doing this."
10  Q   Did Brent get on the phone at any point while
11  you were at Narconon and try to -- and threaten you by
12  saying your job is on the line if you didn't complete
13  this?
14  A   No.  No, I already knew that.
15  Q   Okay.
16  A   I mean, that went without saying.  But I'm an
17  intelligent guy.  So I already knew that if I didn't
18  complete Narconon, I would be fired.  If I left before
19  Narconon was completed -- which is a 90-day program
20  approximately, sometimes it can take longer -- then I
21  would be fired.
22        So when I told them I wanted to leave, they
23  brought out every staff member they could to talk me
24  out of it, literally locked me in a room for an hour to
25  think about it.  And I just said, "You know what?  I

1  have a stronger will than you guys do, man.  I told you
2  about this at 4:00 in the afternoon.  My flight is not
3  until 7:00 in the morning.  The reason I'm willing to
4  sit at the airport overnight is, you all can bring out
5  as big a guns as you want, bring down fucking Tom
6  Cruise himself.  Like, I don't care.  I'm leaving,
7  period.  So you want to get Brent on the phone, get
8  Aimee on the phone, I'm not going to talk to anybody.
9  I'm going to sit here and wait until you release me.
10  If not, I'm going to call the police."  And they
11  finally let me go.
12  Q   Okay.  When you came back to Las Vegas, what
13  conversations did you have with anybody at the company?
14  A   I had conversations with employees there, and
15  had heard that Aimee said I'm no longer working with
16  the company prior to me being terminated.  So I reached
17  out to ADP who does our human resources consulting and
18  accounting, payroll services, and told them what my
19  grievances were, and told them that I wanted to get
20  these resolved, I had zero interest in suing the
21  company myself, but that I had some grievances, and I
22  wanted to get those grievances resolved.  And then met
23  with David Gardner and signed my separation paperwork.
24  And that's the last contact I've had with the company
25  other than sending David a text saying that this is a

1  waste of my time that I'm being subpoenaed to do all
2  this.
3  Q   Did you have any conversations with Grecia?
4  A   Not to my understanding.
5  Q   Did you have any text messages at all with
6  Grecia about testimony or anything about you
7  participating in her case?
8  A   She had hit me up, and we haven't -- we
9  weren't BFFs to begin with.  She's unhappy with all of
10  this.  But her and I haven't coordinated any of this
11  stuff.  We're not on that level together.  I don't have
12  a dog in this race.  I really don't care, other than
13  I'm subpoenaed to be here.  And from what counsel has
14  told me, and what other members of law enforcement have
15  told me, that I have to tell the truth.
16  Q   So you're telling the truth whether that helps
17  or hurts Grecia's case; correct?
18  A   Yeah.  I don't care.
19        MR. GUTIERREZ:  Okay.  Let's attach these
20  exhibits.
21        (Exhibits 8-13 marked)
22  BY MR. GUTIERREZ:
23  Q   Let's start in order with Exhibit 8.  Do you
24  have that in front of you?
25  A   What now?

1  Q   Exhibit 8, the Non-Optimum Report.
2  A   Yeah.
3  Q   What is this report?
4  A   These are write-ups.
5  Q   This is a write-up from Bonnie regarding
6  Grecia; is that correct?
7  A   Yeah.
8  Q   Okay.  What were the circumstances regarding
9  why Grecia was terminated?
10  A   Ultimately, there was a number of things.  I
11  don't know if the GPS one is in here.  The GPS on one
12  of the cars was disabled.  She -- yeah, the last page
13  of the Non-Optimum Report is ultimately why she was
14  terminated.  I went to a couple stores and they said
15  that no one from Real Water had visited.  And so
16  ultimately, that's when I made the decision because
17  of -- the example is today, we're sitting here going
18  over all this stuff -- because of lawsuits, you can't
19  just fire somebody.  Given Nevada is a right-to-work
20  state, if you just terminate somebody, then they can
21  have a wrongful termination lawsuit against you.
22  Q   Did Bonnie ever talk to you about Grecia's
23  work performance?
24  A   Uh-huh.
25  Q   That's a "yes"?  What did she say?

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

1    A   She didn't think that she was very good.  And
2  you can tell from these write-ups that Bonnie had an
3  issue against Grecia.
4       I'm a male, and females have different things
5  than males have.  Females have -- you know, we're very
6  direct in what we want to get.  Women have emotions
7  more so than we do.  And so I thought they just had
8  like a personality conflict.  So when she first started
9  complaining about Grecia, I dismissed it.  And then
10  when she -- just dismissing it to some personality
11  conflict.  And then when she started to give me
12  specific examples of stores that Grecia was supposed to
13  have visited and didn't visit, I asked her to give me a
14  write-up on it, give me -- instead of just complaining
15  about it, to write it up, put it in writing, and show
16  me what specifics she was talking about.
17    Q   And this is the write-up that you're looking
18  at, Exhibit 8?
19    A   Yeah.  There's a number of them here.
20  There's -- looks like -- I think it's three different
21  write-ups from Bonnie, only one of which looks like
22  Grecia signed -- no -- two of which Grecia signed.
23  Looks like four here.  Never mind.
24    Q   Looks like the one for 10-8, there was a
25  write-up because Grecia was sick, had been throwing up

1  for two days.
2    A   Yeah.
3    Q   Now, were there progressive disciplinary steps
4  that should have been done at Real Water like
5  write-ups, suspension, before termination?
6       MS. GINAPP:  Objection.  Foundation.
7  BY MR. GUTIERREZ:
8    Q   Or was it just based upon management's
9  discretion?
10    A   Nevada is a right-to-work state, man.  If
11  somebody wants you to wear black shoes and you're
12  wearing brown shoes, you can be legally terminated.
13    Q   I'm not talking Nevada law.  I'm talking about
14  within the company, as far as the company following its
15  own policies and procedures for termination.
16    A   The company policy is if you have three
17  Non-Ops, you can be fired.
18    Q   Okay.  How many did Grecia have?
19    A   I wrote her up myself for a GPS thing that's
20  not here.  But it looks like there's four write-ups
21  right here.
22    Q   Did the company have policies and procedures
23  in place on how to prevent either religious
24  discrimination, or sexual harassment, or retaliation
25  within the workplace?

1    A   Not really.  Prior to Grecia, we never really
2  dealt with somebody objecting to the Admin Tech.  So,
3  like, this was like a new thing to deal with.
4    Q   But from your understanding, have you heard of
5  these type of lawsuits related to Scientology in the
6  workplace throughout the country?
7       MS. GINAPP:  Objection.  Form.  Foundation.
8       THE WITNESS:  No.  My first experience with
9  Scientology was with Real Water.
10  BY MR. GUTIERREZ:
11    Q   At any point following Grecia's lawsuit, did
12  you, or Brent, or anyone at Real Water discuss how
13  there had been multiple lawsuits across the country
14  against employers who were forcing Scientology on their
15  employees?
16       MS. GINAPP:  Objection.  Form.
17       THE WITNESS:  No.
18  BY MR. GUTIERREZ:
19    Q   Okay.  So you said that there was really no
20  policy or procedure in place regarding discrimination
21  and harassment; correct?
22    A   Yeah.
23    Q   Okay.  Go to that next exhibit that you have
24  in front of you.  That's Exhibit 13.  These are what
25  purport to be text messages from you and Grecia.  Do

1  you see that?
2    A   Uh-huh.
3    Q   Is that a "yes"?
4    A   Yes.
5    Q   I'll represent to you that it looks like
6  these -- well, do you know when these were sent to
7  Grecia?  Can you tell based on your phone when these
8  were sent?
9    A   I can't.
10    Q   Was it within the last 60 days?
11    A   I do not know.
12    Q   Okay.  Do you have your phone with you that
13  you can check?  I want to authenticate to make sure
14  that this is an accurate depiction of text messages
15  that you sent to and from Grecia.
16    A   Some of this is like edited, so it's hard to
17  tell, like, the font changes.
18    Q   Where are you looking at specifically?
19    A   It appears in --
20    Q   When you reference page numbers, see that
21  reference where it says PLTF00185?
22    A   PLTF00191.
23    Q   Okay.
24    A   The font changes.  It says, "I am a
25  mastermind, love being underestimated."  "Bet they

1    didn't know you were like that." And then the font
2    changes to something else. If you go to the previous
3    page, PLTF00190, it goes from one font to another font.
4        Q   Right. Is that because there's been a text
5    message thread that's been cut and pasted within this
6    thread?
7        A   Yeah, that could be the case.
8        Q   Okay. So what I need you to clarify today is
9    that this is a true and accurate depiction of text
10   messages between you and Grecia, for evidentiary
11   purposes.
12       A   Yes.
13       Q   Okay. You have no reason to dispute the
14   validity or the contents of these messages; correct?
15       A   Correct.
16       Q   Okay. But everything in those text messages
17   has been consistent with what you've told today under
18   oath; is that correct?
19       A   Yeah. I don't have a dog in this race. I
20   mean, I know that Real Water is a good product, but I
21   don't have a dog in this race.
22       Q   On 186, you state that you "have an audio
23   recording of Aimee Jones telling the head of human
24   resources that she has to force every employee to do
25   courses that would help you." What does that mean?

