# EXHIBIT 2

Videotaped Deposition of Brent A. Jones

# Condensed Transcript of the Testimony of

# **Brent A. Jones**
Volume I

**Date:**  December 28, 2016

Grecia Echevarria-Hernandez v. Affinitylifestyles.com, Inc.
Case No. 2:16-cv-00943-GMN-VCF

Oasis Reporting Services, LLC
Phone:  702-476-4500
E-mail:  info@oasisreporting.com
Internet:  www.oasisreporting.com

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2                   DISTRICT OF NEVADA
 3  GRECIA                    )
    ECHEVARRIA-HERNANDEZ,      )
 4                            )
              Plaintiff,      )
 5                            )
         vs.                  )  No. 2:16-cv-00943-GMN-VCF
 6                            )
    AFFINITYLIFESTYLES.COM,    )
 7  INC. d/b/a REAL ALKALIZED )
    WATER, a Nevada           )
 8  corporation; DOES I-X; and )
    ROE BUSINESS ENTITIES I-X, )
 9  inclusive,                )
                              )
10              Defendants.   )
    _____ )
11
12
13     VIDEOTAPED DEPOSITION OF BRENT A. JONES
14        Taken on Wednesday, December 28, 2016
15   By a Certified Court Reporter and Legal Videographer
16                   At 2:00 p.m.
17           At 8816 Spanish Ridge Avenue
18                  Las Vegas, Nevada
19
20
21
22
23
24  Reported by:  MARY COX DANIEL, FAPR, RDR, CRR, CCR 710
25  Job No. 19705B
```

Page 2

```
 1  APPEARANCES:
 2  For Plaintiff:
 3     MAIER GUTIERREZ AYON
       BY:  JOSEPH A. GUTIERREZ, ESQ.
 4     8816 Spanish Ridge Avenue
       Las Vegas, NV 89148
 5
 6  For Defendants:
 7     LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
       BY:  KRISTOL BRADLEY GINAPP, ESQ.
 8     6385 South Rainbow Boulevard
       Suite 600
 9     Las Vegas, NV 89118
10
11  Also Present:  David Gardner; Kenneth Laursen,
    Videographer
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                  I N D E X
 2
    WITNESS:  BRENT A. JONES
 3
                    PAGE
 4
    Examination By Mr. Gutierrez          5
 5  Examination By Ms. Ginapp           116
    Further Examination By Mr. Gutierrez 118
 6
 7            INDEX TO EXHIBITS
 8  Exhibit                    Page
 9   1    WISE International Business   31
         Directory 2006, Bates labeled
10       PLTF00857-01154
11   2    Portions of Basic Study      48
         Course, beginning with Bates
12       label RW-000149
13   3    Portions of "Formulas For    68
         Business Success," beginning
14       with Bates label RW-000828
15   4    Expert Report written by     73
         Stephen A. Kent, PhD, dated
16       December 13, 2016
17   5    Portions of "Speaking From   78
         Experience," beginning with
18       Bates label RW-001306
19   6    Employment Agreement, Bates  83
         labeled RW-000016-28
20
     7    Charge of Discrimination,    92
21       Bates labeled RW-000067-68
22   8    Printout from Newsmax TV,    98
         Bates labeled PLTF00022-23
23
24
25
```

Page 4

```
 1            (Exhibits Continued)
 2   9    Printout of article titled,  107
         "Bend Dentist Fined Nearly
 3       $348,000 for Required
         Scientology-Based Training,
 4       BOLI Announces," Bates labeled
         PLTF01171
 5
 6  10    "Message to Garcia" Video    118
         Review, Bates labeled
 7       RW-000031-32
 8  11    Real Water Course Memo and ADP 119
         TotalSource-Work Orders, Bates
         labeled RW-000060-64
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1      THE VIDEOGRAPHER:  Today is Wednesday,
2  December 28, 2016.  The time is approximately 1400, or
3  2:00.
4      The videographer is Kenneth Laursen.  The
5  court reporter is Mary Daniel.  We are here on behalf
6  of Oasis Reporting Services.
7      The witness is Brent Jones.  We are here in
8  the matter of Grecia Echevarria-Hernandez versus
9  Affinitylifestyles.com.
10      Will counsel please state your appearance, and
11  then the court reporter will administer the oath.
12      MR. GUTIERREZ:  Joseph Gutierrez on behalf of
13  the Plaintiff.
14      MS. GINAPP:  Kristol Bradley Ginapp on behalf
15  the Defendant.
16
17          EXAMINATION
18  BY MR. GUTIERREZ:
19   Q   Can you state and spell your name for the
20  record?
21   A   Brent, B-R-E-N-T, A., Jones, J-O-N-E-S.
22   Q   Okay.  Have you ever had your deposition taken
23  before?
24   A   Yes, I have.
25   Q   How many times?

Page 6

1   A   Three, I believe.
2   Q   In what capacity?
3   A   As a corporate officer.
4   Q   For which company?
5   A   Affinitylifestyles.com, Inc., dba Real Water.
6   Q   Were those civil lawsuits against the company?
7   A   Correct.
8   Q   And what were the claims in each of those
9  lawsuits?
10   A   Distributor dispute, one; a contractual
11  dispute on another; and -- two then, only two times.
12   Q   Have you ever testified in court?
13   A   No.
14   Q   Are you comfortable with the deposition
15  process?
16   A   Yes.
17   Q   So you realize that the oath you just took is
18  the same oath you would take in a court of law, carries
19  the penalty of perjury just as if you were testifying
20  in front of a judge and jury; correct?
21   A   Yes.
22   Q   Do you understand it's important for me to
23  finish each question before you respond to give your
24  counsel time to object and so we have a clean
25  transcript, okay?

Page 7

1   A   Yes.
2   Q   Are you on any medication that would affect
3  your ability to give clear testimony?
4   A   No.
5   Q   Okay.  Have you ever been convicted of a crime
6  involving fraud or dishonesty?
7   A   No.
8   Q   Have you ever been sued for fraud?
9   A   I believe the two litigations that I just --
10  well, no, the second -- the second one did probably
11  contain an allegation of fraud.
12   Q   And the second one was -- remind me again.
13   A   A contractual dispute.
14   Q   How did that case resolve?
15   A   Settled.
16   Q   And were you sued personally in that case, or
17  just as -- through the company?
18   A   Company.
19   Q   Have you ever personally been sued for fraud
20  or named in a Complaint?
21   A   No.
22   Q   You've never been named in any Complaints
23  civilly individually?
24   A   My name may have been named as the officer
25   Q   Okay.

Page 8

1   A   It has to do with business.
2   Q   Got it.
3      Give us an overview of your educational
4  background.
5   A   I have a Bachelor of Science in business
6  administration, double major finance and real estate;
7  and I have a law degree from Pepperdine University
8  School of Law, JD.
9   Q   And what year did you get your law degree?
10   A   '91.
11   Q   Did you take the Bar exam?
12   A   Yes, I did.
13   Q   And where did you get licensed?
14   A   California.
15   Q   What year?
16   A   '91.
17   Q   Any other states?
18   A   It could have been '92.  No -- yeah, I
19  graduated in -- no.
20   Q   How long were you a practicing attorney?
21   A   Approximately seven or eight years.
22   Q   In what areas of law did you practice?
23   A   Business, contractual civil litigation, and
24  real estate.
25   Q   Did you ever handle employment litigation?

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    83da6eb4-60b7-476d-9bae-9662a9872d9d2

1   A   No.
2   Q   Did you work for a law firm or have your own
3   firm?
4   A   My own firm.
5   Q   What was the name of your firm?
6   A   Brent Jones, Esquire.
7   Q   Did you put your license on hold, or are you
8   still active?
9   A   It's been inactive -- I don't know if I
10  renewed it this last year or not. I'm not sure. But
11  I've been keeping it inactive for -- but I may have --
12  actually, I think the dues are due in February. So I
13  haven't reactivated it yet for next year.
14  Q   Okay. But you haven't practiced law in close
15  to 18 years; is that fair to say?
16  A   Correct. Correct.
17  Q   Okay. Tell us what you did after law school.
18  Give us like an overview of your work history after law
19  school.
20  A   I practiced civil litigation for business, and
21  I determined that it wasn't for me because I did not
22  feel that I was producing value for society. So I
23  started working with upstart companies. And I, between
24  '95 and 2000, I helped fund six different companies,
25  four of which went public. When the dot-com -- so

1   there was an overlap. I was still practicing law when
2   I started working with the private companies. But then
3   I phased out my law practice completely.
4        And then in 2000 when the dot-com crash
5   happened, all the companies that I was helping went out
6   of business. So I decided that I needed to learn how
7   to run a business myself instead of just raise money
8   for other people that squander it, or are ineffective,
9   or however you want to phrase it.
10       And Affinity was one of those companies that I
11  helped fund, but I was a minority shareholder. The
12  majority shareholders gave their shares to me, and went
13  away. And then I started running Affinity. And at
14  that point, I went to the Hubbard College of
15  Administration, which is a secular college that teaches
16  a management technology. And I learned a system of
17  management that I currently use today, because I
18  believe when you are doing a business, you need two
19  things. You need mentorship of people that actually
20  have experienced business and know what to do; and a
21  system that you can apply as you grow because it's very
22  hard to go from a -- one guy managing three or four
23  guys, or five guys, or six guys, to managing 20 or 30.
24  And I chose the Hubbard College of Administration
25  system.

1   Q   Okay. Let's back up. You said you helped
2   fund six companies or raise capital; is that fair to
3   say?
4   A   Correct.
5   Q   And one of those companies was Affinity?
6   A   Correct.
7   Q   What business was Affinity in at the time?
8   A   It was selling nutritional products. Our
9   flagship product was called Sea Energy, which is an
10  aloe vera based drink with sea vegetation and other
11  nutrients. And then over the years, we developed up to
12  close to 20 different products.
13       And then in 2007, I came across our E2
14  technology, which is the basis of our Real Water, which
15  is ability to stabilize and -- stabilize negative ions
16  and alkalize the water. And based on my research, I
17  believed that it would be a success. So I transitioned
18  out of the nutritional products and went fully with the
19  Real Water. And since 2008, we've been basically
20  selling only Real Water.
21  Q   Now, was this -- was Affinity based out of
22  California?
23  A   Correct.
24  Q   When did you move the company to Las Vegas?
25  A   2004.

1   Q   And what were you selling in 2004?
2   A   Nutritional products. Sea Energy was the
3   flagship. We had another one called One Day Diet. We
4   had Lose and Snooze. We had a number of formulations
5   for, you know, heart health, joint health, things like
6   that.
7   Q   And you said that you were given shares or
8   given somebody's interest in the company at some point,
9   Affinity?
10  A   Yes.
11  Q   Describe that process.
12  A   I think -- I believe Affinity -- I might be
13  off a little bit on the dates -- was actually started
14  in '98. And I was a minority shareholder at that time.
15  I wasn't the one responsible for the day-to-day
16  management. And when the dot-com crashed and 2000
17  came, so between 2000 and 2001 is when I started
18  working full-time managing the company.
19  Q   And when did you go to the Hubbard College of
20  Administration?
21  A   Around that time, early 2000s.
22  Q   How were you exposed to that school?
23  A   I do not recall. I believe I went to a
24  seminar on organization and management.
25  Q   How long have you been a practicing

Page 13

1  Scientologist?
2      A   I believe I did my first course in Scientology
3  about 1992, or '93, something like that.
4      Q   And was Affinity, at the time you started
5  working with them, affiliated with Scientology in any
6  way?
7      A   No.
8      Q   And what's the relationship between Affinity
9  and Real Water currently?
10     A   Affinity is the old corporate name.
11 Real Water is the dba name, is the product that we
12 sell.
13     Q   Would Affinity be the parent company for
14 Real Water?
15     A   Yes.
16     Q   So they're separate entities?
17     A   Well, now there is another company that we
18 formed called Real Water, Inc., which has the drinking
19 water ready to drink and drinking water rights.  But
20 our technology can also be used for other things, such
21 as cosmetics in a concentrate version, and a plant
22 formulation for plants.  That -- those are still in
23 Affinity, and they haven't been developed.  But the
24 drinking water is now in a wholly-owned -- well, almost
25 wholly owned, 95 percent owned subsidiary.

Page 14

1      Q   Okay.  But all companies are affiliated,
2  Real Water, Inc., Affinity, and Real Water the dba;
3  correct?
4      A   Yes.
5      Q   Okay.  So for purposes of this deposition, is
6  it fair if we just label it "Real Water" unless I refer
7  to "Affinity"?
8      A   Yes.
9      Q   Okay.  What documents did you review in
10 preparation of your deposition today?
11         MS. GINAPP:  And I object to the extent it
12 calls for disclosure of attorney/client privilege
13 information.
14         MR. GUTIERREZ:  Go ahead.
15         MS. GINAPP:  You can answer otherwise.
16         THE WITNESS:  Actually, the only -- I actually
17 didn't review a document.  I was provided the
18 opportunity to look at my son's deposition, but I
19 didn't really.
20 BY MR. GUTIERREZ:
21     Q   So you haven't reviewed any documents in
22 preparation of your deposition today?
23     A   No.
24     Q   Besides your attorney or anyone at her law
25 firm, have you spoken to -- who have you spoken to

Page 15

1  about your deposition today?
2      A   David Gardner knows about it.  My wife knows
3  about it.  And my son knows about it.  Bonnie knows
4  about it, because she was scheduled earlier today.  I
5  think that's about it.
6      Q   Who's David Gardner?
7      A   The attorney sitting to my left, but to your
8  right.
9      Q   Is he the attorney for the company?
10     A   Yes, he is.
11     Q   In-house counsel?
12     A   Yes.
13     Q   And did you speak to your wife about any of
14 the substance of her deposition?
15     A   Briefly.  She discussed that she was asked
16 about our relationship, how we came to know each other.
17     Q   Did she give you any specifics as far as
18 questions or topics that were asked?
19     A   Just that topic.
20     Q   How about your son, did you talk to him?
21     A   Oh, my son mentioned the Basic Study Manual
22 had listings of the church in it, and he was confused
23 on how that got into our library, or potentially into
24 our library.
25     Q   And what was your response to him on that?

Page 16

1      A   Make sure that there are no such references in
2  our classroom library.
3      Q   And why did you tell him that?
4      A   You're not going to like this.  To avoid
5  scumbags like yourself.
6      Q   What does that mean?
7      A   Just what it says.  You can interpret it as
8  you interpret it.  I interpret it as I interpret it.
9      Q   Well, I can have my own interpretations.  But
10 you're the one that said it, so I'm asking you.
11     A   I would leave it just as it's stated.
12     Q   Well, eventually you'll be in front of a jury
13 on this.  So you don't want to explain yourself?
14     A   No.
15     Q   Okay.  So no fear as to actually complying
16 with the law or Title VII; you're just worried about
17 being sued?  Fair to say?
18         MS. GINAPP:  Objection.  Misstates testimony.
19 BY MR. GUTIERREZ:
20     Q   You can answer.
21     A   Yeah, I have no intention of violating any
22 laws.
23     Q   Okay.  And you think you're in compliance with
24 all Title VII laws; correct?
25         MS. GINAPP:  Objection.  Calls for a legal

Page 17

1  conclusion.
2  BY MR. GUTIERREZ:
3     Q   Go ahead.
4     A   The laws are very complex.  We try as hard as
5  we can to make sure we're in compliance.
6     Q   What do you do to ensure that you're complying
7  with Title VII?
8     A   We pay for a service that we pay through ADP,
9  which is above and beyond a traditional payroll, and
10  they provide us with legal opinions.  And any time we
11  have a question, we submit it to them.  They gave us --
12  they talk to our HR people and give them advice.  And
13  if we have any questions, they tell them how we should
14  proceed.  So we utilize that service extensively.  And
15  as I said, we have to -- we pay a premium for that
16  service.
17     Q   Is ADP still your vendor for paychecks?
18     A   Yes.
19     Q   They didn't try to drop your company at any
20  time?
21     A   Not -- no.
22     Q   Okay.  And has ADP even sent out
23  representatives to do training or seminars on Title VII
24  compliance?
25     A   Yes.