1        A   One of the employees there recorded Aimee
2    stating that everyone had to do Scientology coursework
3        Q   Who was that employee?
4        A   Ryan Moodley.
5        Q   Have you heard that recording?
6        A   I have not.
7        Q   But that recording is of Aimee telling -- that
8    recording is consistent with what you've testified
9    today, which is that the Real Water coursework is not
10   optional, it's mandatory; correct?
11       A   Yeah.
12       Q   So there's nothing different from what that
13   recording would say other than what you've told us
14   which is what they've said is optional is actually
15   mandatory; correct?
16       A   Correct.
17       Q   You say that, "I have known they force people
18   to do Admin Tech Scientology for a while but they
19   started to force me" -- you -- "to do religious
20   Scientology about six months ago." That's what we
21   talked about already with you --
22       A   In June.
23       Q   -- doing the Orange County trip; correct?
24       A   Yeah.
25       Q   So that's consistent with what you testified

1    to.
2            Anything else that we haven't discussed today
3    that you'd like to talk about regarding this particular
4    case or your knowledge of Real Water's policies and
5    procedures regarding religious discrimination or
6    retaliation?
7        A   What is the rest of this stuff?
8        Q   The rest of this stuff -- we can go through
9    it -- are documents which pertain specifically to
10   Grecia's termination and Bonnie's time sheets, which I
11   have a question or two regarding Grecia.
12       A   These are copies of e-mails?
13       Q   What you have in front of you is Exhibit 11.
14   I took Bonnie's deposition about six weeks ago. She
15   said that she periodically sent you Grecia's time
16   sheets. And that's what this is.
17       A   Okay.
18       Q   You've seen this document, correct, Jeramy,
19   Exhibit 11?
20       A   I haven't seen this document before.
21       Q   What were the purposes of Grecia's time sheets
22   being sent to you by Bonnie? Was that just routine by
23   every employee?
24       A   Bonnie was -- I would have Bonnie gather -- at
25   one point in time, we had a number of demo girls,

1    merchandisers, brand ambassadors, whatever title you
2    want to give it. And so I would have Bonnie organize
3    them and send them to me.
4        Q   Okay.
5        A   In the coursework, the definition of an
6    executive is a person who gets everyone else to do
7    their job. So I would have -- I would streamline
8    things and have -- the same way I would have Ryan
9    Moodley do stats for me of my department, I would have
10   Bonnie do stats and collect stats of everybody else,
11   and then turn them in to me so I could focus on
12   expansion and not be stuck in the muck of having to
13   gather paperwork and stuff like that. I would delegate
14   that to other people.
15       Q   Got it. Okay.
16           Exhibit 12, which is in front of you, is from
17   the Nevada Equal Rights Commission. What this is is a
18   Charge of Discrimination that Grecia had filed as part
19   of her -- the administrative claim for this type of
20   lawsuit. This was received by the company -- it
21   appears in January of 2016 -- which is three months
22   before she filed her lawsuit.
23           Do you recall any conversation with anybody at
24   the company regarding this charge of discrimination?
25       A   Hold on. This was filed three months prior to

Electronically signed by Mary Cox Daniel (101-361-287-3117)                          e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 77

1 her termination?
2    Q   No, three months prior to her filing the
3 lawsuit.  So she was terminated in October of 2015.
4    A   Okay.
5    Q   She filed this in November of 2015.  This
6 Charge of Discrimination was sent by the Nevada Equal
7 Rights Commission to Real Water requiring them to
8 respond by February 25th, 2016.  So this was well
9 before the lawsuit was filed, and well before --
10    A   I just wanted to understand the timeline.
11    Q   Okay.  So given that, because one of the
12 issues that I've seen is that Brent Jones testified or
13 said in the media that the lawsuit, the timing was
14 suspect because it was right before the primary.
15    A   Yeah.
16    Q   And that they had no knowledge of Grecia's
17 complaints.  This document proves otherwise because it
18 states that as of January 2016, five months before the
19 primary, he had actual knowledge that she had made
20 these complaints of discrimination.  Do you recall any
21 conversations with Brent, or anyone else at the
22 company, as to Grecia's claims of how --
23        MS. GINAPP:  Objection.  Sorry.
24        MR. GUTIERREZ:  Go ahead.
25        MS. GINAPP:  No, it's gone on for a while, but

Page 78

1 I thought you were done.  Are you done?
2 BY MR. GUTIERREZ:
3    Q   Very simple:  Did you have any conversations
4 with Brent, or anyone at the company, in January or
5 February of 2016 regarding Grecia's claims prior to the
6 lawsuit being filed?
7        MS. GINAPP:  I'm going to object to form.
8        THE WITNESS:  At that point, we were being
9 sued by another company, that was a bigger concern
10 because we were losing that lawsuit -- we had already
11 lost that lawsuit.  We had lost that lawsuit in
12 November.  And they were sweeping our bank accounts at
13 that point.  So at that point, we had bigger fish to
14 fry than this.  We had issues of making payroll because
15 our bank accounts were being hit.  Maria, our
16 accountant at the time, quit literally the day that our
17 bank accounts were hit.  So, like, she was in cahoots
18 to share information with them of bank accounts that
19 only she knew about that were hit.  So we had bigger
20 issues.  We had issues, we couldn't make payroll, man.
21 BY MR. GUTIERREZ:
22    Q   This is what time frame again?  January of
23 2016?
24    A   Yeah, this is in January.  Our bank accounts
25 were being swept.  So I had to go to political friends

Page 79

1 of mine to fund raise and sell Real Water shares to so
2 we could make payroll.  So we had bigger concerns than
3 a complaint at that point in time.  So the
4 conversations we were having about legal problems at
5 that time was this other case.
6    Q   Who was the lawsuit from?
7    A   It's called Real Water District.  We sold a
8 territory to another company.  And evidently, Anthony
9 was infringing on that exclusive distribution
10 agreement, and we were selling into their exclusive
11 territory, and then we lost that case in court.  And
12 then bank accounts were being hit.  So the
13 conversations we were having about legal problems at
14 that time weren't in reference to this Nevada
15 Department of Employment, Exhibit 12.
16    Q   So to be clear, that lawsuit wasn't a
17 discrimination-based lawsuit?  It appears to be a
18 contractual or commercial litigation --
19    A   Yeah.
20    Q   -- where it was reduced to judgment, and then
21 bank accounts were being garnished?  Is that fair to
22 say?
23    A   Yeah.  It was all through mediation.  And the
24 court that had jurisdiction was State of California,
25 not the State of Nevada.

Page 80

1    Q   Okay.  So at that time, the company was
2 focused on survival?
3    A   Yeah.
4    Q   Not necessarily responding to a NERC complaint
5 and whether they got it or not; fair to say?
6    A   Yeah.
7    Q   Okay.  Did brand ambassadors in general have
8 to fill out reports and return them to you as part of
9 their employment?
10    A   Uh-huh.
11    Q   Is that a "yes"?
12    A   Yes.  Sorry.
13    Q   And if they didn't, were they written up or
14 given a Non-Optimum Report?  Or was that not enforced?
15    A   Sometimes it was enforced.  With other
16 employees, I had written them up for not turning in
17 stats.  That's really a human resources function, where
18 the head of human resources, Shawna, will write
19 somebody up for not turning in their stats.  I know in
20 the case of Deon Humphrey, I issued him a couple of
21 Non-Ops for not turning in his stats.  But ordinarily,
22 Shawna would issue those, for stats specifically.
23    Q   I've seen the name on some reports.  Her name
24 is Christy.  She was in charge of HR, Christy
25 Pantelakis.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 81

1    **A   Yes.**
2    Q   When did she leave?
3    **A   She left right -- I don't know the exact time**
4    **frame, actually.  I'm trying to think of -- I mean, I'd**
5    **have to look at my Facebook.  It was right after one of**
6    **the fights.  We had fights, first every other month,**
7    **then we started doing them quarterly.  But she went to**
8    **the corporate retreat with us, which was actually this**
9    **time last year.  And then by the primary, she was gone.**
10   **So the primary was the second Tuesday in June.  So**
11   **by -- I want to say June 8th, she was gone.  But I**
12   **don't know an exact date.**
13   Q   Do you know who replaced her?
14   **A   Yeah.  Shawna ended up replacing her.  Shawna**
15   **was my assistant in sales.  For a while, we didn't have**
16   **anybody in HR.  Clare was -- Clare LaHara was kind of**
17   **filling that position, and then -- oh, no, that's**
18   **right -- I had Lisa Marie Bailey, did the HR position**
19   **for a while.  And she was quite confrontational, and we**
20   **had to let her go.**
21   Q   Did you ever take over HR at any point?
22   **A   Yeah, I was the head of HR.**
23   Q   At what point?
24   **A   Somewhere between January and June.**
25   Q   Of 2016?