Page 18

1     Q   When?
2     A   I don't know.  I don't know the dates.
3     Q   But it's been done?
4     A   I -- as far as I understand, yes, a rep has
5  come out and helped.  And actually, we had an audit, I
6  think, a couple times where they come through and they
7  review our stuff.  But I don't remember specifically
8  the dates.
9     Q   I'm not talking about audits.  I'm talking
10  about training for employees and supervisors to ensure
11  compliance with Title VII.
12     A   They do an audit, and then they train on any
13  outpoints.
14     Q   Okay.  So that's been done?  There's been
15  actual training provided for that?
16     A   I believe so, yes.
17     Q   Okay.  Anything else besides reliance on ADP?
18     A   Occasionally our people go to HR seminars
19  where, you know, pay a couple hundred bucks, they go
20  for a half a day, or whatnot, or a day.  And they go to
21  a seminar and learn whatever the latest trend is.  And
22  I don't know the company that that's through.  But
23  we've had in the past memberships with these little
24  continuing education programs where we pay like a
25  thousand dollars, and you get so many courses a year.

Page 19

1     Q   Okay.  What are your current duties as --
2  you're president and CEO of the company; correct?
3     A   Yes, correct.
4     Q   What are your current duties on a daily basis?
5     A   I set the vision of the company.  I monitor.
6  I have weekly meetings generally with the main staff
7  members.  When I mean "main," people that are in charge
8  of areas.  I handle the finances.  And any major things
9  that come up, I give guidance as to how we should
10  handle them.
11     Q   Now, the company's full name is
12  Affinitylifestyle, Inc.; correct?
13     A   Dot-com, Inc.
14     Q   Dot-com --
15     A   Affinitylifestyles.com, Inc.
16     Q   And does the word "Affinity" have any relation
17  to Scientology?
18     A   No.  "Affinity" represents -- if you look it
19  up in the dictionary, it means a coming together, a
20  bonding, or a likeness, a liking of two things.  They
21  have a high affinity when they come together.
22     Q   But there's no definition within any of the
23  Scientology coursework regarding affinity?
24     A   The --
25         MS. GINAPP:  Objection.  Form.  Foundation.

Page 20

1  BY MR. GUTIERREZ:
2     Q   Go ahead.
3     A   The term is used in Scientology.  But as any
4  term, it's a regular term which is in a standard
5  dictionary, just like "the" or "a."
6     Q   How many employees does the company currently
7  have?
8     A   We fluctuate, depending on the number of crews
9  we have making water.  But it's usually between 40 and
10  60, I think, or 40 and 50, in that area.
11     Q   And what location is the company currently in?
12     A   3208 West Desert Inn, Las Vegas, Nevada 89102.
13     Q   That's the corporate address?
14     A   Correct.  Although we're in a number of
15  suites, but that's what we use for our mailing and our
16  reception.
17     Q   How many states does the company do business
18  in?
19     A   I don't know exactly how many states, but I
20  imagine close to all 50.  We -- probably our water is
21  represented in all the 50 states, due to the
22  fact that we have national distribution through two
23  companies.  One is called Nature's -- well, it's called
24  KeHE now.  It was bought out by Nature's -- KeHE bought
25  out Nature's Best.  So it's called KeHE Powered by

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    83da6eb4-60b7-476d-9bae-9662a98729d2

Page 21

1    Nature's Best.  And the other one is called UFI.  And
2    they distribute to natural product stores across the
3    United States.  So I don't have an exact, each store
4    location.
5        Q    Your wife currently works for the company;
6    correct?
7        A    Yes.
8        Q    What's her position?
9        A    She's vice president.  I don't know what the
10   tail end of her -- if it's sales and marketing, or what
11   exactly the name of her title is right now.
12       Q    Okay.  And your son works for the company as
13   well?
14       A    Correct.
15       Q    What's his title?
16       A    He's a vice president as well.  And I'm not
17   sure what his is either.  It could be -- yeah, I'm not
18   sure -- I'm not sure what their titles are.
19       Q    Now, both your wife and your son, are they
20   practicing Scientologists?
21       A    Yes.
22       Q    And how long have they been with the church?
23       A    My son became a Scientologist -- well, he was
24   introduced to Scientology throughout his life.  But he
25   became his own practicing Scientologist when he was

Page 22

1    about 20.  So that would have been about eight, nine
2    years ago.
3        Q    Okay.
4        A    And then my wife Aimee, I don't know exactly
5    when she started.  She was already a Scientologist when
6    I met her, but it was probably seven years ago,
7    something like that.
8        Q    Do you have any other children?
9        A    Yes.  I have four children all together.
10       Q    And are they all in the church?
11       A    No.  Just my oldest son is in the church.  The
12   other -- I have two younger children.  One is going to
13   be three next month, and the other one is one and a
14   half.  And then I have a son who's in college right
15   now, and he is not a practicing Scientologist.
16       Q    Do you have an independent recollection of
17   Grecia Hernandez?
18       A    I know of her.  But if I saw her, I would not
19   recognize her, as I've only met her briefly once or
20   twice.
21       Q    Were you involved in the decision to hire her?
22       A    No.
23       Q    Who was?
24       A    I'm not sure.
25       Q    Okay.  So as you sit here today, you don't

Page 23

1    have testimony as far as your interactions with Grecia
2    because you only met her once or twice; is that fair to
3    say?
4        A    Yes.
5        Q    Okay.  Bonnie testified earlier that the --
6    that the job description of brand ambassador was sort
7    of created when she came on to the company; is that
8    correct?
9        A    No.  We've had various terms about "demo
10   girl."  Brand ambassador is more -- if they want to be
11   call that, they can.  But basically, it's a person that
12   goes out and demonstrates and/or merchandises our
13   product with stores.  So I think it's an incorrect
14   characterization.  Now, her being the lead brand
15   ambassador, she's probably the only one that's been in
16   that position.  But we've had demo people since
17   Real Water was started, including myself.  I initially
18   did demos.
19       Q    Who did Grecia report to while at the company?
20       A    I believe -- again, this is just -- I don't --
21   I believe she reported to Bonnie.
22       Q    Bonnie testified that she also reported to
23   Jeramy Edgel.
24       A    Well, Jeramy is Bonnie's boss.  So he's more
25   responsible for sales.  So he may coordinate with

Page 24

1    Bonnie to have them go out in a specific region, or
2    something to that effect.  But, again, I -- her direct
3    boss was Bonnie, as far as I understand.
4        Q    Is Jeramy still with the company?
5        A    No --
6        Q    When did --
7        A    -- well, yes, I guess.  I don't --
8        Q    Well, explain that.
9        A    Well, he's recently been in a rehab facility,
10   so --
11       Q    For what?
12           MS. GINAPP:  I'm going to object to the extent
13   that it calls for disclosing confidential employee
14   health information.
15           THE WITNESS:  Okay.
16           MS. GINAPP:  And I direct you not to answer.
17           MR. GUTIERREZ:  That's okay.  You got to deal
18   with the media with Grecia, so I'm sure you guys can
19   deal with it here.
20   BY MR. GUTIERREZ:
21       Q    So why is he not with the company?
22       A    I'll follow the advice of my counsel and not
23   answer.
24       Q    Okay.  So you guys believe it's proper to go
25   ahead and release Grecia's medical information to the

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                83da6eb4-60b7-476d-9bae-9662a98729d2

1  media, but you don't want to testify as to Jeramy's
2  current condition; correct?
3      MS. GINAPP: I'm going to object as to form
4  and foundation. It's argumentative. It misstates
5  prior testimony on the issue.
6  BY MR. GUTIERREZ:
7      Q   You can answer.
8      A   **I don't know what medical information was**
9  **released to the media.**
10     Q   We'll get to that.
11         So is he with the company or not? Is he
12  employed, or he is unemployed with the company?
13     A   **He's officially with the company, I believe,**
14  **at this point, but he's not active working right now.**
15     Q   So he has not been terminated, and he has not
16  quit; correct?
17     A   **Correct.**
18     Q   Is he on -- like on FMLA leave, or some type
19  of leave of absence?
20     A   **I don't know how it's legally characterized.**
21     Q   Okay. When did he go on this -- when did he
22  stop working? When was his last day of work?
23     A   **He's not -- he's not terminated. So we still**
24  **pay him. But he's not actively working.**
25     Q   When did he stop actively working?

1      A   **Approximately a month and a half ago. I don't**
2  **know the exact dates.**
3      Q   Okay. Have you hired someone to replace him
4  or take over his duties?
5      A   **Not yet.**
6      Q   Do you have plans to hire someone to take over
7  his job duties?
8      A   **Yes.**
9      Q   You just haven't hired that person yet;
10  correct?
11     A   **Right, or unless, you know -- if everything**
12  **works out, then he'll be able to take over the duties.**
13     Q   Okay. Are you -- have you ever looked at
14  Grecia's social media?
15     A   **Personally, no.**
16     Q   What does that mean? Has anyone else that
17  you're affiliated with looked at it?
18     A   **I heard that she was doing texts, but I don't**
19  **know what the content of those really were. I mean,**
20  **I -- I -- personally, no, I have not looked at her**
21  **social media.**
22     Q   You heard she was doing what?
23     A   **Sending texts to, like, Bonnie and stuff. I**
24  **don't know if you could characterize that as social**
25  **media. But I have not looked at her social media.**

1      Q   Did your wife ever try to become Facebook
2  friends with her after the Complaint was filed?
3      A   **I don't know. You'd have to ask her.**
4      Q   You have no knowledge of that, though;
5  correct?
6      A   **No.**
7      Q   Did you ever instruct anybody to try to get in
8  contact with Grecia after the Complaint was filed?
9      A   **No.**
10     Q   Now, is Real Water affiliated with Scientology
11  in any way?
12     A   **No.**
13     Q   So there's no connections to the Church of
14  Scientology; correct?
15         MS. GINAPP: Objection. Asked and answered.
16  Go ahead.
17         THE WITNESS: No connections.
18  BY MR. GUTIERREZ:
19     Q   What is WISE, World Institute of Scientology
20  Enterprises?
21         MS. GINAPP: Objection. Form and foundation.
22  Go ahead.
23         THE WITNESS: It is a secularized group that
24  helps facilitate, or licenses you the right to use the
25  Hubbard Administrative Technology. You, meaning a

1  company.
2  BY MR. GUTIERREZ:
3      Q   So the company pays WISE a licensing fee each
4  year; correct?
5      A   **Yeah, we pay on a monthly basis.**
6      Q   How much do you pay per month?
7      A   **$600 per month.**
8      Q   Was there a start-up cost as well associated
9  with this license?
10     A   **No.**
11     Q   No flat rate? Nothing?
12     A   **Well, you can pay once a month, or you can**
13  **pay a week -- you can pay annually, or you can pay**
14  **monthly. We chose to pay monthly.**
15     Q   And the company licenses the actual course
16  materials, not you individually; correct?
17     A   **Correct.**
18     Q   Okay. Is there any type of fee that is given
19  to WISE or the church by the company?
20     A   **Just the licensing fee that we just discussed.**
21     Q   There's no percentage of gross revenues given
22  to the church or WISE at all?
23     A   **No.**
24     Q   Okay. And what benefits does Real Water get
25  with this license?

Page 29

1    **A   We get to utilize the admin technology, and**
2    **the courses, and attend seminars if we want to.  I**
3    **believe they offer seminars.**
4    Q    Were those the human resource seminars you
5    talked about earlier, or was that separate from WISE?
6    **A   No.  The seminars I went to were related to**
7    **the Hubbard College of Administration, which utilizes**
8    **the same technology, but it's not through WISE.  It's**
9    **through Hubbard College of Administration.**
10   Q    No, but you talked about sending your human
11   resources people to various seminars to have an
12   understanding of Title VII.
13   **A   No.**
14   Q    Are those seminars produced by WISE, or --
15   **A   No.**
16   Q    Okay.  Those are all separate and distinct?
17   **A   Correct.**
18   Q    Okay.  Are there any terms and conditions
19   associated with the use of the license?
20   **A   Yes, there would be.**
21   Q    Such as what?
22   **A   I don't have the contract here.  I couldn't**
23   **tell you.**
24   Q    But is one of those terms and conditions a
25   requirement that you only use their products?

Page 30

1        MS. GINAPP:  Objection.  Form.  Foundation.
2        THE WITNESS:  I do not believe so.
3    BY MR. GUTIERREZ:
4    Q    Okay.  There's no requirement that you have to
5    use only the products within that Hubbard technology,
6    you can't use outside products?
7        MS. GINAPP:  Objection.  Form.  Foundation.
8    Asked and answered.  Go ahead.
9        THE WITNESS:  I do not believe so.
10   BY MR. GUTIERREZ:
11   Q    Does the lawsuit that was filed in this case
12   have any effect on your license with WISE?
13       MS. GINAPP:  Objection.  Form.
14       THE WITNESS:  I do not believe so.
15   BY MR. GUTIERREZ:
16   Q    Do you get monthly literature from them as
17   part of your membership fee?
18       MS. GINAPP:  Objection.  Form.
19       THE WITNESS:  I would not say monthly.  But
20   occasionally, we get what's called a "Prosperity"
21   magazine, and we get e-mails occasionally which have
22   quotes and little tidbits and tips.  So the e-mails
23   come more often.  The literature, not so often.  And
24   then, annually there's a little, like, a daytimer, or
25   like a datebook that goes out which has, you know, the

Page 31

1    calendar in it, and has little tips and stuff in the
2    edges.
3    BY MR. GUTIERREZ:
4    Q    So there's a magazine called "Prosperity"
5    magazine?
6    **A   Yes.**
7    Q    And is there one called "WISE At Work"?
8    **A   I'm not familiar with that one.**
9    Q    Okay.  So --
10   **A   I am familiar with "Prosperity."**
11   Q    What's in the "Prosperity" magazine?
12   **A   Success stories, and strategies, management**
13   **strategies.**
14   Q    Okay.  Does the company have a WISE membership
15   card?
16   **A   Maybe.  I'm not certain.**
17   Q    Okay.  I'm just trying to understand the scope
18   of the membership.
19       We'll go ahead and attach this as Exhibit 1.
20       (Exhibit 1 marked)
21   BY MR. GUTIERREZ:
22   Q    Have you see this document before?
23   **A   I don't recall it.**
24   Q    Okay.  It's a WISE International Directory,
25   dated 2006.

Page 32

1        And before we get to this, it's your position
2    that WISE has no connection to the Church of
3    Scientology; correct?
4    **A   Yes.**
5    Q    Okay.  And what's your basis for that
6    statement?
7    **A   Because it's an independent organization**
8    **outside of the church.**
9    Q    Does the church take the position that all
10   writings of L. Ron Hubbard are considered scripture?
11       MS. GINAPP:  Objection.  Form.  Foundation.
12       THE WITNESS:  I do not believe so.  LRH wrote
13   a lot of fiction.  He was very popular.  That's what he
14   started out as, a fiction writer, and was very, very
15   published, pretty extensively.  He's done a number of
16   things.  He wrote stuff on navigation because he was a
17   sailor.  So he's wroten [sic] a number -- a number of
18   things.  I don't believe everything he's written is
19   considered scripture.  But I don't make that
20   characterization, so I wouldn't know.
21   BY MR. GUTIERREZ:
22   Q    Wasn't that characterization made, though,
23   when the church applied for tax exempt status with the
24   IRS?
25       MS. GINAPP:  Objection.  Form.  Foundation.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    83da6eb4-60b7-476d-9bae-9662a98729d2

Page 33

1       THE WITNESS:  I don't know what agreements
2    were.  I just know there's different aspects of it.
3    Just like, you know, he wrote "Battlefield Earth," and
4    I don't think that has anything to do with scripture.
5    And it was made to a movie, a terrible movie, but it
6    was made into a movie.  But it was a number one novel,
7    you know, on the fiction for years.  He wrote a number
8    of stuff in the '30s, and I don't think those would be
9    considered fiction -- or -- scripture.
10       Now, there's actual writings having to do with
11    you as a spiritual being.  Yes, those would be, I could
12    consider scripture, people as a spiritual being.
13    BY MR. GUTIERREZ:
14       Q   What is your definition of a scripture,
15    according to the church?
16       MS. GINAPP:  Objection.  Form.  Foundation.
17       THE WITNESS:  I can't testify as to according
18    to the church.  I can only testify as to what I
19    believe.
20       So I believe when there -- when the church has
21    documents which you read when you do church services
22    that treat you as a spiritual being and refer to a God
23    dynamic, then it's a spiritual.  When it's documents
24    that don't have anything to do, such as "Battlefield
25    Earth," which is a fiction novel about aliens and

Page 34

1    planet Earth a thousand years from now, that has
2    nothing to do with a spiritual -- you as a spiritual
3    being and God.
4       And the WISE technology has nothing to do with
5    spiritual being and God.  It has only to do with how to
6    run a business, and management by statistics, and
7    organization, and those types of things, which have
8    nothing to do with the spiritual being or God.
9    BY MR. GUTIERREZ:
10       Q   So it's your position that none of the actual
11    documents or writings within WISE overlap with the
12    Scientology-based religious documents?
13       MS. GINAPP:  Objection.  Form.  Foundation.
14       THE WITNESS:  There may be similar principles,
15    like you should be ethical.
16    BY MR. GUTIERREZ:
17       Q   Okay.
18       A   **But nothing in WISE has to do with you as a**
19    **spiritual being and God.  Stuff like you should be**
20    **ethical, you should be industrious, you should work**
21    **hard -- those types of things would be in both.**
22       Q   What type of thing would be in the actual
23    Scientology church that would not be in the WISE
24    business documents?
25       MS. GINAPP:  Objection.  Form.  Foundation.