Page 82

1    **A   2016.**
2    Q   After June, that's when you said this Shawna
3    person came in and took over?
4    **A   Well, really, I mean, Shawna still isn't over**
5    **HR.  Technically, at this point, Aimee is over HR,**
6    **according to the organizational board.  But at one**
7    **point, I never had the official title of it, never saw**
8    **like a salary bump for taking on additional**
9    **responsibility.  But it was my job to make sure that HR**
10   **ran smoothly.**
11   Q   What was Aimee Jones' position while you were
12   there?  How did her position evolve?
13   **A   To my understanding, before my time, she ran**
14   **the demo girls.  And then when I got there, she was**
15   **involved in operations, which means the manufacturing**
16   **of the actual product, blowing the bottles, filling the**
17   **bottles up, labels, stuff like that.  And then Brent**
18   **thought that she was doing a great job, and so he would**
19   **just give her more responsibility.  And then -- I mean,**
20   **ultimately the reason I blew out of the company is**
21   **because of having to deal with Aimee Jones.**
22   Q   Okay.  Did she have a supervisory capacity
23   over you?
24   **A   It evolved to that, yeah.**
25   Q   At what point did she get that supervisory

Page 83

1    capacity?
2    **A   Right towards the end.  I mean, that's when my**
3    **attitude changed, because I was having to explain stuff**
4    **to someone who's never had any experience in sales.**
5    **Granted, all the beverage industry knowledge I have, I**
6    **had to teach myself, because there's no one there to**
7    **explain it to me.  Brent is not in the marketplace.  He**
8    **couldn't know it.  Anthony is not in the marketplace.**
9    **He doesn't know it.  Really, the Budweiser guys that I**
10   **befriended taught me everything about the beverage**
11   **industry.  And so I was having to explain all this**
12   **stuff to someone who doesn't understand it, and do my**
13   **job, and be micromanaged by that same person.  And it**
14   **got pretty frustrating.**
15       MR. GUTIERREZ:  Okay.  I know you have some
16   questions, right, Kristol?
17       MS. GINAPP:  Yes.
18       MR. GUTIERREZ:  I'm going to pass the witness
19   for now.  So Kristol will ask you some question.
20             EXAMINATION
21   BY MS. GINAPP:
22   Q   I want to talk about Grecia to start with.
23   You were the representative of the company who
24   interacted with Grecia; correct?
25   **A   Yeah.**

Page 84

1    Q   You testified that you were her supervisor;
2    correct?
3    **A   Uh-huh.**
4    Q   So you were the one that would make decisions
5    regarding her employment; is that correct?
6    **A   Yeah.  I mean, ultimately ADP does.  ADP**
7    **does -- I don't know legally how to explain it -- but**
8    **they more or less have to back up firing somebody.  I**
9    **don't know if they do some sort of legal insurance for**
10   **a wrongful termination suit, but it always seemed like**
11   **no matter what I wanted to do, I still had to get**
12   **Brent's approval and, more importantly, even more than**
13   **Brent's approval, ADP's approval to terminate somebody.**
14   Q   But you were the one who terminated Grecia;
15   correct?
16   **A   Yes.**
17   Q   You were the one who made the decision?
18   **A   Yes.**
19   Q   And you asked Brent for approval?
20   **A   Yes.**
21   Q   And you asked ADP for approval?
22   **A   Yeah.**
23   Q   And they both backed you up on it?
24   **A   Yes.**
25   Q   Okay.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 85

1      A   ADP said that I had to have write-ups.  So the
2  reason we have all these write-ups in Exhibit 8 -- if
3  you look at the date on them, they're all dated the
4  same day.  That's not a common practice.  And I don't
5  know why my write-up isn't here, but my write-up was
6  for disabling a GPS.
7      Q   Let's talk about that real quick.  Tell me
8  more about the -- the write-up was against Grecia for
9  disabling a GPS?
10     A   Uh-huh.
11     Q   Was that on a company car?
12     A   Yes.
13     Q   Okay.  Can you explain to me what happened?
14     A   All right.  So none of this is friendly, big
15  brother stuff that anybody in America wants to think
16  about, because we all want to feel like we're
17  independent.  But in my experience, people lie.  And so
18  I started using, in campaigns, when we went from paper
19  files to smartphone apps, there's a term called a geo
20  timestamp.  A geo timestamp is ultimately a GPS
21  tracking system on somebody's phone.  I found this in
22  campaigns to be really effective because I could tell
23  if the canvasser is knocking on a door at a super voter
24  where they're supposed to be, or if they're at
25  Starbucks or McDonald's.

Page 86

1          So I took that same tool and transferred it
2  over on Real Water from a company called
3  MobileTrackingConsulting.com.  And for a monthly fee,
4  we could install GPS onto all of our company vehicles,
5  plugging it into the auxiliary port.  How a mechanic
6  reads the computer of your car to tell you what's wrong
7  with it, using that same port you, plug a little device
8  in there, and it does the same thing as a geo
9  timestamp.  It follows the vehicle everywhere.
10     Q   Kind of like the same thing -- I assume that,
11  I don't know if you know this -- Geico or somebody, or
12  Progressive advertises -- if you don't know, that's
13  okay.
14     A   I don't know.  But it's like LoJack.
15     Q   Okay.  And the company can monitor where the
16  car is and what it's doing?
17     A   Yeah.  You can log in and see how long a car
18  has been turned off, how long a car has been turned on,
19  the address it stopped at.  It's been very effective to
20  find if people are on task or off task.
21          So I had another employee that disabled her
22  GPS.  So I knew what it looked like if a GPS was
23  sitting there because, for some reason, it didn't have
24  a function to tell if you if it was disabled or not.
25  If somebody unplugged it, it had some battery life to

Page 87

1  where it would just say that it's sitting right there
2  in that same location.
3          When I saw that the GPS was sitting in the
4  same location and wasn't working anymore, to me, that's
5  a terminational offense.  If you're not on task doing
6  what I've told you to do, just that by itself, to me,
7  is enough to want to fire somebody.
8      Q   So that was -- so just to clarify -- you
9  pulled at some point the GPS for Grecia's car?
10     A   Yes.
11     Q   Her company-owned car; correct?
12     A   Correct.
13     Q   That was the car that you guys at the company
14  provided to her to do her work as a brand ambassador;
15  correct?
16     A   Yeah.  So we had a whole fleet of cars.  I
17  don't recall which vehicle it was because we had a
18  vehicle that was totaled.  She was sideswiped, or
19  whatever, in one car, so we switched cars at one point.
20  But one of the vehicles had GPS that was disabled.
21     Q   Was it, to your knowledge, the vehicle that
22  she was driving at the time of her termination?
23     A   Yeah.
24     Q   Okay.  Did you address your concerns about the
25  GPS with Grecia?

Page 88

1      A   Yeah.
2      Q   What was her response?
3      A   So with a lot of my communication, I would
4  follow Brent's lead on the fact that an executive's job
5  is to make sure that other people are doing their job,
6  so with some dealings, I would deal hands-on with
7  employees, with some stuff I would delegate.  And so I
8  would delegate that responsibility to Bonnie, and say,
9  "Bonnie, this is how I feel, you need to do this action
10  with this person, this action with this person," and
11  give them a to-do list.  And then Bonnie would come
12  back to me at the scheduled time and give me a
13  disposition of what had transpired.
14          And so Bonnie told me that Grecia said that
15  the GPS, that she ultimately didn't disable it herself,
16  that she found it that way.
17     Q   Okay.
18     A   But the reason that all these are dated the
19  same day is because once I was fed up, I was fed up.
20  Once I went and visited a couple stores myself and saw
21  that they weren't being merchandised, I made the
22  decision I wanted the fire her.
23     Q   So what stores did you visit?
24     A   A Smith's on Flamingo and -- it may not be a
25  Smith's, but it's a grocery store on Flamingo and

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

1  Buffalo, and then for sure a Vons on Desert Inn and
2  Durango.
3      Q   What did you find at the Smith's?
4      A   That they had never seen Grecia.
5      Q   Is it your understanding that Grecia was the
6  brand ambassador that was supposed to service that
7  particular Smith's, or whatever it was?
8      A   Yeah.
9      Q   What did you find for Vons?
10     A   Same thing.
11     Q   She wasn't servicing it?
12     A   Correct.
13     Q   They had never met her?
14     A   Correct.
15     Q   Is it your understanding that that Vons on
16 Durango was one that Grecia was supposed to go to?
17     A   Yeah.
18     Q   How do you know that these two stores were
19 ones that Grecia was supposed to go to but not Bonnie?
20     A   Because we divided up the city.  So my mind,
21 unfortunately, forever more, works in the grid of
22 politics.  So I just take those same skills and
23 transpire it to everything else.  I take a map in an
24 Assembly district, and I break it up in the most
25 efficient way possible.  And so I take the city and

1  broke it up -- okay, what does Bonnie live, where does
2  Grecia live -- and broke up the city the same way, and
3  said, "Okay, this half of the city, Bonnie, you're
4  going to do; this half of the city, Grecia is going to
5  do."  And that pissed Bonnie off because Bonnie had
6  some good stores that she had relationships with, and
7  she could build case stacks and get financial
8  incentives for.  But tough titties said the kitty, and
9  that's how it is.
10     Q   Do you know if they ever exchanged stores that
11 they were -- say, like, on a particular date if someone
12 was on one side of town or the other, for whatever
13 reason -- do you have any knowledge of them ever
14 switching stores?
15     A   I don't.  I don't.
16     Q   Okay.  Were there times when Bonnie would go
17 out of town to work?
18     A   Oh, yeah, all the time.
19     Q   What happened with her stores while Bonnie was
20 out of town?
21     A   They would typically get neglected.
22     Q   Okay.
23     A   My focus became more so California than this
24 marketplace.  I had no financial interest in Las Vegas.
25 Anthony Randolph gets a commission off Nevada Beverage,