Page 35

1       THE WITNESS:  As I just got through saying,
2    stuff having to do with you as a spiritual being and/or
3    God, dealing with God, those would be spiritual.  Stuff
4    having to do with just running a business, statistics,
5    organization, those type of things, they don't have
6    anything to do with the spiritual aspects.
7    BY MR. GUTIERREZ:
8       Q   Okay.  So even though "WISE" stands for "World
9    Institute of Scientology Enterprises," there's no
10    affiliation with the actual Scientology church;
11    correct?
12       MS. GINAPP:  Objection.  Foundation.
13       THE WITNESS:  It's my understanding -- again,
14    I'm not an expert in this area -- but it's my
15    understanding that, yes, they're completely opposite.
16    I mean, they're not commingled.
17    BY MR. GUTIERREZ:
18       Q   Well, have you ever asked anybody about that?
19    Have you ever looked into it?
20       A   **I've been told that it's secular.  And that's**
21    **the purpose for the group, is to keep things secular so**
22    **that they're not religious.**
23       Q   Who told you that?
24       A   **The people that run WISE, when you sign up for**
25    **the membership.  And I would not know the person's**

Page 36

1    **name, as I signed up initially probably 14 years ago,**
2    **or 12 years ago.**
3       Q   So do you feel there's anything in the course
4    materials that WISE provides that could make an
5    employee feel like they're being exposed to
6    Scientology?
7       MS. GINAPP:  Objection.  Form.  Foundation.
8    Calls for speculation.
9       THE WITNESS:  I do not believe so.
10    BY MR. GUTIERREZ:
11       Q   Okay.  And you've never been told that by any
12    employee?
13       A   **No.**
14       Q   Now, this document, which we've attached as
15    Exhibit 1, has Affinitylifestyles.com, Inc. listed on
16    the International Business Directory.  It's Bate number
17    00925.
18       A   **Okay.**
19       Q   Okay.  It also has you personally listed on
20    the directory at 00906.  And I want to ask you about --
21    turn to 01051.
22       A   **Where is it?  Where is that number?**
23       Q   I'm looking at the Bate numbers in the lower
24    right-hand corner.
25       A   **Are they in order?**

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    83da6eb4-60b7-476d-9bae-9662a9872d2

Page 37

1    Q   Yes.
2    **A   Okay.  So you want -- you want me to go to**
3    **01 --**
4    Q   051.
5    **A   Okay.**
6    Q   Do you have it in front of you?  Okay.
7        Under "Health Products," it has
8    Affinitylifestyles.com, Inc., your name, Brent Jones.
9    Do you see that?
10   **A   Yes.**
11   Q   And it says, "Charter Committee Member."  What
12   does that mean?
13   **A   You know what?  I'm not sure what that means.**
14   **I don't know if it's -- it may mean because we have an**
15   **elevated rank, like we pay more, because you can have**
16   **basic membership which is $500 a month.  We have the**
17   **one that's $600 a month.  So it may mean -- it may mean**
18   **that.  I'm not -- I couldn't answer.**
19   Q   Okay.  So you don't know what the charter
20   membership --
21   **A   No.**
22   Q   -- means?  Okay.
23   **A   Is there a syllabus or an index that says?**
24   Q   No.
25       Do you attend annual WISE conventions?

Page 38

1    **A   No.  I have been to a WISE convention twice, I**
2    **believe, but I do not attend them annually.**
3    Q   Go to PLTF00886.  This page lists out
4    different types of memberships.  Does this page lists
5    memberships the company has?
6        MS. GINAPP:  Do you want him to read it?
7        MR. GUTIERREZ:  I just want him to look at it
8    and see if it refreshes his memory as to what
9    membership he has, or the company.  I'm sorry.
10       MS. GINAPP:  So do you want him to guess based
11   upon his looking at it, or do you want him to --
12       MR. GUTIERREZ:  No, I didn't ask him to guess.
13   I asked him to look at this and see if it refreshed his
14   memory.  It's very simple.
15       THE WITNESS:  It doesn't refresh my memory,
16   because I don't ever remember seeing this.  But the one
17   that's called charter membership, which is $1,500, we
18   may have had that back in 2006.  Now we have the
19   corporate membership, which is $6,000.
20   BY MR. GUTIERREZ:
21   Q   Got it, okay.  So do you know when you
22   switched to the corporate membership?
23   **A   No.**
24   Q   Okay.  Okay.  Great.
25   **A   So that's probably it.**

Page 39

1    Q   Got it.  Thank you.
2        MR. GUTIERREZ:  Now, how much tape do we have?
3        THE VIDEOGRAPHER:  Off record?
4        MR. GUTIERREZ:  How much tape do we have?
5        THE VIDEOGRAPHER:  Oh, I'm sorry.  We have 23
6    minutes remaining, Counselor.
7        MR. GUTIERREZ:  Okay.
8    BY MR. GUTIERREZ:
9    Q   Are employees required to watch certain videos
10   when they're hired at Real Water?
11   **A   Yes.**
12   Q   Which videos?
13   **A   "The Secret," "Just Do It," "Message to**
14   **Garcia," "Way to Happiness," and then what we call our**
15   **"Culture" videos, which is me explaining what's**
16   **expected of them, and how we operate at Real Water.**
17   Q   So if an employee does not watch those videos,
18   they cannot work at Real Water; correct?
19   **A   I never had an employee say they didn't want**
20   **to watch them.  The first week, we generally have them**
21   **watch them.  So nobody has said they don't want to**
22   **watch them.**
23   Q   Hypothetically, if someone takes a job there
24   and they say, "I don't want to watch these videos," are
25   they terminated, or are they still allowed to work

Page 40

1    there?
2        MS. GINAPP:  Objection.  Form.  Foundation.
3    Calls for speculation.  Incomplete hypothetical.
4        THE WITNESS:  Yes, it hasn't happened, so I
5    don't know what the response would be.
6    BY MR. GUTIERREZ:
7    Q   So there's no company policy on if it does
8    happen, this is the result?
9    **A   I don't believe there's a specific company**
10   **policy on it, although there may be, because our**
11   **policies is about an inch and a half thick.**
12   Q   Okay.  And where did you -- where did you get
13   the videos that you make a requirement for the company
14   for employees to watch?
15   **A   Some are downloaded from the internet; some**
16   **are purchased off of Amazon; and some are got from**
17   **WISE.**
18   Q   Which ones are through WISE?
19   **A   "Message to Garcia" -- "Garcia" -- I believe,**
20   **was obtained through WISE.  And I'm not sure how we got**
21   **"The Way to Happiness."  "Just Do It" was downloaded.**
22   **"The Secret" was bought on Amazon.  And then the**
23   **"Culture" videos are what we created in-house.**
24   Q   Now, Blain testified that the orientation
25   videos were not mandatory, but Aimee testified that

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    83da6eb4-60b7-476d-9bae-9662a9872902

1  they were.  So you're quite fine in saying they are
2  mandatory to watch; correct?
3       MS. GINAPP:  I'm going to object based on the
4  fact he's not the corporate representative.  Go ahead.
5       THE WITNESS:  It's my understanding that
6  that's our standard procedure, is to put people through
7  them.  We've never had anybody object.  So I don't know
8  if Blain was taking the viewpoint that if somebody
9  doesn't want to watch them, whether or not we allow
10 them to continue to work.  Not everybody that works
11 with us watches them.  For instance, we have some
12 independent contractors that work closely with us and
13 they don't watch the videos, and we continue to use
14 them as long as they produce value.  So I would have to
15 speculate on how Blain is characterizing that.
16 BY MR. GUTIERREZ:
17     Q   Okay.  Do you recall giving a podcast shortly
18 after this lawsuit was filed regarding this litigation?
19     **A   I don't recall specifically.  I was**
20 **interviewed on the radio, and on TV, but I don't recall**
21 **a specific podcast.**
22     Q   Did you ever tell any media outlet that this
23 lawsuit was as a result of the, quote, establishment
24 media?
25     **A   Probably.  I don't specifically remember it,**

1  **but I probably would.**
2      Q   What does that mean?
3      **A   Establishment media is media that's just**
4  **trying to sensationalize anything to get ratings, and**
5  **they don't care about the truth.  They just want to**
6  **promote what will make headlines.**
7      Q   Okay.  So when you reviewed this lawsuit, you
8  said that it was as a result of the establishment
9  media; is that fair?
10     **A   If you say I said that, if I did, I wouldn't**
11 **deny that I would say that, but I don't recall**
12 **specifying using those words.  So, I don't deny it.**
13     Q   Do you recall ever telling a member of the
14 media that you thought this lawsuit was from pressure
15 by Governor Sandoval?
16     **A   I may have said that as well, yes.**
17     Q   And what's your basis for that?
18     **A   Being that I was a very strong critic of**
19 **Governor Sandoval, I believe this lawsuit is very**
20 **frivolous, and just is a harassment technique.  So that**
21 **would be my statement.**
22     Q   You realize that your company has been sued by
23 Lisa Marie Bailey as well; correct?
24     **A   Yes.  I understand you did a fishing**
25 **expedition to obtain other -- other clients --**

1      Q   Okay.  And --
2      **A   -- to bilk money from those that reduced -- to**
3  **line your pockets because you don't produce anything of**
4  **value for society.**
5      Q   Okay.  Okay, that's great.
6          Matt Nappi, do you remember him?
7      **A   Yes.**
8      Q   Do you realize he filed a claim against your
9  company as well?
10     **A   Yes.**
11     Q   Okay.  So instead of taking responsibility,
12 you blame the people that are actually bringing the
13 lawsuit?  Is that fair to say?
14         MS. GINAPP:  Objection.  Form.  Foundation.
15 It's argumentative.
16         MR. GUTIERREZ:  I'm just responding to his
17 statements.
18 BY MR. GUTIERREZ:
19     Q   Go ahead and answer.
20     **A   No, I believe --**
21         MS. GINAPP:  Just making my objections for the
22 record.
23         THE WITNESS:  I believe that you tell people
24 that you'll obtain them money through bringing this
25 process, so they believe you.  And, therefore, they

1  create a reason to sue, yes.
2  BY MR. GUTIERREZ:
3      Q   And the reason you believe it's completely
4  frivolous is because you believe they're lying;
5  correct?
6      **A   You'd have to give me something specific that**
7  **I discuss what they're lying about.**
8      Q   Is Grecia lying about her lawsuit?
9          MS. GINAPP:  Objection.  Form.
10         THE WITNESS:  No.  The lawsuit exists.
11         MS. GINAPP:  Objection.  Form.  Foundation.
12 BY MR. GUTIERREZ:
13     Q   Is Grecia lying about the claims in her
14 lawsuit?
15     **A   I believe so, yes.**
16         MS. GINAPP:  Same objection.
17 BY MR. GUTIERREZ:
18     Q   Okay.  Is Matt Nappi lying about the claims
19 that he's made with the EEOC?
20         MS. GINAPP:  Same objection.
21         THE WITNESS:  I -- first of all, I don't know
22 what the claims are that Matt Nappi has made, so -- I
23 know that Matt Nappi, when we let him go, did a lot of
24 threatening, and made a lot of -- you know, he called
25 the Health District, and they came in the day

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    83da6eb4-60b7-476d-9bae-9662a98729d2

1  afterwards, and the health lady said, "Oh, we were told
2  all this stuff, but you still have an 'A' because it
3  was all just false." I know that occurred. I know
4  shortly thereafter, the OSHA showed up as well.
5  BY MR. GUTIERREZ:
6      Q   Is Lisa Marie Bailey lying about her lawsuit
7  and claims?
8          MS. GINAPP: Objection. Form. Foundation.
9          THE WITNESS: I haven't read her lawsuit, and
10 I don't know the specifics.
11 BY MR. GUTIERREZ:
12     Q   So as you sit here today, there's nothing that
13 you think the company could have done differently to
14 alleviate these allegations?
15         MS. GINAPP: Objection. Form. Foundation.
16         THE WITNESS: I -- I don't believe that our
17 company does the things that are alleged in the
18 lawsuit. And I wasn't specifically involved with
19 Grecia, so I can't say how specifically and exactly she
20 was handled or not handled, or dealt with or not dealt
21 with. But, no, we do not require people to be
22 Scientologists. We do not force people to have a
23 certain set of beliefs, et cetera.
24 BY MR. GUTIERREZ:
25     Q   But you do reward your employees by taking

1  coursework that is based on Scientology; correct?
2          MS. GINAPP: Objection. Form. Misstates
3  prior testimony.
4          THE WITNESS: Yes, they receive raises based
5  on completion of courses. And the purpose of that is
6  so that they're more effective in their performance.
7  So, yes, they get raises. So we're on the same page,
8  meaning like --
9  BY MR. GUTIERREZ:
10     Q   Who put that -- I'm sorry. Go ahead. You can
11 finish.
12     A   For instance, learning how to do statistics,
13 if somebody doesn't understand how to measure their
14 performance, the course will teach them how to do that.
15 How to be better organized, the course teaches you how
16 to do those things. If an employee is more organized
17 and more productive, that's good for us, and it's also
18 good for them.
19     Q   And the optional coursework -- I'm sorry.
20         Who put the policy in place to get a 25-cent
21 raise for watching each of these optional courses?
22     A   You asked a compound question there. I put
23 the policy in place. But it's not watching courses,
24 it's doing courses. The videos, they know do not get
25 money for watching the videos, or a raise for watching

1  the videos.
2      Q   Okay. Good clarification. Let's back up. So
3  let me ask the question again.
4          The 25-cent raise is for completing the
5  coursework. It's not a video, it's a book. Correct?
6      A   Books, plural, yes.
7      Q   And you put that policy in place when?
8      A   I'm not certain.
9      Q   Was it when the company started in '06, '07,
10 or was it prior to that?
11     A   The company actually started in 1998. I took
12 it over in early 2000. Real Water was created in 2008.
13 So --
14     Q   So, okay, let me clarify again.
15         Was it -- was that policy in place when you
16 took over the company in '98?
17     A   No. I didn't take the company over in '98. I
18 took the company over in early 2000. But, no, it was
19 not in place.
20     Q   Was that policy in place when you had
21 Real Water created in 2008?
22         MS. GINAPP: Objection. Form.
23         THE WITNESS: It may have. I don't know
24 exactly when it was put in place.
25         MR. GUTIERREZ: Okay. This is the next

1  exhibit in line.
2          (Exhibit 2 marked)
3          MS. GINAPP: I'm going to lodge a continuing
4  objection to this exhibit as being incomplete.
5  BY MR. GUTIERREZ:
6      Q   Tell me what this document is.
7      A   It looks like it is a copy of portions of the
8  Basic Study Manual.
9      Q   Okay.
10     A   And you may be in copyright infringement for
11 making copies of this without obtaining it from WISE.
12 Just saying.
13     Q   Really? Okay. So use of a book in the course
14 of litigation that your company has produced is
15 copyright infringement? That's your testimony; right?
16     A   No. I'm saying if you're making copies of it
17 without their permission, it may be.
18     Q   Yeah, well, that's not true.
19         MS. GINAPP: I don't think we're going to be
20 pursuing that, Counsel.
21         MR. GUTIERREZ: Yeah, that would be fun.
22 BY MR. GUTIERREZ:
23     Q   So let's talk about this. What is this book
24 for, or this study course?
25     A   The Basic Study Manual teaches people how to