1  and I didn't at the time.  I didn't ever.  So my focus
2  became -- I opened up the entire state of California.
3  So my financial interest was to promote California, not
4  Nevada.
5      So I kept Bonnie on the road.  I mean, I don't
6  know if we're talking about the timeline of Grecia and
7  Bonnie at the same time, or in its entirety, I wanted
8  them both on the road all the time.  That's where my
9  kind of frustration with Grecia began is, she couldn't
10 travel, because I want people out of the city.  I
11 didn't have a financial interest to have people working
12 in the city of Las Vegas.  It's not my commission.  I
13 wanted them in California developing that marketplace.
14     Q   While Bonnie was gone, were there discussions
15 about Grecia covering Bonnie's stores?
16     A   Yeah.
17     Q   Was there an expectation that she would
18 attempt to cover Bonnie's stores while Bonnie was out
19 of town?
20     A   Yeah, but the problem that I found is that I
21 didn't see anything getting covered, man.  I created a
22 form that's not one of the exhibits that -- and it
23 didn't start with Grecia.  It started with another
24 employee, Amanda, that she wasn't going to the stores.
25 So I created a form where you have every single store

1  you go to, they --
2      Q   Do you want to look at Exhibit 10 and see if
3  that's the form?
4      A   Yeah.  Okay, this is it.
5      Q   Okay.
6      A   Yeah.  Strike that.  This is it.
7      Q   So you created the form that's part of
8  Exhibit 10, that's titled Real Water Product
9  Demonstration Report?
10     A   Yeah.
11     Q   Why did you create that?  What prompted you to
12 do it?
13     A   Left to their own devices, while the cat's
14 away, the mice will play.  And, again, the same reason
15 that I would have all of my political employees sign
16 non-disclosure agreements, agreeing to geo timestamps.
17 I don't have a whole lot of trust in human beings.  And
18 so I wanted to have verification that stores they said
19 they were visiting, they were actually visiting.
20     Q   There is a place on the form -- it's near the
21 top -- it says, "Store Manager," colon, and then there
22 would be a blank space?
23     A   That's the main function of the whole form.
24 The rest of the form, I really could care less about.
25 And just for them to fill out.

Page 93

1    Q   Can you explain to me why that's the main
2  function of the form where it says "Store Manager"?
3    A   Because signatures are hard to --
4    MR. GUTIERREZ:  Where are you looking at,
5  Kristol?
6    MS. GINAPP:  It's right at the top.  It says,
7  "Store Manager."  It's not blank on the first page.
8    MR. GUTIERREZ:  Got it.  Sorry.
9    THE WITNESS:  Because it's hard to forge a
10  whole bunch of signatures.  You could forge one or two,
11  but it's hard to forge 20 different signatures and have
12  them look different.
13  BY MS. GINAPP:
14    Q   So the idea was your product -- correct me if
15  I'm wrong, I'm trying to summarize my understanding of
16  your testimony -- the idea was that your brand
17  ambassadors would have these filled out whenever they
18  went to any store; is that correct?
19    A   Yes.  So for every single store they visited,
20  I wanted a signature from the manager of every store
21  they visited to verify they've been to that store.
22    Q   Then what would the brand ambassador do with
23  this form after it was completed?
24    A   Turn it in to Bonnie, who would then bring
25  them all to me.

Page 94

1    Q   Did anybody check to see if the "Store
2  Manager" blank was signed?
3    A   Yeah.
4    Q   Who did that?
5    A   I did.  And Bonnie did.  And then Bonnie would
6  point out to me if signatures weren't signed, or if she
7  was skeptical to the validity of it actually being done
8  correctly.
9    Q   How often were brand ambassadors supposed to
10  turn these in?
11    A   So reality -- they're supposed to turn them in
12  every week.  What actually transpired is maybe every
13  couple weeks to once a month, to where I would get a
14  stack of -- I don't know -- an inch and a half thick of
15  all these forms at once being turned in.
16    Q   Do you recall whether or not Grecia was
17  good -- for lack of a better word -- about turning
18  these product demo reports in a timely manner?
19    MR. GUTIERREZ:  Objection.  Form.
20    THE WITNESS:  Not particularly.  I mean, she
21  was not good about turning them in.
22  BY MS. GINAPP:
23    Q   Can you explain to me why you say that?
24    A   At first she would turn them in.  And then the
25  more -- and I don't know if it's because my attitude

Page 95

1  changed, or what -- once I get skeptical of somebody,
2  then my whole persona is going to change.  That's just
3  who I am.  So I was probably more of a dick to her than
4  I was when I first hired her.  And I know that that's
5  not good for productivity in your juniors.  But she
6  went from turning them in all the time to, at the point
7  of termination, us not receiving them at all.  She had
8  said that they blew out the window of the car.  But I
9  don't know.
10    Q   Do you recall at the time of her termination
11  how long it had been since she had turned in her
12  product demo reports?
13    A   I think it had been about a month.
14    Q   Okay.  How often was Grecia in the actual
15  Real Water office?
16    A   Not very often.  If they're in the office,
17  they're not on task.  You know, they had to turn their
18  time sheets in, and they had to turn in stats on
19  Mondays.  So really Mondays and Fridays for, like, an
20  hour or two.  If they were in the office more than
21  that, I would kick them out.
22    Q   Did there come a point in time when Grecia
23  started turning in her stats or her time sheets by text
24  or by e-mail?
25    A   Yeah.

Page 96

1    Q   And at that point, did she come into the
2  office at all, to your recollection?
3    A   I hadn't seen her physically for -- I don't
4  know how long -- but quite some time, when she was
5  terminated.  Her hair was a different color.  She had
6  lost weight.  I mean, there was a marked difference
7  between her appearance when I saw her the last time
8  when I terminated her.
9    Q   Okay.
10    A   But that's how I wanted it.  I much prefer
11  them to be in the field.  This is why I took the
12  efforts of creating a form to have them sign.  This is
13  why I took the efforts of tracking them via GPS.  This
14  is why we have the technology of smartphones, is so
15  they don't have to be in the office, so they can be in
16  the field being productive.  If they're in the office,
17  they're going to take my sales team off task, if
18  they're girls or not -- I had some female
19  salespeople.  But for the most part, the men that
20  survive in sales, or the people that survive in sales
21  are men, because they can be on the road, they can be
22  away from families, they can be non-emotional about
23  things.  So most of my salespeople ended up being
24  males.  When the girls would come to the office, they
25  would distract the males.  So I would prefer to have no

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

1  females come into my office because they would distract
2  my salesmen from being on task.
3    Q   Okay.  To do the Admin Tech coursework --
4    A   You have to come into the office.
5    Q   The employees had to come to the office;
6  correct?
7    A   Yeah.
8    Q   Okay.
9    A   Unless you lived in California, in which case
10  we would give it to you in person, and then you would
11  e-mail us your stuff.
12    Q   Are you aware of any time that Grecia came
13  into the office to do any Admin Tech coursework?
14    A   Other than the -- I'm not, other than these
15  write-ups for the videos and stuff, I'm not.  Again, I
16  was not over courses.  Like I stated earlier, I really
17  couldn't care less about course.  I wanted to make
18  money.  So, I don't know.
19    Q   Just could be clear, the videos are not part
20  of the Admin Tech coursework for which you would get a
21  raise if you completed a course, correct?
22    A   Correct.  These are just orientation videos
23  that everybody is forced to do.
24    Q   Did you ever, to the best of your
25  recollection, ever impress on Grecia that she needed to

1  come in and do the coursework?
2    A   I mean, there might be some e-mails, because I
3  had to press on everybody to do it.  But, like I said,
4  I wasn't very good about forcing people to do
5  coursework because, other than the statistics for us to
6  do our jobs, and then fill out these reports, as long
7  as their stats came in, I didn't really care.
8    Q   So would it be fair to say that it was not
9  important to you whether or not Grecia did the
10  coursework?
11    A   Not important to me at all.
12    Q   Do you have any recollection of any
13  conversations you had with Grecia about her doing the
14  coursework or her saying she didn't want to do the
15  coursework?
16    A   No.  No.  But we didn't have a relationship
17  like that.  Like, Bonnie and I were relatively close,
18  because she worked for me on the political side as
19  well, and was a go-getter.  Grecia was an employee.
20    Q   Did you hear anything at all while Grecia was
21  an employee or thereafter that she had told Bonnie, or
22  someone else, that she didn't want to do the coursework
23  and she felt it was Scientology?
24    A   Bonnie said something about that, yeah.  But,
25  again, I really didn't think the coursework was my