Page 49

1  study so that they can comprehend and be able to
2  duplicate what they're learning and be able to apply it
3  in the real world.  And it goes over three basic
4  subjects, which is:
5       If you have a misunderstood word, you should
6  clear it through the dictionary.  Misunderstood words
7  create a lot of confusion and people do not grasp
8  what's being said with a misunderstood word.
9       Secondary is too steep of a study gradient.
10  So if you're bypassing, you're going too quickly where
11  you can't comprehend, you got to slow the gradient down
12  so you can understand.
13       And the third aspect is lack of mass, meaning
14  if you're trying to describe an engine, it's hard to
15  understand an engine by just reading words.  You need
16  to have mass to see, oh, the spark plug goes up here,
17  and then this is where the heads are, and this is the
18  carburetor.  So the mass gives you the ability to fully
19  duplicate was being taught.
20       So it goes over those three areas.  So if you
21  find yourself having difficulty studying or
22  comprehending what you're reading, look to see if you
23  have misunderstoods, look to see if the study gradient
24  is too steep, or look to see if you have lack of mass.
25  And that helps you then understand what you're

Page 50

1  studying.
2       And that's the overall premise of this book.
3  And we have people do this first before they do any
4  other courses.  So if they start running into trouble
5  and they're not able to duplicate the material, they
6  can see if it's a misunderstood word, too steep of a
7  study gradient, or lack of mass.
8       Q   Is this study manual intended to make an
9  employee more efficient at their job?
10      A   It is intended to do what I just stated.  So
11  when they study the other courses, they understand.  Or
12  when they study anything, when they study anything,
13  whether it be duplicating an SOP, because if you're on
14  a line, you have to read SOPs.  If you're doing demos,
15  there's demo programs.  And if you don't understand it,
16  see if you have a misunderstood word, see if you have
17  steep study gradient, or see if you have a lack of
18  mass.
19       Understanding why the product is good -- we
20  have another video actually that -- which shows me
21  demonstrating the product.  And it goes through why our
22  product alkalinity, PH, if you want to understand that,
23  clear PH, clear alkalinity, clear negative
24  ionization -- "clear" meaning with the dictionary -- so
25  you fully understand what those terms are meaning.

Page 51

1       Q   Go to Bate number 000153.  153, do you have
2  that in front of you?  It would be a --
3       A   Oh, I got 253.  I'm sorry.
4       Q   Now, is the student or the employee supposed
5  to have their supervisor -- well, tell me, what -- what
6  is the supervisor's role with the student's review of
7  this course material?
8       A   The supervisor is just answering questions
9  they have, or help them, or give them guidance if
10  they're running into problems.  The idea is that the
11  course itself should be self-contained and somebody
12  should be able to go through it by themselves.  But
13  occasionally, things show up and there's questions, and
14  the supervisor would then help put them, you know --
15  oh, why don't you go look that up, or go take a look at
16  this, or reread this page, or go back a couple pages
17  and see where you have a misunderstood or whether you
18  don't understand something to where you last understood
19  it and start from there -- things like that to help
20  them make sure that they duplicate the information.
21       Q   And this page says, "Tear out and hand to your
22  supervisor."  Correct?
23       A   Yes.
24       Q   Where does the supervisor keep this?
25       A   I -- I -- each student has a student file

Page 52

1  which is just having to do with their coursework.
2       Q   Is that student file the same as their
3  employee file?
4       A   No.
5       Q   So it's kept separately?
6       A   Yes.
7       Q   And is anyone else given access to that
8  student file?
9       A   No.  It should only just be the supervisor.
10  It's in a drawer in the supervisor's office.
11      Q   And that -- that file is not sent out to WISE
12  or any other entity?
13       A   No.
14       Q   Okay.  So do you have access to that student
15  file?
16       A   I could probably get it, but I don't.  I don't
17  look at it.  I mean, if I asked, I could probably get
18  it, access to it.
19       Q   Okay.  So Grecia has a student file; is that
20  correct?
21           MS. GINAPP:  Objection.  Calls for
22  speculation.  Foundation.
23           THE WITNESS:  Yeah, I would assume she has a
24  student file.
25  /////

1  BY MR. GUTIERREZ:
2     Q   Does that student file include the mandatory
3  videos and the reviews that they put in there as well?
4     A   No.  The reviews go into their employment
5  file, I believe.
6     Q   Only the optional coursework goes into the
7  student file; correct?
8     A   The student file really doesn't have much in
9  it except for just the courses completed, as I
10 understand it, and if they -- I'd have to look, but it
11 would just have things only limited to the course.  But
12 I know that the actual -- when they do the write-up at
13 the end, it goes into their employment file.
14    Q   Got it.
15       Go to Bate number RW-000162.  Under Section
16 15a, it asks the student to look up the word
17 "nonbeliever" in the dictionary.  What's the purpose of
18 that?
19       MS. GINAPP:  Objection.  Form.  Foundation.
20 Calls for speculation.
21       THE WITNESS:  You know what?  I have no idea.
22 BY MR. GUTIERREZ:
23    Q   Have you ever seen that before?
24    A   I've probably seen it, because I've done the
25 Basic Study Manual, but I don't recall it.

1     Q   What does the definition of "nonbeliever" have
2  to do with anything that could potentially be related
3  to work?
4        MS. GINAPP:  Objection.  Foundation.
5        THE WITNESS:  This course is -- is not
6  specific to a job function.  This course is specific to
7  understanding how to use a dictionary, looking up
8  misunderstood words, and stuff like that.  So this
9  would be an -- it looks like it's just an exercise in
10 looking up two different words and how they're -- well,
11 actually, it's one word, but "non" -- how it is broken
12 down in a dictionary.  So I believe this is just to
13 give somebody an exercise of looking up a word in a
14 dictionary.  And that's extent of it.
15 BY MR. GUTIERREZ:
16    Q   It has no affiliation to whether or not
17 somebody else believes in religion or does not?
18    A   No.
19    Q   That's your testimony; correct?
20       MS. GINAPP:  Objection.  Form.  Foundation.
21 Misstates testimony.
22 BY MR. GUTIERREZ:
23    Q   Go ahead.
24    A   Absolutely not.  It has nothing to do with
25 religion.  Just like, we have people that are

1  nonbelievers in the Real Water technology, and we have
2  people that are believers.
3     Q   Go to 249, two pages out.
4     A   We're at 162.  So you wanted to go to 249?
5     Q   Correct.
6        MS. GINAPP:  They're not -- there are missing
7  pages.
8        THE WITNESS:  Okay.
9  BY MR. GUTIERREZ:
10    Q   Do you have 00249 in front of you?
11    A   Yes.
12    Q   And just so we're clear, this is selected
13 portions of this document so we're not bringing in
14 binders of documents for this deposition.  But this is
15 a true and correct copy of what you understand to be
16 the Basic Study Manual Course; correct?
17       MS. GINAPP:  Objection.  Form.  Foundation.  I
18 reiterate my objection.  It's an incomplete document.
19 BY MR. GUTIERREZ:
20    Q   Go ahead.
21    A   This is from a course.  I don't believe this
22 is all the courses, have this in it.
23    Q   Okay.  So the second paragraph on this page
24 says, quote, "There is a further Scientology service
25 available which you should now do which is designed to

1  bring you greater success and happiness in your work,
2  your social life, your relationships with others, or
3  any aspect of your life."
4        What are -- what is that -- what is that
5  talking about?
6        MS. GINAPP:  Objection.  Form.  Foundation.
7        THE WITNESS:  This would be telling someone
8  that there's other courses they could take that would
9  help them in their work, their social life,
10 relationships with others, or any other aspect of their
11 life.  There are other courses available that would
12 help in that.
13 BY MR. GUTIERREZ:
14    Q   Other WISE courses, or Scientology courses?
15    A   This looks like it came from one of the Basic
16 Study Manuals that was probably purchased at a church,
17 as opposed to one that should have come from the WISE,
18 which would have had all this removed.
19    Q   What's the difference?
20       MS. GINAPP:  Objection.  Form.  Foundation.
21       THE WITNESS:  Well, the ones that are WISE
22 would have no mention of Scientology in them.
23 BY MR. GUTIERREZ:
24    Q   But this is what was produced by your company.
25 So this is what's given to your employees; correct?

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    83da6eb4-60b7-476d-9bae-9662a98729d2

Page 57

1    MS. GINAPP: Objection. Form. Foundation.
2  I'm going to object to the extent he's not the
3  corporate representative.
4    THE WITNESS: I believe this is probably a
5  mistake, and it should not have been included in the
6  materials that were produced, and we have what are
7  called secular copies of the Basic Study Manual that
8  have no reference to Scientology whatsoever.
9  BY MR. GUTIERREZ:
10   Q   So you would agree that this reference is
11 inappropriate because it references the actual
12 Scientology, and should not be given to employees?
13   MS. GINAPP: Objection. Form. Foundation.
14 Misstates testimony.  Argumentative.
15   THE WITNESS: I'm not saying that it's
16 inappropriate.  I'm saying just to be as safe as
17 possible, we would prefer that it not be there, not any
18 mention of Scientology.  We're very -- we're very
19 careful in not mixing the two.  And do I personally
20 believe that just because a word is used, it's -- it's
21 promoting something?  I'd just rather not have it in
22 there so that it's not doing that.
23 BY MR. GUTIERREZ:
24   Q   Do you believe that paragraph is secular or
25 non-secular?

Page 58

1    MS. GINAPP: Objection. Form. Foundation.
2  Calls for speculation.  Calls for a legal opinion.
3  Calls for an expert opinion.
4  BY MR. GUTIERREZ:
5    Q   Go ahead.
6    **A   Yeah, I'm not -- I'm not going to say one**
7  **thing or the other.  I think that we should include**
8  **this without any reference to Scientology.**
9    Q   Okay.  It also states that it's a, "Service
10 available which you should now do."  So it's -- do you
11 get the impression that it's implying that they need to
12 do the service once they complete this course?
13   MS. GINAPP: Objection. Form. Foundation.
14   THE WITNESS: I believe it's a recommendation.
15 But, again, this -- in a perfect world, we would not
16 have included this.
17 BY MR. GUTIERREZ:
18   Q   Okay.
19   **A   But I -- but -- yeah.**
20   Q   Turn two pages, to 251.  Okay.
21     And is this also a mistake that should not
22 have been included in your -- for the Basic Study
23 Course for your employees?
24   MS. GINAPP: Objection. Form. Foundation.
25   THE WITNESS: Again, I don't know that this is

Page 59

1  included in our -- I think in our WISE acad-- or, our
2  academy itself would not -- would have a BSM that would
3  not have this in it.  This probably came from Blain's
4  office, or one of our personal offices, and it was
5  inadvertently left in.  But, yeah, we don't need to
6  promote the International Association of Scientologists
7  to our employees.
8    MR. GUTIERREZ: Let's take a break while he
9  changes tapes.
10   THE VIDEOGRAPHER: This is the end of Disk
11 No. 1 in today's videographed deposition of Brent
12 Jones.  The time, 1500 hours.  We are off the record.
13   (Recess taken from 3:00 p.m. to 3:09 p.m.)
14   THE VIDEOGRAPHER: We're back on the record.
15 This is the beginning of Disk No. 2 in today's
16 videographed deposition of Brent Jones.  The time,
17 1509.
18 BY MR. GUTIERREZ:
19   Q   Before we went on break, we were talking about
20 the page at 000251 entitled, "Your Guarantee of
21 Freedom."  Do you have that in front of you, Mr. Jones?
22   **A   Yes.**
23   Q   And what is this particular page for?
24   MS. GINAPP: Objection. Form. Foundation.
25 Calls for speculation.

Page 60

1    THE WITNESS: I think it speaks for itself of
2  what it says.  It's fairly succinct.  It's promoting
3  the International Association of Scientologists.
4  BY MR. GUTIERREZ:
5    Q   So it's promoting the church?
6    MS. GINAPP: Objection. Form. Foundation.
7  BY MR. GUTIERREZ:
8    Q   Correct?
9    **A   The International Association of**
10 **Scientologists is a different group than the church.**
11   Q   How so?
12   MS. GINAPP: Objection. Form. Foundation.
13   THE WITNESS: It -- it states what the purpose
14 is right here: "To unite, advance, support and protect
15 the Scientology religion and Scientologists in all
16 parts of the world so as to achieve the aims of
17 Scientology as originated by L. Ron Hubbard."
18     That's the purpose of the International
19 Association of Scientologists.  Its purpose is not to
20 teach Scientology or -- or -- or provide courses, or
21 whatnot.  It's just to unite, advance, support, and
22 protect.
23 BY MR. GUTIERREZ:
24   Q   So how is that different than the church?
25   **A   This is a group that was formed when a number**

Page 61

1  of organizations were suing the church. So it was
2  formed to help prevent, or go against the organizations
3  that were suing the church for -- on legal bases. And
4  it basically one -- it's done in Europe in stuff, like,
5  governments would outlaw the Church of Scientology.
6  The IAS would go in to get the government to accept the
7  church. That's its purpose. Not to teach the church
8  or teach people, but to make sure that the church is
9  not outlawed.
10  Q   So to protect the tax exempt status that the
11  church receives from the IRS? Is that one of the
12  purposes?
13  A   I could not state what the specific purpose is
14  other than what's stated on here, because I'm not an
15  officer, or involved, or in management with the IAS.
16  IAS, standing for International Association of
17  Scientologists.
18  Q   Are you a member of the IAOS group?
19  A   Yes, I do have a membership in the IAS.
20  Q   Okay.
21  A   But I'm not in management or involved with
22  them as an employee or anything.
23  Q   Do you pay dues to the IAS?
24  A   I bought a lifetime membership, so do I not
25  have to pay dues.

Page 62

1  Q   How much is that?
2  A   You have different levels. So you can have a
3  level -- I think it's three or $500 a year if you
4  just go -- if you want to be a member.
5  Q   Okay. So this is encouraging people to be a
6  member of IAS, not the actual church; is that fair to
7  say?
8  MS. GINAPP: Objection. Form. Foundation.
9  THE WITNESS: It's stating what it states. I
10  don't know if it asks for membership. I think it's
11  just discussing what the IAS is here.
12  BY MR. GUTIERREZ:
13  Q   It says in the fourth paragraph down: "Become
14  a member of the International Association of
15  Scientologists."
16  A   Okay. So that would be -- pursuant to that
17  paragraph, that's what it would be stating.
18  Q   Okay. If this was included in any of the
19  coursework given to your employees, do you think that's
20  appropriate?
21  MS. GINAPP: Objection. Form. Foundation.
22  Incomplete hypothetical. Calls for a legal conclusion.
23  THE WITNESS: I would prefer that it not be
24  included. And if I saw that it was in, I would have it
25  removed.