1  priority.  I felt people visiting stores, me closing
2  Budweisers, making the company more productive is my
3  responsibility, not micro-managing people doing some
4  courses.
5    Q   So would it be fair to say that, as Grecia's
6  supervisor, you would have rather had her be out
7  visiting the stores than in the office doing the
8  coursework?
9    A   Yes.
10    Q   Okay.
11    A   Which is not the attitude that I was supposed
12  to have, but, yes.
13    Q   But you were Grecia's supervisor.  And would
14  it be fair to say that that would have been the
15  attitude she was receiving from the company, would have
16  been your attitude, that it didn't matter whether or
17  not she did the courses?
18    A   I mean, short of -- there may be e-mails out
19  there, you know -- I mean, last time I looked in my
20  e-mail box, I had thousands of them.  To satisfy
21  whatever demands I had from ownership, I would shoot
22  out random e-mails to everybody that, you have to do
23  this.  But short of that, I really didn't care.
24    Q   Okay.  So just to clarify, did Grecia's
25  failure to do any of the Admin Tech courses have any

1  impact on your decision to terminate her employment?
2    A   No.
3    Q   Did your hearing from Bonnie that Grecia
4  thought maybe the courses were Scientology and she
5  didn't want to do them, did that have any impact on
6  your decision to fire her?
7    A   No.
8    Q   Okay.
9    A   It had impact on Bonnie.  But, again, Bonnie
10  wasn't her supervisor.
11    Q   What do you mean, it had impact on Bonnie?
12    A   Bonnie buys into the whole thing.  She's not a
13  Scientologist, but she's done a tremendous amount of
14  course.  And Bonnie had a beef with Grecia, for
15  whatever reason.  So she had issues, but she wasn't her
16  boss.  She wasn't in the capacity to fire her, hire
17  her, do whatever.  I would duly note her complaints,
18  and that's why I created forms that had to be signed.
19  I would take what she had to say and consider it, but
20  her opinion didn't -- wasn't the deciding factor.
21    Q   Did Bonnie make any statements to you that she
22  was upset with Grecia because Grecia wouldn't do the
23  courses?
24    A   Not because she wouldn't do the courses.  I'm
25  trying to think.  It's all been kind of -- you know, so

Electronically signed by Mary Cox Daniel (101-361-287-3117)                e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 101

1  long ago.
2    Q   Well, Bonnie is a hard worker; right?
3    A   **Bonnie is an incredibly hard worker.**
4    Q   Does she have patience with people who are not
5  hard workers?
6    A   **Not at all.**
7    Q   Would it be fair to say at least your
8  impression was that she struggled with Grecia because
9  she didn't see Grecia as hard a worker as she was?
10   A   **Yeah.**
11   Q   Okay.
12   A   **I mean, I worked an event -- I mean, if you go**
13 **to my Facebook, I got a picture of Grecia and I. We**
14 **worked an event together, and sweated our butt off,**
15 **outside in the middle of the summer, and she worked the**
16 **event really well. But according to Bonnie, she did**
17 **nothing. And that's why I created a form to start**
18 **monitoring things because my experience was one thing,**
19 **Bonnie's experience was another. And so it was my job**
20 **to figure out what the reality of that was. And my**
21 **experience was the reality was that it was somewhere in**
22 **between. She had maybe some stores that she visited**
23 **all the time. But then there were absolutely four**
24 **certain stores that she never visited.**
25   Q   And you verified those stores --

Page 102

1    A   **I went in person and verified myself**
2  **because -- I take more of an offense of people that are**
3  **not hard workers than Bonnie does, because I'm an**
4  **exceptionally hard worker. But, like Bonnie, I get**
5  **frustrated with people that aren't hard workers. And**
6  **so when I would terminate people in the political**
7  **world, it was a whole lot different than how I would**
8  **have to go through all this paperwork here. I would**
9  **make quite a scene to make sure my other independent**
10 **contractors knew that it would be bad if they were**
11 **publicly humiliated and I fired them.**
12   Q   And just to clarify: No one at Real Water
13 told you to fire Bonnie [sic]? You made that decision
14 on your own?
15   A   Grecia.
16   Q   Oh, Grecia. Sorry. I'll ask the question the
17 correct way. Strike that.
18       Just to clarify: No one at Real Water told
19 you to fire Grecia; correct?
20   A   **Correct.**
21   Q   Okay. Would you agree that her termination
22 was due to performance only?
23       MR. GUTIERREZ: Object to form.
24       THE WITNESS: Yes. I mean, some of it had to
25 do with medical issues that she had. She couldn't

Page 103

1  carry boxes. You know, there were limitations to what
2  she could do or not. As a corporation, you can't
3  discriminate, or whatever, but it gets really fricking
4  frustrating when somebody can't do their job.
5  BY MS. GINAPP:
6    Q   But you were working with her to the best of
7  your ability, correct, on those medical issues?
8    A   **Yeah. But it's kind of hard if somebody can't**
9  **do their job because they can't lift a case of water.**
10   Q   To the best of your knowledge, did Grecia ever
11 tell you that the reason she wasn't visiting the stores
12 was because of her medical condition?
13   A   **No.**
14   Q   Was Grecia ever disciplined for not doing
15 coursework, the Admin Tech coursework?
16   A   **She might have had verbal. I don't think we**
17 **have anything in writing.**
18   Q   Did you ever verbally counsel her as a
19 disciplinary as opposed to encouragement?
20   A   **There might -- I don't know.**
21   Q   Okay.
22   A   **In all sincerity, I don't know. I know that**
23 **I've given a bunch of verbals to juniors about getting**
24 **your coursework done, because I would get verbals from**
25 **above me. And so in the corporate world, stuff rolls**

Page 104

1  **downhill. And so you just pass it along. But I don't**
2  **think we had any physical hard copy write-ups to her**
3  **for not doing coursework. I remember learning that she**
4  **was Catholic to some degree. I don't know how that**
5  **came about. But I remember learning that she was some**
6  **form of Catholic at some point.**
7    Q   Did that make any impression on you
8  whatsoever?
9    A   **I don't care.**
10   Q   Do you recall Grecia ever complaining to you
11 about Scientology in the workplace?
12   A   **Everybody complained about Scientology in the**
13 **workplace. I don't recall her as being more or less**
14 **than anybody else's.**
15   Q   How often did you speak with her?
16   A   **In reality, maybe once or twice a week, mostly**
17 **via text. I spoke more to her in the interview**
18 **process, in the termination process, than I did while**
19 **she was working there. But I would set it up that way.**
20 **Like, we would have stats and things that would monitor**
21 **and tell me if somebody is doing good, if you're doing**
22 **bad. You would hear from me if you're doing bad. If**
23 **you're not hitting your stores, then you'd hear from**
24 **me. Otherwise, I don't really care. I was focused on**
25 **expanding that work, not micro-managing people.**

1    Q   Do you have a specific recollection of Grecia
2  complaining to you about Scientology?
3    A   I remember one time at the office, she did
4  complain about Scientology.
5    Q   Do you remember what she said?
6    A   I don't.  I just remember it was cloudy
7  outside.  I remember I was outside smoking a -- at that
8  time, I smoked cigarettes.  And she was complaining
9  about something about Scientology.  It was before her
10  hair was purple.  I remember that much.  When I
11  terminated her, she had either purple hair or had a
12  purple streak in her hair.
13    Q   Did you take any action with regard to
14  whatever she was complaining about with regard to
15  Scientology?
16    A   No.
17    Q   Do you recall why you didn't take any action?
18    A   Because everybody complained about
19  Scientology.
20    Q   Did you tell anybody in HR or above you at the
21  company about her complaint?
22    A   No.
23    Q   To your recollection, was she asking you to do
24  anything about it, or was she just complaining.
25    A   It just seemed like a gripe.  Everybody griped

1  about the courses.  And it's more about the courses
2  than it is even the church.  And this is before I even
3  got into the church.  So, you know, in sales, people
4  complain.  And when you're a supervisor, you have to
5  listen to them complain.  But I listened to them
6  complain as minimal as possible, and then move to
7  something positive, because when people complain, it
8  steals your juju, it steals your vibe and your ability
9  to close other deals.  Like, you have to maintain
10  enthusiasm, or manufacture enthusiasm in sales.  And
11  when somebody's complaining, it takes away from your
12  enthusiasm.  So any time somebody goes into complaining
13  mode, I might be looking them in the eyes, but I'm not
14  even listening to what they're saying.  It's going in
15  one ear and out the other, just placating them so I can
16  move on back to being productive.
17    Q   Do you recall her complaining to you about any
18  of the orientation videos?
19    A   No.  In fact, if you read them, they're quite
20  glowing.
21    Q   Just to clarify:  During Grecia's employment,
22  at any time during Grecia's employment, did you
23  consider yourself a Scientologist, or were you taking
24  Scientology courses?
25    A   When was she terminated?