Page 63

1  BY MR. GUTIERREZ:
2  Q   You haven't gone to rule out -- you haven't
3  gone back and looked at what's actually been given in
4  this actual coursework to your employees, have you?
5  A   Me personally, no. I made it clear that we
6  make sure that we have no references whatever --
7  whatsoever to the church in our coursework.
8  Q   Okay. And if Grecia saw this particular page
9  and was offended, would you -- do you believe that's
10  a -- do you believe that's an appropriate response
11  based upon her religious beliefs and feeling like it
12  was imposing Scientology on her?
13  MS. GINAPP: Objection. Form. Foundation.
14  Calls for speculation.
15  THE WITNESS: I'm not sure what your question
16  was. But if Grecia came to me and said this is in
17  here, I'd say, "We will remove it, it should not be in
18  there," would be my response.
19  BY MR. GUTIERREZ:
20  Q   If she went to one of her supervisors and said
21  that she felt uncomfortable with some of the optional
22  coursework, how would the company remedy that?
23  MS. GINAPP: Objection. Form. Foundation.
24  Improper hypothetical.
25  THE WITNESS: Well, we -- we'd ask for a

Page 64

1  specific, "What are you uncomfortable with?" And if it
2  was something like this, we'd absolutely say it should
3  be removed. If it was because she does not want to do
4  statistics, and we'd say, "Well, we measure our
5  performance based on statistics, so you need to learn
6  how to do statistics."
7  BY MR. GUTIERREZ:
8  Q   Does the company provide any other non-WISE
9  material for employees for this 25-cent raise?
10  A   Yes. We have another program which is the 10X
11  book that we provide. And it's -- has nothing to do
12  with WISE or the church. We have --
13  Q   Let's stop there. 10X book, who wrote that
14  book?
15  A   Grant Cardone.
16  Q   And he's a Scientologist, though; correct?
17  MS. GINAPP: Objection. Form. Foundation.
18  THE WITNESS: I don't know Grant personally.
19  I believe he's a Scientologist, but I don't know him
20  personally. And it doesn't mention anywhere in the
21  book that he's a Scientologist.
22  BY MR. GUTIERREZ:
23  Q   Okay. Are you aware that he got sued for very
24  similar allegations to what's been set forth in this
25  case?

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                        83da6eb4-60b7-476d-9bae-9662a98729d2

Page 65

1    **A   No --**
2        MS. GINAPP: Objection. Form. Foundation.
3        THE WITNESS: No, I'm not aware.
4    BY MR. GUTIERREZ:
5    Q   Okay.
6    **A   I don't know him personally. I don't know.**
7    Q   All right. Go ahead.
8    **A   I know that I bought the book on Amazon.**
9    Q   What other non-WISE books are available for
10   this optional course?
11   **A   We have SOPs, groups of SOPs, that when**
12   **employees read them, they can get a raise based on that**
13   **they fully understand areas in their -- of their jobs.**
14   Q   Okay. Anything else?
15   **A   We have other courses. Like, I have a**
16   **marketing, which is "Dominate Your Marketplace," which**
17   **nobody is done yet, but they would do it. I'm trying**
18   **to get our promotion guy to go through that course. It**
19   **has nothing to do with WISE, or --**
20   Q   Okay. Go to the next page. This states,
21   "Books and Tapes by L. Ron Hubbard," and it's a series
22   of pages of different books by L. Ron Hubbard.
23       Now, is this provided in the Basic Study
24   Manual Course as well?
25   **A   Apparently, the one that you received, yes.**

Page 66

1    **But the ones that we buy from WISE, they should not be.**
2    Q   So you would agree with me that pages -- and
3    we'll start with 252, and we'll go down to 264, should
4    not be included in the Basic Study Course provided to
5    your employees?
6        MS. GINAPP: Objection. Form. Foundation.
7        THE WITNESS: I don't believe it's that big of
8    a deal. But definitely, we -- we -- I prefer that it
9    not be included.
10   BY MR. GUTIERREZ:
11   Q   Okay. Go to 263. This has a page, or has a
12   book stated, "The Affinity/Reality/Communication
13   Triangle." Do you see that?
14   **A   Yes.**
15   Q   And have you read that book?
16   **A   I don't know the specific book that this is**
17   **referring to, but I am familiar with the ARC Triangle,**
18   **the Affinity/Reality/Communication Triangle.**
19   Q   What does that mean, the ARC Triangle?
20   **A   It has to do with when you're communicating,**
21   **or when you're trying to get understanding, if you work**
22   **on one of these three, then you can increase**
23   **understanding.**
24       **Affinity -- to give you an example, like, if a**
25   **salesman comes in and sees that you're a golfer and**

Page 67

1    **starts talking about golfer -- golfing, he's becoming**
2    **friends with you to have something in mutual agreement,**
3    **and that you'll, therefore, open up and communicate**
4    **better.**
5        **Or shares a similar reality -- meaning if you**
6    **say, "Yeah, I like this movie," then the person will**
7    **warm up to you and be more receptive because you have a**
8    **similar reality, as opposed if you say, "Oh, you know,**
9    **your group stinks," then you have a -- your reality**
10   **gets broken, and you want to go away.**
11       **And then communication is putting forth a**
12   **communication with the intention that the other party**
13   **would receive it. And it basically teaches you how to**
14   **do that so that you can bring about understanding.**
15   Q   Okay. And Bate number 265 to 270 is a list of
16   Scientology churches and organizations around the
17   world. Do you see that?
18   **A   Yes.**
19   Q   And is that supposed to be provided to your
20   employees?
21       MS. GINAPP: Objection. Form. Foundation.
22       THE WITNESS: It -- it shouldn't be included
23   in the -- in the coursework. I prefer that it not be.
24       MR. GUTIERREZ: Exhibit next in line.
25       THE WITNESS: We're done with this?

Page 68

1        MR. GUTIERREZ: Yes.
2        (Exhibit 3 marked)
3        MS. GINAPP: Is this Exhibit 3?
4        THE REPORTER: Yes.
5        MS. GINAPP: I'm going to lodge a continuing
6    objection to Exhibit 3 as being incomplete.
7    BY MR. GUTIERREZ:
8    Q   Okay. Tell me what this document is.
9    **A   "Formulas for Business Success." This**
10   **instructs people how to utilize what we call**
11   **conditions. So they take what their production was the**
12   **previous week and they apply a formula to it so that**
13   **they will improve or increase their particular**
14   **statistic the next week. That's the intention behind**
15   **it, teach people how to improve their production.**
16   Q   Okay. Turn to 1042. This page towards the
17   bottom discusses socialism, communism. What does that
18   have to do with any type of business success?
19       MS. GINAPP: Objection. Form. Foundation.
20       THE WITNESS: I believe it's referring to the
21   types of systems where, when government runs versus
22   private, which is capitalism, or private individuals
23   run an organization, and the difference, the resulting
24   difference in those types of organizations.
25   /////

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    83da6eb4-60b7-476d-9bae-9662a98729d2

Page 69

1  BY MR. GUTIERREZ:
2     Q   Okay.  Turn to 1110.
3     A   Okay.
4     Q   The second word from the bottom is
5  "suppressive person."  Do you see that?
6     A   Uh-huh.
7     Q   Is that a "yes"?
8     A   Yes.
9     Q   Okay.  Now, what's the definition of a
10  "suppressive person" within the church's definition?
11        MS. GINAPP:  Objection.  Form.  Foundation.
12        THE WITNESS:  This states a suppressive person
13  is: "A person who possesses a distinct set of
14  characteristics and mental attitudes that cause him to
15  suppress other people in his vicinity.  This is the
16  person whose behavior is calculated to be disastrous.
17  Also called antisocial personality."
18  BY MR. GUTIERREZ:
19     Q   Okay.
20     A   So a criminal would be an example.  Somebody
21  that steals and robs and doesn't produce viability but
22  causes harm would be a suppressive person.
23     Q   Okay.  So doesn't the Church of Scientology
24  also have a definition of a suppressive person?
25     A   This definition is given right here.  So that

Page 70

1  is the definition of a suppressive person.
2     Q   That's not what I asked.  I asked:  Does the
3  Church of Scientology have its own definition of a
4  suppressive person?
5        MS. GINAPP:  Objection.  Form.
6        THE WITNESS:  I'm not sure.  I'd have to look
7  it up or ask somebody if there's a different
8  definition.
9  BY MR. GUTIERREZ:
10     Q   So if L. Ron Hubbard's textbook "Introduction
11  to Scientology Ethics" has "suppressive persons"
12  defined, is that a complete coincidence?
13        MS. GINAPP:  Objection.  Form.  Foundation.
14  Calls for speculation.
15        THE WITNESS:  I'm not understanding the
16  question.
17  BY MR. GUTIERREZ:
18     Q   Sure.  Let me ask it again.
19        If L. Ron Hubbard's textbook "Introduction to
20  Scientology Ethics" defines "suppressive persons," is
21  that a coincidence to this?
22        MS. GINAPP:  Same objection.
23        THE WITNESS:  Is it a coincidence?
24  BY MR. GUTIERREZ:
25     Q   Yes.

Page 71

1     A   No, I believe that a suppressive person in
2  ethics would be similar to a suppressive person here,
3  which is somebody that causes harm to those around him.
4  I don't know that there's a difference.
5     Q   Okay.  So what does the Church of Scientology
6  view as a suppressive person?
7        MS. GINAPP:  Objection.  Form.  Foundation.
8        THE WITNESS:  I can't say specifically what
9  the Church of Scientology views.  I can state what this
10  definition is right here, and I think it's pretty
11  self-explanatory.  I just read it.
12  BY MR. GUTIERREZ:
13     Q   I'm not asking about the definition.  I'm
14  asking about the Church of Scientology.
15     A   I can't say about the Church of Scientology.
16  I'd have to look at another being document that would
17  say what the church says.  I can't say off -- what they
18  would characterize other than what's stated here.
19     Q   Okay.  So does the church look at non-members
20  of Scientology as suppressive people?
21        MS. GINAPP:  Objection.  Form.  Foundation.
22        THE WITNESS:  My belief -- this is my, my
23  opinion -- my opinion is the church believes that most
24  people are good, meaning most people are not
25  suppressive people, but there are certain people which

Page 72

1  are suppressives in our society that they tend to be
2  destructive.  An example would be a criminal that just
3  wants to steal and rob and hurt people.  That's a
4  suppressive person, as opposed to somebody who goes to
5  work, and puts out good energy or love, or has a, you
6  know, nice family, and is a productive member of
7  society.  That's what's being differentiated.
8  BY MR. GUTIERREZ:
9     Q   So the definition of "suppressive person"
10  within the church is different than what is in the
11  "Formula for Business Success"?
12        MS. GINAPP:  Objection.  Form.  Foundation:
13        THE WITNESS:  I think you've already asked me
14  this about three times.  But I can't tell you exactly
15  what the differences would be.  I would have to look at
16  a different document which would tell me if that's what
17  the church says.  I can't make an evaluation for the
18  church.
19        I can tell you that there's two types of
20  people:  Those that are the good, which the church
21  believe most people are good, as I do believe most
22  people are good; and then there are suppressive people
23  which are destructive with their intentions.  And an
24  example would be a criminal who destroys and harms
25  people instead of somebody who is an able-bodied person

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    83da6eb4-60b7-476d-9bae-9662a98729d2

1    that helps produce value for society.  And I don't know
2    how I can be more clear on that.
3    BY MR. GUTIERREZ:
4      Q    Okay.  We'll get to that.
5      A    We're done with this?
6      Q    Yes.
7                (Exhibit 4 marked)
8            THE REPORTER:  Number 4.
9    BY MR. GUTIERREZ:
10     Q    Have you seen this expert report before?
11     A    No.
12     Q    Do you know who Dr. Stephen Kent is?
13     A    No.
14     Q    Dr. Kent wrote an expert report for this case,
15   pretty long, and reviewed the coursework that's been
16   provided by Real Water in connection with the
17   Scientology coursework, and did an analysis of that in
18   this report, okay?
19           Have you -- you haven't reviewed any of this
20   report?
21     A    (Witness shakes head).
22     Q    Okay.  I want to go through some of his
23   findings with you and see if you agree with them.  Go
24   to page 9.  He states:
25           "Scientology-related entities that are key to

1    this course -- Applied Scholastics, ABLE" -- A-B-L-E --
2    "the Hubbard College of Education, and probably the
3    current iteration of WISE -- all received charitable
4    status based partly on Scientology's religious claims
5    to the IRS."
6            Is that something you've learned in your
7    studies?
8            MS. GINAPP:  Objection.  Form.  Foundation.
9            THE WITNESS:  No.  I -- I do not have any
10   awareness of this whatsoever.
11   BY MR. GUTIERREZ:
12     Q    Okay.  So you don't have any understanding of
13   whether WISE was given charitable exemption from the
14   IRS?
15     A    No.
16     Q    Would that change any of your viewpoints as to
17   whether WISE and their material is secular?
18           MS. GINAPP:  Objection.  Improper
19   hypothetical.
20           THE WITNESS:  I believe WISE materials to be
21   secular.  I'd have to be shown something more specific
22   to know otherwise.
23   BY MR. GUTIERREZ:
24     Q    Okay.  Dr. Kent does an analysis of the Basic
25   Study Manual, which we've just gone through, and

1    compares it with two other books by L. Ron Hubbard.
2    And as you can see from page 9, all the way through
3    pages 15, he comes to the conclusion that the text of
4    these three books are exactly the same, whether it's a
5    WISE book or a Church of Scientology book.  Do you have
6    any opinion on that?
7      A    No.
8            MS. GINAPP:  Objection.  Form.  Foundation.
9            THE WITNESS:  No.
10   BY MR. GUTIERREZ:
11     Q    Go to page 25.  Have you read the book,
12   "Analysis of Speaking From Experience"?
13           MS. GINAPP:  The book title --
14           THE WITNESS:  The book analysis --
15           THE REPORTER:  I'm sorry --
16           MS. GINAPP:  I'm sorry.  Are you talking about
17   the one referenced on here where the full title is,
18   "Analysis of Speaking From Experience:  Illustrated
19   Solutions to the Business Problems We Face Every Day"?
20           MR. GUTIERREZ:  Yes.
21           MS. GINAPP:  Okay.
22           THE WITNESS:  Okay.  So first of all, I don't
23   think "Analysis Of" is the name of the book.  The
24   book's name is "Speaking From Experience."
25   /////

1    BY MR. GUTIERREZ:
2      Q    Okay.
3      A    I think he's doing an analysis of "Speaking
4    From Experience."
5            Yes, I have read "Speaking From Experience."
6    And I believe it was produced as well.
7      Q    Okay.  And is that one of the optional
8    coursework for your company, Real Water?
9      A    Yes, yes.
10     Q    Okay.  And it's your position that that's a
11   completely secular book; correct?
12     A    Yes.
13           MS. GINAPP:  Objection.  Form.
14           MR. GUTIERREZ:  Okay.
15           THE WITNESS:  Sorry.
16           MS. GINAPP:  That's all right.
17           THE WITNESS:  Yes.
18   BY MR. GUTIERREZ:
19     Q    Go to the next page.  Dr. Kent quotes an
20   article from the Church of Scientology Celebrity Center
21   stating that, quote, "WISE deals with and has the
22   purpose of getting LRH administration technology into
23   full use in every business on the planet."
24           MS. GINAPP:  Can you show us where that quote
25   is.  Oh, there it is.  The second paragraph?

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    83da6eb4-60b7-476d-9bae-9662a98729d2

Page 77

1       MR. GUTIERREZ:  Yeah, first full paragraph.
2   BY MR. GUTIERREZ:
3       Q   Have you ever seen that --
4       **A   No.**
5       Q   -- or heard that?
6       **A   No.**
7       Q   Okay.  Go to page 29.  Dr. Kent, he comes to
8   the conclusion that the books "Speaking From
9   Experience," that, "Parts of it are exactly or nearly
10  exact quotes from L. Ron Hubbard, which means that they
11  are Scientology scripture.  Anyone studying this book
12  or the others, therefore, is studying aspects of the
13  Scientology religion."
14      Do you believe that to be true or not?
15      **A   I believe this is his analysis.  It's not my**
16  **analysis.**
17      Q   Okay.  So you don't agree with that?
18      **A   No.**
19      Q   Okay.  So we talked --
20      **A   I mean, not all parts of it.  I mean, I can't**
21  **say to -- are parts close to LRH, L. Ron Hubbard, and**
22  **stuff.  Again, I haven't compared them, so I could not**
23  **make that analysis.  But I imagine that are quotes from**
24  **L. Ron Hubbard in the book.**
25      Q   Okay.  Let's go to another document.