1    Q   She was terminated --
2    A   No, no, I wasn't, because I turned to
3  Scientology after the primary.
4    Q   In fact, you started doing Scientology after
5  this lawsuit was filed; correct?
6    A   Uh-huh.
7    Q   Is that a "yes"?
8    A   Yes.
9    Q   If you look at Exhibit 8, which are these
10  Non-Ops for Grecia?
11    A   Okay.
12    Q   Was Grecia presented with these Non-Optimum
13  Reports at the time of her termination?
14    A   Yeah.
15    Q   I note that on the first page, which is marked
16  PLTF1, there's no signature of recipient --
17    A   Uh-huh.
18    Q   -- by Grecia.  Is there a reason that you can
19  recall why there's no signature for Grecia?
20    A   Yeah.  She lost it in the office, and refused
21  to sign anything.
22    Q   Okay.
23    A   And I said, "I'm not going to give you your
24  paycheck unless you sign some stuff."  And at the very
25  least, I think she had to sign her final paycheck

1  breakdown, and I could release the check to her.  So I
2  remember -- but her -- she started to -- I mean,
3  terminating people sucks.  No matter if they're
4  justified or not, women crying sucks to see.  And so
5  when you terminate somebody, you kind of have to put
6  your armor on emotionally, and get ready for them to
7  cry, get ready for them to freak out, plead for their
8  job, whatever the situation is.  And she got quite
9  upset, and refused to sign the stuff.  And I'm like,
10  "Well, then you're not getting your paycheck."
11    Q   So she refused to sign PLTF01; correct?
12    A   Oh, yeah.  That's what that stands for.  Yes.
13    Q   And then two pages later, PLTF03, she refused
14  to sign that Non-Optimum Report as well; correct?
15    A   Uh-huh.  One of them signed, though.  I don't
16  know what the difference is.
17    Q   Right.  If you turn to PLTF5, that one is
18  signed?
19    A   Yeah.
20    Q   Do you recall why she agreed to sign this one
21  and not the other two?
22    A   I don't.
23    Q   Was she also, you said -- sorry, there's one
24  more -- the fourth one.
25    A   The fourth one, she signed.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 109

1    Q   Do you know why she agreed to sign this one
2  and not the others?
3    A   I don't.
4    Q   Okay.  Then you believe there's a fifth one
5  about her GPS; correct?
6    A   Yeah.
7    Q   Do you recall whether or not she signed that
8  one?
9    A   I don't think she did sign that one either.
10  Either I asked -- because Christy at the time was
11  working here still -- and I think I delegated the GPS
12  one to Christy to write up.  But I know for sure there
13  was a write-up about the GPS.
14    Q   Did Grecia ever tell you that she used her own
15  car?
16    A   On one occasion, yeah, which didn't make any
17  sense to me because gas -- and at the time, she was
18  driving a Dodge pickup, which is a lot less economical
19  than a Smart Car on gasoline.
20    Q   So the company provides the cars to the brand
21  ambassadors; correct?
22    A   Yes.
23    Q   Is there a policy that the brand ambassadors
24  are supposed to drive the company car and not their own
25  car?

Page 110

1    A   It is, because of the -- the company cars are
2  wrapped, meaning they're plastered in company logos.
3  And so it's free advertising with those funny-looking
4  cars driving around.  But she didn't receive a write-up
5  for it.  I just found it to be weird.
6        MR. GUTIERREZ:  Two-minute break, Kristol?
7        MS. GINAPP:  Yeah, sure.
8      (Recess taken from 12:42 p.m. to 12:47 p.m.)
9  BY MS. GINAPP:
10    Q   I want to look at Exhibit 13 really quick, the
11  text messages.  If you could turn to PLTF189?
12    A   Okay.
13    Q   This is where it appears there's some sort of
14  picture of text messages inserted into the text;
15  correct?
16    A   Uh-huh.
17    Q   Is this a picture that you sent, or a picture
18  of text messages that Grecia sent to you?
19    A   I don't know.
20    Q   Can you review it and see if it refreshes
21  your recollection?
22    A   It says "S" on here, so that doesn't stand for
23  "Grecia."  So I don't know.
24    Q   Do you recall taking pictures of text messages
25  and sending them to Grecia?

Page 111

1    A   I mean, it looks like it's Grecia talking
2  about -- I mean, I remember saying that Brent was
3  violating HIPAA laws and he told multiple people that I
4  was in rehab.  But like the font is different.  I don't
5  get these texts.
6    Q   When you checked your text messages earlier,
7  were these in your texts?
8    A   I have a crappy phone.  I was just recently
9  divorced, and so I switched from AT&T to Cricket.  So
10  at the time, I just bought whatever crappy phone I
11  could buy that had smartphone capacity.  And so my
12  phone doesn't have -- I have enough memory on my phone
13  to have Instagram and Facebook, and those are the only
14  apps I have.  So I literally have to delete my texts as
15  they go.
16    Q   Okay.  So you don't know who "S" is?
17    A   I don't know who "S" is.
18    Q   Does your phone -- do the text messages look
19  like this when they come in?  Do they have a "S" and
20  like there's a red person in a symbol, I guess?
21    A   Before I learned how to use it, I believe the
22  red was me.  Now I have a profile picture there.  The
23  "S" doesn't make any sense to me because I think
24  that -- I don't know who "S" is.  Grecia starts with a
25  "G."  So that doesn't make sense to me.

Page 112

1    Q   Okay.  So then turn to PLTF191.  Do you
2  recognize these photographs that look, again on this
3  page and the following two pages, there are more
4  photographs of text messages.  Do you recognize these?
5    A   I remember talking about Aimee saying that
6  everybody had to -- that everybody had to do
7  coursework, but -- and pushing it down the line.  But,
8  "They also went under oath, they're not forcing people,
9  are making it mandatory to take the courses, however I
10  have an e-mail from Aimee telling me it's mandatory and
11  for me to tell everyone else that is mandatory for them
12  to take those courses.  Or they are fired?"  That
13  doesn't -- I don't know.  This doesn't really jibe.
14  It's like a repeat.
15    Q   Okay.  I want you to skip to the back of that
16  exhibit, the last three pages -- or -- yeah, the last
17  three pages, third from the last page.  It says,
18  "Shawna Real Water," at the top.  I think the Bates
19  stamp must be stuck under the black bar at the bottom.
20        MR. GUTIERREZ:  I think it would be 198, 199.
21  BY MS. GINAPP:
22    Q   There's no Bates on there, but it would be
23  198, 199.  Do you see them, these ones right here?
24    A   Yeah.
25    Q   Okay.  So correct me if I'm wrong.  Do these

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 113

1  look like -- those look like the texts that were taken
2  pictures of?
3     A   Oh, it's from Shawna.
4     Q   So if you look at these, are these your text
5  messages with Shawna, or is it your correspondence with
6  Shawna?
7     A   Perhaps.
8     Q   Okay.
9     A   Yeah.
10    Q   Explain who Shawna is.
11    A   Shawna is the head of human resources.
12    Q   Current head of human resources?
13    A   I sure hope so.
14    Q   So she's the current head of human resources
15  at Real Water?
16    A   I think technically Aimee is, but she runs the
17  post.
18    Q   Aimee is like the VP or executive in charge of
19  it?  Would that be correct?  And then Shawna does the
20  daily work?
21    A   Yes.
22    Q   Okay.  So why were you corresponding with
23  Shawna in these, looks like two pages of text messages?
24    A   Shawna -- I see value in Shawna.  And Shawna
25  is -- I have a friendship with her.  And she was

Page 114

1  complaining to me about her frustrations there.  She
2  recently submitted a CSW to get a raise, and couldn't
3  get the raise because she had to complete coursework to
4  get the raise, and was venting with me.
5     Q   And then you took screenshots of it and sent
6  it to Grecia?
7     A   I guess so.
8     Q   Do you recall why you did that?
9     A   I don't.
10    Q   Then look at the very last page marked
11  PLTF200.
12    A   This looks like an e-mail from Aimee to
13  somebody.
14    Q   Do you recognize it as being to you?
15    A   I don't have access to my e-mails.  I haven't
16  had access to my e-mails since I left.  So it couldn't
17  be to me.
18    Q   This text message, or whatever this message
19  is, e-mail or text, is dated 7-18-2016; correct?
20    A   Although, it could have been to me.  But I
21  don't think it is to me.
22    Q   Did you have the same phone then, on July
23  18th, 2016, as you do now?
24    A   No.
25    Q   Do you have access to the information from

Page 115

1  your old phone, on that date?
2     A   Yeah, but I don't think this is from my phone.
3     Q   Okay.  Do you recall sending anything like
4  this to Grecia?
5     A   I don't.
6     Q   And when you were corresponding with Grecia
7  since your termination -- sorry -- your separation from
8  the company, separation from Real Water, did you at all
9  have access to any e-mails with Real Water?
10    A   No.  I've been locked out of my e-mail
11  since -- Shawna told me when I was locked out of my
12  e-mails.  I got locked out of e-mail when I was in
13  Narconon.  And then I contacted Aimee, and Aimee reset
14  the password, and I had access to them again for a
15  couple weeks.  And then right after I came back, Shawna
16  told me that I was -- they were changing the passwords,
17  and that I was locked out of my e-mails again.
18    Q   When you had your termination meeting with
19  Grecia, was she given the opportunity to argue her side
20  of the story?
21    A   Not really.
22    Q   Why not?
23    A   Because it was pretty cut and dry.  I mean,
24  when I go into those meetings, my mind is already made
25  up, you know.  I already have a final paycheck cut.