Page 78

1       **A   So we're done with this?**
2       Q   For now.
3       MR. GUTIERREZ:  We're at 5?
4       THE REPORTER:  Yes.
5       MS. GINAPP:  Can I have a copy?
6       I'm going to lodge a continuing objection to
7   this exhibit, Exhibit 5, as being incomplete.
8       (Exhibit 5 marked)
9   BY MR. GUTIERREZ:
10      Q   Okay.  What is this book, "Speaking From
11  Experience"?
12      **A   It's an overview of the Management Technology.**
13      Q   And what's the purpose of -- how does it help
14  your employees?
15      **A   It helps them understand the overall -- how**
16  **the Management Technology runs in our company.  For**
17  **instance, it shows how organization -- the organization**
18  **board fits with statistics, fits with what's called our**
19  **admin scale, or the flow of work.  So it gives them a**
20  **little review on the different parts and how they fit**
21  **together as a whole.**
22      Q   Okay.  If Grecia testified that this book was
23  upsetting to her because she felt it promoted
24  Scientology, would you disagree with that?
25      MS. GINAPP:  Objection.  Form.  Foundation.

Page 79

1   Misstates prior testimony.
2       THE WITNESS:  I -- I would ask her
3   specifically to see where -- what she believed was --
4   BY MR. GUTIERREZ:
5       Q   Okay.  Go to page 1352, which is page 5.
6   L. Ron Hubbard's Management Technology, is
7   that also secular, in your view?
8       MS. GINAPP:  Objection.  Form.  Foundation.
9       THE WITNESS:  The Management Technology was
10  created to run a company and/or to run orgs,
11  organizations.  And it doesn't have to do with you as a
12  spiritual being or have to do with God.  It has to do
13  with just the -- the mechanical aspects of running a
14  company.  And that's why it's referred to as the
15  Management Technology, not the spiritual technology.
16  It's just the management.
17  BY MR. GUTIERREZ:
18      Q   The last paragraph on this page states that,
19  "Mr. Hubbard was a man of amazing accomplishment.
20  Although many of his years were spent in the
21  development of Scientology, it was only one facet of
22  his incredible contribution to mankind."
23      You don't believe that statement to be
24  promoting Scientology?
25      MS. GINAPP:  Objection.  Form.  Foundation.

Page 80

1       THE WITNESS:  Actually, it says that, he --
2   "Although many of his years were spent in the
3   development of Scientology, it was only one facet."  So
4   they're saying that besides Scientology, he did many
5   other things.  That's what I think that's saying.
6   BY MR. GUTIERREZ:
7       Q   You're not reading it to say that Scientology
8   was an incredible contribution to mankind?
9       MS. GINAPP:  Objection.  Form.  Foundation.
10  Argumentative.
11      THE WITNESS:  It was -- it was just one facet
12  of his incredible contribution to mankind.  So we're
13  saying he did many other things.
14  BY MR. GUTIERREZ:
15      Q   And if Grecia was offended by that, or this
16  particular statement, is that something that you would
17  take out of this book going forward?
18      MS. GINAPP:  Objection.  Form.  Foundation.
19  Incomplete hypothetical.  Misstates prior testimony.
20      THE WITNESS:  What I would do with this is, I
21  would probably send it to ADP and get an analysis on
22  it, that this is considered promoting religion, and
23  take their expert opinion.  Or now, I'd have David or
24  Kristol say, is this considered promoting Scientology?
25  /////

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    83da6eb4-60b7-476d-9bae-9662a9872d92

BY MR. GUTIERREZ:

1   Q   Following the filing of this Complaint, have
2 you sent any coursework to ADP or any third party to
3 get an analysis of whether it's in violation of
4 Title VII?
5       MS. GINAPP:  Object to the extent it calls for
6 you to disclose any attorney/client privileged
7 information.  You can answer other than that.
8       THE WITNESS:  It's my understanding that ADP
9 has had copies when they come to audit, they look
10 through these things.  I'm sure that whatever we have
11 has been discussed with ADP, as it has with our
12 counsel, and copies have been provided of all that we
13 do.
14 BY MR. GUTIERREZ:
15   Q   Did ADP, though, give you an analysis as to
16 whether any of the coursework could be in violation of
17 Title VII?
18   **A   I don't -- I don't know if they have or not.**
19   Q   Okay.  You don't recall specifically meeting
20 with anybody at ADP regarding --
21   **A   I don't specifically -- them saying that there**
22 **was -- they believe that any of our stuff was a**
23 **violation of Title VII.**
24   Q   Okay.  Go back to the expert report really

1 quick.  I have a question on that.  Go to page 4.
2       MS. GINAPP:  Exhibit 4?
3       MR. GUTIERREZ:  Yes.  Exhibit 4, page 3.  I'm
4 sorry.
5       MS. GINAPP:  Page 3?
6 BY MR. GUTIERREZ:
7   Q   Section C.  What Dr. Kent is saying is that in
8 documents presented to the IRS, the IRS asked
9 L. Ron Hubbard effectively what constituted scripture.
10 And then we talked about this earlier.  But in
11 response, Scientology officials, quote, "Informed the
12 IRS that everything that Hubbard wrote or spoke on tape
13 or film constitutes Scientology's reputedly sacred
14 doctrines."
15       Is that something that you agree with, or have
16 heard with -- have heard?
17       MS. GINAPP:  I'm going to object to form.
18 Foundation.
19       THE WITNESS:  I have no idea about the inner
20 workings.  And just as my understanding is,
21 L. Ron Hubbard passed away in '86 or '87.  The IRS
22 exemption did not come, I believe, until '91.  So -- or
23 the war with the IRS, or however you want to
24 characterize it, didn't until after his -- his passing.
25 So I'm not sure, and I wasn't involved with any of

1 this, so I couldn't -- oh, it says 1993 here, so --
2 BY MR. GUTIERREZ:
3   Q   Right.  But have you ever heard anywhere where
4 all of L. Ron Hubbard's writings and audiotapes are
5 considered scripture?
6       MS. GINAPP:  Objection.  Form.  Foundation.
7       THE WITNESS:  No, no.  As I mentioned earlier,
8 he did a book in the '80s which was turned into a movie
9 called -- what was it called -- "Battlefield Earth,"
10 which was a number one seller for many years on the
11 fiction charts, and it's not scripture.  And that's a
12 writing by L. Ron Hubbard.
13       MR. GUTIERREZ:  Okay.  Okay.  All right.
14 Let's go to --
15       THE REPORTER:  Number 6.
16       THE WITNESS:  So we're done with 4 and 5?
17       MR. GUTIERREZ:  Yes.
18       (Exhibit 6 marked)
19 BY MR. GUTIERREZ:
20   Q   This is an Employment Agreement for Grecia.
21 Have you seen this document before?
22   **A   Never.**
23   Q   Okay.  Is it standard for all Real Water
24 employees to sign Employment -- Employment Agreements?
25   **A   Yes.**

1   Q   And why is that?
2   **A   It's just our practice.**
3   Q   Okay.  And how long has that been the
4 company's practice?
5   **A   As far as I can recall.**
6   Q   And what's the purpose of having the employees
7 sign an Employment Agreement?
8   **A   It lays out an understanding of what is**
9 **expected and what each individual's rights are.**
10   Q   When do they sign this agreement?
11   **A   Right -- the first couple days they're hired.**
12 **We have -- we have a check sheet where people go**
13 **through when they're hired, they go through the -- it's**
14 **called a New Hire Check Sheet, and this is part of it.**
15 **Stuff like, you know, take a copy -- a copy of their**
16 **driver's license, have them sign a W-2 form, or**
17 **whatever, various things.**
18   Q   Now, is this mandatory for employment?
19   **A   Yeah.  It's our standard operating procedure.**
20   Q   Okay.  So if an employee is hired and does not
21 want to sign this agreement, then they don't have a
22 job; correct?
23   **A   We've never run across that before, but it's**
24 **what our standard operating procedure is.**
25   Q   So you would agree they would not be employed

1  with the company if they didn't sign this document?
2  **A   I guess.**
3  Q   Okay.  Now --
4  **A   Again, it would be something we would go to**
5  **ADP.  This person doesn't want to sign an Employment**
6  **Agreement, what are -- what's our -- what's the rules**
7  **on that?  Whenever we get something that's out of the**
8  **ordinary, or something that there's an issue, we always**
9  **go to ADP to ask them how it should be handled.**
10  Q   Who created this agreement?
11  **A   You know what?  I'm not sure.  I can't --**
12  **couldn't tell you.  It's -- I think it's been around**
13  **for a while.  So I don't know.**
14  Q   Did ADP create it for you?
15  **A   No, no, I don't think that ADP created this**
16  **one.**
17  Q   Is it a document that you received from WISE
18  or any other organization?
19  **A   Could be.**
20  Q   Okay.  Section 3 discusses L. Ron Hubbard
21  specifically as the header.  Do you see that?
22  **A   Yes.**
23  Q   Okay.  And what's the purpose of that
24  particular paragraph?
25  **A   Just to inform people that we use the Hubbard**

1  **Technology which is created by L. Ron Hubbard --**
2  Q   Okay.
3  **A   -- as it states.**
4  Q   Section 4 talks about the Management
5  Technology; correct?
6  **A   Yes.**
7  Q   Now, what is that?  Is that the optional
8  courses?
9  **A   No.  Our overall -- the way we run the company**
10  **is based on the Management Technology.  For instance,**
11  **we have a large organization board which has all the**
12  **posts laid out in it, and people get placed on that.**
13  **We have -- everybody is run by statistics.  That's part**
14  **of the organization.  We've what's called a time**
15  **machine for work orders.  So the overall process of how**
16  **we run the company is utilizing the Management**
17  **Technology.**
18  Q   But it states that that's, "Outlined in the
19  Summary of L. Ron Hubbard's Management Technology";
20  correct?  That's what this paragraph says.
21  **A   If that's what it states, yes.**
22  Q   Okay.  And it also states that the employee
23  is, "Required to read, understand and apply this
24  Management Technology to their job"; correct?
25  MS. GINAPP:  I'm going to object.  The

1  document speaks for itself.
2  THE WITNESS:  Yeah, I don't know what -- where
3  you're quoting, but if that's what it says, then I
4  would agree.
5  BY MR. GUTIERREZ:
6  Q   Section 4, halfway down where it says, "I
7  further understand and agree that in order to properly
8  function as a team member of your company, I will be
9  required to read, understand and apply this management
10  technology to do my job."
11  **A   Yes.**
12  Q   Okay.
13  MS. GINAPP:  I'm going to have a continuing
14  objection that the document speaks for itself.
15  BY MR. GUTIERREZ:
16  Q   So there's no discretion there with the
17  employee; correct?  It's a requirement?
18  MS. GINAPP:  Objection.  Form.  Foundation.
19  THE WITNESS:  Pursuant to this, yes, it is a
20  requirement.  If somebody had an issue, we would look
21  at the specific issue.  And then if we can't come to a
22  real -- or an understanding on it, then we would
23  request ADP to tell us how we should proceed.
24  BY MR. GUTIERREZ:
25  Q   And nobody has ever had an issue with this?

1  **A   No.**
2  Q   Section 7 discusses "Additional Training."  Do
3  you see that?
4  **A   Yes.**
5  Q   It says, "After becoming a regular employee, I
6  understand that I will be provided the opportunity to
7  take further courses, which will be essential for my
8  advancement and increased earnings in the company."
9  Now, is that discussing the optional courses?
10  **A   Yeah, that would be referring to the training,**
11  **but also just like it depends on the post.  For**
12  **instance, forklift operators have to go to forklift**
13  **certification.  You know, line workers have to go and**
14  **take a course on -- what's it called -- through the**
15  **health department.  So there's different courses.  A**
16  **demo person has to fully understand how to do a demo,**
17  **and why a demo, and why our water is special.  So**
18  **beyond the Management Technology, there's also other**
19  **courses, or other things that -- study that people have**
20  **to do for their specific jobs.**
21  Q   Okay.  Next page, "Freedom of Religion."  Do
22  you see that?
23  **A   Yes.**
24  Q   It states that, "It is a policy of your
25  company that its management methods as developed by

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    83da6eb4-60b7-476d-9bae-9662a98729d2

1  Mr. Hubbard are purely secular."
2      Where does it get that opinion?
3      MS. GINAPP: Objection. Form. Foundation.
4  Asked and answered.
5      THE WITNESS: They're purely secular in that
6  all aspects relating to you as a spiritual being and
7  God are removed, and it only has to do with specific
8  things like -- like, you were implying that clearing a
9  word, and not skipping a study gradient, and lack of
10 mass is a religious thing. I would say that has to do
11 with being able to read a dictionary and understand
12 what a word means, having to learn. So it has nothing
13 to do with being a spiritual being or a God, or
14 anything like that. So that's the difference between
15 secular. And any aspect or reference to Scientology
16 absolutely should be removed.
17 BY MR. GUTIERREZ:
18     Q   Got it.
19     A   And if anybody has a question on any of this,
20 for instance, if Grecia would have said, "Hey, I don't
21 like this," because of this, we would have cut that out
22 of that book immediately. But I don't think that she
23 received that book. I think that book was actually
24 taken from either my office or my son's office
25 inadvertently.

1      Q   But you don't know that for sure; correct?
2      A   I do not know that for sure. That's why I
3  said "I think."
4      Q   Section 10 discusses "Mediation and Binding
5  Arbitration of Disputes." Do you see that?
6      A   Yes.
7      Q   Okay. Was this paragraph actually explained
8  to Grecia prior to her signing it?
9      MS. GINAPP: Objection. Form. Foundation.
10 Calls for speculation.
11     THE WITNESS: I wasn't there. So --
12 BY MR. GUTIERREZ:
13     Q   Okay. But, again, this is mandatory as part
14 of the their -- every employee signing up for --
15 signing the Employment Agreement for Real Water;
16 correct?
17     A   It's on our policy, yes. It's in our --
18     Q   Okay. Okay. And there's a separate
19 Employment Agreement at RealWater-20.
20     A   Yeah.
21     Q   What's the difference between this and the one
22 we just went through?
23     MS. GINAPP: Objection. Form. Foundation.
24     MR. GUTIERREZ: Is it -- is it --
25     THE WITNESS: I don't know.

1  BY MR. GUTIERREZ:
2      Q   Okay. I just -- it looked like -- everything
3  looked very similar to what was actually in the other
4  document. I just wanted to know if there was a reason
5  why there was two.
6      A   I -- somebody may have reprinted it, or done
7  something just to make -- I don't know.
8      MS. GINAPP: I'm going to --
9      THE WITNESS: Or they pulled them both off --
10     MS. GINAPP: I'm just going to object. The
11 document speaks for itself on any differences.
12 BY MR. GUTIERREZ:
13     Q   Okay. The final page, on page 28, it looks
14 like it was signed by Jeramy Edgel. Correct?
15     A   Yes.
16     Q   And was that typical when an employee is
17 hired, their supervisor is the one that signs off on
18 the Employment Agreement?
19     A   I can't say with specificity. I know that
20 the -- that usually the managers of the area are the
21 ones that do the final decision on hiring. But whether
22 or not they are the ones that sign it, I'm not sure.
23     Q   Okay. I'm done with that document.
24     Do you recall ever receiving a Charge of
25 Discrimination for Grecia in this case?

1      A   I don't know what that specifically means.
2      THE REPORTER: Number 7.
3      (Exhibit 7 marked)
4  BY MR. GUTIERREZ:
5      Q   This is a Charge of Discrimination that's
6  filed with the Nevada Equal Rights Commission. That is
7  then sent to Real Water for a mandatory response within
8  30 days. This is requiring a response. This was dated
9  December 15th, 2015. And it's requiring a response
10 from Real Water.
11     Did Real Water ever receive this document?
12     MS. GINAPP: I'm going to object to the form
13 of that question. Go ahead.
14     THE WITNESS: I -- I don't have any idea. I
15 don't deal with day-to-day workings. I've never seen
16 this document. So --
17 BY MR. GUTIERREZ:
18     Q   So is it your position that the first time you
19 ever learned of Grecia's complaints was when the actual
20 Complaint or lawsuit was filed in April of 2016?
21     A   No. I -- I recall getting a demand letter,
22 which I don't recall the specifics of it, but it was
23 forwarded to ADP. And then I thought it was being
24 handled. Then all of a sudden, the lawsuit popped up.
25     Q   Okay. So do you recall receiving notice from

Page 93

1  my office from a demand letter to try to resolve the
2  case prior to litigation; correct?
3  **A   Correct.  And then it was forwarded to ADP.**
4  Q   Okay.  You didn't -- did you ever provide ADP
5  with a substantive response of the company's position
6  related to the claims that Grecia has made?
7  **A   I didn't personally.  But the people in HR**
8  **would do that.**
9  Q   And who were those people?
10 **A   At the time, it could have been Clare LaHara,**
11 **or it could have been Melissa -- what was her -- I**
12 **think Melissa was -- Melissa was gone when Grecia was**
13 **fired, I think.  So it would have been Clare, or Blain**
14 **sometimes would step in and handle these things, maybe**
15 **Frank.**
16 Q   There was a name mentioned by Bonnie earlier,
17 a lady by the name of Christian or Christy in HR.
18 **A   Oh, Christy.  Yeah, it could have been**
19 **Christy.**
20 Q   Okay.  So Clare LaHara, Melissa, or Christy;
21 is that fair?  They would be --
22 **A   Or Blain.**
23 Q   That would be the ones handling this?
24 **A   Yeah, whoever was in the --**
25 Q   Got it.