Page 116

1     Q   Okay.  Would it be fair to say that -- and I
2  think you alluded to this in your testimony earlier --
3  but would it be fair to say that prior to -- well,
4  prior to your separation from Real Water, that you had
5  a personal relationship with Brent Jones outside of the
6  workplace?
7     A   Uh-huh.  It was so intertwined.  Yes.  Yeah,
8  we had a friendship.
9     Q   Okay.  You referenced that before you went to
10  Narconon, that you had been drinking alcohol, I assume;
11  correct?
12    A   Uh-huh.
13    Q   At an increased frequency?
14    A   Thursday to Sunday.
15    Q   Would you say that was an increased frequency?
16    A   Not for me.
17    Q   Was it perceived that your drinking was
18  interfering with work?
19    A   No.  The reality is, Brent lost his campaign
20  because I wasn't involved.  Laurel tanked it.  And I
21  really felt like Narconon was a reaction to a couple
22  things.  He lost his election, and my attitude was not
23  positive.
24        The night of the election of the primary,
25  Laurel got drunk and tried to put hands on another

Electronically signed by Mary Cox Daniel (101-361-287-3117)                              e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 117

1  legislator, and I stepped in the line of fire, and the
2  anger turned towards me.  And I decided at that moment,
3  there was no way I was going to work with her again.
4  So I told Brent, "I'm not going to be involved in your
5  campaign.  If you want her involved, that's fine, I
6  won't be involved."  So she ran his campaign, and lost.
7       And I felt like Narconon was really kind of a
8  punishment for not being involved.  But also, it had a
9  lot to do with my attitude being crappy because I now
10 had Aimee Jones breathing down my throat micro-managing
11 me, which made me not want to work there.
12    Q   Did Brent --
13    A   So the better perception to think was that I
14 was drinking, or something, and that's why my attitude
15 had changed.  My attitude had changed -- my drinking
16 was the same as it always was.  I would drink -- I
17 would get bottle service on Thursday night, Friday
18 night, Saturday night.  And that was my standard
19 operating procedure at the time.
20    Q   So prior to going to Narconon, did Brent come
21 to you and say that he expressed that he felt like the
22 drinking was getting -- was interfering with your work
23 performance?
24    A   No.  I mean, it was right before I went to
25 Narconon he's like, "This is what it is.  I can tell

Page 118

1  that you're not on drugs, but something is different."
2  I said, "Yeah, I'm drinking a few days a week."  And
3  he's like, "Well, then you have to go to Narconon."
4     Q   Just to be clear:  Brent paid for you to go to
5  Narconon?
6     A   He ultimately ended up paying for me to go to
7  Narconon.  My paycheck was changed without me signing
8  anything.  My paycheck was changed.  My paycheck was
9  cut in half.  I didn't agree to this.  And the reason I
10 signed papers to separate from them was simply just to
11 get my paycheck paid back.  But at the time, ultimately
12 I, through some sort of debt that I incurred from my
13 paychecks, was paying, co-paying for Narconon while I
14 was there.
15      And then it ended up, through our agreement,
16 that they ultimately ended up paying for the period of
17 time that I was at Narconon because they reimbursed me
18 for what was taken out of my paychecks.
19    Q   Just to be clear:  This was your paycheck
20 while you were gone at Narconon?
21    A   Yes.
22    Q   The company was continuing to pay you while
23 you were not working?
24    A   I was still working.  I was still managing my
25 accounts that Aimee was trying to burn down.  As I was

Page 119

1  there, I still had to play damage control.  She is not
2  a very friendly human being.  And so every single
3  distributor that we have was constantly threatening to
4  drop us because of the way that she handled them.
5  Prior to me going to Narconon, she reached out to Los
6  Angeles Budweiser once, and left a voicemail.  And Los
7  Angeles Budweiser said if they ever reached out to them
8  again, that they would drop us.
9       So I was still managing my juniors while I was
10 in Narconon, and was still communicating with my
11 Budweisers while I was there, shooting out e-mails to
12 people, and making sure that there was a company for me
13 to go back to.
14    Q   Were you working full-time?
15    A   I was working about six hours a day, which is
16 about the same amount of time I was working when I was
17 not in Narconon.
18    Q   Did you ever ask to go anywhere other than
19 Narconon?
20    A   I didn't want to go to Narconon.  I didn't
21 have a choice.
22    Q   Okay.  But did you ask, ever suggest going
23 somewhere other than Narconon for rehab?
24    A   I wanted to go to Malibu Passages.  But it was
25 not a choice.  It was either you go to Narconon, or you

Page 120

1  don't work here anymore.  Either you don't get married
2  to this particular girl, or you don't work here
3  anymore.  And so I chose to go to Narconon and maintain
4  my employment until I saw that it was straight up --
5  the brainwashing part, I couldn't handle that anymore.
6  I mean, I'm all about -- now I haven't had a drink of
7  alcohol or any substance since November 20th.  So now
8  it's been months and months.  I look 10 years longer
9  younger than I did before.  My mind is clearer than it
10 has ever been.  And so I saw some benefit to the
11 Narconon, the detoxification process, what they call
12 Purif.  But once it got to the heavy-duty objectives
13 where I thought it was brainwashing, you know, I
14 objected to it.  I couldn't do it.  And I knew that
15 Brent would not agree with me on this.  And so I just
16 had to leave.  I had to coordinate a way to book
17 airfare, even though my money supply was cut off, to
18 get back to Las Vegas.
19    Q   So prior to going to Narconon, you had been --
20 you testified that you had been taking some Scientology
21 courses; correct?
22    A   Uh-huh.
23    Q   I'm unclear, based upon your testimony,
24 whether or not that was voluntary, in your mind.
25    A   Absolutely not.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

1  Q   It was not voluntary?
2  **A   Absolutely not.  I have never --**
3  Q   I'm sorry.  Do you need to text, or do
4  you want to testify?
5  **A   That's all right.**
6  Q   Okay.
7  **A   No, absolutely not.  No, in June, it was laid**
8  **out to me if I wanted to continue with employment with**
9  **the company, I had to go to Orange County and start the**
10 **Purif process.  And I didn't really object to it**
11 **until -- I mean, with Brent, you really -- you can't**
12 **really express your opinion.  You don't have a choice.**
13 **When you're dealing with people that are this bold, the**
14 **only way that you survive is by agreeing.**
15 Q   Okay.  To be clear, you didn't object to it.
16 You actually signed a document saying that you were
17 doing it voluntarily, correct, the Purif?
18 **A   I had no choice.  But, yes.**
19 Q   But you did sign it; correct?
20 **A   I had no choice.**
21 Q   My question is:  You did sign the document
22 that said that you, being of sound mind, want to go
23 through the Purif process; correct?
24 **A   I did sign it, but I had no choice.**
25 Q   And then you also signed a document actually

1  on the same day stating that you voluntarily wanted to
2  start learning Scientology; correct?
3  **A   Yes.  But, again, I had no choice.  If you**
4  **knew Brent Jones, then you'd understand.**
5  Q   So -- strike that.
6  **A   I'm not suing Real Water.**
7  Q   I understand.  I just want to make sure that I
8  understood that you signed those, and you weren't
9  disputing signing them.
10 **A   I mean, under duress -- let's be real -- I**
11 **absolutely signed them under duress, but I signed them.**
12 Q   So what do the circumstances of Grecia's
13 termination -- how do they relate to the circumstances
14 of your separation with the company?  Would you say
15 that they have anything to do with each other?
16     MR. GUTIERREZ: Objection. Form.
17 BY MS. GINAPP:
18 Q   In your opinion?
19 **A   In my opinion, they're two totally separate**
20 **things.**
21 Q   Okay.  And why is that?
22 **A   I was forced to do Scientology religious**
23 **stuff.  Again, I wasn't over courses.  So I don't know**
24 **how much coursework she had to do.  But if anything,**
25 **she would have done ABLE courses.  She would have done**

1  **Admin Tech.  Until you get into, like, Course 8, or**
2  **whatever, when you "Ups and Downs" or "Personal Values**
3  **and Integrity," they're the Administrative Tech, how to**
4  **run a business, how to read, stuff like that.**
5  Q   Until you get into those courses what?  Sorry.
6  **A   Oh.  It's not religious, from what I've seen.**
7  **From doing the religious Scientology myself, it's not**
8  **religious.**
9      MS. GINAPP:  Okay.  I'll pass the witness.
10          FURTHER EXAMINATION
11 BY MR. GUTIERREZ:
12 Q   You talked about signing those documents under
13 duress because of how Brent Jones is.  What does that
14 mean?
15     MS. GINAPP:  I'm going to object to form.
16 Foundation.  Go ahead.
17     THE WITNESS:  So the phenomena of Brent Jones
18 is kind of hard to explain.  The reason the revolving
19 door is as big as it is -- I alluded to it before -- is
20 because of the screaming matches that go on before
21 Brent and Aimee.  That's how they communicate.  That's
22 just how they vibe.  Like right now, even though this
23 is a confrontational lawsuit, and you all aren't BFFs,
24 right, because you're on the opposite side of the
25 table, you're still communicating in a civil manner.