Page 94

1       Did the company ever investigate Grecia's
2  claims or allegations prior to the lawsuit being filed?
3  **A   It's my understanding that we followed**
4  **whatever guidelines ADP suggested.**
5  Q   And do you have a recollection as to whether
6  ADP said, give us an investigation, or talk to certain
7  people?
8  **A   I don't have any recollection.**
9  Q   Do you recall if any witness statements were
10 taken and given to ADP?
11 **A   No.**
12 Q   Okay.  Did ADP suggest any changes in company
13 policies following this charge?
14 **A   Not that I --**
15      MS. GINAPP:  Objection.  Form.  Go ahead.
16 BY MR. GUTIERREZ:
17 Q   Go ahead.
18 **A   Not that I'm aware of.**
19 Q   Okay.  I'm done with that document.
20      What's your understanding as to why Grecia was
21 terminated?
22      MS. GINAPP:  I'm going to object as to form.
23 Foundation.
24      THE WITNESS:  I -- I don't know the specifics.
25 I just know that Bonnie and Jeramy were under the

Page 95

1  under -- the opinion that she was not doing her job to
2  their standards.  And I -- I don't know the specifics,
3  what she was not doing or doing improperly or properly.
4  BY MR. GUTIERREZ:
5  Q   What's a Non-Optimum Report?
6  **A   A Non-Optimum Report is when somebody is doing**
7  **something which is outside policy or is not favorable**
8  **to the company's advancement.  And the intention of a**
9  **non-op report is that the individual learns of the**
10 **discrepancy or the inappropriate conduct, and then**
11 **corrects it so that we, as a team, move forward in a**
12 **positive direction.**
13 Q   I'm sorry.  You said there was an intentional
14 Non-Optimum Report?  There's two?
15 **A   No, no.  The intention of --**
16 Q   Oh, okay.
17 **A   -- the Non-Optimum Report.**
18 Q   And so is it part of the company's progressive
19 disciplinary policy --
20      MS. GINAPP:  Objection.
21 BY MR. GUTIERREZ:
22 Q   -- to have a Non-Optimum Report and then
23 counseling?
24      MS. GINAPP:  Objection.  Form.
25      THE WITNESS:  I don't know what specifically

Page 96

1  what "progressive disciplinary" specifically means.
2  But it is -- the intention is to make sure that people
3  are doing things that help the company do better, as
4  opposed to going off policy and harming the company.
5  BY MR. GUTIERREZ:
6  Q   So there's no progressive discipline policy in
7  place as far as for the employees of Real Water?
8       MS. GINAPP:  Objection.  Form.  Foundation.
9       THE WITNESS:  I don't know specifically what
10 you mean by that.
11 BY MR. GUTIERREZ:
12 Q   Certain companies have a policy and procedure
13 in place so that there's a certain number of write-ups,
14 before there's actually termination, or points are
15 assigned to different conduct.
16 **A   I don't know that we --**
17 Q   Does Real Water have that, or anything similar
18 to that?
19 **A   I don't know that we have specific --**
20 **there's -- we follow, again, the guidelines from ADP.**
21 **But as part of our formula, we do issue Non-Optimums**
22 **when somebody is doing something that's against policy.**
23 **And then if they get handled, great.  But there's**
24 **different levels.  I mean, if you show up drunk on the**
25 **job and you cause harm, that's a lot more than not**

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    83da6eb4-60b7-476d-9bae-9662a98729d2

1  **showing up -- showing up 15 minutes late.  You know**
2  **what I mean?  So each individual -- the circumstances**
3  **are looked at individually.**
4  Q   And who ultimately makes the determination
5  whether to terminate an employee?
6  **A   Generally the manager gets that discretion,**
7  **after --**
8  Q   And in this case -- okay, I'm sorry.  Go
9  ahead.
10  **A   After they follow the guidelines submitted by**
11  **ADP, provided by ADP.  It's our policy -- tell ADP what**
12  **we're experiencing.  Then they give us guidance as to**
13  **how it should be handled.**
14  Q   So were the Non-Optimum Reports for Grecia
15  submitted to ADP?
16  MS. GINAPP: Objection. Form. Foundation.
17  THE WITNESS: It should be the policy to do
18  so.  Specifically whether or not they were, I couldn't
19  tell you because I wasn't involved with it.
20  BY MR. GUTIERREZ:
21  Q   And the person that would have been in charge
22  of firing her at the time, would that be Jeramy, based
23  on his position as a supervisor?
24  MS. GINAPP: Objection. Form.
25  THE WITNESS: I wasn't involved with the

1  specifics, but I think it would be Bonnie would state
2  what the issues are.  And then between Bonnie and
3  Jeramy, they would make a decision.
4  BY MR. GUTIERREZ:
5  Q   Okay.
6  **A   Then they'd coordinate with ADP, which would**
7  **be Christy, or whoever, which does the liaison with**
8  **them.  And then whatever policy -- or whatever**
9  **decisions from there would be followed.**
10  MR. GUTIERREZ: This is the next exhibit.
11  THE REPORTER: Number 8.
12  (Exhibit 8 marked)
13  BY MR. GUTIERREZ:
14  Q   Have you seen this article before by Newsmax
15  TV?
16  **A   I'm sure I've seen it, but I don't**
17  **specifically recall it.**
18  Q   Did you have any knowledge that Bonnie was
19  speaking to news media regarding Grecia's complaints?
20  **A   I don't recall specifically.  I do believe**
21  **that I found out about it, but I don't recall**
22  **specifically whether or not she was going there to do**
23  **it.**
24  Q   Is that something --
25  **A   I don't recall the specifics.**

1  Q   Is that something you would have authorized
2  her to do, to speak to the media regarding the
3  complaints?
4  MS. GINAPP: Objection. Form. Foundation.
5  Incomplete hypothetical.
6  THE WITNESS: The media did show up, and we
7  had people parked outside.  And after a couple days
8  when we found out what it -- was going on, I did -- I
9  think I said, "We need to all talk to the media."  But
10  I don't recall specifically with Bonnie and Newsmax
11  what -- how that occurred.
12  BY MR. GUTIERREZ:
13  Q   In the article, on the second page, four
14  paragraphs down, it states, "Mercado said Hernandez
15  always talked about her money problems and even a past
16  prescription drug problem."
17  Do you think that's appropriate to inform the
18  media of an employee's prescription drug problem?
19  MS. GINAPP: Objection. Form. Foundation.
20  Calls for a legal conclusion.
21  THE WITNESS: Yeah, I don't -- I don't know
22  that that should have been stated or not stated.  You
23  know, Bonnie is a very good producer at our company.
24  But, you know, she should probably talk about
25  specifics, not about past stuff, absolutely.

1  BY MR. GUTIERREZ:
2  Q   Well, not even past stuff.  We're talking
3  about a prescription drug issue.  Is that appropriate
4  at all to be given publicly?
5  MS. GINAPP: Same objections.
6  THE WITNESS: Yeah, I don't -- I wouldn't -- I
7  wouldn't advise it personally.
8  BY MR. GUTIERREZ:
9  Q   Did you or the company discipline Bonnie in
10  any way for this statement made to the media?
11  **A   No.**
12  Q   Why not?
13  **A   We didn't look into it, like analysis-wise, we**
14  **didn't analyze it and go over it.**
15  Q   You didn't see this as a HIPAA violation or
16  some type of privacy violation that's --
17  **A   No --**
18  MS. GINAPP: Objection. Form. Are you done
19  with the question?
20  MR. GUTIERREZ: Yeah.
21  MS. GINAPP: Objection. Form. Foundation.
22  Calls for a legal conclusion.
23  THE WITNESS: It didn't even cross my radar,
24  so to speak.  I didn't.
25  /////

1   BY MR. GUTIERREZ:
2      Q   Okay. But earlier today you had a problem
3   talking about Jeramy's rehab.
4         MS. GINAPP: Objection --
5   BY MR. GUTIERREZ:
6      Q   Do you remember that?
7         MS. GINAPP: Objection. Form. Foundation.
8         THE WITNESS: I had a problem in that I
9   didn't -- don't want to give the specifics regarding
10  it.
11  BY MR. GUTIERREZ:
12     Q   It was your objection.
13     **A   Yeah, I don't want to give specifics regarding**
14  **Jeramy's situation with his rehab.**
15     Q   Okay. But it was okay for Bonnie to give it
16  to the media so that everybody could see?
17        MS. GINAPP: Objection. Form. Foundation.
18  Misstates testimony. Argumentative. Calls for a legal
19  conclusion.
20        THE WITNESS: Well, I think Bonnie was saying
21  that she always talked about this to people. So Bonnie
22  must have been under the assumption that it was a
23  well-known fact that was disclosed, broad disclosure.
24  And, again, I can only assume, because I'm not Bonnie.
25  And I'd never had any conversations with Grecia except

1   that, "Hi, I'm Grecia," "Oh, nice to meet you."
2   BY MR. GUTIERREZ:
3      Q   But don't you view this as problematic, an
4   employee giving private information about somebody's
5   medical issue to the media? Don't you view that
6   problematic at all in any way?
7         MS. GINAPP: Objection. Form. Foundation.
8   Asked and answered. Calls for a legal conclusion.
9   Argumentative.
10        THE WITNESS: Yeah, I don't -- I don't know
11  that I should comment one way or the other. We didn't
12  do anything on this. This didn't even cross our radar
13  at the time. I don't know that I've even read this
14  article, to be honest with you. So I can't really
15  comment on it. I don't have any -- I mean, it's just
16  something new out of the -- I don't -- I don't have an
17  opinion one way or the other based on the limited facts
18  I have, and I don't -- it's --
19  BY MR. GUTIERREZ:
20     Q   Would you agree with me that the public
21  dissemination of this private information would cause
22  anxiety or harm to somebody like Grecia?
23        MS. GINAPP: Objection. Form. Foundation.
24  Calls for speculation.
25        THE WITNESS: Personally, if I -- if Bonnie

1   says that she always talked about this subject, then I
2   don't see how it could be something that causes harm,
3   because if you're talking about it openly, you don't
4   consider it a dark secret. And I don't know that
5   Bonnie and Grecia were in a position that they were
6   close friends where Grecia was giving her confidential
7   information. This sounds like Bonnie was stating
8   things which were out in the open which Grecia openly
9   discussed.
10  BY MR. GUTIERREZ:
11     Q   Well, that's not what the sentence says. It
12  says, "Hernandez always talked about her money problems
13  and even a past prescription drug problem."
14     **A   Right. So it says "always" --**
15     Q   Okay.
16     **A   -- not confidentially talked about. It says**
17  **"always," which would mean that she frequently**
18  **discusses. "Always" means a frequent tendency to**
19  **discuss something. So when you frequently discuss**
20  **something, I don't consider it to be something that's**
21  **private. Now if it said, "She told me in confidence**
22  **that she had a past drug problem," I think that would**
23  **be inappropriate because that's told in confidence.**
24  **But when she's always just talking about it, then**
25  **that's not something that's a secret, so to speak.**

1         MS. GINAPP: I'm going to object to the whole
2   line of questioning as calling for speculation.
3         MR. GUTIERREZ: So --
4         THE WITNESS: And by the way, again, I'd like
5   to say, I have no -- I was not involved in any of these
6   conversations. I was not in -- I do not know how --
7   what the relationship, other than Bonnie was her
8   supervisor. I don't -- it's -- I don't know anything
9   about.
10  BY MR. GUTIERREZ:
11     Q   The next sentence states that, "According to
12  public records, Hernandez has a judgment against her
13  for $1,233 in favor of Capital One Bank," and that she,
14  "Used to work for a personal injury lawyer."
15        Is any of this stuff relevant to her claim for
16  religion discrimination?
17        MS. GINAPP: Objection. Form. Foundation.
18  Calls for speculation.
19        THE WITNESS: I didn't write this article. A
20  news -- this was written by a news organization. I
21  didn't provide any of these facts. So --
22  BY MR. GUTIERREZ:
23     Q   Well, you did provide a statement in the third
24  paragraph to the bottom. Do you see that?
25     **A   Yeah, on the Kevin Wall show, not to the**

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                      83da6eb4-60b7-476d-9bae-9662a98729d2

1  **Newsmax.  So they pulled it off of something else.**
2  Q   Okay.  That statement states that:
3       "I'm not at all surprised that three weeks
4  outside of an election, the Governor and his pro tax
5  cartel are again trying to take me down.  They have
6  tried over and over but the people stand with me and I
7  stand with them.  The Governor and his establishment
8  politicians have betrayed the people who trusted them.
9  I will continue to fight for the people, small business
10 owners, against taxes, against common core.  It's time
11 we take on the establishment head on.  And I have no
12 problem leading the charge."
13      That's your quote; correct?
14 **A   Yes.  I -- I don't recall exactly the exact**
15 **words, but I'm not going to be deny that I wouldn't**
16 **have said something similar.**
17 Q   Did you -- so you believe this Complaint was
18 politically motivated?
19      MS. GINAPP:  Objection.  Asked and answered.
20      THE WITNESS:  I believe what I stated here is
21 what I stated.
22 BY MR. GUTIERREZ:
23 Q   Well, we have a podcast, too, where you talk
24 about this Complaint being politically motivated.  Do
25 you recall that?

1       MS. GINAPP:  Objection.  Asked and answered.
2       THE WITNESS:  Do I recall the podcast?
3  BY MR. GUTIERREZ:
4  Q   Yes.
5  **A   No.**
6  Q   So as you sit here today, do you believe any
7  portion of this Complaint is politically motivated?
8       MS. GINAPP:  Objection.  Form.  Foundation.
9       THE WITNESS:  I believe it could be
10 politically motivated.
11 BY MR. GUTIERREZ:
12 Q   Why do you say that?
13 **A   Because it's kind of curious how when I do**
14 **stand out, all of a sudden we're being attacked on**
15 **various fronts.  When I say "attacked," with legal**
16 **proceedings, with OSHA showing up, with the health**
17 **department showing up, all these things happening, when**
18 **they didn't really happen before.**
19 Q   Okay.  Is that it?
20 **A   And what I said is, I'm not at all surprised**
21 **that it happens three weeks before the election.**
22 Q   Okay.  Are you aware of other similar lawsuits
23 around the country alleging that their employers have
24 violated Title VII by forcing Scientology on their
25 beliefs?