1  Q   Right.
2  **A   If Brent is mad at somebody, he's not**
3  **communicating with you in a civil manner.  He's**
4  **screaming at you.  Screaming at you to where the blood**
5  **vessels are popping out of your head, to where -- I've**
6  **seen him scream at his son, Blain, to where the blood**
7  **vessels are popping out of his head, to where Blain**
8  **gets so frustrated, he literally knocks everything off**
9  **of Brent's desk while there are other juniors, meaning**
10 **employees, in the office.  That's just how the guy**
11 **operates.  Either you agree with him or you don't agree**
12 **with him.  If you don't agree with him, you don't work**
13 **there anymore.  It's his way or the highway.**
14 BY MR. GUTIERREZ:
15 Q   So he manages through fear?  Fair to say?
16 **A   Yes.**
17     MS. GINAPP:  Objection. Form. Foundation.
18 BY MR. GUTIERREZ:
19 Q   You said the only way to survive is by
20 agreeing with him.  Now, how would an employee who has
21 a fear of losing their job make a complaint about these
22 courses involving religious undertones, and who would
23 they complain to actually get their matter heard?
24     MS. GINAPP:  Objection. Form. Foundation.
25     THE WITNESS:  I don't know.  Good luck with

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 125

1  that one.
2  BY MR. GUTIERREZ:
3      Q   Do you see the issue? I mean, as far as --
4  you testified earlier about Grecia making complaints to
5  you about having to do the coursework, and you said one
6  to two complaints a week regarding Scientology in the
7  workplace, but that any action or any complaints would
8  be futile. Nobody would do anything; correct?
9          MS. GINAPP: Objection. Form. Foundation.
10  Misstates prior testimony. Argumentative.
11         THE WITNESS: No one has the power to do
12  anything.
13  BY MR. GUTIERREZ:
14     Q   Because ultimately everything ended with Brent
15  or Aimee; correct?
16     A   Yes -- no, with Brent.
17     Q   With Brent. Brent would have not been
18  receptive to an employee not wanting to do the
19  coursework; correct?
20         MS. GINAPP: Objection. Form. Foundation.
21         THE WITNESS: Yeah, he would lose his shit.
22  BY MR. GUTIERREZ:
23     Q   And by "lose his shit," he would actually flip
24  out, like you testified to, to the point where there is
25  no option but to agree with him; correct?

Page 126

1      A   Or quit.
2          MS. GINAPP: Objection. Form. Foundation.
3  BY MR. GUTIERREZ:
4      Q   And that's -- why Brent wanted you to start
5  this Purif process in June of 2016. That's months
6  before any of these issues with drinking ever came up;
7  correct?
8      A   Correct.
9      Q   So why did he want you to start the Purif
10  process back then?
11     A   He felt that I was neglecting the company. So
12  at the time, I was running seven Assembly races. And
13  so either I had Brent pissed off at me, or I had Laurel
14  pissed off at me the entire time. And that was just
15  what Brent presented.
16     Q   Did you run his 2016 campaign?
17     A   We had a separation of responsibilities. I
18  ran his -- what's called his ground game, which
19  means -- ground game is in reference to phone calls and
20  reference to door knocking. So as David can attest to,
21  General Counsel for Real Water, I ran a ground game
22  against him with the Diana Orrock ground game, and I
23  actually paid walkers to follow David around, and to go
24  after the doors that he had just knocked on to convert
25  them back to us. So there's a separation. So I ran

Page 127

1  half of his campaign, not all of his campaign. I
2  ran -- I'm the sales guy. So I do human-to-human
3  relations, whether that's over the phone or in person.
4      Q   So when he had you start this Purif process in
5  June, did he mention you going to Narconon at all?
6      A   He wanted me to do Narconon then, but I wasn't
7  open to the idea, because I wasn't open to the idea of
8  being gone and not working. So the compromise was to
9  do the Purif at a Mission in Orange County, at a Church
10  of Scientology in Orange County.
11     Q   When he wanted you to do Narconon in November,
12  why did he send you to Florida and not just do one out
13  here?
14     A   So the person that got him into the Church of
15  Scientology, or that was his case supervisor back in
16  the day 20 years ago, Kathy -- I can't remember her
17  last name -- owns that Narconon in Florida.
18     Q   So he specifically picked out that location
19  for you; correct?
20     A   Yes.
21     Q   You had no choice in that matter?
22     A   Correct.
23     Q   Was that even -- did those Narconon facilities
24  even help with any type of rehab, or are they just a
25  front for Scientology?

Page 128

1          MS. GINAPP: Objection. Form. Foundation.
2          THE WITNESS: You'd have to interview a lot of
3  people to go through them to have a -- I think they're
4  just a front for Scientology.
5  BY MR. GUTIERREZ:
6      Q   Now, back to Grecia's complaints of these
7  Scientology-based courses in the workplace, or at least
8  her opinion of it, who could she go to within the
9  company at the time she was employed to remedy or
10  address any of her complaints?
11     A   I think legally she could have gone to HR. I
12  think we had some internal document that you could fill
13  out. I don't know of anybody actually filling it out.
14     Q   Let's say she went to Christy in HR. What
15  would Christy do?
16         MS. GINAPP: Objection. Incomplete
17  hypothetical.
18         THE WITNESS: I can't imagine Christy doing
19  anything.
20  BY MR. GUTIERREZ:
21     Q   Because ultimately, it ends with Brent;
22  correct?
23     A   Yeah. You'd have to go back to Brent. It's
24  not like -- prior to this lawsuit, we weren't even
25  thinking about being sued.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141

Page 129

1    Q   You said Bonnie was, I guess, a believer of
2  the coursework and the principles of Scientology?
3    A   Uh-huh.
4    Q   Is it possible that some of Bonnie's beef or
5  complaints with Grecia was based upon Grecia not
6  wanting to do the coursework?
7        MS. GINAPP: Objection. Form. Foundation.
8        THE WITNESS: I don't know what her beef with
9  her really was. I just know there was a beef.
10 BY MR. GUTIERREZ:
11   Q   With the GPS, did the employees know about the
12 GPS?
13   A   Yeah.
14   Q   Okay.
15   A   Yeah. It's against the law to not inform
16 somebody if you're tracking them. In my political
17 campaigns, I would make every employee sign an
18 acknowledgment of a geo timestamp. If you record
19 somebody over the phone -- yes, the short answer is
20 yes. It's illegal to NSA somebody without their
21 permission.
22   Q   Were there employees who were active
23 Scientologists that were given preferential treatment
24 than people who were not?
25       MS. GINAPP: Objection. Form. Foundation.

Page 130

1        THE WITNESS: There really weren't any
2  Scientologists there that stayed working there. I
3  mean, Hiro ended up leaving. The only, like,
4  full-fledged -- I mean, Anthony, the highest paid
5  employee of Real Water is Anthony Randolph, and he's
6  absolutely not a Scientologist. He's refused to do any
7  of the courses.
8  BY MR. GUTIERREZ:
9    Q   But in your dealings with Brent, if somebody
10 was an active Scientologist or doing all the
11 coursework, would they be given preferential treatment?
12   A   I did it --
13       MS. GINAPP: I'm going to object. Form.
14 Foundation. Go ahead.
15 BY MR. GUTIERREZ:
16   Q   Go ahead.
17   A   I did it to make my life easier. I mean, I
18 didn't have a choice. But I knew that when I did the
19 courses, and I could speak in the vocabulary that they
20 use, it's something that he identified with, and I
21 could get what I wanted more often.
22   Q   You said that your concern was making money,
23 profitability, but that you were being pressured to
24 pressure employees to do the coursework; is that
25 correct?

Page 131

1        MS. GINAPP: Objection. Misstates testimony.
2  BY MR. GUTIERREZ:
3    Q   Is that correct? Yes?
4    A   Yes.
5    Q   Who pressured you to put that pressure on
6  employees?
7    A   Brent and Aimee.
8        MR. GUTIERREZ: I have no further questions.
9        MS. GINAPP: Nothing further.
10       MR. GUTIERREZ: Jeramy, you're going to have
11 the opportunity to review your deposition transcript
12 and make any changes as far as typos or anything to the
13 transcript. You can waive off on that now, or if you
14 want to actually review the transcript and make
15 changes, you can. It's your option.
16       THE WITNESS: It's not my case. I don't care.
17       MR. GUTIERREZ: Okay. So you're comfortable
18 with everything you testified to. We're going to waive
19 off on him reading and signing. We're done.
20  (Thereupon, the deposition concluded at 1:16 p.m.)
21
22
23
24
25

Page 132

1        CERTIFICATE OF REPORTER
2  STATE OF NEVADA  )
              )  ss:
3  COUNTY OF CLARK  )
4        I, Mary Cox Daniel, a Certified Court
   Reporter licensed by the State of Nevada, do hereby
5  certify:
6        That I reported the deposition of JERAMY
   EDGEL, commencing on Monday, February 13, 2017, at
7  10:11 a.m.
8        That prior to being examined, the
   witness first duly swore or affirmed to testify to the
9  truth, the whole truth, and nothing but the truth; that
   I thereafter transcribed my said shorthand notes into
10 typewriting and that the typewritten transcript is a
   complete, true and accurate record of testimony
11 provided by the witness at said time.
12       I further certify (1) that I am not a
   relative or employee of an attorney or counsel of any
13 of the parties, nor a relative or employee of any
   attorney or counsel involved in said action, nor a
14 person financially interested in the action, and (2)
   that pursuant to Rule 30(e), transcript review by the
15 witness was waived.
16       IN WITNESS WHEREOF, I have hereunto set
   my hand in my office in the County of Clark, State of
17 Nevada, this 20th day of February, 2017.
18
19
20       MARY COX DANIEL, CCR 710, FAPR, RDR CRR
21
22
23
24
25

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    e8fb53ff-da05-4ec6-8440-d50a67a3a141