1       MS. GINAPP:  Objection.  Form.  Foundation.
2       THE WITNESS:  No, I'm not aware.
3  BY MR. GUTIERREZ:
4  Q   You haven't been made aware any other current
5  claims across the country that are similar to this one?
6       MS. GINAPP:  Objection.  Form.  Foundation.
7  Asked and answered.
8       THE WITNESS:  No, I'm not.
9       MR. GUTIERREZ:  Okay.
10      THE WITNESS:  We're done with this one?
11      MR. GUTIERREZ:  Yes.
12      THE REPORTER:  Number 9.
13      (Exhibit 9 marked)
14 BY MR. GUTIERREZ:
15 Q   This is a 2013 article describing a lawsuit
16 against a dentist for Title VII violations related to
17 an employee who was threatened to be fired for not
18 attending a Scientology-related training session.
19      Have you ever seen or heard anything about
20 this particular lawsuit?
21 **A   No, I have not.**
22 Q   Okay.  We have -- one, two, three -- four
23 other lawsuits that are similar to this, all with very
24 similar allegations of employees who have filed
25 Complaints under Title VII for being forced to watch

1  videos and do coursework that is Scientology based.
2  Have you heard any of that?
3  **A   We're done with this one?**
4  Q   Yes.
5  **A   No --**
6       MS. GINAPP:  Objection.  Form.
7       THE WITNESS:  No, I have not heard of any of
8  these lawsuits.
9  BY MR. GUTIERREZ:
10 Q   And have you ever spoken with anyone at WISE
11 or been exposed to a seminar at WISE that discusses the
12 potential for these lawsuits if you're using their
13 material?
14 **A   No.**
15      MR. GUTIERREZ:  Okay.  Let's take a quick
16 break, and we'll change the tape.
17      THE VIDEOGRAPHER:  Stand by, please.
18      This is the end of Disk No. 2 in today's
19 videographed deposition of Brent Jones.  The time,
20 1605.  And we are off the record.
21      (Recess taken from 4:05 p.m. to 4:16 p.m.)
22      THE VIDEOGRAPHER:  We're back on the record.
23 This is the beginning of Disk No. 3 in today's
24 videographed deposition of Brent Jones.  The time,
25 1616.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                   83da6eb4-60b7-476d-9bae-9662a9872-9d2

1  BY MR. GUTIERREZ:
2     Q   Let's go back to Exhibit 1.  That should be
3  the very bottom.
4        What's the Code of being a WISE member?
5        MS. GINAPP:  Objection.  Form.  Foundation.
6        THE WITNESS:  You -- you asked previously
7  about if there's any requirements to be a WISE member.
8  And I said there's like a membership application.  I
9  think that's when the Code is included.  But I don't
10 know the specific points.  It's stuff like, you know --
11 I can't even recall the specific points.
12 BY MR. GUTIERREZ:
13    Q   Well, look at the very first page.  It says:
14       "The people listed in this directory are all
15 members of WISE and have signed an agreement committing
16 themselves to standardly applying LRH Admin Tech in
17 their business activities and to upholding the Code" --
18 capitalized -- "of a WISE member."
19       What does that mean?
20       MS. GINAPP:  Objection.  Form.  Foundation.
21 Asked and answered.
22       THE WITNESS:  So their signed agreement would
23 include the Code, and I'm not sure what the specifics
24 are of the Code.  But, you know, you're an ethical
25 company, you don't commit fraud, those types of things,

1  I believe, it would involve.
2  BY MR. GUTIERREZ:
3     Q   Okay.  And what is LRH Admin Tech?  Is that
4  the proprietary information that's given out for the
5  coursework?
6     A   That's -- that's the Management Technology
7  which we utilize in our business.
8     Q   Okay.
9     A   So "admin" refers to "administrative."  So,
10 either management or administrative -- that's used kind
11 of interchangeably.
12    Q   How did you and your company get exposed to
13 WISE?
14       MS. GINAPP:  Objection.  Asked and answered.
15       THE WITNESS:  Yeah, I don't recall
16 specifically that, exact -- but I believe I went to a
17 seminar back in the early 2000s.  I was looking for a
18 system.  Even though I graduated with an undergraduate
19 degree in business administration and finance and real
20 estate, I believe that you need a system to build a big
21 company.  And looking for the system, I found the admin
22 technology and decided to utilize it.
23 BY MR. GUTIERREZ:
24    Q   Your wife testified that she was exposed to
25 WISE through the church.  Is that something -- do you

1  recall ever hearing about WISE through the Church of
2  Scientology?
3     A   I don't specifically recall hearing about WISE
4  through the church.  I wouldn't say that it would not
5  be discussed at the church.  But I don't specifically
6  recall at the church saying WISE.  They -- the church
7  really works to try to keep things separated as much as
8  possible.  Of course, there's some overlap.  But, like,
9  if you're a businessman, you're not allowed to go after
10 a fellow Scientologist for business.  They want
11 everything to be separated.
12    Q   What does that mean?
13    A   Like, market to them, solicit business from
14 them, you're not supposed to do that.
15    Q   Why not?
16    A   Because the church tries to keep -- or works
17 at keeping everything as separate as possible.  So when
18 you're at the church, you're there for your own
19 spiritual development.  You're not there to promote
20 your business or build your business.  When you doing
21 your business, you shouldn't be promoting spiritual
22 development.
23    Q   Got it.
24       On page 861 of this document, it says to,
25 "Train your staff on these courses in your own in-house

1  course room," right in the middle.  Do you see that?
2     A   Yes.
3     Q   And so what is an "in-house course room"?
4     A   It's a room with desks and dictionaries and
5  demo kits, and it's where the courses are housed.  So
6  when somebody wants to work on a course, they don't do
7  the course at their desk.  They go into the course room
8  and do their course.  And then the supervisor checks on
9  them to help them with any problems they're having.  So
10 it's a separate room.
11    Q   And where is the in-house course room for
12 Real Water?
13    A   It's in the 3208 suite -- 3208 suite.  And
14 when you go into reception, it's off to the left.  And
15 it's probably a 12-by-15 or 16-foot room.
16    Q   And what's in that room?
17    A   Desks, books, dictionaries, and demo kits.
18    Q   Is there a TV to watch videos?
19    A   I don't think so.
20    Q   So where do the employees watch the mandatory
21 videos?
22    A   Either on their laptops, which is just a
23 little -- a screen on a laptop.  Sometimes you can
24 watch the videos, too -- they'll do it out in reception
25 if reception is not being used.

1    Q   Bonnie testified earlier that the in-house
2  course room was also an HR office.  Is that accurate?
3    **A   The HR office is right next to the course**
4  **room.**
5    Q   They're separate rooms, though?
6    **A   But the HR person is also the course supe.  So**
7  **she goes back and forth.**
8    Q   Makes sense.  Okay.
9        We're done with that particular document.
10       Have you ever heard that "The Way to
11  Happiness" video has been reported as a, quote,
12  "gateway to Scientology"?
13   **A   No.**
14   Q   You've never heard that, or read from in any
15  documents?
16   **A   No.**
17   Q   It's been reported --
18   **A   It's kind like marijuana is a gateway to meth,**
19  **crystal meth.**
20   Q   I've read it in the EEOC documents.  I didn't
21  know if it's something that you've come across, or it's
22  been referenced in any WISE course you've taken.  But
23  you've never heard that; correct?
24   **A   Uh-uh.  Have you watched "The Way to**
25  **Happiness" video?**

1    Q   I have not seen it.
2    **A   Okay.  Maybe you should, and you'll see how**
3  **benign it is, particularly if you're basing your case**
4  **on it.**
5    Q   I'm not basing my case on that video.
6    **A   Good to know.  Write that down.**
7    Q   We have a lot more than that.
8        The Real Water employees, why do they have to
9  write down video reviews?  What's the purpose of them
10  writing down reviews?
11   **A   Just to just determine what they got out of --**
12  **out of it, what they learned.**
13   Q   Okay.  And when they do the coursework, what's
14  the purpose of filling out the material afterwards?  Is
15  that a WISE requirement?
16       MS. GINAPP:  Objection.  Form.  Foundation.
17       THE WITNESS:  I believe at the end of every
18  WISE course, they have a section for a summary or
19  request.  And, again, it -- it shows whether or not the
20  person duplicated the material so that they can apply
21  it in their job.  For instance, if they understand
22  conditions, they know how to apply the condition to
23  their specific stat that week.  Or if it applies to
24  stats, they can draw a stat up, and they understand how
25  to measure their individual employment stats.  So if

1  they get it, then they can apply it in their work.  And
2  that's the purpose of the course.
3  BY MR. GUTIERREZ:
4    Q   Okay.  Prior to Grecia making a complaint for
5  religious discrimination, have -- has your company ever
6  received any complaints for religious discrimination?
7    **A   Not that I'm aware of.**
8    Q   Have they ever received complaints of
9  retaliation?
10   **A   Not that I'm aware of.**
11   Q   How about any other type of harassment under
12  Title VII, whether it's sexual harassments, national
13  origin, race?
14   **A   Not that I -- no, not that I'm aware of.**
15   Q   Okay.  So you've never had a -- you've never
16  been involved in either an EEOC or a NERC proceeding in
17  any way?
18   **A   I haven't.  Again, when these things -- like**
19  **the one you showed me, I don't even get it.  So as far**
20  **as I know, we have not been involved in any of these**
21  **things.  Yours is the first suit that's ever been**
22  **brought on this.  Now, whether or not -- what people**
23  **complain about when they get unemployment, and stuff**
24  **like that, I have no awareness of that.**
25   Q   And who is the best person in the company to

1  handle those, or to discuss how the company handles
2  those?
3    **A   It would probably be Blain because he --**
4        MR. GUTIERREZ:  Okay.  Kristol, do you have
5  any questions?
6        MS. GINAPP:  I do.
7        MR. GUTIERREZ:  Do you want to go?  I have
8  only a few more, but you can ask.  I'll pass the
9  witness for now.
10             EXAMINATION
11  BY MS. GINAPP:
12   Q   Okay.  Earlier counsel asked if employees got
13  raises for courses based on Scientology.  Do you
14  remember that question?
15   **A   Not specifically.**
16   Q   Okay.  I just want to clarify:  Are the
17  courses that the employees get the raise on based on
18  Scientology, in your opinion?
19   **A   No.  They're based on the Admin Tech, which is**
20  **not Scientology, which Scientology has to do with you**
21  **as a spiritual being.  With Admin Tech, it has to do**
22  **with very mechanical things for management.**
23   Q   Okay.  To your knowledge, are the courses
24  designed specifically for use in the workplace?
25   **A   Yes.**

1    Q   When the documents are handed in to a
2  supervisor, is it -- at your company, is it the actual
3  supervisor, or is it HR, or somebody else who it's
4  handed to?
5    **A   Well, the supervisor is the person who is in**
6  **HR.**
7    Q   Okay.
8    **A   Okay.  So they're the same person.  And I**
9  **believe sometimes the -- their supervisor would also**
10 **look at the answers to make sure that there's a**
11 **coordinated effort to whether the person can be -- the**
12 **student can be efficient in their application having to**
13 **do with their job specifically, whether it be sales,**
14 **demo, I mean, you know, promotion, internet, you know,**
15 **whatever their function is in the company.**
16   MS. GINAPP:  I'll pass the witness back.
17 Reserve additional questions, if necessary.
18   THE WITNESS:  Is that a legal term, "pass
19 back"?
20   MS. GINAPP:  It's a polite term.
21   MR. GUTIERREZ:  Very polite.
22   THE WITNESS:  We didn't use that term in
23 California.
24   MR. GUTIERREZ:  Pepperdine didn't teach you
25 that?

1    THE WITNESS:  No.  Pepperdine is big on ADR,
2  though.
3    MR. GUTIERREZ:  One of the biggest in the
4  nation.  That's what they do.
5    Let's attach this as an exhibit.
6    THE REPORTER:  Number 10.
7    (Exhibit 10 marked)
8      FURTHER EXAMINATION
9  BY MR. GUTIERREZ:
10   Q   This is Garcia's video review for "Message to
11 Garcia."  Is this a standard document given to all
12 employees for the video reviews?
13   **A   Yes.  This -- yeah, this would be the**
14 **questions.**
15   Q   And --
16   **A   Can it help you with your work or life, give**
17 **specific examples -- yeah, yeah.**
18   Q   And this is completed on the employee's first
19 day with the company typically?
20   **A   Not the first day.  It's generally the first**
21 **week.  I don't know that they get all the videos --**
22 **depending on which way they watch the videos, but it's**
23 **usually done the first week or two.**
24   Q   Okay.  And are they paid for their time to
25 watch these videos?

1    **A   Yes.**
2    Q   Okay.  And this document is put in the
3  employee file; correct?
4    **A   Yes.**
5    MR. GUTIERREZ:  All right.  Okay.
6    (Exhibit 11 marked)
7    THE REPORTER:  11.
8  BY MR. GUTIERREZ:
9    Q   This is a Real Water Course Memo.  These are
10 the optional courses that give rise to the
11 25-cent-per-hour raise; correct?
12   **A   You know, I haven't looked at this list.  But**
13 **it looks like it.  Yeah, I mean, it looks like it, but**
14 **I haven't specifically looked at this list, and I**
15 **haven't really gone over it, not in the near term.  I**
16 **may have years ago.**
17   Q   Go to the second page.  This states that,
18 "Clare will administer course; employees will give
19 their essays to Clare."  Is this the summary of how the
20 process works to get the raise following completion of
21 the videos?
22   **A   Yeah, although Clare is not with us anymore,**
23 **so it shouldn't say Clare, to be honest with you.  It**
24 **should say the course supervisor.  And then the**
25 **employee should turn the essays into a course**

1  **supervisor -- Clare was the HR person and course**
2  **supervisor.  That's a title there, so she probably**
3  **changed that.**
4    Q   And what's that CSW?
5    **A   That stands for "completed staff work."**
6    Q   Okay.  So what does that mean?
7    **A   What it is, it's a form which is a**
8  **standardized form which states what the situation is,**
9  **what the facts are, and then what the requested action**
10 **is.  And it has "approval" or "denial."**
11   **So in this case, it would say -- whoever this**
12 **is for -- so-and-so has completed the course, they**
13 **completed the course and it has been turned -- the**
14 **completed course has been turned into the course**
15 **supervisor.  It's been attested to its completion.**
16 **Then the solution would be provide so-and-so with a**
17 **25-cent raise.  And once that's signed, and it to goes**
18 **to the HR, which then contacts our Division 3, which**
19 **says bump them up with ADP to 25 cents per hour,**
20 **because it's signed off, it's approved.**
21   Q   Got it.
22   And the following form is an ADP page.  Do you
23 know what the purpose of this document is?
24   **A   No, I've never seen this.**
25   Q   How about the next page?

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    83da6eb4-60b7-476d-9bae-9662a98729d2

Page 121

1    A   I haven't seen the specifics.  So this must be
2  for ADP, how they want you to -- or -- they want us to
3  do it when they get people.
4    Q   So you don't know what this document is for?
5    A   No.  I don't know what Kenexa ProveIt is or
6  Behavioral Assessment Services.
7        MR. GUTIERREZ:  Okay.  I don't have any
8  further questions.
9        MS. GINAPP:  I don't either.
10       THE VIDEOGRAPHER:  Stand by, please.
11       This concludes today's videographed deposition
12 of Brent Jones consisting of three disks.  The time is
13 1632.  And we are off the record.
14    (Thereupon, the deposition concluded at 4:32 p.m.)
15
16
17
18
19
20
21
22
23
24
25

Page 122

1        CERTIFICATE OF WITNESS
2  PAGE   LINE   CHANGE              REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18        * * * * *
19       I, BRENT A. JONES, witness herein, do
   hereby certify and declare under penalty of perjury the
20 within and foregoing transcription to be my deposition
   in said action; that I have read, corrected and do
21 hereby affix my signature to said deposition.
22
23 _____
24       BRENT A. JONES  DATE
25

Page 123

1        CERTIFICATE OF REPORTER
2  STATE OF NEVADA  )
        )  ss:
3  COUNTY OF CLARK  )
4        I, Mary Cox Daniel, a Certified Court
   Reporter licensed by the State of Nevada, do hereby
5  certify:
6        That I reported the videotaped
   deposition of BRENT A. JONES, commencing on Wednesday,
7  December 28, 2016, at 2:00 p.m.
8        That prior to being examined, the
   witness first duly swore or affirmed to testify to the
9  truth, the whole truth, and nothing but the truth; that
   I thereafter transcribed my said shorthand notes into
10 typewriting and that the typewritten transcript is a
   complete, true and accurate record of testimony
11 provided by the witness at said time.
12       I further certify (1) that I am not a
   relative or employee of an attorney or counsel of any
13 of the parties, nor a relative or employee of any
   attorney or counsel involved in said action, nor a
14 person financially interested in the action, and (2)
   that pursuant to Rule 30(e), transcript review by the
15 witness was requested.
16       IN WITNESS WHEREOF, I have hereunto set
   my hand in my office in the County of Clark, State of
17 Nevada, this 5th day of January, 2017.
18
19
20       MARY COX DANIEL, CCR 710, FAPR, RDR, CRR
21
22
23
24
25

Electronically signed by Mary Cox Daniel (101-361-287-3117)                83da6eb4-60b7-476d-9bae-9662a98729d2