# EXHIBIT 3

Deposition of Designee of AffinityLifeStyles.Com,
Inc. d/b/a Real Alkalized Water (Blain Jones)

# Condensed Transcript of the Testimony of

# **Blain Jones**
Volume I

**Date:** October 20, 2016

Grecia Echevarria-Hernandez v. Affinitylifestyles.com, Inc.
Case No. 2:16-cv-00943-GMN-VCF

Oasis Reporting Services, LLC
Phone:  702-476-4500
E-mail:  info@oasisreporting.com
Internet:  www.oasisreporting.com

## Page 1

```
 1                UNITED STATES DISTRICT COURT
 2                     DISTRICT OF NEVADA
 3   GRECIA                     )
     ECHEVARRIA-HERNANDEZ,       )
 4                              )
                  Plaintiff,    )
 5                              )
          vs.                   ) No. 2:16-cv-00943-GMN-VCF
 6                              )
     AFFINITYLIFESTYLES.COM,    )
 7   INC. d/b/a REAL ALKALIZED  )
     WATER, a Nevada            )
 8   corporation; DOES I-X; and )
     ROE BUSINESS ENTITIES I-X, )
 9   inclusive,                 )
                               )
10                  Defendants. )
     _____)
11
12              DEPOSITION OF DESIGNEE
13          OF AFFINITYLIFESTYLES.COM, INC.
14            D/B/A REAL ALKALIZED WATER
               (Pursuant to FRCP 30(b)(6))
15                    BLAIN JONES
16          Taken on Thursday, October 20, 2016
17               At 9:58 a.m.
18           By a Certified Court Reporter
19          At 8816 Spanish Ridge Avenue
20                 Las Vegas, Nevada
21
22
23
24   Reported by:  MARY COX DANIEL, FAPR, RDR, CRR, CCR 710
25   Job No. 19027
```

## Page 2

```
 1   APPEARANCES:
 2   For Plaintiff:
 3        MAIER GUTIERREZ AYON
          BY:  DANIELLE J. BARRAZA, ESQ.
 4        8816 Spanish Ridge Avenue
          Las Vegas, NV 89148
 5
     For Defendants:
 6
          LEWIS, BRISBOIS, BISGAARD & SMITH, LLP
 7        BY:  KRISTOL BRADLEY GINAPP, ESQ.
          6385 South Rainbow Boulevard
 8        Suite 600
          Las Vegas, NV 89118
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1                   I N D E X
 2   WITNESS:  BLAIN JONES
 3                               PAGE
 4   Examination By Ms. Barraza          5
     Examination By Ms. Ginapp         208
 5
 6
 7              INDEX TO EXHIBITS
 8   Exhibit                    Page
 9    1   Plaintiff's Amended Notice of    8
          Taking Deposition of
10        Designee(s) of Defendant
          Affinitylifestyles.com, Inc.
11        d/b/a Real Alkalized Water
          Pursuant to Fed. R. Civ. P.
12        30(b)(6)
13    2   Employment Agreements, Bates    23
          labeled RW-000016-28
14
15    3   Defendant's Responses to       66
          Plaintiff's First Set of
          Requests for Admission
16
17    4   "Message to Garcia" Video      72
          Review, Bates labeled
18        RW-000031-32
19    5   "The Way to Happiness" Video   81
          Review, Bates labeled
20        RW-000034-35
21    6   Real Alkalized Water           92
          Non-Optimum Reports, Bates
22        labeled PLTF00001-6
23    7   Real Water Course Memo, Bates  127
          labeled RW-000060-64
24
25
```

## Page 4

```
 1        (Exhibits Continued)
 2    8   Portions of Basic Study Manual   146
          Course, L. Ron Hubbard,
 3        beginning with Bates label
          RW-000149
 4
 5    9   Formulas for Business Success,   167
          Bates labeled RW-000828-001115
 6   10   Speaking from Experience,        176
          Illustrated Solutions to the
 7        Business Problems You Face
          Every Day, Bates labeled
 8        RW-001306-1312
 9   11   New Game, All Manager, "The     181
          10X Club," Bates labeled
10        PLTF00013
11   12   Charge of Discrimination,        186
          Bates labeled RW-000067-68
12
13   13   Portions of Employee Handbook,   201
          beginning with Bates label
14        RW-000121
15   14   Basic Study Manual Course, L.   208
          Ron Hubbard (not Bates
16        labeled)
17
18
19
20
21
22
23
24
25
```

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 5

1   (A discussion was held off the record between the court
2   reporter and counsel, wherein counsel present agreed to
3   waive the reporter requirements as set forth under NRCP
4   Rule 30(b)(4) or FRCP Rule 30(b)(5), as applicable.)
5                    BLAIN JONES,
6   having been first duly sworn to testify to the truth,
7   the whole truth and nothing but the truth, was examined
8   and testified as follows:
9
10                    EXAMINATION
11  BY MS. BARRAZA:
12      Q   Can you please state and spell your last name
13  for the record?
14      A   Jones, J-O-N-E-S.
15      Q   Please give me your full name.  Sorry about
16  that.
17      A   Okay.  Blain, B-L-A-I-N, Jones, J-O-N-E-S.
18      Q   Thank you.
19          Mr. Jones, have you ever had your deposition
20  taken before?
21      A   No.
22      Q   I'm going to go through a few things.  Your
23  attorney might have already gone through them with you,
24  but just very briefly.
25          Do you understand that the oath you just took

Page 6

1   is the same oath that you would take as if you were in
2   a court, meaning you're subject to the penalties of
3   perjury?
4       A   Yes.
5       Q   So all we're asking you to do today is tell
6   the truth, not to speculate, just to give your best
7   testimony based on the recollection of the events in
8   question.  Do you understand that?
9       A   Yes.
10      Q   Okay.  Please wait for me to finish each
11  question before you start answering, and I'm going to
12  try my best to wait for you to completely finish your
13  answer before going on to another question, as we have
14  a court reporter here and it's very difficult for her
15  to write down what we're saying if we're talking other
16  each other.  Do you --
17      A   Okay.
18      Q   -- understand that?
19      A   Sounds good.
20      Q   Good, there we go.
21          Can we agree that if you answer a question,
22  you understood the question?
23      A   Sure.
24      Q   Are you currently on any medications that
25  would affect your ability to give accurate testimony

Page 7

1   today?
2       A   No.
3       Q   Is there any other reason why you would not be
4   able to give me your full, complete, and truthful
5   answers to my questions today?
6       A   No.
7       Q   From time to time, your counsel is going to
8   put objections onto the record.  Unless she
9   specifically instructs you not to answer, I'm still
10  going to expect you to answer the question.  Do you
11  understand that?
12      A   Uh-huh.
13      Q   Okay.  You're here today as the designee for
14  Real Water -- and when I say "Real Water," I'm
15  referring to the Defendant in this action -- also known
16  as Affinitylifestyles.com, Inc., doing business as Real
17  Alkalized Water.  Do you understand that?
18      A   Yes.
19      Q   Do you understand that the answers you give me
20  today, unless you or I indicate otherwise, are going to
21  be on behalf of Real Water and they will bind the
22  company?
23      A   Uh-huh.
24      Q   Is that a "yes"?
25      A   Yes.

Page 8

1       MS. BARRAZA:  This is Exhibit 1.
2           (Exhibit 1 marked)
3   BY MS. BARRAZA:
4       Q   Do you recognize this document?
5       A   Yes.  Uh-huh.
6       Q   Okay.  I've given you Exhibit 1, which is
7   marked as Plaintiff's Amended Notice of Taking
8   Deposition of Designee of Defendant Real Water.  Is
9   that what you understand this document to be?
10      A   Yes.
11      Q   Okay.  When did you first get notice regarding
12  this deposition for Real Water?
13      MS. GINAPP:  Are you asking for communications
14  with his attorney?
15      MS. BARRAZA:  No.
16  BY MS. BARRAZA:
17      Q   I'm asking when, approximately which date you
18  first became aware that Real Water was going to be
19  deposed in this matter?
20      A   Soon after this was filed.
21      Q   Okay.  I understand there have been a few
22  notices.
23          I'm going to point you to page 2 of Exhibit 1.
24  Do you see that there's a list, which goes on to page
25  3, of subjects laid out on those pages?

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 9

1   A   Yep, I do.
2   Q   Have you read and reviewed all 17 of those
3   subjects?
4   A   Yes.
5   Q   Are you prepared to testify here today
6   regarding all 17 of those subjects?
7   A   Yes.
8   Q   Are there any subjects that you feel you are
9   not prepared to testify on?
10   A   No.
11   Q   Okay.  Have you ever been arrested for any
12   crimes involving fraud or dishonesty?
13   A   No.
14   Q   Where did you go to high school?
15   A   First three years were in Ojai, California, at
16   Nordhoff High School.  And my senior year where I
17   graduated was Boulder City High School.
18   Q   What year was that?
19   A   Graduated in 2005.
20   Q   Did you go to college after high school?
21   A   I did some college at a community college in
22   Ventura, called Ventura College.  And then I also did
23   some at College of Southern Nevada.
24   Q   What kind of courses did you take?
25   A   Business management, and obviously

Page 10

1   prerequisites, and that type of thing, too.
2   Q   Okay.  Did you graduate from either Ventura
3   College or CSN?
4   A   No, I never finished my degree.
5   Q   What year was your last year of attending
6   college courses?
7   A   2009.
8   Q   When did you start working for Real Water?
9   A   I started working for Affinity Lifestyles when
10   I was 12 or 13 after school.
11   Q   Okay.  Going forward, if you refer to
12   Affinity Lifestyles, you're talking about the Defendant
13   in this action?
14   A   Correct. Affinitylifestyles.com, Inc. is the
15   legal name of the company.
16   Q   Okay.  Briefly explain to me your work history
17   with Real Water.
18   A   Well, when we started going by Real Water, was
19   a little over eight years ago.  I started by working on
20   the production line as just a single employee on the
21   production line.  I then ended up needing to
22   familiarize myself with the bottling equipment and
23   being able to run that.  Became the lead of the
24   production team that would run the line.  I then became
25   the head over the production division, which is

Page 11

1   ordering materials, running the production crews,
2   getting the orders delivered.
3   I then was needed to help in accounting.  And
4   so I took over the accounting for a year and a half,
5   two years.  And then ended up finding a replacement for
6   me for that, and became the vice president of
7   operations, which in our -- my company is over
8   accounting, production and quality control.  And I
9   oversaw those areas of the company.
10   At that point, I was doing that for a year,
11   maybe two.  And then I moved over to doing sales, and
12   was over our sales and distributors for the company for
13   nine months or so.  And shortly after that, became more
14   involved with the marketing and doing in-store
15   demonstrations throughout central, and northern
16   California, southern California, Arizona, New Mexico,
17   Colorado, where I actually personally did in-store
18   demonstrations, probably over 300 or so of those.  I
19   also oversaw other product demonstrators that would be
20   in stores and traveling and doing those.  And then did
21   that for a little over a year.
22   And then at that point, I moved back over to
23   operations because it was needed at that time, and took
24   over the accounting, production, and quality control
25   aspects of the company again.  And did that for -- I

Page 12

1   don't know, nine months to a year.
2   And then currently -- and then moved up to my
3   current position which is the executive vice president
4   of operations, which is pretty much over the whole
5   entire company, but my main focus is still operations.
6   Q   When did you move into your current position
7   of executive vice president of operations?
8   A   Two years ago, thereabouts.
9   Q   Who do you report to in your current position?
10   A   Brent Jones.
11   Q   Aside from your history of going to Ventura
12   College and CSN, are you involved in any other -- are
13   you involved in any professional associations?
14   A   Can you clarify as far as what a professional
15   association is?
16   Q   Just professional -- are you involved in any
17   kind of business associations aside from working at
18   Real Water?
19   MS. GINAPP:  I'm going to object to form.  Go
20   ahead.
21   THE WITNESS:  Are you asking if I have another
22   job?  I'm not sure what you're asking.
23   BY MS. BARRAZA:
24   Q   Are you currently involved in any kind of
25   groups or associations that are business oriented?

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 13

1     MS. GINAPP: Objection. Form. Go ahead.
2     THE WITNESS: I can't think of any. Running
3 my own business takes up quite a bit of time.
4 BY MS. BARRAZA:
5     Q   What did you do, besides any communications
6 you had with your attorney, to prepare for your
7 deposition today?
8     **A   Reviewed certain employment histories;**
9 **obviously, reviewed the -- what happened with,**
10 **particular with Grecia, and what happened with her**
11 **because I wasn't involved with the decision-making**
12 **process at the time she was terminated, and so I had to**
13 **review the findings and evidence of why she was**
14 **terminated; and reviewed some of our employment**
15 **agreements and type of legal documentation that we get**
16 **from our human resources company.**
17     Q   Have you reviewed the Complaint that was filed
18 for this lawsuit?
19     **A   Yes.**
20     Q   Okay. What's your understanding of what the
21 allegations are in that Complaint?
22     MS. GINAPP: Objection. Form. Foundation.
23 Go ahead.
24     THE WITNESS: Religious discrimination, citing
25 a movie, "The Secret."

Page 14

1 BY MS. BARRAZA:
2     Q   Have you reviewed the written discovery that
3 was propounded on Real Water? When I say "written
4 discovery," I'm talking about questions that were asked
5 to Real Water in this litigation.
6     **A   I'm not sure I understand exactly what you're**
7 **referring to.**
8     Q   Do you recall any interrogatories or Requests
9 for Admissions or Requests for Production of documents
10 that were propounded on Real Water?
11     **A   Yeah, I'm familiar with the requests. I'm not**
12 **extremely familiar with the actual forms, what**
13 **everything was asked, and everything like that. But I**
14 **am familiar that there was a request for some**
15 **documents.**
16     Q   In your preparation for this deposition, did
17 you review any of Real Water's responses to those
18 requests?
19     **A   I reviewed what was submitted --**
20     Q   Did you review --
21     **A   -- what documents were submitted.**
22     Q   Okay. Have you reviewed any of the deposition
23 transcripts from Aimee Jones' deposition or from Frank
24 Consiglio's deposition?
25     **A   No.**

Page 15

1     Q   Besides any conversations that took place with
2 your attorney, have you spoken with Aimee Jones
3 regarding her deposition?
4     **A   Just briefly, a couple things.**
5     Q   What did she tell you?
6     **A   She felt it was odd asking about her personal**
7 **relationship with my father, as far as some of the**
8 **questions in that. And then she also said that it went**
9 **fine other than that.**
10     Q   Same question: Aside from any conversations
11 that took place with your attorney present, have you
12 spoken with Frank Consiglio regarding his deposition?
13     **A   Briefly, yes.**
14     Q   What did he tell you?
15     **A   Same thing. He said it went fine, minus the**
16 **questions about his personal life.**
17     Q   Okay. Did either of them give you any
18 substantive details about what they testified to at
19 their depositions?
20     **A   No, not particularly.**
21     Q   Okay. When was Real Water formed?
22     **A   Affinitylifestyles.com, Inc., was formed, I**
23 **think, around 2000. Actually, earlier than that, maybe**
24 **1998, if I remember correctly. We filed for "the doing**
25 **business as," fictitious firm name "Real Water" eight**

Page 16

1 years ago, or something like that.
2     Q   Briefly describe for me the business model and
3 purpose of Real Water.
4     MS. GINAPP: Objection. Form.
5     THE WITNESS: Prior to us filing and starting
6 doing business as Real Water, or after?
7 BY MS. BARRAZA:
8     Q   Let's go with prior.
9     **A   Prior we were an online internet marketing**
10 **sales company with vitamins, nutrients, weight loss**
11 **products, health products basically. An individual**
12 **would go online, place an order. We would take their**
13 **order and ship them their various products that they**
14 **ordered. We had around 20 -- anywhere between 20 and**
15 **30 products at any given time over that period.**
16 **We then transitioned to being more of a --**
17 **well, basically we would buy those products from**
18 **manufacturers and then, you know, resale them. When we**
19 **started doing Real Water, we transitioned to being a**
20 **manufacturer where we actually manufactured our own**
21 **products, and got rid of the business of the other**
22 **vitamins sales and health product sales, and switched**
23 **our business model completely over to being a**
24 **manufacturer and selling to main-line distributors**
25 **through conventional channels.**

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 17

1    Q   Aside from Brent Jones, who else was involved
2 in forming the company originally?
3    **A   There was a few people that were around in the**
4 **beginning.  However, I don't know of many of them since**
5 **it was such a long time ago.  I do know of one**
6 **gentleman -- his name is Steve Wright -- that was**
7 **around in the beginning.  That was nearly 20 years ago**
8 **now.**
9    Q   How many employees did Real Water have when it
10 first -- back when it first started out?
11      MS. GINAPP:  Objection.  Form.  Are you
12 talking about when it was Affinity Lifestyles?
13      MS. BARRAZA:  Yes, I'm talking about when it
14 was Affinity Lifestyles.
15      THE WITNESS:  I'm not sure --
16      MS. GINAPP:  I'm going to object as beyond the
17 scope of the deposition notice.  But if you know, you
18 can answer.
19      THE WITNESS:  I don't know.  That's over --
20 about 20 years ago.
21 BY MS. BARRAZA:
22    Q   Okay.  What about in the year 2015, how many
23 employees did Real Water have?
24    **A   40s, in that range.**
25    Q   Were all the employees located in Las Vegas,

Page 18

1 Nevada, or elsewhere?
2    **A   Employees of Affinity Lifestyles, yes, all of**
3 **them were located in Las Vegas, Nevada, during that**
4 **time period.**
5    Q   Time period being 2015; correct?
6    **A   Correct.**
7    Q   In 2015, how many locations did Real Water
8 have?
9    **A   Business locations?**
10    Q   Yes.
11    **A   Affinity Lifestyles had the one location in**
12 **Las Vegas, Nevada, on Desert Inn Road.**
13    Q   Since then, has it acquired any other
14 locations?
15    **A   No.**
16    Q   So am I correct that back in 2015, you were
17 employed in what is your current position, being the
18 vice president of operations?
19    **A   Correct.**
20      MS. GINAPP:  Objection.  Form.  You're the
21 executive vice president; right?
22      THE WITNESS:  Yes.
23      MS. GINAPP:  Okay.  I just want to make a
24 distinction, because I think there is one; right?
25      THE WITNESS:  Yeah, there is.  We have one

Page 19

1 position, vice president of operations.  And then we
2 have the executive vice president of operations.  I
3 hold the executive vice president of operations
4 position.  Frank Consiglio holds the vice president of
5 operations currently.
6 BY MS. BARRAZA:
7    Q   Okay.  In 2015, were there any other just
8 vice presidents of operations?
9    **A   I believe Aimee held that position at that**
10 **time.**
11    Q   Anybody else?
12    **A   Not that I recall.**
13    Q   Okay.  When did you first meet Grecia?
14    **A   Probably when she was brought around for her**
15 **orientation checklist.  The company, when she --**
16 **shortly around when she first started working, I was**
17 **introduced to her, said "hello."  And that was pretty**
18 **much the extent of the conversation.  Part of our**
19 **procedure when we hire somebody is, we want them to be**
20 **introduced to as many people as possible and make them**
21 **feel welcome.**
22    Q   Are you aware of who interviewed Grecia for
23 her position at Affinity Lifestyles?
24    **A   I believe it was somewhat of a combination**
25 **between Jeramy Edgel mostly and Bonnie Mercado.**

Page 20

1    Q   Are you familiar with what Grecia's job
2 position was?
3    **A   Very familiar.**
4    Q   What was her position?
5    **A   She was one of our in-store product**
6 **demonstrators.  She would be asked to travel to stores**
7 **that would sell our product, or that do sell our**
8 **product, and basically demonstrate the product to**
9 **customers and also the staff that worked at that**
10 **individual retail store educating them on the product,**
11 **having them try it, taste it, and, in essence, you**
12 **know, trying to get them to buy the product, and**
13 **understand why it's a good product.**
14    Q   Is a store product demonstrator also known as
15 a brand ambassador?
16    **A   Yes, similar title.**
17    Q   Do you know who Grecia's supervisor was while
18 she was working at Affinity Lifestyles?
19    **A   Bonnie Mercado.**
20    Q   What was Bonnie Mercado's job title at that
21 time?
22    **A   Head brand ambassador, something in that**
23 **regard.  She would also do in-store demonstrations, but**
24 **she oversaw Grecia as well, made her schedule, ensured**
25 **that she was doing her job adequately.**

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 21

1    Q   When did Bonnie Mercado start working at
2  Affinity Lifestyles?
3    A   I believe she's been with us for almost four
4  years now.
5    Q   Do you know if Bonnie Mercado started out as a
6  brand ambassador?
7    A   I do, and she did.
8    Q   Do you know approximately when Bonnie Mercado
9  moved into the position of the head brand ambassador?
10   A   Two or three years ago, shortly -- or somewhat
11 shortly after she had started.  She does an excellent
12 job at being a brand ambassador and demonstrating in
13 the stores.  She's great with customers, very friendly,
14 approachable, and she does a great job.
15   Q   In 2015, how many brand ambassadors were
16 employed at Affinity Lifestyles?
17   A   Over the whole time period of the year?
18   Q   Yes.
19   A   On and off, there were, I think, about three
20 or four.  Not all at the same time, but throughout that
21 whole year-long time period.
22   Q   Aside from Grecia -- you understand when I say
23 "Grecia," I'm referring to the Plaintiff in this
24 action?
25   A   Yeah.

Page 22

1    Q   Okay.  Aside from Grecia, can you give me the
2  names of the other brand ambassadors from 2015?
3    A   I don't recall their names right now.  I would
4  have to look up our employment history to know
5  specifically.
6    Q   Do you know if any of the brand ambassadors
7  that were working in 2015 are still currently working
8  for Real Water?
9    A   Bonnie.
10   Q   Anybody else?
11   A   No.
12   Q   Were all three or four of the brand
13 ambassadors working in 2015 being supervised by Bonnie
14 Mercado?
15   A   Yes.  She held the position of lead brand
16 ambassador, the manager of the brand ambassadors.
17   Q   Did Bonnie Mercado supervise anybody else
18 aside from the brand ambassadors?
19   A   No.
20   Q   In 2015, who did Bonnie Mercado report to?
21   A   Jeramy Egel.
22   Q   What was his job title at that time?
23   A   At that time, he was our director of sales.
24   Q   What were his duties as far as supervising
25 Bonnie Mercado?

Page 23

1    A   Coordinating with her with different store
2  chains or retail locations that we were wanting to
3  focus on to grow sales in; and at times opening up
4  different areas of, say, southern California, or some
5  other area of distribution; and making sure that the
6  product demonstrations were actually resulting in
7  increase in sales.
8    Q   You mentioned that you first met Grecia around
9  the time she was doing her orientation; is that
10 correct?
11   A   Yes.
12   Q   After that, how much contact did you have with
13 Grecia in the workplace?
14   A   Nothing.
15   Q   You never saw her again after that day?
16   A   I might have seen her once, maybe twice, over
17 the time period that she was there.  I don't think I
18 ever said anything to her, or we ever had a
19 conversation more than "hello."
20   Q   Have you had any contact or attempted to have
21 any contact with Grecia following her termination from
22 Real Water?
23   A   No.
24      MS. BARRAZA:  Let's mark this as Exhibit 2.
25        (Exhibit 2 marked)

Page 24

1  BY MS. BARRAZA:
2    Q   I just handed you what's been marked as
3  Exhibit 2.  I'll give you a second to look through it.
4  Let me know when you're done.
5    A   Okay.
6    Q   Okay.  It looks like to me in this packet,
7  there are two marked employment agreements.
8    A   Uh-huh.
9    Q   Is that your understanding?
10   A   Yes.
11   Q   Are these employment agreements that Grecia
12 signed and reviewed?
13   A   Seems to be by her initials and signature at
14 each location.
15   Q   I'm going to start with the document marked as
16 the employment agreement on page RW-16.
17      In 2015, when do Real Water employees sign
18 these agreements?  Is it their first day at work?
19   A   Before they start; correct.
20   Q   Okay.  Would this be the first thing they
21 would do when they come in for the first day?
22   A   Depends on what part of the hiring process.
23 There's usually the application and interview process
24 where they'll fill out an application.  And that would
25 usually be the first thing that they do when they come

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 25

1  into the office for the first time.  But once they are
2  selected as someone that we actually do want to hire,
3  this is one of the first documents that they are given
4  to review.
5      Q   In 2015, was Real Water only accepting written
6  applications, or did it also accept online applications
7  for employment?
8      A   Written.
9      Q   Do you know how Grecia came to be hired at
10 Real Water?
11     A   I believe she replied to an online ad that was
12 posted, and she was one of a few candidates, and went
13 through an interview process.
14     Q   Who interviewed her?
15     A   Most likely, the initial stages were done by
16 Clare LaHara, or whoever was in charge of human
17 resources, and then Jeramy Edgel probably took over at
18 that point to get more in-depth questions answered as
19 it pertained to the specific job position that was
20 being offered.
21     Q   Did Clare LaHara or Jeramy Edgel personally
22 know Grecia prior to her applying for the position at
23 Real Water?
24     A   Not to my knowledge.
25         MS. GINAPP:  Objection.  Form.  Foundation.

Page 26

1  BY MS. BARRAZA:
2      Q   Okay.  Who made the decision that Grecia was
3  going to be hired?
4      A   It was probably a consensus among Jeramy Edgel
5  and the person in charge of human resources at the
6  time.  But most likely, Jeramy has the most weight in
7  regards to that decision because it's an employee that
8  will be working under him.
9      Q   All right.  I think you mentioned that back
10 when Grecia was hired, Clare LaHara was the HR
11 representative for Real Water; is that correct?
12     A   Uh-huh.  She did work in the human resources
13 division, but she wasn't the only one that was there.
14 She helped with paperwork, and different things like
15 that.  But we had another person, Melissa Nava, that
16 was there as well that did more of the submitting --
17 posting job ads, our job ads, handling responses to the
18 job ads, reviewing resumés, selecting the people to
19 pass on to the next round of interviews, that type of
20 thing.
21     Q   Okay.  How long was Clare LaHara in the HR
22 department at Real Water?
23     A   Around a year.
24     Q   Do you know approximately when she left that
25 position?

Page 27

1      A   Last spring, late spring, somewhere in there.
2      Q   Are you talking about late spring 2015?
3      A   No, of this year.
4      Q   Okay, 2016.
5          Does Clare LaHara still work at Real Water?
6      A   No.
7      Q   Do you have any contact information for Clare
8  LaHara?
9      A   I believe I have her phone number still.
10     Q   Why did Clare LaHara leave employment for
11 Real Water?
12     A   She decided she wanted to move back to the
13 east coast to be closer to her children.
14     Q   Okay.  What about Melissa Nava, how long was
15 she in the HR department at Real Water?
16     A   Nine months to a year, somewhere around that
17 time period, before she was working as a sales
18 assistant.
19     Q   Approximately when did Melissa Nava leave her
20 position as an HR representative for Real Water?
21     A   Around the spring of 2015.
22     Q   Do you know if it was before or after Clare --
23 it was before Clare LaHara, correct, left?
24     A   No, because Clare wasn't the head person over
25 human resources.  She was just somebody that would

Page 28

1  help.
2      Q   Okay.  What was Clare's -- did Clare have a
3  specific job title in 2015?
4      A   I don't recall what her specific title was.
5  She would facilitate and help things in the human
6  resources department.  She would also help facilitate
7  in other areas of the company depending on what we
8  needed.
9      Q   In 2015, at the time Grecia was hired, was any
10 employee of Real Water specifically designated as a
11 human resources --
12     A   Melissa Nava.
13     Q   Okay.
14         MS. GINAPP:  Make sure you let her finish her
15 question.
16         THE WITNESS:  Okay.
17 BY MS. BARRAZA:
18     Q   -- specifically designated as the human
19 resources department representative?
20     A   Melissa Nava.
21         MS. GINAPP:  You have to remember lawyers
22 might change it up at the end.
23 BY MS. BARRAZA:
24     Q   I think you mentioned that Melissa Nava left
25 the HR department in approximately the spring of 2015;

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

1  is that correct?
2  **A   Yes.**
3  Q   Did she leave the whole company at that time
4  as well?
5  **A   Correct.**
6  Q   Why did she leave the company?
7  **A   She had a newborn baby, and wanted to dedicate**
8  **more of her time to starting a family.**
9  Q   Do you have Melissa Nava's contact
10  information?
11  **A   Possibly.  I could look it up.  I don't know**
12  **if it's current.**
13  Q   Okay.  So after Melissa Nava left in the
14  spring of 2015, which employee of Real Water stepped
15  into the human resources department?
16  **A   We then hired somebody -- I don't think it was**
17  **immediately, like the next day after, but with some**
18  **time passing -- Christian Pantelakis.**
19  Q   Had Christian Pantelakis already been working
20  at Real Water prior to that, or did she get hired just
21  to start out working in the HR department?
22  **A   No, she, I believe -- I believe she was**
23  **working as my father's assistant, Brent Jones'**
24  **assistant.**
25  Q   And that was prior to the spring of 2015?

1  **A   Correct.  And then we began to transition her**
2  **into that position as we needed somebody.**
3  Q   How long was Christian Pantelakis in the HR
4  department of Real Water?
5  **A   Six to nine months.**
6  Q   Are you aware if Christian Pantelakis was in
7  the HR department at the time Grecia was terminated
8  from Real Water?
9  **A   I believe she was, yes, at least operating**
10  **some of the functions within that division.**
11  Q   Aside from Christian Pantelakis, Clare LaHara,
12  and Melissa Nava, were there any other employees of
13  Real Water in the human resources department at any
14  time from March of 2015 through October of 2015?
15  **A   I don't believe so, no.**
16  Q   Does Christian Pantelakis still work at
17  Real Water?
18  **A   No.**
19  Q   When did she leave?
20  **A   Late last year, early this year.**
21  Q   Why did she leave Real Water?
22  **A   She quit because she wanted to find other**
23  **employment.**
24  Q   Do you still have Christian Pantelakis'
25  contact information?

1  **A   I have the records she provided at the time,**
2  **yes.**
3  Q   Looking back to the employment agreement which
4  starts on page RW-16, who at Real Water would have
5  given this employment agreement to Grecia to review and
6  sign?
7  **A   According to the page where it was signed as a**
8  **witness, it was Clare LaHara --**
9  Q   Okay.
10  **A   -- or, excuse me -- the witness was Jeramy**
11  **Edgel, but the human resources designee at the time was**
12  **Clare LaHara.  So one of them, most likely.**
13  Q   For the employment agreement that starts on
14  page RW-20, is it your understanding that Jeramy Edgel
15  would have been the one to give Grecia that document
16  and witness her reviewing it and initialing it?
17  MS. GINAPP:  Objection.  Foundation.
18  THE WITNESS:  It's possible; correct.
19  BY MS. BARRAZA:
20  Q   In 2015, did Real Water have anybody
21  designated to be a person who gives new employees the
22  employment agreements?
23  **A   Other than the people we already discussed?**
24  Q   Other than Jeramy Edgel?
25  **A   No, he was not the person that was designated**

1  the person to give.  We discussed the human resources
2  positions that we had, Melissa Nava, Clare LaHara, and
3  Christian Pantelakis, throughout that time period.
4  Q   So the human resources department was
5  responsible in 2015 for making --
6  **A   Yeah, ultimately they are responsible for**
7  **maintaining the records.**
8  Q   Okay.  I'm wondering -- as you can see here,
9  it looks like there are two separate agreements.  Do
10  you know, why does Real Water have two separate
11  documents marked as employment agreements?
12  **A   When Grecia started, it was during a**
13  **transition period from the first employment agreement**
14  **that is in this exhibit to the next one.  And the**
15  **people that were having her fill out her paperwork**
16  **probably just had her do both by mistake instead of**
17  **doing one or the other.**
18  Q   What led to Real Water changing its employment
19  agreements at this time, around this time?
20  **A   Honestly, most of it is pretty much the same.**
21  **However, we did start working with ADP and their human**
22  **resources consulting service of TotalSource.  And they**
23  **reviewed our employment agreement, made it look a**
24  **little prettier with adding our logo to it, and that**
25  **type of thing.**

1  Q  Okay.  So ADP made --
2  **A  They recommended the changes.**
3  Q  And we're talking about for the second
4  agreement which starts on page RW-20?
5  **A  Correct.**
6  Q  Okay.  So did Real Water start doing business
7  with ADP in 2015?
8  **A  No.**
9  Q  When did Real Water start doing business with
10  ADP?
11  **A  2009, 2010, thereabouts, with ADP as our**
12  **payroll processing company, which is separate from the**
13  **service of TotalSource that has human resources**
14  **consulting services.**
15  Q  When did Real Water start using the
16  TotalSource aspect of ADP?
17  **A  I believe it was around 2015.  I don't have**
18  **the exact date memorized.**
19  Q  All right.  I want to point your attention to
20  Section 3 of the employment agreement, the first one,
21  starts on page RW-16.  Can you read that to yourself
22  and let me know when you're done?
23  **A  Okay.**
24  Q  What's your understanding of what Section 3
25  states?

1  MS. GINAPP:  Objection.  Form.  Foundation.
2  Go ahead.
3  THE WITNESS:  Section 3 is informing the
4  prospective employee that we use a Management
5  Technology or a set of tools and procedures that was
6  created by a person named L. Ron Hubbard, and also
7  pointing out that he was also the creator of a religion
8  called Scientology.  However, the Management Technology
9  and the religion are quite distinct and separate.  And
10  it's just laying that out there in the beginning for
11  the employee to understand and acknowledge, and being
12  up front and honest.
13  BY MS. BARRAZA:
14  Q  At the time that Grecia signed this employment
15  agreement back in 2015, had Real Water given Grecia any
16  documents reflecting exactly what the Management
17  Technology would be?
18  **A  Based on the procedure of our hiring**
19  **procedure, most likely not.  However, I can't speak for**
20  **the event because I wasn't the one doing it myself.**
21  Q  Okay.  Does Real Water -- back in 2015, did
22  Real Water have any kind of policy regarding giving new
23  hires any kind of documents which detail exactly what
24  the L. Ron Hubbard Management Technology is prior to
25  having them sign any employment agreements?

1  **A  Prior to them signing employment agreements?**
2  Q  Yes.
3  **A  The procedure -- we don't have any steps in**
4  **our hiring procedure where we give them information**
5  **about the Management Technology.**
6  Q  Okay.
7  **A  If they ask, we are more than happy to answer**
8  **any questions, show them anything that they want to**
9  **know more about.  But, you know, as anybody knows when**
10  **they're getting hired for a position, there's usually**
11  **lots of paperwork, and people don't like to read books,**
12  **and all that kind of stuff, so we don't bombard them**
13  **with things at that time other than the legal**
14  **requirements that we need.**
15  Q  Understood.
16  Aside from any potential documents, did
17  Real Water have any policy in 2015 regarding verbally
18  explaining to new hires exactly what the L. Ron Hubbard
19  Management Technology and business system entailed?
20  MS. GINAPP:  Objection.  Form.
21  THE WITNESS:  Other than what's stated in the
22  employment agreement, no, no one was instructed to say
23  anything in regards to that.  But if someone had a
24  question, they were, of course, wanted to or required
25  to have the question answered to the best of their

1  ability.  And if they couldn't answer the question to
2  the person's satisfaction, then, you know, the policy
3  was always to have the question answered.
4  BY MS. BARRAZA:
5  Q  Is there any specific reason why Real Water
6  felt the need to include Section 3 in its employment
7  agreement?
8  **A  Basically to lay out that there is a**
9  **difference, and make sure people are aware that there**
10  **is a difference between the Management Technology that**
11  **we use and the religion of Scientology, because,**
12  **unfortunately, sometimes people like to muddy the**
13  **waters and think that they're all the same thing when**
14  **it's not the truth, that it isn't the same thing.**
15  Q  How did Real Water become informed that the
16  Management Technology aspect of L. Ron Hubbard's
17  teachings is not the same thing as the Scientology
18  aspect?
19  MS. GINAPP:  Objection.  Form.
20  THE WITNESS:  Yeah, can you -- I don't
21  understand your question.  Can you clarify?
22  BY MS. BARRAZA:
23  Q  Okay.  You just explained to me that Section 3
24  is included in here because employees don't always
25  understand right away that the Management Technology is

1 completely separate from the Scientology aspect of
2 L. Ron Hubbard; is that correct?
3    A   Yes.
4    Q   How did Real Water come to that understanding
5 itself?
6       MS. GINAPP: Objection. Form.
7       THE WITNESS: I don't know specifically. The
8 company has been around for almost 20 years now. And I
9 think it was probably something during the beginning
10 forming ages possibly, or -- I can't speak of exact
11 time and place when we -- when the company became aware
12 of that.
13 BY MS. BARRAZA:
14    Q   Do you know of anybody who would be able to
15 testify about that?
16    A   Possibly Brent Jones.
17    Q   Okay. I want to point you to -- I guess we'll
18 call it the second employment agreement, which starts
19 on page RW-20, specifically Section 3 and Section 4.
20 I'll let you read those to yourself.
21       Let me know when you're done.
22    A   Okay.
23    Q   Explain to me what the purpose of Section 3 is
24 on this document.
25    A   Similar to Section 3 of the previous document,

1 being up front and honest with the prospective
2 employee, and letting them know that we use the
3 Management Technology of procedures and techniques and
4 tools that was created or founded by L. Ron Hubbard,
5 who is also the founder of Scientology. However, there
6 is a distinct difference, and the Management Technology
7 that we use does not get into the religious aspects of
8 Scientology in any regard.
9    Q   What about Section 4? What's the purpose of
10 Section 4?
11    A   Giving a very concise and brief explanation of
12 what the Management Technology is, and how it relates
13 to the operations of an organization or company. And
14 the word "promotion" there is not job enhancement. It
15 is getting products known.
16    Q   Okay. You're referring to in Section 4, how
17 it states, "Promotion" --
18    A   Yes. Because I know that was one of the
19 allegations in the lawsuit, that's why I just wanted to
20 point it out.
21    Q   You're clarifying that that term "Promotion"
22 in Section 4 means "job enhancement"?
23    A   No, not "job enhancement."
24    Q   Not "job enhancement," okay.
25    A   Getting products known.

1    Q   Exactly, okay. You're just talking about
2 retail side of promotion?
3    A   Sales.
4    Q   Okay. Sales, okay.
5       Why in 2015 did Real Water utilize the
6 Management Technology formed by L. Ron Hubbard?
7    A   Because the majority of the shareholders and
8 the board of directors determined that it had value,
9 and in being able to help the operations and efficiency
10 of the company.
11    Q   What individuals were involved in that
12 decision?
13    A   At what time period?
14    Q   At the time period that Real Water first
15 decided to implement L. Ron Hubbard's business
16 Management Technology teachings into the company?
17    A   Probably Brent Jones and my mother, Lori
18 Jones.
19    Q   Approximately what year would that be?
20    A   I honestly couldn't say. It was before --
21 definitely longer than 10 years ago.
22    Q   Is Brent Jones a practicing Scientologist?
23    A   Yes.
24    Q   Do you have knowledge of how Brent Jones first
25 became aware of L. Ron Hubbard's Management Technology

1 system?
2       MS. GINAPP: I'm going to object that it's
3 beyond the scope of the deposition notice. You can
4 answer if you know.
5       THE WITNESS: I believe he attended some
6 business organizational courses at the Hubbard College
7 of Administration in Los Angeles.
8 BY MS. BARRAZA:
9    Q   When was that?
10      MS. GINAPP: Same objection. Foundation.
11      THE WITNESS: I don't know. I'm not sure.
12 BY MS. BARRAZA:
13    Q   Would you say it's more than 10 years ago?
14    A   Most likely, yes.
15    Q   More than 20 years ago?
16    A   Probably not.
17    Q   Okay. Aside from the disclaimers that are
18 made in the two employment agreements we just went
19 over, at the time that Grecia was hired, did anybody
20 verbally explain to her what role, if any, Scientology
21 would have at Real Water?
22    A   Of course not, because Scientology did not
23 have any role with her employment at Real Water.
24    Q   So there was no verbal discussion whatsoever
25 about Scientology; correct?

Electronically signed by Mary Cox Daniel (101-361-287-3117)        c773ac71-bef8-43c9-b345-181b55e3b981

1    MS. GINAPP: Objection. Foundation.
2    THE WITNESS: I wasn't there during her hiring
3  process, so I can't speak to those events, person.
4  BY MS. BARRAZA:
5    Q   What about -- Real Water has no policy, is
6  that correct, regarding having its HR representatives
7  give any kind of verbal discussions about Scientology;
8  is that correct?
9    MS. GINAPP: Objection. Form.
10    THE WITNESS: To initiate conversations?
11  BY MS. BARRAZA:
12    Q   Correct.
13    **A   No.  They're not supposed to do that.**
14    Q   What about if a new hire, after reviewing the
15  employment agreement, were to bring up any concerns
16  about Scientology at that time?
17    MS. GINAPP: Objection. Incomplete
18  hypothetical. Form. Foundation. Go ahead.
19    THE WITNESS: They were instructed to answer
20  any questions that a new hire might have in regards to
21  their employment from job description, pay, what
22  they're going to be doing, anything that consists in
23  this employment agreement, and make sure that that
24  person understands exactly what they're agreeing to, to
25  the best of their ability, should the applicant have

1  questions.
2  BY MS. BARRAZA:
3    Q   And should the applicant have questions about
4  Scientology specifically, would the HR representative
5  then report that up the chain, or would they be solely
6  responsible for handling it at that time?
7    MS. GINAPP: Same objections.
8    THE WITNESS: No, they would be -- there was
9  no policy of them to report that to any seniors or
10  people in the company, no policy in regards to that
11  whatsoever. If they could not answer a question that
12  was being asked, or did not have the information and
13  they could not find that on their own through their own
14  research or the documentation that we have, yeah, they
15  are wanted to provide the applicant with the
16  information as much as possible so they can make an
17  informed decision on working at our company.  So it's
18  possible that at some point at one time or another
19  somebody did ask a question in regards to that.
20  BY MS. BARRAZA:
21    Q   Do you have any knowledge of anybody asking
22  such a question about Scientology at the time that they
23  were reviewing the employment agreement?
24    **A   When you say "somebody," what are you**
25  **referring to?**

1    Q   I'm referring to -- are you aware of any
2  Real Water new hire who came in and reviewed the
3  employment agreements and then posed a question
4  regarding Scientology after reading them?
5    **A   No, not aware of it.**
6    Q   Okay. I want to point your attention to
7  Section 8 of the first employment agreement, which is
8  on page RW-18.  Let me know when you're done reading
9  that to yourself.
10    THE WITNESS: What's the policy on bathroom
11  breaks?
12    MS. GINAPP: Do you need one?
13    THE WITNESS: I'd like one.
14    MS. BARRAZA: That's fine. There's no
15  question, so that's fine.
16    (Recess)
17  BY MS. BARRAZA:
18    Q   Before we went on break, I asked you to read
19  Section 8 of the first employment agreement located on
20  page RW-18.  Have you had time to do that?
21    **A   No.**
22    Q   Go ahead and let me know when you're done.
23    MS. GINAPP: Sorry, RW-18?
24    MS. BARRAZA: 18.
25    THE WITNESS: Okay.

1  BY MS. BARRAZA:
2    Q   What's the purpose of Section 8 in this
3  agreement?
4    **A   To define and express that the staff and**
5  **executives of the company are not trying to encroach**
6  **upon one's freedom or right to their own beliefs and**
7  **their own religion; and that the Management Technology**
8  **that is used in the company is not an effort to enforce**
9  **or promote religious beliefs upon any of its employees;**
10  **and that if they do feel any type of encroachment upon**
11  **their beliefs, that they agree and understand that the**
12  **policy is to report it in writing to their senior or**
13  **supervisor at once.**
14    Q   What policies and procedures did Real Water
15  have in place in 2015 to prevent any kind of religious
16  discrimination from taking place?
17    **A   Other than what's put here in the employment**
18  **agreement, it's pretty comprehensive and to the point**
19  **of what the procedure was.**
20    Q   So there's no other kind of special training
21  that took place, or videos, or documents of any sort
22  that the employees were given regarding how Real Water
23  takes steps to prevent religious discrimination; is
24  that correct?
25    MS. GINAPP: Objection. Form.

1    THE WITNESS:  Other than what's laid out in
2  this employment agreement, in this document, possibly
3  there were times that it was verbally gone over that we
4  don't want to encroach upon someone's freedom of
5  religion, and we need to follow this agreement, but it
6  was always pointing it back to this.
7  BY MS. BARRAZA:
8    Q   Is there any kind of document which would
9  reflect that Real Water has a policy of verbally
10  speaking with its employees regarding Real Water's
11  religious discrimination policies?
12    MS. GINAPP:  Objection.  Misstates testimony.
13  Form.
14    THE WITNESS:  No.  Because, again, this is the
15  document.  This is the procedure.  This is the policy.
16  BY MS. BARRAZA:
17    Q   Okay.  In your review of employment
18  agreements, such as the first two that Grecia signed,
19  did the employment agreements actually lay out what
20  specific courses the employees will have to participate
21  in that have anything to do with L. Ron Hubbard's
22  teachings?
23    A   Can you clarify --
24    MS. GINAPP:  Objection.
25    THE WITNESS:  Sorry.

1    MS. GINAPP:  That's okay.  Go ahead.
2    THE WITNESS:  The beginning of the question?
3  BY MS. BARRAZA:
4    Q   Sure.
5    Do any of the employment agreements that new
6  hires sign specifically lay out exactly what kind of --
7  exactly which courses the employees will have the
8  option of taking part in that have anything to do with
9  L. Ron Hubbard's teachings?
10    MS. GINAPP:  Objection.  Form.
11    THE WITNESS:  During what time period?
12  BY MS. BARRAZA:
13    Q   2015.
14    A   These are the documents.
15    Q   Okay.  Did Real Water, back in 2015, give its
16  employees any documents upon their hire which explained
17  that they will have to watch "The Secret" or "The Way
18  to Happiness"?
19    A   Documents?  No.
20    Q   What about, does Real Water have any kind of
21  policy that says that the new hires are to be verbally
22  informed that they're going to have to watch "The
23  Secret" and "The Way to Happiness"?
24    A   We have what's called, what we refer to as a
25  hiring checklist.  And one of the steps on the hiring

1  checklist is having the new employee watch those films.
2    Q   Okay.  Is there any kind of policy as far as
3  whether those films are watched before or after the
4  employees have already signed their employment
5  agreements, back in 2015?
6    A   I would have to review the exact order of the
7  new hiring checklist.  I believe, I feel that they
8  would sign these agreements, then watch the videos.
9    Q   I'm just trying to ascertain whether in 2015,
10  prior to the time the new hires had to sign any kind of
11  employment agreements, they were put on any kind of
12  notice that some of the videos they would have to watch
13  would include "The Secret" or "The Way to Happiness"?
14    A   No, I don't believe we have any notices,
15  because the order of the procedure is to have them sign
16  the employment agreement so they understand that what
17  they're going to be doing is -- accept all the
18  different parts -- but particularly for this one, since
19  this is the one we're focusing on -- that we are not
20  trying to encroach upon their religious freedom and
21  their rights to choose what they believe in, and then
22  they would be asked to watch the films.
23    Q   Just to clarify, the films, "The Secret" and
24  "The Way to Happiness," were those optional for the
25  employees to watch, or were those required?

1    A   Optional.  If they had an issue or a problem
2  with watching one of them, they did not have to watch
3  them.  I don't think it's ever been -- I can't honestly
4  say that I've ever heard of anybody saying, "No, I
5  don't want to get paid to watch a video," though.
6    Q   All right.  Did you have any part in
7  responding to Real Water's written discovery?  Do you
8  remember how we talked about the interrogatories and
9  the Request for Admissions earlier?
10    A   Yes.
11    Q   Did you have any part in formulating the
12  answers to those questions?
13    A   I can't speak to the answers that you're
14  referring to because I don't know those documents by
15  heart.
16    Q   Okay.  Now, I want to go over "The Secret" and
17  "The Way to Happiness".  Are those part of videos that
18  are watched in the orientation period of, once an
19  employee starts working at Real Water; is that correct?
20    A   Correct.
21    Q   What other videos, if any, aside from "The
22  Secret" and "The Way to Happiness," fall into that
23  orientation portion?
24    A   We have a video of a gentleman named Art
25  Williams, who I believe is a Christian business leader.

1    I think he's from Georgia, if I remember correctly.
2    And the title of the video is "Just Do It." It's a
3    short video.  And it's -- kind of puts the principle or
4    the idea of, don't worry about the problems that you
5    might face in life or on your job, or what have you,
6    just figure out a way to get it done, and just do it.
7        There's another video called "Message to
8    Garcia."  That is a reading of a typed, or a written
9    passage, I believe, of the same title, "Message to
10   Garcia," that was written in the early 20th century,
11   and kind of goes over a similar principle of, don't get
12   mired down in the reasons why something can't get done,
13   just find a way to achieve the goal.
14       Q   Okay.  Any other videos besides those two you
15   just described to me?
16       A   "The Secret" and "The Way to Happiness."
17       Q   How about you give me a brief overview of "The
18   Secret"?
19       A   "The Secret" is a video that portrays a way of
20   thinking about life in a positive manner, and to give
21   somebody a tool or a way to attract different things,
22   or conditions, or happiness in their life that they
23   want.  It's been used and promoted by many different
24   people, including Oprah, other companies.  I've heard
25   that they use it as a motivational type tool for their

1    employees.
2        Q   Why don't you briefly describe to me "The Way
3    to Happiness"?
4        A   "The Way to Happiness" is a set of principles
5    or guides for living a happy life, everything from eat
6    correctly, brush your teeth, don't do drugs -- type of
7    things like that -- down to, you know, respect the
8    religious beliefs of others.  I mean, there's even
9    don't murder, things like that in there.  It's sort of
10   a simple guideline of how somebody can live a happy
11   life.
12       Q   We're going to come back and discuss these
13   videos in more detail when we go over Grecia's video
14   reviews.  I just want to make sure I get this
15   orientation list we had started completely filled out.
16       I think you mentioned "Just Do It".  When was
17   that video first introduced into the orientation
18   section for Real Water?
19       MS. GINAPP:  Objection.  Form.  I believe the
20   title is called, "Do It."
21       THE WITNESS:  What was that?
22       MS. GINAPP:  Is it "Just Do It"?
23       THE WITNESS:  I think it's "Just Do It."
24       MS. GINAPP:  Oh, it's "Just," oh, okay.
25       THE WITNESS:  Well, it's a speech that the

1    gentleman gave that was filmed.  And so I don't think
2    there was ever -- like, he didn't say, "This is the
3    title of my speech."  But it's commonly referred to as
4    "Just Do It," I believe.
5        MS. GINAPP:  Sorry.  My apologies.
6        THE WITNESS:  Three, four years ago maybe.
7    BY MS. BARRAZA:
8        Q   So it's fair to say that the "Just Do It"
9    video would have been part of Grecia's orientation
10   viewing?
11       A   Yeah.
12       Q   Okay.  How long approximately is that video?
13       A   Five minutes, approximately.
14       Q   Do the new hires have a video review that they
15   fill out that's associated with the "Just Do It" video?
16       A   I don't believe there is one, but I'm not a
17   hundred percent certain on that, if we've ever had a
18   review of that video.  But because it's so short and
19   there's not really much to it, I don't think we have
20   one.
21       Q   All right.  So we've gone through "Just Do
22   It," "Message to Garcia," "The Secret," and "The Way to
23   Happiness."  Any other videos that were part of the
24   2015 orientation?
25       A   We do have two, what we call, "Real Water

1    Culture" videos that give people a little bit of an
2    understanding of the Management Technology, and the
3    ideas, principles, tools, policies, procedures, type
4    things, that we have that we use at the company.
5        Q   Aside from those videos that we've gone over,
6    any other videos that need to be added to the list of
7    orientation videos?
8        A   No.
9        Q   Okay.  Before we move on from what's been
10   marked Exhibit 2, I'm going to ask you to go to page
11   RW-18, which looks like it's part of the first
12   employment agreement.  Can you read Section 10 to
13   yourself?  Let me know when you're done.
14       A   Okay.
15       Q   What's the purpose of Section 10?
16       MS. GINAPP:  Objection.  Calls for a legal
17   conclusion.  Form.  Foundation.  Beyond the scope of
18   the deposition notice.
19       MS. BARRAZA:  I'll put on the record that we
20   believe this is not beyond the scope as it goes to the
21   religion discrimination claims.
22       THE WITNESS:  Can you ask the question again?
23   BY MS. BARRAZA:
24       Q   Sure.  What's the purpose of Section 10?
25       MS. GINAPP:  Same objections.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    c773ac71-bef8-43c9-b345-181b55e3b981

1      THE WITNESS:  The purpose is to have the
2   employee agree and acknowledge that should they have
3   any objections or feel that they were discriminated
4   against, their civil rights encroached upon at any time
5   during their employment, that they have the right to go
6   to a binding arbitration with a mediation step prior to
7   that, and that they agree to take that avenue of
8   resolution instead of the legal court system.
9   BY MS. BARRAZA:
10      Q    So this would include if an employee felt he
11   or she was being religiously discriminated against,
12   they would go to the binding arbitration that you just
13   described; is that correct?
14      MS. GINAPP:  Objection.  Calls for a legal
15   conclusion.  The document speaks for itself.  Outside
16   the scope of the notice.
17      THE WITNESS:  If the --
18      MS. GINAPP:  Foundation.  Go ahead.
19      THE WITNESS:  Sorry.
20      MS. GINAPP:  No, go ahead.
21      THE WITNESS:  If the procedures that we have
22   in place to, you know, handle any sort of feelings of
23   religious discrimination, including reporting it to
24   their immediate senior in writing, if they then don't
25   get anywhere there, reporting it to the human resources

1   department, or their senior's senior, their boss' boss,
2   all of that, don't get anywhere, and aren't able to
3   resolve the situation, and they feel so aggrieved or
4   that there is such a problem beyond those remedies that
5   have already been taken, then they have the right to an
6   arbitration.
7   BY MS. BARRAZA:
8      Q    Why was the arbitration provision included in
9   the employment agreement?
10      MS. GINAPP:  Objection.  Foundation.  Beyond
11   the scope of the notice.
12      THE WITNESS:  I think it's pretty standard in
13   employment agreements.  And so it was added because
14   it's kind of a common thing that companies do.
15   However, I think the underlying reason of why was
16   because the legal court system is a costly drain on
17   society, and there's other ways to handle problems and
18   find proper remedies to solutions where both parties
19   can be happy and move forward outside of the legal
20   court system.
21   BY MS. BARRAZA:
22      Q    I want to point you to the second employment
23   agreement in your packet located at page RW-24 and
24   RW-25.  I would ask you to read Sections 12 and 13.
25      A    Okay.

1      Q    I'll give you a chance to look over it.  To
2   me, it looks like Sections 12 through 17 all deal with
3   Real Water's arbitration policies.  So I'll let you
4   look through that, and let me know if that's also your
5   understanding.
6      MS. GINAPP:  12 through 17?
7      MS. BARRAZA:  Yes.
8      MS. GINAPP:  I'm going to object to form.
9   Calls for a legal conclusion.  Foundation.
10      THE WITNESS:  Okay.
11   BY MS. BARRAZA:
12      Q    Would you agree with me that the sections you
13   just read from the second employment, being Sections 12
14   through 17, is not the exact same language as the
15   section on arbitration in the first agreement,
16   Section 10?
17      MS. GINAPP:  Objection.  The document speaks
18   for itself.  Calls for a legal conclusion.  Outside the
19   scope of the notice.
20      THE WITNESS:  Can you clarify your question?
21   BY MS. BARRAZA:
22      Q    My question is:  Would you agree with me that
23   Section 10 in the first agreement is not the exact same
24   as the arbitration sections in the second agreement,
25   being Sections 12 through 17?

1      MS. GINAPP:  Same objections.
2      THE WITNESS:  The second employment agreement
3   that was signed by Grecia is more extensive in the
4   explanation of the same idea, yes.
5   BY MS. BARRAZA:
6      Q    Okay.  Is there any kind of document which
7   explains to Grecia whether the arbitration terms in the
8   first agreement she signed or the arbitration terms in
9   the second agreement she signed would be the ones that
10   would be imposed on her?
11      MS. GINAPP:  Objection.  Calls for a legal
12   conclusion.  Outside of the scope of the notice.
13   Foundation.
14      THE WITNESS:  Nothing is being imposed on her.
15   She's agreeing to follow those procedures.
16   BY MS. BARRAZA:
17      Q    Okay.  Is there anything that would explain to
18   Grecia -- is there any evidence or knowledge that you
19   have that Grecia was talked to about whether Section 10
20   of the first agreement is what she's bound by, or
21   Sections 12 through 17 of the second agreement is what
22   she's bound by?
23      MS. GINAPP:  Same objections.
24      THE WITNESS:  She agreed to both of them.
25   /////

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 57

1  BY MS. BARRAZA:
2     Q   Is it Real Water's position that Grecia will
3  be bound by both agreements?
4        MS. GINAPP: Objection. Calls for a legal
5  conclusion. Argumentative. Beyond the scope of the
6  notice. Just generally form and foundation.
7        THE WITNESS: She agreed to both of the
8  agreements.
9  BY MS. BARRAZA:
10    Q   Okay. Do you know why the arbitration
11 language in the second agreement is more extensive than
12 the language in the first agreement?
13       MS. GINAPP: Objection to the form of the
14 question in general. Calls for a legal conclusion.
15 Beyond the scope of the notice. Foundation.
16       THE WITNESS: To explain the idea more
17 thoroughly.
18 BY MS. BARRAZA:
19    Q   Did ADP come up with the more extensive
20 arbitration language?
21       MS. GINAPP: Objection to the form of the
22 question.
23       THE WITNESS: They consulted and suggested
24 language.
25 /////

Page 58

1  BY MS. BARRAZA:
2     Q   All right. Were the arbitration provisions
3  that Grecia signed in the first and second agreements,
4  were they negotiable?
5        MS. GINAPP: Objection. Form. Foundation.
6        THE WITNESS: In the second agreement, she
7  clearly has an option between two choices in Section 13
8  that she's given.
9  BY MS. BARRAZA:
10    Q   Let's go over Section 13 of the second
11 agreement, page RW-25. What's the first option that
12 she has?
13       MS. GINAPP: Objection. The document speaks
14 for itself. Calls for a legal conclusion. Form.
15 Foundation. Beyond the scope of the notice.
16       THE WITNESS: It says there what the option
17 is.
18 BY MS. BARRAZA:
19    Q   Okay. Am I correct that Option A, if she were
20 to select that option, it means that she's agreeing
21 that any and all Title VII claims are resolved by
22 binding arbitration?
23       MS. GINAPP: Objection. The document speaks
24 for itself. Calls for a legal conclusion. Beyond the
25 scope of the notice.

Page 59

1        THE WITNESS: It's pretty clear what it says
2  there. As far as the interpretation of, I'm not an
3  attorney, so I can't give my interpretation.
4  BY MS. BARRAZA:
5     Q   Explain to me what the difference is between
6  the option in Option A and Option B.
7        MS. GINAPP: Objection. Beyond the scope of
8  the deposition notice. Calls for a legal conclusion.
9  The document speaks for itself.
10       THE WITNESS: I'm not well versed in law. I'm
11 not an attorney.
12 BY MS. BARRAZA:
13    Q   Okay. Would you say Grecia would be able to
14 make an informed decision about whether she should
15 select Option A or Option B?
16       MS. GINAPP: Objection. Calls for
17 speculation. Beyond the scope of the notice. What
18 else? Form. Foundation, just in general.
19       THE WITNESS: I don't know Grecia's
20 experience. I've had two words, "hi" and "bye,"
21 communicated between her. So I can't speak to her
22 experience or knowledge.
23 BY MS. BARRAZA:
24    Q   Okay.
25    A   **However, the standard policy is if someone has**

Page 60

1  **a question or an issue with one of these, it's**
2  **obviously to be addressed.**
3     Q   Did anyone ever explain to Grecia at the time
4  she was signing these employment agreements that either
5  of the arbitration provisions could be modified?
6        MS. GINAPP: Objection. Calls for
7  speculation.
8        THE WITNESS: Can you refer me to where
9  they're being modified?
10 BY MS. BARRAZA:
11    Q   I'm just saying, at the time Grecia signed the
12 first agreement and the second agreement, was there any
13 Real Water policy to have her put on notice that either
14 of the arbitration provisions could be potentially
15 modified?
16       MS. GINAPP: I'm going to object. Foundation.
17       THE WITNESS: I don't think I'm totally
18 understanding your question. It seems very
19 hypothetical. So is your question, is there a document
20 that would explain to Grecia or any employee that if
21 something was changed, they would -- I don't
22 understand.
23 BY MS. BARRAZA:
24    Q   That's fine. I'll reword it.
25       Back in 2015, did Real Water have any policy

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

1  of informing its new hires, when they're going over
2  these employment agreements, that any of the
3  arbitration language can be modified?
4      MS. GINAPP: I'm going to object. It assumes
5  facts not in evidence. Foundation.
6      THE WITNESS: I don't understand the question,
7  because basically in order for somebody to be held to
8  an agreement they made, they would actually have to
9  make that agreement, and if -- there's nothing in this
10 document that says that we can change it whenever we
11 want, and because you're signing here, you agree to
12 anything that we want -- I don't understand where
13 you're trying to go.
14 BY MS. BARRAZA:
15     Q   Let me ask you this: Is there any Real Water
16 policy in 2015 that that the HR representatives who are
17 giving the employee the employment agreements to look
18 over are to give any kind of special instructions
19 regarding the agreement?
20     **A   No. Other than asking any questions that they**
21 **might have in respect to the agreement, they're not**
22 **instructed or there is no policy for the human**
23 **resources department to initiate interpretation of a**
24 **document.**
25     Q   Okay. Are these two employment agreements

1  seen as take-it-or-leave-it offers for employment?
2      MS. GINAPP: Objection as to form.
3      THE WITNESS: Generally, when somebody wants
4  to be employed by a company, they have to agree to the
5  conditions and procedures and policies that the company
6  has in regards to employment. If they have an issue
7  with something, they have -- they are well within their
8  rights to not be employed by that company.
9  BY MS. BARRAZA:
10     Q   Would you agree with me that Grecia's
11 employment was conditioned on her accepting the
12 arbitration provisions in agreement one and agreement
13 two?
14     MS. GINAPP: Objection. Form. Foundation.
15     THE WITNESS: It's never been an issue. We
16 don't have a set procedure as far as someone objecting
17 to the agreement of arbitration. And it's never came
18 up as an issue with any employee over the life history
19 of Affinity Lifestyles.
20 BY MS. BARRAZA:
21     Q   Aside from it ever being an issue, am I
22 correct that the new hires had to sign off on the
23 arbitration provision portions of the employment
24 agreements if they wanted to actually get hired at
25 Real Water?

1      **A   Again, there's no procedure that specifically**
2  **addresses the arbitration clause of the employment**
3  **agreement. There is a procedure, however, that the**
4  **employment agreement needs to be fully filled out and**
5  **completed prior to the commencement of employment.**
6      Q   Why didn't Real Water have Grecia sign an
7  arbitration agreement which was its own separate
8  agreement separate and apart from her employment
9  agreement?
10     MS. GINAPP: Objection. Form. Foundation.
11     THE WITNESS: Because, again, usually when a
12 person starts employment at a company, there's a lot of
13 forms and different things that need to be filled out,
14 signed, agreed to. And instead of making each
15 section a separate agreement, we decided to make one
16 agreement.
17 BY MS. BARRAZA:
18     Q   Would you agree with me that the arbitration
19 agreement in the first agreement, Section 10, is in the
20 same kind of font and not in any way distinguishable
21 from the other sections of the agreement?
22     MS. GINAPP: Objection. Form. Foundation.
23 Beyond the scope of the notice.
24     THE WITNESS: No, there is a clear difference.
25 It's emboldened in certain sections, and in the attempt

1  to draw a person's attention to that so they actually
2  review it, so they know what they're agreeing to when
3  they agree to it.
4  BY MS. BARRAZA:
5      Q   All right. Is there any kind of reason why
6  the arbitration provision is at the very end of the
7  entire agreement?
8      MS. GINAPP: Objection. Calls for
9  speculation. Beyond the scope of the notice.
10 Generally, form and foundation.
11     THE WITNESS: Why the person that fully wrote
12 this document did it that way, I can't say to his
13 personal belief. But if I had to give you my opinion,
14 I would say because the document starts with giving a
15 description of their employment, what the company
16 expects of them, and sort of a brief explanation of
17 their employment at the company, the arbitration is at
18 the end because it wants to give a person the
19 understanding that if they have any issues with what
20 was mentioned before, they have the right to an
21 arbitration.
22 BY MS. BARRAZA:
23     Q   Okay. I just want to clarify, in the second
24 agreement, Section 13, how there are the two options,
25 is there any policy for Real Water to verbally explain

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 65

1   to the new hires exactly what the differences are
2   between Option A and Option B?
3          MS. GINAPP: Objection. Asked and answered.
4          THE WITNESS: To initiate an interpretation
5   explanation of? No.
6   BY MS. BARRAZA:
7      Q   Okay. Do you see how some Real Water
8   applicants might find Option A and Option B confusing?
9          MS. GINAPP: Objection. Calls for
10  speculation. Beyond the scope of the notice. Form.
11  Foundation.
12         THE WITNESS: I could see how someone could be
13  confused by some of -- there -- but, again, they always
14  have the option to ask questions and clarify things.
15  And if they truly wish, have -- hire counsel to explain
16  it to them.
17  BY MS. BARRAZA:
18     Q   Okay. I want to go back to the orientation
19  videos that you had talked to me about.
20         I believe -- correct me if I'm wrong -- is it
21  Real Water's position that the orientation videos are
22  not required?
23         MS. GINAPP: Objection. Asked and answered.
24         THE WITNESS: State your question again,
25  please.

Page 66

1   BY MS. BARRAZA:
2      Q   Are the orientation videos -- and when I say
3   "the orientation videos," I'm referring to the ones
4   we've gone over, being "The Secret," "The Way to
5   Happiness," "Message to Garcia," ""Real Water
6   Culture"," and "Just Do It" -- are those required
7   videos for the new employees to watch?
8      A   No.
9          MS. BARRAZA: Okay. Let's do this next.
10         (Exhibit 3 marked)
11  BY MS. BARRAZA:
12     Q   I've just handed you Exhibit 3, which I'll
13  represent to you the Real Water's Responses to
14  Plaintiff's First Set of Requests for Admission.
15         Are you familiar with Real Water's Request for
16  Admission -- I mean -- with Plaintiff's Requests for
17  Admission?
18     A   I am somewhat familiar with this, yes.
19     Q   Okay. I'm going to point you to
20  Request No. 2. It asks which videos were required in
21  March of 2015. I see "Real Water Culture," "Message to
22  Garcia," "The Secret," and "The Way to Happiness"
23  listed on there. Am I correct from your testimony
24  today, we need to add "Just Do It" to that list?
25     A   I don't know if it should be added to this

Page 67

1   document or not.
2      Q   Okay.
3      A   I'm not --
4      Q   That's fine.
5          Would you agree with me that "Just Do It" is
6   part of the orientation videos in 2015?
7      A   Yes, "Just Do It," as we've already discussed,
8   is one of the orientation videos.
9      Q   Okay. I want to point you to Request No. 9.
10  Can you read into the record the second sentence of
11  Response to Request for Admission No. 9?
12         MS. GINAPP: I'm going to object based upon
13  the fact that the question hasn't been entered into the
14  record. And I'm also going to reassert the objections
15  stated in the response to the Request for Admission
16  No. 9.
17         THE WITNESS: So you're asking me to read that
18  question aloud, or that sentence aloud?
19         MS. BARRAZA: Sure, yes.
20         MS. GINAPP: Same objections.
21         THE WITNESS: I thought I was supposed to
22  answer questions, not --
23         MS. BARRAZA: That is part of my question.
24         MS. GINAPP: Go ahead. It's a question.
25         THE WITNESS: "Admit that Real Water employees

Page 68

1   were not allowed" --
2          MS. GINAPP: No, actually, she wants you to
3   read just the second sentence.
4          THE WITNESS: Of the Response to Request for
5   Admission No. 9?
6          "Without waiving and subject to said
7   objections, Defendant admits that employees are not
8   allowed to decline" --
9          MS. GINAPP: Just go ahead and finish.
10         THE WITNESS: -- "decline to watch the four
11  videos which are part of employee orientation."
12  BY MS. BARRAZA:
13     Q   Okay. Would you agree with me that the four
14  videos that are part of video orientation would be the
15  "Real Water," "Message to Garcia," "The Secret," and
16  "The Way to Happiness"?
17     A   Sure, yes.
18     Q   So I just want to clarify exactly what
19  Real Water's position is, because there's some
20  discrepancy in your testimony and what Real Water's
21  already disclosed.
22         Were those four videos required to be
23  watched --
24     A   No.
25     Q   -- by employees in 2015?

Electronically signed by Mary Cox Daniel (101-361-287-3117)        c773ac71-bef8-43c9-b345-181b55e3b981

Page 69

1    **A   No, they were not required.**
2    Q   Is there any document that states that they
3    were not required to be watched?
4        MS. GINAPP: Objection. Form.
5        THE WITNESS: I don't -- possibly, but it's
6    known that it's not a requirement. It's an option.
7    BY MS. BARRAZA:
8    Q   Have any Real Water employees declined to
9    watch any of the four videos, being "Real Water
10   Culture," "Message to Garcia," "The Secret," or "The
11   Way to Happiness"?
12   **A   Not that I'm aware of.**
13   Q   Okay. Did you have any input in responding to
14   that Request No. 9 that we just reviewed?
15   **A   Possibly. We've had -- I've had conversations**
16   **with my attorney.**
17       MS. GINAPP: Don't talk about any
18   conversations with your attorney.
19       THE WITNESS: That's what I was going to say.
20   BY MS. BARRAZA:
21   Q   Okay. Explain to me how these orientation
22   videos were viewed back in 2015.
23       MS. GINAPP: Objection. Form.
24       THE WITNESS: How they were viewed?
25   /////

Page 70

1    BY MS. BARRAZA:
2    Q   Right. Is there any kind of special room that
3    they're viewed in?
4    **A   They watch them on the television screen in**
5    **reception.**
6    Q   Okay. Is there any Real Water representative
7    who is responsible -- and this is back in 2015 -- who
8    is responsible for watching over and making sure that
9    the employees were actually watching the videos in
10   reception?
11   **A   No.**
12   Q   Okay.
13   **A   They would start the video and let the person**
14   **watch it.**
15   Q   Is there any kind of paperwork that the
16   employees are supposed to fill out with these
17   orientation videos?
18   **A   There's reviews; correct.**
19   Q   Who at Real Water formed those review forms?
20   **A   Who wrote those?**
21   Q   Yes.
22   **A   I believe it was Brent Jones.**
23   Q   What does Real Water do with the review forms
24   that they get from the employees after they've watched
25   the video and filled out the review forms?

Page 71

1    **A   Filed in their employment file.**
2    Q   Is there any kind of grading system of the
3    reviews?
4    **A   No. The purpose of the review is solely to**
5    **have the person actually somewhat engage with the**
6    **content of the video. There's no grading, or --**
7    **usually they're not even reviewed after they're done by**
8    **the human resources department, or anybody, for that**
9    **matter. It's just a way for the person to engage**
10   **somewhat with the content of the video and think about**
11   **it, so they're not, you know, just not paying**
12   **attention, or what have you. It's to goad them into**
13   **engaging with it and actually thinking about the**
14   **different ideas.**
15   Q   Am I correct that Grecia, when she finished
16   filling out her video reviews, would have been
17   responsible for handing that review in to her HR
18   supervisor?
19   **A   Sure, the person that was in charge of**
20   **collecting the documents and filing them in the**
21   **employment file.**
22   Q   Aside from having those review forms filed in
23   the employment file, does Real Water do anything else
24   with the reviews, back in 2015?
25       MS. GINAPP: Objection. Form.

Page 72

1        THE WITNESS: No, generally.
2    BY MS. BARRAZA:
3    Q   Are they sent out to any other entity?
4    **A   No.**
5    Q   Okay. Did Real Water in 2015 make a copy of
6    the review forms before filing it in Grecia's file?
7        MS. GINAPP: Objection. Form. Foundation.
8        THE WITNESS: There's no procedure to do that.
9    However, because I wasn't the person to administer the
10   forms and collect the forms, I can't say whether or not
11   someone made a copy of it. But there's no procedure to
12   do that, or reason.
13   BY MS. BARRAZA:
14   Q   I'm assuming there's no procedure to have a
15   copy made of the completed review, and then hand it
16   back to the employee who filled out the review?
17   **A   No. But if they want one, they can keep it.**
18   **I don't see why there would be an issue with that.**
19       MS. BARRAZA: Let's start with this.
20       (Exhibit 4 marked)
21   BY MS. BARRAZA:
22   Q   I've just handed you Exhibit 4, which I'll
23   represent to you is a "Message to Garcia" video review
24   that Real Water has produced in this litigation. Do
25   you recognize this document?

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

1    **A    Yes.**
2    Q    Let me start with just the video review form
3  itself.  Has the video review form for "Message to
4  Garcia" ever changed throughout Real Water's history?
5    **A    I don't believe so.**
6    Q    It looks like this document is dated March 11,
7  2015; is that correct?
8    **A    Looks so, yes.**
9    Q    I want to point you briefly back to Exhibit 2,
10  the first employment agreement.  If you look at the end
11  of it, page RW-19, it looks like the first agreement
12  was signed on March 10, 2015.  Is that what you're
13  seeing?
14    **A    Looks like it.**
15    Q    Okay.  So is it reasonable to assume that
16  Grecia watched -- I'm sorry -- yeah -- that Grecia
17  watched the "Message to Garcia" video after she had
18  already signed the employment agreement?
19        MS. GINAPP:  Objection.  Form.  Foundation.
20        THE WITNESS:  If those dates are correct when
21  they were signed, it looks that way.
22  BY MS. BARRAZA:
23    Q    All right.  You talked to me a little bit
24  about what "Message to Garcia" is about.  I want to
25  ask:  Why specifically does Real Water have its

1  employees watch "Message to Garcia"?
2        MS. GINAPP:  Objection.  Asked and answered.
3        THE WITNESS:  Because it's a good story of an
4  account of somebody going above and beyond what was
5  required of them, and in front of insurmountable odds,
6  and they achieved the goal that they set out to do.
7  BY MS. BARRAZA:
8    Q    How does the "Message to Garcia" video relate
9  to Grecia's responsibilities as a brand ambassador?
10    **A    I can see how, because of that job's position,**
11  **if you are in a store and you're explaining a product**
12  **to somebody and they disagree with you in some regard**
13  **to what you're saying, or some difficulty comes up in**
14  **performing the job functions, that this video was, in**
15  **her case, given to her to watch to encourage her to**
16  **find solutions to problems that she might face, and**
17  **still try to achieve the goal that she set out to do**
18  **instead of give up or quit.**
19    Q    Did Real Water have a policy of giving any
20  kind of feedback to its employees after they had turned
21  in their video reviews?
22    **A    No.**
23    Q    What would happen if somebody in 2015
24  indicated they did not want to watch "Message to
25  Garcia"?

1        MS. GINAPP:  Objection.  Incomplete
2  hypothetical.  Calls for speculation.
3        THE WITNESS:  They wouldn't watch it.
4  BY MS. BARRAZA:
5    Q    Would there be any kind of repercussions for
6  that?
7    **A    Of course not.**
8    Q    Has anybody at Real Water ever indicated that
9  they did not want to watch "Message to Garcia"?
10    **A    Not familiar with anybody having any**
11  **objections with watching any of the videos.**
12    Q    Can you understand if some employees might
13  feel compelled to watch the videos?
14        MS. GINAPP:  Objection.  Calls for
15  speculation.
16        THE WITNESS:  Hypothetically, I can
17  understand.
18  BY MS. BARRAZA:
19    Q    Have you personally ever watched "Message to
20  Garcia"?
21    **A    More than once.**
22    Q    When was the first time you watched it?
23    **A    Three or four years ago maybe.**
24    Q    Fair to say, you were not required to watch
25  "Message to Garcia" prior to coming to work at

1  Real Water; is that correct?
2        MS. GINAPP:  Objection.  Form.
3        THE WITNESS:  No.
4  BY MS. BARRAZA:
5    Q    That's correct, yes?
6    **A    No, I was not required to.**
7    Q    Okay.  Got it.
8        Is there anything in Grecia's written review
9  of "Message to Garcia" that Real Water took specific
10  notice of when they were reviewing her video review?
11        MS. GINAPP:  Objection.  Foundation.
12        THE WITNESS:  As we've already --
13        MS. GINAPP:  Speculation.  Sorry.  Go ahead.
14        THE WITNESS:  As we've already talked about,
15  there's no procedure or set policy for the review of
16  these.
17  BY MS. BARRAZA:
18    Q    All right.  Would you agree with me that
19  Grecia's written responses to her video reviews, which
20  includes any responses she made to "Message to Garcia,"
21  "The Secret," or "The Way to Happiness" had no bearing
22  on her employment at Real Water?
23    **A    Can you ask the question again?**
24    Q    Would you agree with me that Grecia's written
25  responses, written reviews, regarding "Message to

1  Garcia," "The Way to Happiness," and "The Secret" had
2  no bearing on whether or not she would still be
3  employed at Real Water?
4      **A   Because there's no set procedure on having the**
5  **forms reviewed after they're filled out by the new**
6  **employee, there would be no judgments, disciplinary**
7  **action, reward of any kind or any sort, because there's**
8  **no set procedure to actually look at this.**
9      Q   Okay.  So there's no reward or punishment that
10  would be imposed based on the substance of an
11  employee's reviews; is that correct?
12     **A   Correct.**
13         MS. GINAPP:  Can we go off the record for a
14  second?
15         MS. BARRAZA:  That's fine.
16             (Discussion off the record)
17             (Lunch recess)
18         MS. BARRAZA:  We're back on the record.
19  BY MS. BARRAZA:
20     Q   Before we broke last hour, we were just
21  discussing "Message to Garcia."  I'm going to move on
22  and discuss "The Way to Happiness."  You've previously
23  given me a brief overview of what "The Way to
24  Happiness" is about.
25         I'm wondering what Real Water's position is as

1  far as what "The Way to Happiness" specifically has to
2  do with a brand ambassador's duties.
3         MS. GINAPP:  Objection.  Form.
4         THE WITNESS:  A brand ambassador deals with
5  people, numerous people on a daily, continuous basis
6  throughout their job, probably more so than any other
7  position within the company.  And some of the
8  suggestions or guidelines, or what have you, that are
9  contained in "The Way to Happiness" deal with
10  respecting others, deal with how to keep relations with
11  other people on a friendly, happy level.
12  BY MS. BARRAZA:
13     Q   How long has "The Way to Happiness" been an
14  orientation video for Real Water?
15     **A   Four or five years, maybe.**
16     Q   Have you personally viewed "The Way to
17  Happiness"?
18     **A   Numerous times.**
19     Q   Have you personally filled out any of
20  Real Water's video reviews?
21     **A   I think I might have done the "Culture" video**
22  **reviews personally.**
23     Q   Okay.  And just to clarify, you've actually
24  watched the "Real Water Culture" video and then written
25  down your feedback on a video review form?

1      **A   Uh-huh.**
2      Q   Okay.  Who did you -- did you turn that video
3  review form into anybody?
4      **A   Human resources, it's probably in my file.**
5      Q   Have you personally reviewed any of the video
6  reviews in the course of your employment at Real Water?
7      **A   When I was actually over the human -- or,**
8  **doing some of the human resources functions, hiring**
9  **procedure, et cetera, I'm sure I looked at some of the**
10  **reviews that were done basically just to make sure that**
11  **there was something written down on the paper and it**
12  **wasn't just left blank.**
13     Q   Approximately when was that your
14  responsibility?
15         MS. GINAPP:  Objection.  Form.
16         THE WITNESS:  Four or five years ago maybe.
17  BY MS. BARRAZA:
18     Q   Now, the "Real Water Culture" video, am I
19  correct in assuming that Real Water formed that video,
20  created that video?
21     **A   Yep.**
22     Q   What about the "Message to Garcia" video, did
23  Real Water form that video?
24         MS. GINAPP:  Objection.  Form.
25         THE WITNESS:  No, it's a narration somebody.

1  BY MS. BARRAZA:
2      Q   Where did Real Water get that video from?
3      **A   I'm not sure, because what we have is a clip**
4  **of some other video.  And I'm not sure where it came**
5  **from, to be honest.**
6      Q   Are you saying that the "Message to Garcia"
7  video is a subpart of a larger video that Real Water
8  has?
9      **A   No.  I'm saying we don't have --**
10     Q   You don't have what?
11     **A   The larger video.**
12     Q   Okay.  Who at Real Water would be able to tell
13  me exactly where Real Water got the "Message to Garcia"
14  video from?
15     **A   Probably nobody with some certainty because it**
16  **was a while ago, and it's -- yeah, probably nobody with**
17  **certainty on this exact when we got it, who we got it**
18  **from, all that kind of thing.**
19     Q   But to your knowledge, as a representative
20  here today, you don't know where Real Water got
21  "Message to Garcia" from; correct?
22     **A   No, I don't know if it was downloaded from**
23  **online, or where it was, because you can find it**
24  **online.**
25     Q   You told me that the employees watched the

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    c773ac71-bef8-43c9-b345-181b55e3b981

1 videos on a TV in the lobby. Is it an actual VHS or is
2 it a DVD?
3   **A   It's a DVD.**
4   Q   When all four -- when I say "four," I'm
5 talking about "The Secret," "Message to Garcia," "The
6 Way to Happiness," and the "Culture" video -- are they
7 all DVDs?
8   **A   Uh-huh.**
9   Q   "Yes"?
10   **A   Yes.**
11   Q   Are these DVDs kept in the human resources
12 department?
13   **A   Correct.**
14       **(Exhibit 5 marked)**
15 BY MS. BARRAZA:
16   Q   Do you recognize what's been marked as
17 Exhibit 5?
18   **A   It is the video review for "The Way to**
19 **Happiness," specifically, Grecia's.**
20   Q   Have you previously read Grecia's video review
21 for "The Way to Happiness"?
22   **A   I have previously read it, not anywhere near**
23 **when she had written it or her time of employment. The**
24 **only reason why I did go back and look at it was**
25 **because of this lawsuit, in preparation for my duties**

1 **today.**
2   Q   So this document is dated March 11, 2015. If
3 you recall the "Message to Garcia" video review was
4 also dated March 11, 2015. Is it normal for the
5 employees to watch all these orientation videos on the
6 same day?
7   **A   Yeah, fairly normal. Different circumstances**
8 **might be different for different people, depending on**
9 **the job position, their schedule. You know, sometimes**
10 **when people start a new job, they're not ready to be**
11 **the full-time employee. They still have another job,**
12 **or they're, you know, working part-time. Everybody's**
13 **situation is different. And so we usually try to cater**
14 **with them and we don't require them that they have to**
15 **sit and watch these videos now. We cater to their**
16 **schedule. And if they can do it all in one fell sweep,**
17 **great. If not, then we accommodate.**
18   Q   In 2015, who was responsible for following up
19 with the employees and making sure they had completed
20 their video reviews?
21       MS. GINAPP: Objection. Asked and answered.
22 Go ahead.
23       THE WITNESS: We already answered it. During
24 the time period of March 2015 to -- it says on one of
25 these, whatever the final month when she was working

1 there -- it was Melissa Nava at the beginning and then
2 Christian Pantelakis towards the end of that time
3 period.
4 BY MS. BARRAZA:
5   Q   All right. Is it Real Water's position that
6 "The Way to Happiness" is a purely non-religious video?
7   **A   Correct, because per the federal law that**
8 **dictates what a religion is, it does not go into the**
9 **afterlife or address somebody as a spiritual being.**
10   Q   What federal law are you referring to?
11   **A   I don't know the exact statute.**
12   Q   Okay. Does Real Water have any document which
13 would reflect that they're following a certain federal
14 law as it pertains to any policies that can be related
15 to religion?
16       MS. GINAPP: Objection. Form.
17       THE WITNESS: Ask it again.
18 BY MS. BARRAZA:
19   Q   Does Real Water have any specific document
20 which would indicate exactly what federal law you're
21 talking about?
22       MS. GINAPP: Same objection.
23       THE WITNESS: No, because that's held by The
24 Way to Happiness Foundation who was able to be deemed
25 as a secular foundation.

1 BY MS. BARRAZA:
2   Q   Where did Real Water get "The Way to
3 Happiness" video from?
4   **A   We bought it some way from The Way to**
5 **Happiness Foundation.**
6   Q   Did Real Water purchase it online, or via the
7 mail, or any other kind of way?
8   **A   I don't recall exactly where or how we**
9 **purchased it, but some way or fashion from The Way to**
10 **Happiness Foundation, and it was probably mailed to us**
11 **because I don't think they have an office here in**
12 **Las Vegas, retail location.**
13   Q   When did Real Water first start implementing
14 "The Way to Happiness" into its orientation videos?
15   **A   Four or five years ago.**
16   Q   Does Real Water receive any kind of
17 compensation from any entity for showing its employees
18 any of these orientation videos?
19   **A   No. It would be nice. No, we generally want**
20 **to provide people with different thoughts and ideas to**
21 **potentially help them and improve their lives. That's**
22 **why we have them watch it, or have somebody watch it.**
23   Q   If I told you that one of the quotes from "The
24 Way to Happiness" was, "Men without faith are a pretty
25 sorry lot," would you consider that in any way as

1 imposing religion?
2         MS. GINAPP: Objection. Form. Foundation.
3 Calls for a legal conclusion.
4         THE WITNESS: Personally, no, because I think
5 everybody has some idea about what they believe in,
6 faith, whether it is Christianity, Buddhism, Hinduism,
7 Scientology, or an atheist.  That's what they believe.
8 That is what they put faith in.  An atheist puts faith
9 in that they -- there is no God, that they determine
10 their future.  And that's what they put their faith in.
11 So the definition of faith is what they believe in.
12 Everybody believes in something.
13 BY MS. BARRAZA:
14   Q   Okay.  So am I correct that Real Water
15 subscribes to the notion that, "Men without faith are a
16 pretty sorry lot"?
17         MS. GINAPP: Objection. Form. Foundation.
18         THE WITNESS: As a business entity, no, it
19 does not subscribe to a certain belief or thought.  I
20 think that that statement is pretty benign, and it's
21 basically saying that people that don't believe in
22 anything aren't very happy.  And I think if you
23 actually took a look at it, you would agree.
24 BY MS. BARRAZA:
25   Q   Okay.  I want to point you to the actual

1 substance of Grecia's review of "The Way to Happiness."
2   A   Sure.
3   Q   A lot of this you've actually testified about,
4 because it looks like a lot of the review is kind of a
5 recap of what the video actually says.  Is that also
6 your opinion?
7         MS. GINAPP: Objection. Form.
8         THE WITNESS: Yeah.
9 BY MS. BARRAZA:
10   Q   Okay.
11   A   Also, her --
12         MS. GINAPP: Just wait until a question is
13 asked.
14 BY MS. BARRAZA:
15   Q   What else besides kind of a recap of the video
16 do you see Grecia put in for her review?
17         MS. GINAPP: Objection. Form.
18         THE WITNESS: Well, just a quote from what she
19 said, "The video was actually great.  I definitely
20 agree with it.  Everything was good."  So she obviously
21 enjoyed watching it.
22 BY MS. BARRAZA:
23   Q   Okay.  You understand that some employees
24 might feel compelled to give a positive review to a
25 video that their employer is having them watch?

1   A   No.
2         MS. GINAPP: Objection. Calls for
3 speculation. Argumentative. Form. Foundation.
4         THE WITNESS: No, I don't, because it's their
5 opinion, and everybody is entitled to their opinion.
6 And there's no culture, or policy, or procedure to
7 punish somebody for their opinion at Real Water.
8 BY MS. BARRAZA:
9   Q   Okay.  Is it Real Water's position that any of
10 the topics that are covered in "The Way to Happiness"
11 could be considered as having some kind of religious
12 undertones?
13         MS. GINAPP: Objection. Form. Foundation.
14         THE WITNESS: I don't believe so, no.  I mean,
15 honestly, I haven't watched the video in a few years.
16 I've seen it a few times.  I can't speak for every
17 single word that's said in the video because I don't
18 know it verbatim.  But, no, I don't think it's
19 religious because, again, religion deals with
20 addressing somebody as a spiritual being or the
21 afterlife.
22 BY MS. BARRAZA:
23   Q   Okay.  Does Real Water believe it's necessary
24 to show its employees a video which informs them that
25 they are not to murder, and that they are to stay

1 clean?
2         MS. GINAPP: Objection. Form. Foundation.
3         THE WITNESS: Can you repeat your question?
4 BY MS. BARRAZA:
5   Q   Does Real Water believe that it's necessary to
6 show its employees a video which states notions like,
7 do not murder, do not harm others, things along that
8 nature?
9         MS. GINAPP: Same objections.
10         THE WITNESS: Do I think it's necessary?  No,
11 I don't think it's necessary.  The reason why we do it
12 is because we hope that somebody might watch it or
13 listen to it and it might improve their lives in some
14 way.
15         I can give you a specific example.  I had an
16 ex-criminal, a felon, that served their own time.  They
17 watched that video, and that actually made them change
18 their viewpoint on that exact fact of, you shouldn't
19 murder somebody.  And they said, "Wow, you know, I
20 actually changed my opinion on that."  And so we have
21 people watch it because we want for them to have -- be
22 able to look at a different idea, and possibly find
23 some happiness in that.
24 BY MS. BARRAZA:
25   Q   Does Real Water think it's appropriate to have

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 89

1  its employees watch a video which states that people
2  should not be promiscuous, and they should be faithful
3  to their sexual partners?
4      MS. GINAPP: Objection. Form.
5      THE WITNESS: I think that's sort of a moral,
6  ethical idea personally that people shouldn't be
7  promiscuous and cheat on their significant others. And
8  I think if people really look at it, they'll see, by
9  doing that, it usually doesn't lead to happiness or
10  good things happening in their life, and -- you know,
11  but it doesn't stop certain people from doing it. And,
12  again, do I think it's necessary? No. But the reason
13  why we do it is because we want to possibly help
14  improve someone's life.
15  BY MS. BARRAZA:
16      Q  Does it have anything to do with the
17  employee's actual job duties?
18      A  No. We're not a brothel.
19      Q  Okay. What is Real Water's position as to why
20  Grecia was terminated?
21      A  Our position is that she was, in essence,
22  stealing from the company. She was reporting that she
23  was on the job and performing her job duties at
24  specific retail locations when, in fact, it was checked
25  upon she wasn't. I think if I remember, there was

Page 90

1  about 10 or 15 different locations that were followed
2  up with, or called, or visited, and found out that when
3  she said she was there, she actually wasn't there. So
4  instead of her going to perform her job functions, she
5  went to the mall, or went home, or whatever she did,
6  but she wasn't where she said she was on the clock
7  doing what she was supposed to be doing. And it was
8  the determination of Bonnie and Jeramy at the time that
9  that was egregious enough for immediate termination.
10  And so they made that decision.
11      Q  Explain to me, did Grecia have any kind of
12  written notice as to that, what she was doing was not
13  in line with Real Water's policies?
14      A  Other than the general consensus that when you
15  say you're somewhere and you weren't, and you were
16  doing a job and you weren't, no. There were some
17  reports given to her saying, "Hey" -- backing up the
18  fact that that's kind of a generally accepted thing,
19  is, "Hey, you weren't doing what you said you were
20  doing, your job duties, this is not okay."
21      Q  When you say "reports," are you talking about
22  non-optimum reports?
23      A  Correct.
24      Q  Explain to me what non-optimum reports are?
25      A  Exactly what it means. It's a report or a

Page 91

1  document stating something on someone's behalf of
2  something that was not optimum, or good, or generally
3  accepted as what should be happening.
4      Q  Who at Real Water in 2015 had the authority to
5  fill out a non-optimum report?
6      A  Every single employee.
7      Q  How many non-optimum reports were written
8  regarding Grecia?
9      A  I think there was two, three maybe. I'm sure
10  you have it there somewhere.
11      Q  Now, when these non-optimum reports were
12  filled out back in 2015, who was involved in that?
13      A  Whoever wrote them and signed their name at
14  the bottom. I think Bonnie wrote some of them. Jeramy
15  might have wrote some of them as well. I'm not sure.
16  I can't recall the exact reports.
17      Q  When a Real Water -- back in 2015, when a
18  Real Water employee would write out a non-optimum
19  report, would that go up the chain to anybody else?
20      A  It would usually go to that person's immediate
21  senior. And then they give it to the person. They
22  have them sign it, and the HR department keeps it on
23  file. But, again, it depends on the severity of what
24  the person was doing. And 15 to 20 locations at a
25  minimum of two hours apiece -- so let's just say that's

Page 92

1  40 hours of work times her wage -- that's how much
2  money was stolen, basically. That was found to be
3  egregious enough for termination. But sometimes
4  non-optimum reports are written on somebody and there's
5  nothing that happens of it other than the notification
6  of, "Hey, you shouldn't have done that."
7      (Exhibit 6 marked)
8  BY MS. BARRAZA:
9      Q  I'll give you a second to look through what's
10  been marked as Exhibit 6. Let me know when you're
11  done.
12      A  Okay.
13      Q  Okay. So I'm going to go through these
14  reports, and we'll start with what's been marked as
15  PLTF1. Looks like this report was dated October 8,
16  2015, and it was filled out by Bonnie. Is that
17  correct?
18      A  Looks like it.
19      Q  Okay. In your review of this packet, is this
20  the kind of natural order that you would put these
21  documents in, or would you put them in a different
22  order?
23      MS. GINAPP: Objection. Form. Foundation.
24      THE WITNESS: Chronologically, they seem to
25  fit. I mean, that's the basics of -- you know, these

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    c773ac71-bef8-43c9-b345-181b55e3b981

1  types of reports are put into someone's personnel file
2  because, again, it's a documentation of things that
3  were done against the company's policies or procedures.
4  BY MS. BARRAZA:
5     Q   It looks like, am I correct, that there are
6  four separate non-optimum reports?
7     A   Looks like it, yep.
8     Q   Okay.  Now, what's Real Water's policy as far
9  as having the employee who had a non-optimum report
10  written about him or her actually review the
11  non-optimum report and sign off on it?
12    A   What's the procedure for that?
13    Q   Right.
14    A   The person that writes it, writes it, signs it
15  as the originator, either gives it to the person
16  directly, depending on the situation, or has the human
17  resources person meet with that person, have them
18  review it, sign it, and then it goes into their
19  personnel file.
20    Q   So I'm looking at this first line from the
21  report that's marked as PLTF1.  Who would you say
22  signed off as the signature of originator on that?
23    A   Bonnie.
24    Q   We're talking about Bonnie Mercado?
25    A   Uh-huh.

1     Q   Is there a reason why Grecia never signed this
2  non-optimum report?
3     A   I don't know of the specific reason, again,
4  because I wasn't involved with these proceedings.  So I
5  couldn't say.
6     Q   Okay.  Would Bonnie Mercado be the best person
7  to ask about that?
8     A   Possibly.
9     Q   So is it true that not in every instance that
10  a non-optimum report is filled out is it signed off on
11  by the recipient of the non-optimum report?
12       MS. GINAPP:  Objection.  Form.
13       THE WITNESS:  Yeah, I mean, you can look and
14  see here she signed some of them and acknowledged some
15  of them as true, but she didn't sign the other ones.
16  BY MS. BARRAZA:
17    Q   Okay.
18    A   But, again, this was -- what happened in this
19  particular case was found to be so egregious, that she
20  was lying for such a long time, and stealing from the
21  company for such a long time, that there might not have
22  been an opportunity for a formal meeting to be taken
23  where Grecia reviewed the non-optimum report, she
24  signed it, et cetera, because, again, the -- what she
25  did was so egregious, it warranted immediate

1  termination.
2     Q   Going into the next page marked as PLTF2, what
3  is this document indicating?
4     A   It looks like it was actually originally
5  written on the back side of the first page because it
6  was too lengthy to fit into the box that was provided
7  because there was a lot that she was doing wrong.
8        But basically it's saying that Bonnie followed
9  up with the different stores that Grecia was supposed
10  to be visiting.  She listed the individual stores,
11  their address, and even in some instances the manager,
12  different notes about each individual location, and
13  basically that she said she had either called or talked
14  to the manager or the appropriate person at that store
15  that would have signed off on her demo report forms,
16  and said that she was, in fact, there that were turned
17  in, that she actually wasn't there, and didn't do what
18  she said she did as far as her job duties.
19    Q   Now, did Grecia have a list of specific stores
20  or locations that she was supposed to hit as part of
21  her duties as a brand ambassador?
22    A   Yes, on a, you know, a running, evolving
23  basis.  It really depends on what stores we're actually
24  wanting to target, go after.  If we have specials in
25  certain stores, we'll target them more, if the special

1  isn't there, or what have you.  But, again, that is
2  determined by Bonnie.  And these stores were on her
3  schedule for when she was supposed to -- what she was
4  supposed to be doing on the given dates in that report,
5  and that was her schedule.
6     Q   Okay.
7     A   But over a time period of years, yeah, it can
8  vary.  We don't have somebody go to the same store for
9  multiple years on end.
10    Q   Can you tell me approximately -- would
11  somebody be going to the same stores for only a week at
12  a time, or a month at a time, or six months at a time?
13    A   Depends on what type of store it is, and what
14  we're doing with that store.  So if we're running a
15  special -- I mean, you go to a grocery store, I'm sure,
16  and buy food -- sometimes you see our products on sale
17  and some not on sale the next week.  So that sale was
18  only for that last week.  Well, if our product is on
19  sale, we want to promote that sale and get more people
20  to buy the product.  And that's what that brand
21  ambassador's job is to do.
22       Once it goes off sale, maybe there's another
23  store that we're on sale with them.  So we start
24  shifting our focus to that week -- or -- to that store
25  for that week, or what have you.  It's, you know,

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55ce3b981

1  dictated by what the marketing and sales strategy is at
2  that time.
3     Q   Who set up Grecia's schedule of stores that
4  she needed to hit while she was employed at Real Water?
5     A   So back to the beginning when I answered this
6  question already -- the overview of it was determined
7  by Jeramy, who was the director of sales.  The
8  nitty-gritty --
9     Q   Sorry, not to stop you.  But when you say
10  "overview," can you tell me exactly what that means?
11     A   So if we're going to be targeting, say,
12  Smith's grocery stores, because there were products on
13  sale, that's an overview.  It's not saying, "Go to this
14  Smith's at this location at this time."  It's, "We need
15  to promote at Smith's for this month."  That's kind of
16  an overview.
17     Q   Okay.
18     A   Bonnie would go into the more detail of
19  saying, "Okay, you're going to go to this store, this
20  location, at this time, in the morning, and then stay
21  there for this many hours, and then in the afternoon,
22  go to this store, this location for this amount of
23  time, the next day" -- on and on.
24     Q   Am I correct that that information was written
25  down into a schedule?

1     A   It could have been written down into an actual
2  calendar format, or it might have been in an e-mail, or
3  it might have been spoken to.  Things can -- you know,
4  sometimes they were more organized than other times.
5        For instance, like, when I used to go on demo
6  trips, I would have my -- sometimes I would plan out a
7  three-week trip, sometimes I would plan out a two-day
8  trip.  It just depends on what it is that you're trying
9  to achieve.
10     Q   Okay.  So what is Real Water's position as to
11  how Grecia knew that all the locations listed on page
12  PLTF2, knew that she was supposed to be going to all
13  those locations?
14        MS. GINAPP:  Objection.  Form.  Foundation.
15        THE WITNESS:  It's Real Water's opinion that
16  it was told by her supervisor, just like in any job and
17  position, you're told what to do by your supervisor and
18  you're expected to do it.  And that dictates your job
19  performance by how well, or that you do it.
20  BY MS. BARRAZA:
21     Q   Is it Real Water's position that it was
22  verbally told by her supervisor?
23     A   I can't say to that fact because I wasn't the
24  one that did it.  I wasn't there.
25     Q   Okay.

1     A   But I do know that the reports that she --
2  every product demonstrator is required to fill out a
3  report for the store that they visit, stating where it
4  was, when they were there, the stock on the shelves,
5  how many bottles they sold, the traffic in the store,
6  even down to the weather, if it was a sunny or a rainy
7  day, depending on, you know, that would affect the
8  traffic in the store, and if the product was on sale,
9  and then have that manager of that store sign off on
10  her visit, or his visit.
11     Q   Those forms that you're just talking about, do
12  they have a specific title at the top?
13     A   Demo report form, or something along those
14  lines.
15     Q   Okay.  For every location that brand
16  ambassador went to in 2015, they would fill out those
17  details you just testified about in a demo report form,
18  and then hand it off to their supervisor; is that
19  correct?
20     A   Correct, so we could know how well they are
21  performing their job, have proof -- supposed proof at
22  least, in her case -- that she was doing the job.  And
23  then we would also use those to calculate the hours
24  that she worked so we could pay her appropriately.
25     Q   I'm wondering, if the brand supervisor only

1  verbally tells the brand ambassador about which
2  locations to go to, how is there any way to, you know,
3  verify that and follow up if there's any kind of
4  disagreement between the two about which locations were
5  supposed to be hit?
6     A   I didn't say what you said.
7     Q   Okay, go on.  What's wrong with what I just
8  said?
9     A   It's not Real Water's position that her
10  schedule was dictated to her verbally.  I don't know.
11  I wasn't the one that dictated it to her, and I wasn't
12  involved with her scheduling personally.  I don't know
13  if it was through an e-mail, through a text, through
14  a -- written on a calendar schedule, a Google calendar.
15  I don't know, however it was deemed by Bonnie at that
16  time and/or Jeramy of what stores needed to be visited
17  and promoted.
18     Q   So Real Water does not know exactly how or if
19  Grecia was actually given a written list, or a text
20  message, or an e-mail, or a verbal instruction about
21  which stores to hit?
22        MS. GINAPP:  Objection.  Misstates testimony.
23  BY MS. BARRAZA:
24     Q   Is that correct?
25     A   No, it has not been looked into.  I did not

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    c773ac71-bef8-43c9-b345-181b55e3b981

1  prepare that information for today.
2  Q   Okay.  I want to get into this specific
3  document.  You mentioned that the first time you saw
4  this was after the lawsuit had already been filed; is
5  that correct?
6  A   Correct.
7  Q   Did anybody at Real Water -- was anybody at
8  Real Water responsible for reviewing Bonnie's
9  filled-out non-optimum report and conducting any kind
10  of investigation as to whether or not the statements in
11  here are actually true?
12  A   Depending on the severity of the -- you know,
13  what happened on the report, depending on the severity
14  of it procedurally, if it's, say, somebody parked --
15  double parked in the company parking lot not allowing
16  somebody else to park in a spot, there's a little bit
17  of difference between that and actually stealing from
18  the company.  So the general procedure is if it
19  warrants a further investigation, that investigation
20  needs to be done.  And it's generally done by the human
21  resources division, or the area senior.
22  Q   In this instance, did any kind of follow-up
23  investigation happen with the HR department to
24  determine whether or not what Bonnie was saying in this
25  document was actually true?

1  A   I don't have that information in front of me.
2  I think I do know that Jeramy did verify some of the
3  phone calls that were made.
4  Q   Is there any kind of document that would
5  support that?
6  A   I don't have that information with me.
7  Q   Did Jeramy ever tell you that he followed up
8  and verified that, with some of these stores, that
9  Grecia indeed did not attend those stores?
10  A   After the fact, after the lawsuit was filed,
11  and I asked him about what had happened at that time,
12  he said, yes, he made some of the phone calls to
13  verify.
14  Q   That was a verbal discussion between you and
15  Jeramy?
16  A   Yes.
17  Q   Did you memorialize that discussion in any
18  way?
19  A   Define "memorialize."
20  Q   Did you write down the details of that
21  discussion, or --
22  A   No.
23  Q   Okay.  No?
24  A   No.
25  Q   Okay.

1  A   Luckily, she's writing it down now.
2  Q   Okay.  And so moving on to the next page --
3  A   3?
4  Q   Yes, looking at 3 and 4, am I correct that
5  this is a different non-optimum report filled out by
6  Bonnie Mercado, dated the same day as the previous one,
7  October 8, 2015?
8  A   Correct.
9  Q   Okay.  What's the substance of this specific
10  non-optimum report?
11  A   I think it's pretty self-explanatory.  But it
12  looks like she confronted Grecia about the stores she
13  had reported that she had gone to to give her an
14  opportunity to come clean and say, "Well, I actually
15  didn't go to those stores."  But instead she said,
16  "Yeah, of course, I see these people every week.  Of
17  course I was there," or, "I knew them."
18  Q   Were there any demo report forms submitted by
19  Grecia as related to this time period that Bonnie is
20  referring to in her non-optimum reports?
21  A   I would imagine so, because that's the correct
22  procedure.
23  Q   When demo reports were filled in and submitted
24  to -- I'm sorry -- did you say they were submitted to
25  the HR department?

1  A   No.
2  Q   Who are they submitted to?
3  A   The person's senior.
4  Q   So the demo forms are filled out and submitted
5  to the person's senior.  What does the person's senior
6  do with those?
7  A   Evaluates it based on the person's job
8  performance.  If you have somebody that, every time
9  they go to the store, they only sell one bottle, and
10  you have somebody that goes into a store and they sell
11  12 cases, one is doing better than the other.
12  Q   Does Real Water store these demo report forms?
13  A   Yes, there have been records kept on and off
14  throughout the company's history.  It's not something
15  that we keep as secure or, you know, that type of
16  thing, like financial records, or employment files, or
17  things like that, because it's something that's not --
18  it's just not a type of record that's been given that
19  importance.  But we do have -- kept records in the
20  past.
21  Q   What other kind of record would verify the
22  brand ambassador's actual hours besides the demo report
23  forms?
24  A   The sheet that was submitted for her payroll,
25  calculation of her hours.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

1   Q   Would Grecia herself fill that out?
2   A   Uh-huh.
3       MS. GINAPP:  Is that a "yes"?
4       THE WITNESS:  Yes.
5   BY MS. BARRAZA:
6   Q   Does that form have a specific title?
7   A   Employee's hours, or something along those
8   lines.  I might be wrong.
9   Q   Who is that form submitted to?
10  A   Treasury.
11  Q   Who would that be back in 2015?
12  A   Actually, I take that back.  It would have
13  been submitted to Bonnie first, because the manager is
14  supposed to sign off on it.  And then after that, it's
15  submitted to treasury or accounting.  And the person at
16  the time that was there, her name was Maria Cantoran,
17  C-A-N-T-O-R-A-N.
18  Q   In that employee's hours form, would that just
19  be a basic form where the employees would indicate what
20  time they started working, what time they stopped
21  working?
22  A   Generally, yes.  However, there was -- there
23  was a time where we were using a different system for
24  outside salespeople, brand ambassadors, that type of
25  person, because of them actually being out of the

1   office and not sitting in the office or under someone's
2   supervision to make sure they were actually there when
3   they said they were being there, where it would list a
4   location, hey, I was at this location for this many
5   hours, I was at this location for this many hours, I
6   was at this location for that many hours.  Was that
7   procedure being done when Grecia was working?  I don't
8   have that information.  I don't know that for yes or
9   no, either way.  But I know that that was a procedure
10  that we have used in the past.
11  Q   On the employee's hours forms, would the
12  employees fill out any kind of information aside from
13  just the bare facts of the times they were working?
14  A   Depends.  If they were filling out the
15  simplized version of just how many hours, or if we were
16  using the procedure of -- I was at this location for
17  this amount of time, this location for that amount of
18  time, this location for this amount of time.  It
19  depends.  There was -- there's -- for the outside
20  personnel that we have to give some trust to, that
21  they're going to be fulfilling their job duties.  And
22  we unfortunately usually have to take them on their
23  word.  But we have them fill out a form to kind of give
24  us an idea so it at least makes it harder for them to
25  lie.  It can't stop them from lying, as you see what

1   happened here.  But makes it a little bit harder.
2   Q   Okay.  What is Real Water's policy back in
3   2015 as far as keeping a record of the demo report
4   forms for employees who were terminated?
5       MS. GINAPP:  Objection.  Form.
6       THE WITNESS:  I don't think there was a
7   specific policy that pertains to the demo report forms,
8   or the merchandising report forms for employees,
9   keeping those records for employees who have been
10  terminated.  I don't think we have a specific policy.
11  BY MS. BARRAZA:
12  Q   Turning to the next non-optimum report, page
13  PLTF5, am I correct that this looks like another report
14  filled out by Bonnie, and it's also dated October 8,
15  2015?
16  A   Looks like it, yeah.
17  Q   What is your understanding of what this report
18  is about?
19  A   It looks like Bonnie was expecting to meet
20  Grecia at some point in time to go over what a
21  supervisor and a junior do.  And Grecia told her that
22  she couldn't be there because she had a doctor's
23  appointment, and that she had been sick for the last
24  two days, and hadn't been doing her job duties for
25  those two days.

1       And, you know, it's totally fine for somebody
2   to be sick.  It happens.  But, you know, to find out
3   two days after the fact that she wasn't where she was
4   supposed to be doing, what she was supposed to be
5   doing, it's kind of unfair to the company.
6   Q   It looks like to me Grecia signed this
7   non-optimum report.  Is that your understanding?
8   A   Looks like it.
9   Q   Does Real Water have any explanation as to why
10  this non-optimum report was signed, but not the
11  previous two that we've gone over?
12  A   No official reasoning why.  I could tell you
13  my personal opinion is from the text that's there, it
14  looks like Bonnie was getting fairly upset and tired of
15  being lied to by Grecia, so she made it a point to
16  actually get Grecia to sign this one.
17  Q   Would all three of these non-optimum reports
18  that are dated October 8, 2015, would they have all
19  been presented to Grecia at the same exact time?
20  A   Not necessarily.
21  Q   Is there any kind of policy that lays out any
22  kind of repercussions that will happen if an employee
23  doesn't sign off on a non-optimum report that they are
24  the recipient of?
25  A   No.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55eb3b981

1    Q    Turning to the last report on page PLTF6, it
2   looks like to me this is also filled out by Bonnie.
3   It's dated the next day, October 9, 2015.  Is that your
4   understanding?
5    **A    Looks like it.**
6    Q    What's this report about?
7    **A    Looks like another example of some stores that**
8   **Grecia was supposed to go to, and she reported that she**
9   **did go to and perform her job duties, that she, in**
10  **fact, didn't, list out those stores, the manager or**
11  **person in charge of the store, and actually**
12  **acknowledged by Grecia that she said she did go to**
13  **those stores, and she didn't.**
14   Q    When you say it was acknowledged by Grecia, in
15  what form did she acknowledge that?
16   **A    She signed it.**
17   Q    She signed the non-optimum report?
18   **A    Looks like her signature to me.**
19   Q    Okay.  So I'm wondering, is it in any way
20  abnormal to have these four consecutive non-optimum
21  reports written about Grecia by Bonnie in a span of two
22  days?
23   **A    Abnormal?**
24   Q    Right.
25   **A    For the given circumstances, absolutely not.**

1    Q    How soon after these non-optimum reports were
2   filled out was Grecia terminated?
3    **A    I don't have the exact date on the top of my**
4   **head, but I'm sure you have the exit paperwork in that**
5   **stack somewhere.  We could look at the date on that.**
6    Q    Explain to me Real Water's -- does Real Water
7   have any kind of policy insofar as a progressive
8   disciplinary policy?
9    **A    Absolutely.**
10   Q    Explain to me what that is.
11   **A    Generally, we -- the procedure is that if**
12  **someone does something that is not following along the**
13  **lines of the policies and procedures of the company, or**
14  **is not what we expect an employee to do, or what a**
15  **senior doesn't expect their junior to do, they are**
16  **verbally told, hey, don't do that, you know, you**
17  **can't -- you shouldn't do that, that's wrong, some**
18  **fashion like that.**
19   **If they continue to do the same thing, a**
20  **written report is written on them.  If they continue to**
21  **do it again, more written reports are written on them.**
22  **If they continue to do it even further, usually ends up**
23  **in termination.  But, again, it depends on the severity**
24  **of what was being done.**
25   **It looks like, per these reports, Bonnie had**

1   **mentioned to Grecia that she needs to actually go to**
2   **the stores verbally before when she wasn't going to the**
3   **stores.  So then the non-optimum reports were written.**
4   **And then eventually she was terminated.**
5    Q    Was Real Water on any kind of notice that
6   Grecia and Bonnie did not get along?
7    MS. GINAPP:  Objection.  Assumes facts not in
8   evidence.  Form.  Foundation.
9    THE WITNESS:  There was no verbal or written
10  reports at the time.  And, again, the written reports
11  was the procedure that was put in place that Grecia
12  acknowledged that she would do should she have any
13  interpersonal disputes within the company.
14  BY MS. BARRAZA:
15   Q    Is it Real Water's position that a system of
16  having three non-optimum reports filled out in the same
17  day, and then one report the next day, and then a
18  termination on the same day as the last report follows
19  its progressive disciplinary system?
20   **A    Repeat the question.**
21   Q    Okay.  Is it Real Water's position that having
22  three non-optimum reports written by the same person,
23  followed by another non-optimum report written by the
24  same person, followed by a termination the same day as
25  the last non-optimum report, does that fall in line

1   with Real Water's progressive disciplinary structure?
2    **A    I can't speak of to when she was terminated,**
3   **because, again, as I answered your question earlier, I**
4   **don't have that date in front of me.  You probably do.**
5    Q    If I represented to you that she was
6   terminated on October 9, which is the same day as the
7   last non-optimum report was written, would you say that
8   that is still in the line with Real Water's progressive
9   disciplinary structure?
10   **A    Forgive me if -- I would rather see the paper**
11  **instead of take your word.**
12   Q    Okay.  That's fine.
13   Has Real Water ever terminated anybody on the
14  same exact day that a non-optimum report was written
15  about them?
16   **A    Probably.  I could say that it's more than**
17  **likely that it happened.  Again, it all depends on the**
18  **severity of what they did.  In this particular case,**
19  **she, you know, was saying she was working at a specific**
20  **location when, in actual fact, and admitted by her, she**
21  **was not, and getting paid to do so.  That's pretty**
22  **severe.  I mean, if you were to steal money from your**
23  **employer, wouldn't they think it's a problem?**
24   Q    I agree it's severe.  And I'm wondering what
25  kind of documentation Real Water has that proves that

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 113

1   they actually followed up and confirmed that what
2   Bonnie was saying in her non-optimum reports is
3   actually what happened.
4       MS. GINAPP: Objection. Form. Go ahead.
5       THE WITNESS: PLTF6 lists one, two, three --
6   four stores that Grecia admits she was supposed to go
7   to them, said they went to them. When it was checked,
8   she didn't.
9   BY MS. BARRAZA:
10      Q   And the only way that Real Water is saying
11  Grecia admits is because of the signature that's on the
12  bottom of the non-optimum report; is that correct?
13      MS. GINAPP: Objection. Form.
14      THE WITNESS: No, also trusting their
15  employees to do their jobs. I, unfortunately, am one
16  person. I can't do 40 some-odd-peoples' jobs. I have
17  to entrust, as a business owner, that someone else is
18  going to perform those job duties for me, and I have to
19  trust that they're going to do that. And until they
20  prove to me that they're not going to do that, or they
21  don't do that, I have to continue to trust them. I
22  can't do 40 peoples' work in one day. It's impossible.
23  Nobody can.
24      So when you have a company, and you have an
25  employer and an employee structure, the employer trusts

Page 114

1   that that employee is going to be doing their job. And
2   you're going to give them the benefit of the doubt,
3   just as we gave Grecia, and until it was proven wrong,
4   just as I give Bonnie and Jeramy that they actually
5   followed up, even more above Grecia's admission that
6   she didn't go to these stores, but that they followed
7   up to the different stores that they said, found that
8   she wasn't actually there.
9   BY MS. BARRAZA:
10      Q   Let me point you to -- going back to the
11  admissions I gave you earlier. That's Exhibit 2 --
12      A   I think it's 3.
13      Q   Let's go to Admission No. 1, page 3.
14      Am I correct that in Request for Admission
15  No. 1 and the response, Real Water has admitted that
16  Grecia was indeed terminated on October 9, 2015?
17      A   That's what this document says. Again, I know
18  we have exit paperwork sitting in that stack somewhere.
19  So we could verify it, based on her signature.
20      Q   Do you have any reason to believe that
21  Real Water would lie about when Grecia was terminated
22  on its own responses to these admissions?
23      MS. GINAPP: Objection. Argumentative.
24      THE WITNESS: I don't have any reason to
25  believe that Kristol would have the date wrong, no.

Page 115

1   BY MS. BARRAZA:
2       Q   Okay. Let's go back and say that October 9th
3   was the day of Grecia's termination, now that you have
4   some confirmation of that. Is it still Real Water's
5   position that having had these four non-optimum reports
6   in a row in a span of two days, and then terminating
7   Grecia on the day of the last non-optimum report is
8   still in line with its progressive disciplinary
9   structure?
10      A   Yes, because as the reports dictate, she was
11  verbally warned prior to these reports being issued to
12  not say she was going to stores and then not going to
13  the stores. And then the written reports were written
14  and issued, two of them acknowledged by Grecia. And
15  given the severity of what Grecia was actually doing,
16  yes, falls in line with the progressive discipline
17  policy.
18      Q   What was Real Water's policy in 2015 insofar
19  as when supervisors would give out verbal warnings to
20  other workers? Is there any kind of documentation that
21  they fill out informing the higher-ups that they gave
22  out a verbal warning?
23      A   No, because per the definition of a verbal
24  warning, it's verbal.
25      Q   Exactly how is anybody above Bonnie supposed

Page 116

1   to know that she actually gave Grecia a verbal warning?
2       A   She talks about it in one of the reports where
3   she says, this is the last straw that she's being lied
4   to by Grecia.
5       Q   And you're saying Bonnie talked about it in
6   her own report that she wrote?
7       A   Correct.
8       Q   Okay.
9       A   So when I read the report, that's my
10  interpretation. And obviously, I'm also going off of
11  Bonnie's written account -- or -- verbal account --
12  excuse me -- that she verbally warned Grecia, "Hey,
13  I'll give you a pass that you didn't go to the store
14  that you said you went to and stole from the company
15  this time, but please don't do it again."
16      Q   Does Real Water have any knowledge of anybody
17  besides Bonnie submitting any non-optimum reports about
18  Grecia?
19      A   Not to my knowledge.
20      Q   Were all of these non-optimum reports stored
21  in Grecia's file after they were submitted?
22      A   That's the proper procedure, yes.
23      Q   Stored in her HR file?
24      A   In her employment file. That's the proper
25  procedure, yes.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 117

1    Q   So exactly who made the decision that Grecia
2  was going to be terminated?
3    **A   From researching this after the fact of the**
4  **lawsuit being filed, Bonnie -- that was Bonnie's**
5  **recommendation, and Jeramy agreed.**
6    Q   So Bonnie recommended to Jeramy that Grecia be
7  terminated?
8    **A   Yes.**
9    Q   Did Jeramy have sole discretion to decide if
10  an employee was going to be terminated?
11    **A   For the most part, yes.  That's his area.**
12  **He's the manager over that area, and he's given the**
13  **responsibility of making sure the people that are**
14  **working underneath him are honest, ethical, producing**
15  **employees.**
16    Q   Did Jeramy give any kind of notice to anybody
17  higher up at Real Water that the decision had been made
18  to terminate Grecia?
19    **A   Not that I'm aware of.**
20    Q   Would Jeramy have had a duty to do so?
21    **A   No.**
22    Q   Do you know if in this instance Jeramy spoke
23  to anybody else, got anybody else's opinion on whether
24  or not Grecia should be terminated besides Bonnie?
25    **A   I don't know, no.**

Page 118

1    Q   I want to know exactly the process of how
2  Grecia was terminated.  Was she called in to the office
3  by somebody, how that went down?
4    **A   Most likely -- again, I wasn't the one that**
5  **performed the duties of actually terminating her**
6  **employment -- but the procedure is, yes, you have them**
7  **come in; there's some documentation that needs to be**
8  **done, making sure that their final hours are calculated**
9  **correctly; they acknowledge receipt of their final**
10  **paycheck, as well as given their final paycheck; and**
11  **then asked politely to leave the premises.**
12    Q   Did Real Water offer Grecia any opportunity to
13  write down her version of what occurred during the days
14  that Bonnie alleged she was not following up on her job
15  duties?
16    **A   Well, per the dates on the report, she had at**
17  **least a day to do that, at least somewhat of a full**
18  **24-hour period or more.**
19    Q   If an employee doesn't sign off on a
20  non-optimum report, I'm just wondering, how is anybody
21  supposed to know that employee actually saw that
22  non-optimum report?
23      MS. GINAPP:  Objection.  Form.  Foundation.
24      THE WITNESS:  Obviously, there's not a proof
25  of that, and you're having to go off of the person's

Page 119

1  word that is in charge of the human resources division,
2  or that person's immediate senior, or their senior
3  senior, depending on the situation and the condition.
4  Generally, people sign the non-optimum reports.  Why
5  these two out of the four were not signed, I don't know
6  the specific circumstances.  I wasn't in the room.  I
7  wasn't doing the procedures.
8  BY MS. BARRAZA:
9    Q   Okay.  I want to know, who was in the room and
10  who was doing the procedures?
11    **A   Probably Bonnie, because she had signed --**
12  **well, I can tell you this -- based on the procedure of**
13  **how these reports are done -- again, they're written by**
14  **the originator -- then the originator either has the**
15  **option to give it directly to the person they're**
16  **writing it on for them to sign and acknowledge it then,**
17  **then turns it into human resources division.  Or they**
18  **can give it to the human resources division and have**
19  **them actually confront the person, and have them sign**
20  **it, and then it gets filed in their personnel file.**
21    **So per the procedures -- again, I didn't**
22  **prepare and find this information out as far as the**
23  **exact time, place, minute-by-minute play action of when**
24  **Grecia was terminated, who did it, and everything like**
25  **that.  I would imagine there was absolutely a person in**

Page 120

1  **the room from HR, which I believe was Christian**
2  **Pantelakis, who signed her exit paperwork.  I would**
3  **imagine probably Jeramy, and potentially Bonnie as**
4  **well.**
5    Q   Okay.  So topic number 16 on the list of
6  topics that we're here for today indicates that we're
7  here to --
8    **A   What exhibit are you referring to?**
9    Q   Exhibit 1.  It indicates that we're here to
10  determine Real Water's knowledge of the circumstances
11  surrounding Plaintiff's termination from Real Water.
12    So you listed out a few individuals --
13  Christine Pantelakis, Jeramy, and Bonnie.  Is it fair
14  to say that those individuals would have actual better
15  knowledge of this to testify about that?
16      MS. GINAPP:  Objection.  Form.  Foundation.
17      THE WITNESS:  Which point are you referring to
18  again?
19  BY MS. BARRAZA:
20    Q   Number 16.  It's page 3 of Exhibit 1.
21      MS. GINAPP:  I would also note for the record
22  that number 16 is vague and ambiguous.
23      THE WITNESS:  So I do have knowledge of the
24  circumstances based on exit paperwork, which you can
25  see that Christian Pantelakis signed that exit

1  paperwork.  Obviously, Grecia was there because she
2  signed it as well.  And based on the procedures that we
3  have, I would imagine that Jeramy and/or Bonnie were
4  present in the room as well to inform their junior why
5  they were being terminated.  And then at that time,
6  human resources department representative would take
7  over and then finish the paperwork and the giving of
8  the final check for hours that she didn't earn because
9  she wasn't doing her job when she said she was, but we
10 paid her anyways, and asking her politely to leave.
11 BY MS. BARRAZA:
12    Q   In your preparation for this deposition, did
13 you actually go and ask Bonnie or Jeramy as to whether
14 they were in the room when Grecia got terminated and
15 whether they were part of actually terminating her and
16 going through any kind of final paperwork with her?
17    A   I did not ask Jeramy or Bonnie if they were in
18 the room when Grecia was terminated.  I did ask them
19 about the investigation that they performed into why
20 they made the decision to terminate her.  But I did not
21 ask if they were in the room when she was terminated.
22    Q   And you didn't ask about the specific details
23 of any conversations that took place when Grecia was
24 terminated; is that correct?
25    A   Ask the question again.

1     Q   You didn't ask Bonnie or Jeramy about any
2  specific details that took place as far as
3  conversations that were had at the time Grecia was
4  terminated; is that correct?
5     A   Of course I asked specific details.  I asked
6  very specific details.  I asked them about these
7  reports that have extremely explicit, specific details
8  of a store, the exact address, who the manager was that
9  said that they did not see her.  Yes, I got specific
10 details surrounding Grecia's termination.
11    Q   I'm talking about specifically when she was
12 actually called and informed she was terminated, those
13 kinds of specific details.
14    A   If they were in the room?  No, I did not ask
15 if they were in the room.
16    Q   Or what kind of conversations took place at
17 that time?
18    A   Other than what's in these reports and what's
19 in the exit paperwork and the knowledge of the
20 procedures and the policies of what's supposed to
21 happen when she was -- that were followed when she was
22 terminated, I did do investigation into that, those
23 things.  But did I ask for a dictation of the
24 word-by-word conversation between human resources, her
25 superior, and Grecia?  No, I did not get a

1  word-for-word dictation of that.
2     Q   Did you get any kind of information, let alone
3  a word-for-word dictation?
4     A   Yeah, I did.  There's some text messages that
5  Grecia sent to Bonnie threatening -- physically
6  threatening, threatening the company, different things.
7  So we have proof of that communication.
8     Q   When did you become aware of those text
9  messages?
10    A   Upon review of this, after we were filed --
11 after the lawsuit was filed.
12    Q   Okay.  I just want to confirm that there's no
13 document reflecting that the HR department or anyone
14 else reached out to Grecia to try to get her side of
15 the allegations that Bonnie made in the non-optimum
16 reports; is that correct?
17    A   There is no document specifically stating that
18 Grecia was informed again of her right to challenge the
19 reports.  She admitted two of them -- admitted to two
20 of them by her signature.  But she also did acknowledge
21 that if she felt like she was being mistreated in any
22 way in the employment agreement, she would submit that
23 in writing, which she did not do.
24    Q   I want to ask you:  Back in 2015, after Grecia
25 signed her two employment agreements, was she given a

1  copy of those employment agreements for herself to have
2  for her own records?
3        MS. GINAPP:  Objection.  Form.  Foundation.
4        THE WITNESS:  I can't speak to that.  I don't
5  know.  But anybody is obviously welcome to have a copy
6  of the forms themselves.
7  BY MS. BARRAZA:
8     Q   Did Real Water have any kind of specific
9  policy back in 2015 as far as making sure that the
10 employees are given a copy of the employment agreements
11 that they sign?
12       MS. GINAPP:  Objection.  Form.
13       THE WITNESS:  There's no written policy or
14 procedure.  But generally, if someone asks for it,
15 we'll make a copy for them, and they can keep it for
16 their records.
17 BY MS. BARRAZA:
18    Q   There is no written policy or procedure or
19 verbal --
20    A   No --
21       MS. GINAPP:  Objection.  Sorry.  Go ahead.  Go
22 ahead and finish.
23 BY MS. BARRAZA:
24    Q   -- or verbal policy or procedure to offer to
25 make them a copy of the employment agreements; is that

1    correct?
2        MS. GINAPP:  Objection.  Form.
3        THE WITNESS:  No.  It's not a policy and
4    procedure that someone is to offer their employment
5    agreement.  But if they are asked, they can absolutely
6    give it to them.  I can't recall anybody ever asking
7    for it.  Generally, people don't have a problem with
8    it, and it is what it is, and they are excited about
9    actually doing their job.
10   BY MS. BARRAZA:
11       Q   Okay.  So we've discussed the orientation
12   videos, being "The Secret," "The Way to Happiness,"
13   "Message to Garcia," the "Real Water Culture," and
14   "Just Do It."  Aside from those orientation videos, are
15   there any other kind of courses that the employees took
16   part in back in 2015?
17       MS. GINAPP:  Objection.  Form.
18       THE WITNESS:  Yeah.  There's the business
19   management courses that we offer to people to do which
20   go over things like statistics, measure of their
21   production in their position, a filing system known as
22   Three In-Basket Filing System -- the top basket is
23   "in," middle basket is "pending," bottom is "out" --
24   internal office communications, a way to request for a
25   new computer or something that you might want or need

1    to fulfill your job duties.  These are just examples of
2    what is contained in the management policies and
3    procedures in the courses.
4    BY MS. BARRAZA:
5        Q   Was the business management system a required
6    course system, or was that optional?
7        **A   It's optional for entry-level employees and**
8    **non-managerial.  However, we do expect the managers to**
9    **do some of the courses.**
10       Q   As a brand ambassador, was it optional for
11   Grecia to participate in these business management
12   courses?
13       **A   Was it optional?**
14       Q   Right.
15       **A   Yes, it was optional for her to do so.  And I**
16   **don't believe she ever took part in it.**
17       Q   Is there any kind of reward system that
18   Real Water offered for its employees who decided to
19   complete the optional courses?
20       MS. GINAPP:  Objection.  Form.
21       THE WITNESS:  Yes.  If they completed a
22   course, we would give them a 25-cent-per-hour raise
23   because we viewed them by learning those tools and
24   techniques and procedures, that they would be a more
25   effective and productive employee.  Hence, worth

1    earning more money.
2    BY MS. BARRAZA:
3        Q   What did Grecia start out earning when she
4    came to work at Real Water?
5        **A   I don't have the exact figure off the top of**
6    **my head, but I would knowledge somewhere between $10,**
7    **$15, somewhere in there.  We don't actually pay anybody**
8    **minimum wage in our company.  We pay a few dollars**
9    **over.**
10       MS. BARRAZA:  Let's do this next.
11       (Exhibit 7 marked)
12   BY MS. BARRAZA:
13       Q   I'll direct your attention just to the first
14   page in this packet of Exhibit 7, marked as page RW-60.
15       Do you recognize this document?
16       **A   Uh-huh.**
17       Q   What is this document?
18       **A   It is a memo, office memo.**
19       Q   What is this memo about?
20       **A   The courses offered by Real Water.**
21       Q   Are these the optional courses that we were
22   just talking about?
23       **A   Yes.  It says, "We are offering."**
24       Q   Okay.  This document, how was it distributed
25   to the employees?

1        **A   It might have been hard copy or e-mail.**
2        Q   Am I correct that this Real Water Course Memo
3    would have been distributed to employees after they had
4    already been hired?
5        **A   It's not a continuous memo that goes out.  It**
6    **was probably issued at one point in time, and then kept**
7    **on file, which I don't know if behind these black lines**
8    **there's the actual date which is potentially outside of**
9    **when Grecia was employed.  I don't know.**
10       Q   So does this Real Water Course Memo -- has the
11   list of courses changed over a period of time?
12       **A   No.  It's been the same.**
13       Q   Has Real Water ever implemented any different
14   version of the Real Water Course Memo?
15       **A   Not to my knowledge.**
16       Q   Are the employees given this Real Water Course
17   Memo with this list of courses at the time that they
18   sign their employment agreements?
19       **A   It's not standard procedure, no.  But if they**
20   **ask about it, this could be something that would be**
21   **offered to them.**
22       Q   Okay.  I want to go over these courses.  I
23   looks like there's 18 listed on here.  Where did
24   Real Water get these courses from?
25       **A   Either through WISE or Hubbard College of**

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55ea3b981

1    Administration. Prior to a few years ago, WISE sold
2    and licensed -- we buy the license to use these. So we
3    don't pay -- somebody doesn't pay us to do it. We
4    actually have to pay because we use their copyright.
5    So we pay WISE to have license to be able to use these
6    courses. And a few years, two or three years ago prior
7    to that, we purchased the course materials, et cetera,
8    from WISE. But like I said, two or three years ago,
9    they switched over to where actually the Hubbard
10   College of Administration sells the course materials.
11       Q   What is WISE?
12       A   WISE is an organization that offers the
13   Management Technology, Hubbard Management Technology,
14   and helps to get companies to utilize this type of
15   policies, procedures, techniques to help increase that
16   company's efficiency and overall success.
17       Q   Does WISE have any kind of connection to
18   Scientology?
19           MS. GINAPP: Objection. Foundation.
20           THE WITNESS: It's a separate entity.
21   BY MS. BARRAZA:
22       Q   What does "WISE" stand for?
23           MS. GINAPP: Objection. Foundation.
24           THE WITNESS: I believe it stands for "World
25   Institute of Scientology Enterprises."

1    BY MS. BARRAZA:
2        Q   Is there anywhere on this course memo where
3    Real Water indicates that it gets the courses from
4    WISE?
5            MS. GINAPP: Objection. The document speaks
6    for itself.
7            THE WITNESS: I don't see somewhere, no.
8    BY MS. BARRAZA:
9        Q   Is there any reason that that's not included
10   on the Real Water Course Memo?
11       A   Irrelevancy.
12       Q   Real Water doesn't find it relevant to inform
13   its employees exactly where it got these courses? Is
14   that what you're saying?
15       A   If they ask, it's more than -- we're more than
16   willing to explain and tell them. But just like I
17   wouldn't tell you what I had for lunch today, it's just
18   something that -- unless somebody asks, we're not going
19   to, you know, say it.
20       Q   I think you mentioned a few years ago,
21   Real Water would buy the license to use the courses
22   from WISE; is that correct?
23           MS. GINAPP: Objection. Misstates testimony.
24           THE WITNESS: We pay licensing fee.
25   /////

1    BY MS. BARRAZA:
2        Q   Okay. You pay a licensing fee.
3            Is that correlated in any way with any kind of
4    membership that Real Water has or had with WISE?
5        A   Yeah, when you pay the money, you're
6    considered to be a WISE member.
7        Q   When did Real Water become a WISE member?
8        A   I don't know the exact date, but I would
9    imagine it's somewhere in between 10 and 15 years ago.
10       Q   Is there any kind of policy Real Water has of
11   disclosing to its employees that it is a -- was a
12   WISE member?
13       A   Other than what's in the employment agreement
14   showing the difference between the Hubbard Management
15   Technology is a secular technology and the religion of
16   Scientology and how they are different, no.
17       Q   So explain to me, now that Real Water gets the
18   courses from Hubbard College of Administration, is
19   Real Water a member of that administration?
20       A   No.
21       Q   Is Real Water still a member of WISE?
22       A   Yes. WISE is a non-religious secular entity.
23       Q   Does Real Water pay any kind of dues, annual
24   dues, or monthly dues to WISE?
25       A   Annual.

1        Q   What's the annual dues that it pays?
2        A   I think it's somewhere in the realm of $1,000.
3    I can't -- there's different levels. And I don't know
4    the exact total off the top of my head. But it's
5    somewhere in the realm of $1,000 a year.
6        Q   So am I correct that that membership paid for
7    the right to use the courses, or was there a separate
8    fee that had to be paid?
9        A   No. That membership gives you the licensing
10   rights to use the course materials.
11       Q   How did the decision come to be made to start
12   using WISE courses at Real Water?
13           MS. GINAPP: Objection. Asked and answered.
14           THE WITNESS: Going back to when you asked
15   this before -- my father did some courses at the
16   Hubbard College of Administration. He found that it
17   would be useful in his company, in his business, and
18   decided to incorporate it.
19   BY MS. BARRAZA:
20       Q   From the beginning, have these courses always
21   been optional?
22       A   As far as I know, yes.
23       Q   From the beginning, have they always been
24   correlated with a 25-cent raise?
25       A   No, I'm not sure from the beginning of that

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

1  offer to employees.  I know we've given this for quite
2  some years, 25 cents per course a person completes.
3  But I don't know if it was before or not, or for how
4  long, if we did it before, I know when we weren't,
5  et cetera.
6      Q   How was the decision made about the 25-cent
7  raise specifically?
8      A   We wanted to give people encouragement to do
9  the courses because we have certain procedures that we
10  follow within the company.  And if someone doesn't know
11  those procedures, then they aren't able to work
12  effectively and efficiently.
13      You know, if you don't know the rules of how
14  to drive, you're not going to be a very good driver.
15  So we wanted to incentivize people to take initiative
16  to, you know, do those courses.  And so we came up with
17  the decision to give them a 25-cent raise because if
18  they did the courses, they would be a more productive
19  employee.  Hence, earning more wage.  And we like to
20  pay people more.
21      MS. BARRAZA:  Let's go off the record and take
22  a break, five minutes.
23      THE WITNESS:  Okay.
24          (Recess)
25  /////

1  BY MS. BARRAZA:
2      Q   Before we left off, you were explaining some
3  of the details regarding the 25-cent raise that
4  Real Water offers in return for the employees who
5  decide to participate in the optional Real Water
6  courses.  I'm wondering, is there any specific reason
7  why 25 cents was selected as opposed to any other
8  number?
9      A   We deemed it as a satisfactory advance.
10      Q   Who was involved in that decision?
11      A   Myself, Brent Jones.
12      Q   All right.  So we've reviewed that, on the
13  Real Water Course Memo marked as Exhibit 7, there's no
14  indication that these courses are provided by WISE.  Is
15  there any kind of verbal notification that's given to
16  Real Water employees telling them that WISE has
17  provided these courses to Real Water?
18      A   No, because we have the license rights to use
19  them when we pay the membership.
20      Q   Let's go to the next page on Exhibit 7, marked
21  as RW-61.  Have you ever seen this document?
22      A   No.  It looks like somebody's notes, or
23  something.
24      Q   Does this look to you to be something that
25  would be administered to the whole entire company, or

1  no?
2      A   Administered?  Yes, if they took part in the
3  course, because this is a procedure of having somebody
4  do the course, and then receive the raise.
5  Distributed?  Probably not, because it looks like
6  somebody's personal notes on how to do their job.
7      Q   Do you know whose personal notes these are?
8      A   No, I don't know.  Doesn't say.
9      Q   Whose responsibility was it to ensure that
10  employees got their 25-cent raise if they completed an
11  optional Real Water course?
12      A   Well, there's a few people delineated in this
13  document in that procedure.  The person that's in
14  charge of administering the courses has them actually
15  do the course.  And then they compile what's called a
16  Completed Staff Work, or a CSW, which basically is a
17  form that's used for the request and approval, or just
18  approval of something, whether it be a raise, a new
19  computer for your workstation, days off, anything.
20  That would come to me, and I would review the course
21  that was done, make sure that the check sheet was
22  completed, they signed off on every step, make sure
23  that they, you know, did the different exercises, or
24  essays, or written things that were asked of them.  If
25  they did, then I would approve it, and it would go to

1  treasury, who would then increase their pay rate.  And
2  then that would then go back to human resources and be
3  filed in their personnel file.  So there's a few people
4  that are responsible for that procedure.
5      Q   How long have you been responsible for your
6  portion of approving the documents that the employees
7  submit in order to get their raises?
8      A   A few years.
9      Q   Would you say going back to prior to 2015 at
10  least?
11      A   Yes.
12      Q   Is this review that you do of the completed
13  course documents similar to the review that would take
14  place for the orientation videos?
15      A   No.  I would look a little bit more in depth
16  in these.  Again, I would make sure that the check
17  sheet is signed off and they completed every step.  I
18  would go over some of the written practical assignments
19  that were part of the course.  Generally, I look at the
20  final one, because the final one is like -- the sort of
21  overall general theme is, "Tell me what you learned in
22  this course."  It's kind of an overview asking the
23  person of the course.  And I'll read through that.  And
24  as long as it seems like, you know, they have some
25  knowledge of what the course was about, that they

1 actually did it, and they're not just filling out a
2 paper and saying they did it, I will approve it, and on
3 it goes down the line.
4    Q   Understood.
5        Have you personally read and gone through all
6 of the 18 courses listed on the Real Water Course Memo?
7    A   At one time or another.
8    Q   So you would be able to ascertain by reading
9 somebody's review whether or not they had actually
10 taken part in the course and they're not just making
11 things up; is that correct?
12    A   To a certain degree, because, you know, some
13 people are artists at BS.
14    Q   Okay.
15    A   To me, that's the intention, is, I'm trying to
16 make sure that they actually did the course.  And, you
17 know, I'd like to see that they got something out of
18 it.
19    Q   Have you ever reviewed somebody's course
20 documents and decided that you did not approve it and
21 they would not be getting the raise?
22    A   Yeah.
23    Q   On how many occasions was that?
24    A   Over the years that I have done it -- I don't
25 know -- 20 or 30.  But every single one of them then

1 went back and fixed the corrections that I gave them
2 and eventually finished it and got the raise.
3    Q   So would you write down what actual
4 corrections, write down what was wrong about it, and
5 then hand the documents back to them?
6    A   Yes.  There's a place on the form that they
7 file, and it says, "Approve," "Disapprove."  If I check
8 "Disapprove," below it says, "If disapproved, why," and
9 that's where I would write, you know, "The check sheet
10 Section 7A was blank, did you actually do this?"  Or,
11 you know, "There was no final essay," or things like
12 that.
13    Q   Okay.  Going on to the next page, RW-62, what
14 is this document?
15    A   It looks like it is an efficiency, or some
16 sort of grading test for candidates for a position
17 that's offered through ADP TotalSource.  And it looks
18 like you fill this out, and it's an order or an
19 acknowledgment that you want to have this test
20 performed for this candidate to see if, you know,
21 they're proficient in typing, or managerial techniques,
22 or sales.  Or some of the ones we do, because we deal
23 in manufacturing, are mechanical aptitude.  Things like
24 that.
25    Q   Okay.  Then looking through the remainder of

1 the packet, would you say that the remaining pages are
2 part of what you just described for the ProveIt!
3 system?
4    A   Yeah, it looks like this form is similar to
5 the other form except for you can order six tests at
6 once instead of one.
7    Q   You're talking about the form on page 63?
8    A   Yes, comparing 63 to 62.
9    Q   Okay.  What about 64?
10    A   Looks like that's a copy of 62.
11    Q   So do those ProveIt! documents have anything
12 at all to do with the Real Water courses that it
13 offers?
14    A   No.
15    Q   Okay.  Did Real Water ever inform ADP that it
16 was conducting this optional course program?
17    A   Yes.
18    Q   When was that?
19    A   When we started their services.
20    Q   What approximate date was that?
21    A   Oh, shoot -- I know I looked that up.  I think
22 it was two and a half years ago, if I remember,
23 somewhere in that line, two years ago.
24    Q   How was ADP put on notice about the Real Water
25 courses?

1    A   There's -- I don't want to call it an
2 interview process -- but there's like a, you know,
3 question-and-answer process when you start with their
4 services.  And they go, "Okay, so tell us about your
5 business, how do you evaluate your employees?"  Because
6 every company is different, sometimes, you know,
7 companies have a very sort of structured employment
8 evaluation procedure where it's like every six months,
9 we have the review, and this is what we do.  Or it's,
10 you know, wow, that person did an excellent job, I'm
11 going to give them a raise.  You know, every company is
12 different.  So they kind of find out, "Okay, how do you
13 do this, how do you do that?"  And that type of thing.
14    Q   So the details of the Real Water Course Memo
15 would have been filled out in that questionnaire that
16 you just testified about; is that correct?
17    A   I don't know if that exact memo was issued to
18 ADP, but the information that it pertains to, yes, was
19 given to ADP.
20    Q   Including that it was an optional program, and
21 that the employees received a 25-cent raise if they
22 completed any of the courses?
23    A   I would imagine so, yes.
24    Q   Did Real Water ever receive any kind of
25 feedback or statement from ADP regarding the Real Water

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 141

1  course program?
2  **A   To what effect?**
3  Q   Just at all, stating this is a good idea, or
4  this is bad?  Anything?  Any communications at all?
5  **A   Not to my knowledge.**
6  Q   Okay.
7  **A   Oh, there's a few of them.**
8  Q   Is it Real Water's position that no version of
9  the Real Water Course Memo ever identified that the
10  courses being offered were WISE courses?
11      MS. GINAPP:  Objection.  Asked and answered.
12      THE WITNESS:  Was there ever an official
13  document distributed saying these courses are from
14  WISE?
15  BY MS. BARRAZA:
16  Q   Or anything to that effect, yes.
17  **A   I believe we had at one time in one of our**
18  **employment agreements, they talked about the Hubbard**
19  **technology saying we get it from WISE, and that type of**
20  **thing.  But because it didn't seem as pertinent**
21  **information when it was evaluated and reviewed and**
22  **altered for whatever various reasons, depending on the**
23  **different sections that are in the employment**
24  **agreement, that one was removed and that wording was**
25  **changed, or however, it got, you know, lost in**

Page 142

1  **translation, so to speak.**
2  Q   And that would have all taken place prior to
3  Grecia being hired; is that correct?
4  **A   Yes, because of the employment agreements**
5  **that, you know, she has are on file.**
6  Q   Okay.  So is it Real Water's position that all
7  18 of these optional courses are non-religious?
8  **A   Absolutely.**
9  Q   How did Real Water form that position?
10  **A   Because it comes from a secular entity.  And**
11  **in none of these courses does it talk about someone as**
12  **a spiritual being or address the afterlife, which are**
13  **the requisites to be religious.**
14  Q   How was Real Water informed that WISE was a
15  secular entity?
16  **A   I'd imagine it's part of WISE's, you know,**
17  **literature or their materials that they give out to**
18  **inform the public about their services that they have**
19  **and their products.**
20  Q   Did Real Water ever perform any kind of its
21  own due diligence or investigation as to whether WISE
22  was actually a secular entity?
23      MS. GINAPP:  Objection.  Form.
24      THE WITNESS:  Other than -- well, yes.
25  Courses were done, and it was seen that there was no

Page 143

1  mention of a spiritual being, or addressing the person
2  as a spiritual being, or the afterlife.
3  BY MS. BARRAZA:
4  Q   In any documents that were provided to the
5  employees in 2015, did Real Water specifically give
6  that definition as to what "religious" means to its
7  employees?
8  **A   No.  I think it's commonly understood.**
9  Q   Let's go to the Basic Study Manual.  It's
10  marked as number 1 on the Real Water Course Memo.
11      Are you familiar with what the Basic Study
12  Manual is about?
13  **A   Yep.  I did that course when I was nine years**
14  **old.**
15  Q   Okay.  What's it about?
16  **A   It gives you tools and techniques to study**
17  **better, be able to retain knowledge that you're trying**
18  **to learn, and actually be able to apply it and use it**
19  **instead of, you know, read something, and then five**
20  **minutes later, forget -- "What did I just read?"**
21  Q   In what ways does the Basic Study Manual
22  benefit people that were in Grecia's position,
23  specifically brand ambassadors?
24  **A   So it benefits them -- well, first off, she**
25  **never did any of the courses.  But if she was to, or**

Page 144

1  **why it's offered to them, is because our product is a**
2  **product that is a little bit different.  It's not just**
3  **a brand of something.  It has some basis to it, or some**
4  **sort of scientific facts that go along with it.  It's**
5  **alkalized, negatively ionized, so there's a little bit**
6  **of science behind it.  And someone needs to know and**
7  **understand that to be able to communicate that to a**
8  **prospective customer.**
9  **And like I said, I've done over 300 demos**
10  **myself personally.  And, believe me, you get some crazy**
11  **questions.  And sometimes, you know, I don't know what**
12  **the answer of it is, and I'll go and say, "Hey, you**
13  **know what, finish your grocery shopping, give me five**
14  **minutes, I'm going to go research this on my phone, and**
15  **then I'll get back to you with an answer."  And if you**
16  **don't know how to study and research and be able to**
17  **answer a question or retain knowledge about something,**
18  **you're not going to be very good at explaining**
19  **something to somebody.**
20  Q   Since, as you mentioned, Grecia didn't
21  complete the Basic Study Manual, she, therefore, was
22  not eligible for any compensation in the form of a
23  25-cent raise; is that correct?
24      MS. GINAPP:  Objection.  Form.  Foundation.
25  Go ahead.

1 THE WITNESS: To my understanding, she never
2 started it --
3 BY MS. BARRAZA:
4 Q Okay.
5 **A -- which was totally fine. It wasn't an**
6 **issue.**
7 Q Does Real Water management ever follow up with
8 the employees to check on if they're completing the
9 Real Water courses?
10 MS. GINAPP: I'm going to object as to form.
11 THE WITNESS: Well, we talked about before,
12 there is a procedure for them to get their raises, and
13 it needs to be approved. I'm the manager of the
14 company, so --
15 BY MS. BARRAZA:
16 Q For an employee who decides that they don't
17 want to participate, they don't want to do any of the
18 courses, is anybody ever following up with that
19 employee asking them, "Why don't you want to do these
20 courses," or anything to that effect?
21 MS. GINAPP: A non-managerial employee or a
22 managerial employee?
23 BY MS. BARRAZA:
24 Q For a non-managerial employee who decides they
25 don't want to complete the courses, is a managerial

1 employee then ever following up and inquiring as to
2 why?
3 **A No, no one follows up with them. I mean, when**
4 **they say, "Hey, I don't want to do this," they might be**
5 **posed a question of, you know, "Why," or, "Do you have**
6 **a problem with it," or, "Do you disagree with it in**
7 **some way," or you know, something along those lines,**
8 **because, you know, maybe they have misinformation, or**
9 **maybe there's a misunderstanding about something, or --**
10 **you know, that can be cleared up, and then, you know,**
11 **both parties will be happy to proceed. But there's no,**
12 **like, "Oh, six months, we're going to go back and talk**
13 **to that person." No, we don't do that, and there's no**
14 **procedure or policy to do that.**
15 Q Are any of these courses based on Scientology
16 teachings?
17 **A No.**
18 MS. GINAPP: Objection. Form. Foundation.
19 THE WITNESS: Absolutely not.
20 MS. BARRAZA: This is next.
21 (Exhibit 8 marked)
22 BY MS. BARRAZA:
23 Q I've just handed you what's been marked
24 Exhibit 8, which is relevant pages from the Basic Study
25 Manual Course which was disclosed to us in this

1 litigation by Real Water.
2 A Yep.
3 MS. GINAPP: I'm going to lodge a continuing
4 objection to the use of this exhibit as being
5 incomplete.
6 BY MS. BARRAZA:
7 Q Okay. Let's go over a few of these things. I
8 want to start with -- let's just start with page 152.
9 Is this a form that the employees would actually have
10 to fill out, or no?
11 **A The schedule?**
12 Q Right.
13 **A It's encouraged that the people set a schedule**
14 **throughout the work week. However, you know, things**
15 **come up, people get busy, you know, sometimes it's hard**
16 **for people to make a schedule. But it's encouraged for**
17 **people to make a schedule to go to the course room at**
18 **Real Water.**
19 Q Would this be something that's required to be
20 filled out if the employee wants to get the 25-cent
21 raise?
22 **A No.**
23 Q Okay. Let's go to page 155. Am I correct in
24 assuming that the blank lines on the right-hand side of
25 this page and on the pages that follow means that

1 that's where the employee would mark their initials
2 that they've actually read and completed those
3 sections?
4 **A Yes.**
5 Q Okay.
6 **A Looks like it.**
7 Q So part of your duty would be to make sure
8 that all of these lines have been initialed; is that
9 correct?
10 **A Uh-huh.**
11 Q "Yes"?
12 **A Yes.**
13 Q Okay. Going to page 162, number 15,
14 Section A, it asks the reader to look up the word
15 "nonbeliever." Is it Real Water's position that
16 in any way imposes any kind of religious undertones to
17 the employees?
18 MS. GINAPP: Objection. Form.
19 THE WITNESS: No, because if you read the
20 section prior to that in the actual course book, and
21 you'll see that it's teaching a person that -- how to
22 look up a prefix for a word, and then the root of the
23 word to find the meaning of the subsequent whole. It's
24 simply a word that was used to demonstrate prefix and
25 root word.

Electronically signed by Mary Cox Daniel (101-361-287-3117)     c773ac71-bef8-43c9-b345-181b55e3b981

1  BY MS. BARRAZA:
2    Q   When you are reviewing these filled-out Basic
3  Study Manual Courses, what definition do you look for
4  when somebody writes out their definition for
5  "nonbeliever"?
6    **A   I don't look at that.  Generally, I don't.**
7    Q   What is Real Water's position as to what the
8  definition for "nonbeliever" would be?
9        MS. GINAPP: Objection.  Form.  Foundation.
10       THE WITNESS:  We generally go off of
11  Merriam-Webster.
12  BY MS. BARRAZA:
13    Q   Okay.  Does Real Water understand at all how
14  some employees might see the word "nonbeliever" and
15  take it to mean something religious related?
16       MS. GINAPP: Objection.  Form.  Foundation.
17       THE WITNESS:  No.  I think you're stretching
18  it a little bit there.
19  BY MS. BARRAZA:
20    Q   Let's go to page 249.  Can you read into the
21  record the second paragraph, what is marked as the "End
22  Note" of the Basic Study Manual Course?
23    **A   And this check sheet is not the one that we**
24  **use in the course room.**
25    Q   I'm sorry.  When you say "check sheet," what

1  are you talking about?
2    **A   This is a check sheet, because you go through**
3  **and you check off the different things that you've**
4  **done.**
5    Q   Okay.
6    **A   It's a check sheet that accompanies the**
7  **course.**
8    Q   Okay.
9    **A   This isn't the check sheet that we actually**
10  **use.  It was erroneously submitted by an employee that**
11  **doesn't have the experience nor responsibility over the**
12  **area, unfortunately.  And it's not the correct check**
13  **sheet.**
14       MS. GINAPP: Go ahead and answer the question,
15  if she still wants you to.
16  BY MS. BARRAZA:
17    Q   Yes.  Do you want me to repeat it?
18    **A   You just asked me to read that, right?  It's**
19  **not a question.  You're asking me to do something.**
20    Q   I'm asking you to do something as a question.
21  Go ahead.
22    **A   "There's a further Scientology service**
23  **available which you should now do which is designed to**
24  **bring you greater success and happiness in your work,**
25  **your social life, your relationships with others, or**

1  **any aspect of your life."**
2    Q   Okay.  Now, explain to me how Real Water does
3  not see that statement as an endorsement of
4  Scientology?
5        MS. GINAPP: Objection.  Argumentative.
6        THE WITNESS:  It sees it that way because this
7  isn't the course check sheet that's used.
8  BY MS. BARRAZA:
9    Q   So you would agree with me that that statement
10  actually does promote Scientology?
11       MS. GINAPP: Objection.  Misstates testimony.
12  Argumentative.
13       THE WITNESS:  No.
14  BY MS. BARRAZA:
15    Q   Okay.  So --
16    **A   I don't think it applies because Grecia never**
17  **did this course, nor saw this document, or the one**
18  **that's actually in use.**
19    Q   Now, let me ask you:  When the employees first
20  start an optional course, is there any kind of system
21  where they -- like, kind of a checking system, they're
22  checking out this course to mark down that they are
23  beginning a course?
24    **A   Other than this check sheet?  No.**
25    Q   So Real Water has no -- for example, if

1  Grecia, hypothetically, had gone to HR and said she
2  wants to start the Basic Study Manual Course, at that
3  time when she was given the course, is there any kind
4  of memorialization that Grecia was given the course?
5    **A   No.**
6    Q   So I'm asking:  How does Real Water know
7  that -- even though Grecia never completed the Basic
8  Study Manual Course, how does Real Water know that she
9  never read that statement in the Basic Study Manual
10  Course?
11    **A   Because there's none of these that she had**
12  **started, that she started the course.**
13       MS. GINAPP: You need to be more specific
14  about what "these" are.
15       THE WITNESS:  Check sheet.  Sorry.
16       There's no check sheet, Basic Study Manual
17  check sheet, that was started by Grecia proving that
18  she actually started the course.
19  BY MS. BARRAZA:
20    Q   Okay.  So it's possible she could have been
21  given the course, and she just never filled out any of
22  the check sheet?  Is that true, or no?
23       MS. GINAPP: Objection.  Calls for
24  speculation.
25       THE WITNESS:  It's possible.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 153

BY MS. BARRAZA:
1  BY MS. BARRAZA:
2    Q   Okay.  So explain to me how the second
3  paragraph that you read into the record on page RW-249
4  is not an endorsement of Scientology.
5        MS. GINAPP: Objection.  Form.  Foundation.
6        THE WITNESS:  This document that is not in use
7  is obviously suggesting somebody to do the next course
8  that's there.
9  BY MS. BARRAZA:
10   Q   And would that be a Scientology course?
11       MS. GINAPP: Objection.  Form.  Go ahead.
12       THE WITNESS:  Per this document that's not in
13  use, yes.
14  BY MS. BARRAZA:
15   Q   Let's go over how it's not in use.  Explain to
16  me how this document got produced to us from Real Water
17  if it's not in use.
18       MS. GINAPP:  Objection.  To the extent it
19  calls for you to disclose attorney/client privilege
20  information, I direct you not to answer that.  But
21  otherwise, anything that's not protected as
22  attorney/client communications, you can answer.
23       THE WITNESS:  Frank Consiglio, who is not over
24  human resources, nor does he have any responsibility in
25  the course room or knowledge of the operations of, I

Page 154

1  believe he had this course.  It was his.  And he
2  submitted it because, I think, I was out of town at the
3  time.
4  BY MS. BARRAZA:
5    Q   So it's Real Water's testimony today that the
6  Basic Study Manual Course in front of you as Exhibit 8
7  was not given to any employees?  Is that what you're
8  saying?
9    A   Yeah, this isn't the one that was in use.
10  There's different versions of this course.  So we use
11  the one that's secular.  However, there is a version
12  that does, as you see here, mentions Scientology.  It
13  doesn't go into any aspects of Scientology other than
14  to saying the word "Scientology."  So there's different
15  versions of the check sheet.  This version is not the
16  one we use, but it is one that Frank had, for whatever
17  reason.
18   Q   Is there any kind of document that
19  specifically verifies what you're saying, that there's
20  a certain Basic Study Manual Course that Real Water
21  does use?
22       MS. GINAPP:  Objection.  Form.
23       THE WITNESS:  Other than the one that we have
24  on file.
25  /////

Page 155

1  BY MS. BARRAZA:
2    Q   Okay.  So there's no document that would
3  verify Real Water is to only use a certain version of
4  the Basic Study Manual?
5        MS. GINAPP: Objection.  Form.
6        THE WITNESS:  It's generally understood that
7  we use the Hubbard College of Administration and the
8  WISE course materials.
9  BY MS. BARRAZA:
10   Q   How is it generally understood if --
11   A   Because that's the membership we hold.
12   Q   Do you tell the employees that you hold a WISE
13  membership, that Real Water holds a WISE membership?
14       MS. GINAPP:  Objection.  Asked and answered.
15       THE WITNESS:  If they ask, yes.
16  BY MS. BARRAZA:
17   Q   If I told you that Frank Consiglio testified
18  that he's not a Scientologist, and he doesn't believe
19  Scientology is a real religion, why would he have a
20  different version of the Basic Study Manual Course
21  which talks about Scientology?
22       MS. GINAPP:  Objection.  Calls for
23  speculation.
24       THE WITNESS:  I'm not sure.  I don't know
25  where he got this.

Page 156

1  BY MS. BARRAZA:
2    Q   So would you agree with me that this version
3  of the Basic Study Manual Course that we're currently
4  looking at as Exhibit 8 is a non-secular document?
5        MS. GINAPP: Objection.  Form.  Foundation.
6        THE WITNESS:  Yes, I would agree that --
7  actually, no, because it doesn't address spiritual
8  being or the afterlife.  I mean, it says the word
9  "Scientology."
10  BY MS. BARRAZA:
11   Q   It says that you should now do the further
12  Scientology service; is that correct?
13   A   So, I know what you have the objection to, is
14  the word "Scientology," which is what I addressed.
15  Just because there's a word in something -- I mean,
16  people say "God" in their diction on an everyday basis.
17  It doesn't mean that they're discriminating against
18  people that aren't Christian.
19   Q   Am I correct that paragraph two is saying,
20  "There is a further Scientology service which you
21  should now do"?
22       MS. GINAPP:  Objection.  Asked and answered.
23  The document speaks for itself.  Argumentative.
24       THE WITNESS:  That's what it says right there.
25  /////

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

1  BY MS. BARRAZA:
2     Q   Okay.  Just to clarify, there's no actual
3  document which can verify your testimony today that
4  none of the Real Water employees have ever been given
5  this version of the Basic Study Manual Course which
6  includes this end note?
7        MS. GINAPP: Objection. Form. Foundation.
8        THE WITNESS: Not present here.
9  BY MS. BARRAZA:
10    Q   Are you aware of any document that exists?
11    A   I can't speak to whether or not there is or
12 not one because I would need to investigate.
13    Q   Okay. Well, I'll ask you to investigate that
14 and supplement it if you do find any document.
15    A   Uh-huh.
16    Q   Let's go on to the next page of this packet --
17 sorry -- page 251. All right. I'll give you a minute
18 to read through that to yourself. Let me know when
19 you're done.
20    A   I'm somewhat familiar with it.
21    Q   Okay. Explain to me how this specific
22 document is not an endorsement of Scientology.
23       MS. GINAPP: Objection. Form. Foundation.
24       THE WITNESS: This document that's not the one
25 in use in the Real Water course room speaks for itself.

1  BY MS. BARRAZA:
2     Q   I'm asking you: What is Real Water's position
3  as to this document? Does this document endorse
4  Scientology in any way?
5        MS. GINAPP: Objection. Form. Foundation.
6        THE WITNESS: Is there something wrong with
7  people having their own set of beliefs? Because I feel
8  persecuted for my set of beliefs. I feel like you, in
9  particular, are upset that I have a different set of
10 beliefs. I don't get upset with any of my employees.
11 We don't push the religion on anybody. Nor, do we
12 promote it. This whole thing is -- this whole line of
13 questioning that you're doing is, you're trying to
14 vilify me for my beliefs.
15 BY MS. BARRAZA:
16    Q   Are you personally a Scientologist?
17    A   I am.
18    Q   Do you personally talk about Scientology at
19 all at work?
20    A   Not unless someone asks me about it.
21    Q   Has anyone ever asked you about it?
22    A   Over the many years that I have worked there,
23 yes, people have asked me about it.
24    Q   What kind of things do they ask you about?
25    A   "What is it?"

1     Q   How do you respond?
2     A   It's applied religious philosophy that deals
3  with different aspects of life and allows you to be
4  happier and live a better life.
5        MS. GINAPP: I'm going to object to this
6  general line of questions on the grounds that it's
7  outside the scope of the Rule 30(b)(6) notice.
8  BY MS. BARRAZA:
9     Q   Is Real Water familiar with any Real Water
10 employees who have converted to Scientology during
11 their time of employment at Real Water?
12       MS. GINAPP: Objection. Form.
13       THE WITNESS: It's not something we keep track
14 of, nor pay attention to.
15 BY MS. BARRAZA:
16    Q   So are you aware of any Real Water employees
17 who have converted to Scientology?
18       MS. GINAPP: Are you asking him as the
19 corporate representative or personally?
20 BY MS. BARRAZA:
21    Q   I'm asking you personally.
22       MS. GINAPP: Okay. Then I'll object as to
23 this binding the company.
24       THE WITNESS: Not that I'm aware of.
25 /////

1  BY MS. BARRAZA:
2     Q   So assuming that this Exhibit 8, the Basic
3  Study Manual Course, is not in use, as you've just
4  testified today, if this packet, if this course,
5  specific course, were in use, would Real Water see fit
6  that page RW-251 would be included?
7        MS. GINAPP: Objection. Calls for
8  speculation. Incomplete hypothetical.
9        THE WITNESS: It's not in use because we don't
10 think it should be.
11 BY MS. BARRAZA:
12    Q   You don't think what should be in use?
13    A   This course check sheet.
14    Q   You're talking about, in general, this whole
15 version of the Basic Study Manual Course?
16       MS. GINAPP: Objection. This isn't the whole
17 version of the Basic Study Manual Course.
18 BY MS. BARRAZA:
19    Q   Okay.
20    A   It's not the whole version of the Basic Study
21 Manual Course.
22    Q   Why doesn't Real Water think this version of
23 the Basic Study Manual Course is not appropriate to be
24 used?
25    A   Because we respect the religious beliefs of

1  others, and we don't want to enforce any other
2  religious -- our religious beliefs on anybody. And so
3  there shouldn't be -- people should feel comfortable in
4  the workplace.
5      You know, I've met people that dislike others
6  solely on the basis of religion, not just Scientology,
7  but Christianity -- and, you know, Muslim is a big one
8  in the national stage today. And the workplace should
9  be a place where people feel that they don't have their
10  personal beliefs in question, or it's just not a place
11  for it.
12      So based on those viewpoints and those
13  beliefs, that's why we use the other version instead of
14  this version.
15  Q   Let's go to the next page, starting on 252.
16  I'm let you skim through 252 through 264 just briefly.
17      Is it Real Water's understanding that those
18  pages reflect a list of what's been identified as
19  "Basic Scientology Books"?
20  A   Looks like it.
21  Q   Does Real Water have any issue with this list
22  of "Basic Scientology Books" being potentially shown to
23  Real Water employees?
24      MS. GINAPP: Objection. Form.
25      THE WITNESS: Honestly, I feel like if this

1  was shown to an employee, it wouldn't be that big of a
2  deal. If someone had a problem with it, you know, we
3  wouldn't have it in their work area. I have a Bible on
4  my bookshelf in my office, you know, and I have
5  meetings in my office where I bring people in, and I
6  have to go over their job performance, or what have
7  you. If someone said, "Hey, I don't like coming into
8  your office because there's a Bible," I probably would
9  remove the Bible. You know what I mean? But just
10  because this is something that has something to do with
11  a religion, we're not trying to convert people and
12  discriminate against their own religious beliefs.
13  That's not a policy or procedure or effort that we're
14  making.
15  BY MS. BARRAZA:
16  Q   Okay. So on the version of the Basic Study
17  Manual Course that you contend is distributed to
18  employees, is there a list of Scientology books in that
19  version?
20  A   No.
21  Q   Okay. Let's go to the next section starting
22  on page 265.
23      This looks to be a list of Scientology
24  churches and organizations. Is that Real Water's
25  understanding of the pages that go to the end of this

1  document?
2  A   I think it speaks for itself. So that's what
3  it looks like.
4  Q   What's Real Water's position on this list of
5  Scientology churches and organizations?
6      MS. GINAPP: Objection. Form.
7      THE WITNESS: As an entity, I think it -- you
8  know, obviously, like I said, this is not the one
9  that's in use in the course room. So it's not one that
10  we have in the office. Personally, I think it's pretty
11  benign because, just because it's a list of where a
12  church is doesn't reflect any effort to discriminate
13  against, trying to convert, promote, you know, that
14  they believe a certain belief, or anything like that.
15  BY MS. BARRAZA:
16  Q   Is it Real Water's position that this list in
17  no way promotes Scientology at all?
18      MS. GINAPP: Objection. Argumentative.
19      THE WITNESS: It obviously in some way tells
20  people where a church is.
21  BY MS. BARRAZA:
22  Q   A Scientology church; correct?
23  A   Yes.
24  Q   I know you just testified that this Exhibit 8
25  version of the Basic Study Manual Course is not in your

1  office, meaning in Real Water's office. But I just
2  want to clarify where this came from, if not the
3  Real Water's office?
4      MS. GINAPP: Objection. Asked and answered.
5  Also misstates testimony.
6      THE WITNESS: I'll have to further investigate
7  to find out exactly where Frank got this one and sent
8  it in. I have a feeling it might have came from my
9  personal bookshelf or my father's personal bookshelf.
10  But I have to clarify that with him.
11  BY MS. BARRAZA:
12  Q   Do any of these Real Water courses listed on
13  Exhibit 7 talk about suppressive persons?
14  A   I can't say -- I know there's -- most of the
15  vast majority of these courses do not. However, I know
16  there's one that I don't know if it uses that term or
17  that set of words to describe the concept in that
18  course.
19  Q   What does a "suppressive person" mean?
20      MS. GINAPP: Objection. Form. Foundation.
21      THE WITNESS: Per the dictionary, "suppress,"
22  to put down or make less of. "Person" is an
23  individual. So someone that -- putting them
24  together -- someone that has bad intentions for
25  somebody else, or something along those lines.

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

1  BY MS. BARRAZA:
2    Q   Where did you personally first hear the term
3  "suppressive person"?
4       MS. GINAPP: Objection. Form.
5       THE WITNESS: Personally?
6       MS. GINAPP: And I would also object that it's
7  outside the scope of the deposition notice.
8       THE WITNESS: I don't recall where I first
9  personally heard it.
10 BY MS. BARRAZA:
11   Q   Have you ever heard that term used in a
12 Scientology setting?
13   A   Yeah.
14   Q   In what way do Scientologists use that term?
15      MS. GINAPP: Objection. It's outside the
16 scope of the deposition notice.
17      THE WITNESS: They use it to describe somebody
18 that has malicious intent towards another person or
19 group.
20 BY MS. BARRAZA:
21   Q   Is it Real Water's position that the term
22 "suppressive person" has no religious undertones
23 whatsoever?
24      MS. GINAPP: Objection. Outside the scope of
25 the deposition notice. Sorry. Also form, in general.

1       THE WITNESS: I don't know where this is
2  coming from because we don't have any documentation,
3  and we don't promote the term "suppressive person" to
4  any of our employees. I think you probably looked
5  something up online and thought it might be an avenue
6  to investigate.
7       But as in any religion, you use language to
8  portray ideas. So just because a certain grouping or a
9  word is in the Bible, or the Koran, or Vedic's, doesn't
10 mean that it has to be and come from that, or it's
11 religious.
12      So, yes, that term, those two words are used
13 in Scientology to describe an idea so it can be
14 communicated and understood to somebody else.
15 BY MS. BARRAZA:
16   Q   Can Real Water understand how, if an employee
17 sees the term "suppressive person" or hears the term
18 "suppressive person" used at Real Water, they could
19 potentially associate it with Scientology?
20      MS. GINAPP: Objection. Speculation.
21 Incomplete hypothetical. Form. Foundation.
22      THE WITNESS: Yeah, I think it's -- I don't
23 think the common person knows or believes that that's a
24 Scientology term.
25      MS. BARRAZA: Okay. Let's do this next, 9.

1       (Exhibit 9 marked)
2  BY MS. BARRAZA:
3    Q   I just handed you what's been marked as
4  Exhibit 9. I'll represent this is relevant pages from
5  what's been disclosed in this litigation from
6  Real Water as the "Formulas for Business Success"
7  course document.
8    A   Correct. Looks like that to me.
9       MS. GINAPP: I'm going to lodge a continuing
10 objection to this exhibit on the basis that it's
11 incomplete.
12 BY MS. BARRAZA:
13   Q   So this, if I'm correct, is on the list of
14 Real Water courses, on the list of optional Real Water
15 courses as number 4. Is that also your understanding
16 that this is part of the optional Real Water courses?
17   A   It is an optional course, yeah.
18   Q   Okay.
19   A   I don't know what number it is -- here it is.
20 Yep, sure looks like number 4.
21   Q   Okay. Briefly explain to me what "Formulas
22 for Business Success" is all about.
23   A   It kind of goes over the ideas, first, of --
24 it kind of gives some examples of some larger-scale
25 events in our history, governments, companies, and the

1  different time periods or conditions that they went
2  through that ultimately either led to their success or
3  failure. And gives kind of an explanation of the
4  different types of times or conditions that they were
5  operating in. And it kind of gives an idea of that.
6       And then it goes into actually putting names
7  to those types of conditions that an entity, or a
8  government, or a person, or what have you, can be in.
9       And then it gives you certain steps that,
10 based upon the identification of the specific condition
11 that you're in, to improve that condition, and
12 basically do better at whatever that is, whether it's
13 your personal life, the business, the government,
14 the -- whatever.
15   Q   Does it talk about communism in this document?
16      MS. GINAPP: Objection. Form. Foundation.
17      THE WITNESS: I know in the first couple
18 pages, it talks about socialism.
19 BY MS. BARRAZA:
20   Q   What does it say about socialism?
21   A   "Socialism fails, and it always fails, because
22 of two factors: The government seeks to run the
23 individual, and; socialism unmocks companies."
24   Q   Do you think that's appropriate to have a
25 document given to employees which talks about socialism

1  or communism and whether or not those are good notions
2  to live by?
3       MS. GINAPP: Objection.  Outside the scope of
4  the Rule 30(b)(6) deposition notice.  Form.
5  Foundation.
6       THE WITNESS:  It obviously clearly doesn't say
7  that socialism and communism are goods ways to live by.
8  So your question was a little bit incorrect there.
9  However, with that correction, I don't feel that it's
10 not inappropriate.  If someone did have an issue with
11 it, however -- you know, again, these courses are
12 optional.  They don't have to do them.  They can skip
13 this one and go on to the next one, or not do them at
14 all, or whatever.
15      But, you know, I think the general populous
16 here in America thinks that communism and socialism --
17 well, we've kind of got an increase in the popularity
18 of socialism and communism recently.  But a lot of
19 people don't think that they're very good ways to
20 govern.
21 BY MS. BARRAZA:
22   Q   Let me point to page RW-1110 in this packet.
23 You'll see towards the bottom of this document the term
24 "suppressive person" is defined.  So I didn't just pull
25 that term out of nowhere.  It actually came from

1  Real Water's documents that they disclosed to us.
2    A   There we go.  Good.  We found it.
3    Q   Is it Real Water's position that there's no
4  problem with the term "suppressive person" being in a
5  document that it implements in part of an optional
6  course?
7    A   No.  Again, it's optional.  There's no mention
8  of anything religious.  It doesn't address somebody as
9  a spiritual being or in the afterlife.  And it's solely
10 used in the glossary to explain an idea or a concept.
11 I mean, if you even just take a minute and think --
12 have you ever been encountered with somebody that just
13 really had it out for you?  How did you feel when you
14 were around them?  Not very good; right?
15   Q   All right.  Moving on: Would Real Water be
16 surprised if an employee indicated that they were
17 offended by seeing the term "suppressive person"
18 because they associate that with Scientology?
19      MS. GINAPP: Objection.  Form. Foundation.
20      THE WITNESS:  Me, personally?  I would --
21 yeah, I'd probably be surprised because, one, I've
22 never heard it as an issue or a problem before from
23 anybody.  And generally, when I have heard it outside
24 of the workplace said to me in a derogatory,
25 discriminative way towards my beliefs, the person

1  didn't understand what the term was, and so it's kind
2  of just a misunderstanding.  And I'd be surprised
3  because it's never really came up.  And just because
4  two words are used within a religious, you know, text
5  or work, it doesn't mean that that, those two words
6  solely only mean this religion.
7  BY MS. BARRAZA:
8    Q   Does Real Water understand how some employees
9  might be hesitant to actually complain about some of
10 the text that's in documents that they need to review
11 if they want to get their 25-cent raise?
12      MS. GINAPP: Objection.  Asked and answered.
13 Calls for speculation.  Incomplete hypothetical.  Form.
14 Foundation.
15      THE WITNESS:  I truly believe that the culture
16 we have at our company is one that encourages, if
17 someone has an issue or a problem, that they are
18 welcome to bring it up and have it be addressed in a
19 way that they'll feel good about.
20      I take offense to when people are mistreating
21 other employees.  You know, just the other week, there
22 was an issue between two employees.  And one was -- you
23 know, not to get all into it -- doing -- you know,
24 making fun of the other one, for whatever reasons, and
25 the other one didn't like it, and what have you.  And

1  so we made sure that it got addressed, and the person
2  that was doing the insults was corrected.  And, you
3  know, I personally talked to the person that was being
4  insulted, and I said, "Look, we don't want you to feel
5  unwelcome here, you need to feel welcome, it's very
6  important that you feel that way."
7       So, you know, I honestly don't think that
8  people would feel hindered to bring up an objection,
9  because I've been around this company for a long time
10 I've dealt with interpersonal disputes more than I'd
11 like to, because it usually comes down to something
12 stupid.  And I don't want people to feel that way.  And
13 I think that my employees, or our employees don't.
14 BY MS. BARRAZA:
15   Q   Is there another version of the "Formulas for
16 Business Success" that's out there that --
17   A   I'm not sure.
18   Q   So is Real Water prepared to testify today
19 that this version marked as Exhibit 9 is actually part
20 of the Real Water course and given to employees who
21 want to do that course?
22   A   Yes.
23   Q   Okay.  Has anybody ever complained to
24 Real Water about any of the 18 courses listed on the
25 course list?

1    MS. GINAPP: Objection. Form.
2    THE WITNESS: Not that I'm aware of. I don't
3 know of any written complaints to where it's gone to
4 that degree where they were that offended, or that
5 upset, or what have you. But I can't say for any
6 verbal objections or, you know, misunderstandings, or
7 what have you. But, again, they're optional. So, you
8 know, it's not like -- if someone says they don't want
9 to do it, it's not like, well, we go, "Well, why don't
10 you want to do it?" We just go, "Okay."
11 BY MS. BARRAZA:
12    Q   Was Real Water ever put on notice that Grecia
13 had any objection to either the orientation videos or
14 any of the optional Real Water courses because she felt
15 they were Scientology related?
16    **A   At the time of her employment, no. The first**
17 **instance of knowledge of her being upset with it was**
18 **when the lawsuit was filed.**
19    Q   In your preparation for today's testimony, did
20 you talk to Bonnie Mercado and ask her if Grecia ever
21 talked to Bonnie about this and indicated she had
22 problems with any of the orientation videos or the
23 optional courses?
24    **A   Yeah, I've talked to her about that. And she**
25 **said that that didn't come up as a major objection or**

1 **something that was an issue or a problem that Grecia**
2 **ever lodged.**
3    Q   What about as a minor objection?
4    **A   No.**
5    Q   Okay.
6    **A   I mean, she never even did any of the courses.**
7 **She didn't do it. She watched the videos, and her**
8 **reviews were, you know, glowing. She said she loved**
9 **it. But a year and a half later during a political**
10 **cycle --**
11    Q   All right. Did Real Water ever conduct any
12 investigation after receiving notice of this lawsuit to
13 determine whether or not Bonnie Mercado's side of the
14 story is right, that Grecia indeed never did complain
15 at all about any of the videos or any of the courses?
16    **A   Other than -- yes -- reviewing the**
17 **documentation within Grecia's personnel file, which**
18 **we've already discussed and gone over; having the**
19 **conversations with Bonnie and Jeramy, which we've**
20 **discussed and gone over; and the non-optimum reports,**
21 **reviewed those. You know, it's kind of too late to**
22 **call those stores again a year and a half later. That**
23 **wouldn't have been much use. I reviewed her movie**
24 **reviews and the different things, the text messages**
25 **that she sent Bonnie that were threatening, and all**

1 **that.**
2    Q   Let's go to page RW-1113 in Exhibit 9. Looks
3 like this is an "About the Author" section. Is that
4 your understanding of it?
5    **A   Uh-huh.**
6    Q   Does Real Water have any kind of objection
7 with giving its employees a document which talks about
8 L. Ron Hubbard, the founder of Scientology, at all?
9    **A   No.**
10    Q   Read for me into the record the second
11 sentence in the fourth paragraph of that page you're
12 on, 1113.
13    **A   "Having traveled wildly through Asia as a**
14 **youth" -- or -- "widely" -- excuse me -- "through Asia**
15 **as a youth, he realized that neither East nor West**
16 **contained the full answer to the problems of**
17 **existence."**
18    Q   Does Real Water understand how some employees
19 could read that and interpret that in a religious way?
20    **A   No.**
21    MS. GINAPP: Objection. Form. Foundation.
22    THE WITNESS: It doesn't have anything to do
23 with religion, spiritual being, or addressing the
24 afterlife.
25 /////

1 BY MS. BARRAZA:
2    Q   You don't think the "problems of existence"
3 has anything to do with religion at all?
4    **A   No.**
5    MS. GINAPP: Objection. Form.
6 BY MS. BARRAZA:
7    Q   Okay.
8    **A   When you take courses in philosophy in**
9 **college, are they considered religious courses?**
10    MS. BARRAZA: Let's go to my next exhibit.
11 This is 10.
12    (Exhibit 10 marked)
13 BY MS. BARRAZA:
14    Q   This document marked as Exhibit 10, I'll
15 represent to you is relevant pages from what has been
16 disclosed from Real Water as the "Speaking from
17 Experience" course.
18    MS. GINAPP: I'm going to lodge a continuing
19 objection to this exhibit as incomplete.
20 BY MS. BARRAZA:
21    Q   Okay. Do you recognize the "Speaking from
22 Experience" course?
23    **A   This book, yes.**
24    Q   What briefly is this book about?
25    **A   This book is a very concise overview of the**

Electronically signed by Mary Cox Daniel (101-361-287-3117)                                    c773ac71-bef8-43c9-b345-181b55e3b981

1  management, Hubbard Management Technology.  Somebody
2  decided to compile certain parts of this technology and
3  put it into this book format to introduce people to
4  that style of company administration, and policies, and
5  procedures, and -- et cetera.
6      Q   Is it Real Water's opinion that participating
7  in this "Speaking from Experience" course will help a
8  brand ambassador in his or her duties?
9      A   Yeah.  It goes over one of the policies and
10  procedures that we use as far as evaluating persons'
11  job performance, which is statistics.  We actually have
12  them count how many bottles that are sold whether
13  they're in a store, et cetera.  And then we use that
14  value for that time, compare it to other times, whether
15  it be for the week, for that specific store.  So maybe
16  when they went to that store on the beginning of
17  March -- let's say, as an example -- and then when they
18  returned to that store at the end of March.  Did they
19  do better at that store?  Did they do worse at that
20  store?  That's one example of how the information
21  contained in this book could help a brand ambassador.
22      Q   Okay.  Let's go to page 1312 of Exhibit 10.
23  I'll have you read the last sentence -- I mean -- the
24  first sentence of the last paragraph of that document.
25      A   "Mr. Hubbard was a man of amazing

1  accomplishment."
2      Q   Sorry.  Continue on to the next sentence.
3      A   "Although many of his years were spent in the
4  development of Scientology, it was only one facet of
5  his incredible contribution to mankind."
6      Q   Does Real Water have any objection with this
7  document being in part of the Real Water course that it
8  distributes to its employees for the optional raises?
9      A   No.
10      Q   Does Real Water understand how a document
11  which indicates Scientology as an "incredible
12  contribution to mankind" can be seen as imposing
13  religion on to its employees?
14      A   No.
15          MS. GINAPP:  Objection.  Calls for
16  speculation.  Form.  Foundation.
17          THE WITNESS:  I mean, if you follow that logic
18  that you just put across, you're basically agreeing
19  that we -- that one religion should eradicate the other
20  religion.  That's not how I feel.  I feel you should
21  respect the other religious beliefs of someone else.
22  BY MS. BARRAZA:
23      Q   Now, does Real Water have any kind of
24  documents that it distributes to its employees that
25  mentions other religions besides Scientology?

1      A   "Just Do It" is done by a Christian.  I think
2  he's -- I can't remember if he's a Priest, or a Pastor,
3  or a Father, or whatever his term is, or what have
4  you -- but, Art Williams -- you can look him up.  He's
5  got a Wikipedia page, and you can probably get it
6  pretty quick.
7      Q   Is it Real Water's position that the contents
8  of the "Just Do It" video promotes any kind of
9  religion?
10      A   No.
11      Q   Is it Real Water's position that the contents
12  of "Just Do It" mentions any kind of religion?
13      A   No.
14      Q   Let's review -- just so I can get Real Water's
15  testimony the "Speaking from Experience" document --
16  are there any other versions of the "Speaking from
17  Experience" document out there that Real Water uses?
18      A   Not -- that Real Water uses?  No.  I'm sure
19  there's other editions of the book.  And if I was to
20  look over the whole time that we've ever had a copy of
21  "Speaking from Experience" on the premise of
22  Real Water, there might have been a different
23  copyrighted version, because, you know, when books are
24  released and they're sold on a continuous basis,
25  there's little things that are changed, and updated,

1  and what have you.  But, no, this looks like the
2  version that we have on our premises.
3      Q   So it's only the Basic Study Manual which had
4  the list of the Scientology churches, and which
5  indicate you should now participate in Scientology that
6  Real Water is testifying was not part of the course?
7          MS. GINAPP:  Objection.  Form.
8          THE WITNESS:  Yeah, that check sheet is the
9  only one out of the three that we just reviewed that is
10  not in use at Real Water.
11  BY MS. BARRAZA:
12      Q   Okay.  Was it ever in use?
13          MS. GINAPP:  Objection.  Asked and answered.
14          THE WITNESS:  I think I just realized where it
15  came from.
16          MS. GINAPP:  Okay.
17  BY MS. BARRAZA:
18      Q   Go ahead.  Where do you think it came from?
19      A   Well, I'd rather verify it before I put it on
20  the record.  But I think I just realized where it came
21  from.
22          Sorry.  Ask your question again.
23      Q   Was the version that I produced to you as
24  Exhibit 8 ever, ever used as part of the courses?
25      A   No, not offered through the course room or

1   that program that's in Real Water.
2      Q   All right. I'll ask you to supplement your
3   Real Water's written discovery with any kind of
4   accurate information that comes about as to which Basic
5   Study Manual was implemented.
6      A   Sure, no problem.
7      Q   Okay. Did Real Water offer its employees the
8   opportunity to read "The 10X Club"?
9      A   It's a book called "The 10X Rule."
10     Q   Okay.
11     A   We have a term that we use. It's "The 10X
12  Club." And when someone has read the book, they're in
13  The 10X Club.
14     Q   When did that program begin?
15     A   A year ago, something like that.
16     Q   Would it have been before or after October of
17  2015?
18     A   I don't know the exact date. I was trying to
19  think of that, actually, earlier today. And I would
20  have to verify that it was, if it was before, or prior
21  to Grecia working at Real Water.
22     MS. BARRAZA: Okay. Let's mark this.
23     THE WITNESS: But if you have something that
24  says, great.
25     (Exhibit 11 marked)

1      THE WITNESS: Hey, there we go, October 1st.
2   Look at that.
3   BY MS. BARRAZA:
4      Q   Can I assume that the date at the top, October
5   1st, 2015, corresponds with the date that this document
6   was actually created or distributed?
7      A   Yeah, somewhere, I'm sure it was around that
8   time.
9      Q   Now, explain to me -- it says on here, if you
10  read "The 10X Rule" within one week, you get $150;
11  within two weeks, you get $100; within three weeks you
12  get $50. Is that your understanding?
13     A   Yes.
14     Q   Okay. Why was that system put into place?
15     A   Well, first, I'd like the record to indicate
16  that this was for managers, which it explicitly says in
17  the title of, "New Game, All Managers" --
18     Q   Okay.
19     A   -- which didn't apply to Grecia because she
20  was an entry-level employee.
21     However, we did this because Grant Cardone is
22  gaining a lot of fame as a motivational speaker, and
23  being able to give people tools, or viewpoints, or what
24  have you, to sell better, or live a better life, or
25  achieve things. He's a motivational speaker and

1   author.
2      And, you know, on the practical side, a
3   company -- it would behoove that company to have their
4   employees producing more effectively. So if they were
5   able to produce more effectively by reading this, it's
6   good for the company. So it should be good for the
7   employee. They should be compensated and rewarded for
8   that.
9      Q   Now, are any non-manager Real Water employees
10  allowed to participate in The 10X Club and read The 10X
11  Rule in order to get the compensation for it?
12     A   If someone wants to read a book, I am not
13  going to stop them from reading a book.
14     Q   Would Real Water then, in turn, compensate the
15  employee if they completed it within the one week, the
16  two weeks, or the three weeks?
17     A   Uh-huh.
18     MS. GINAPP: The manager employee?
19     MS. BARRAZA: The non-manager employee.
20     MS. GINAPP: Oh, the non-manager employee.
21  Oh, okay.
22     THE WITNESS: Yeah.
23  BY MS. BARRAZA:
24     Q   Okay. It indicates here at the bottom, "Brent
25  just orders more copies of the book." I assume that's

1   referring to Brent Jones; is that correct?
2      A   Yeah. I believe there's a typo. I think it
3   was supposed to be, "Just ordered," not "orders," but,
4   "Ordered more copies of the book."
5      Q   Okay. Where did Brent Jones order copies of
6   the book from?
7      A   We usually get them off of Amazon. They sell
8   a lot of books.
9      Q   Now, we went over how Real Water pays WISE in
10  order to get the documents for the optional Real Water
11  courses; is that correct?
12     A   Yes.
13     Q   Okay.
14     A   And the ability to do so.
15     Q   Okay. Now, does Real Water receive any kind
16  of compensation whatsoever from WISE?
17     MS. GINAPP: Objection. Asked and answered.
18     THE WITNESS: No.
19  BY MS. BARRAZA:
20     Q   When employees fill out the corresponding
21  documents for the optional Real Water courses, does
22  Real Water send any of those documents back to WISE?
23     A   No.
24     Q   Does Real Water do anything with those
25  documents aside from storing them in the employee's

Electronically signed by Mary Cox Daniel (101-361-287-3117)   c773ac71-bef8-43c9-b345-181b55e3b981

1  employment file?
2  **A   No.**
3       MS. GINAPP:  Objection.  Asked and answered.
4  BY MS. BARRAZA:
5  Q   Okay.
6  **A   There's no conspiracy going on.**
7  Q   Is it Real Water's position that "The 10X
8  Rule" book is a purely secular book?
9  **A   Yes.**
10  Q   When did Real Water first become aware that
11  Grecia had filed a Charge of Discrimination?
12  **A   When somebody from your office probably**
13  **notified the local press and they showed up at our**
14  **office, and it was on local news, and national**
15  **headlines, and newspapers.**
16  Q   So you're telling me local press showed up at
17  Real Water's business?  Is that what you're saying?
18  **A   Yeah.  My father and I were running for**
19  **election here in Nevada, elected offices.  And it was**
20  **three weeks before the election.  And someone probably**
21  **thought it would be bad press for our election for this**
22  **to be coming up.**
23  Q   Approximately when was this?
24       THE WITNESS:  What was the date it was filed?
25       MS. GINAPP:  Just you have to answer to the

1  best of your recollection, if you recall.
2       THE WITNESS:  We didn't look at the original
3  Complaint, did we, or filing -- deposition --
4       MS. GINAPP:  It's not in there.
5  BY MS. BARRAZA:
6  Q   Would you say it would have been earlier this
7  year of 2016?  Would it have been last year, 2015?
8  **A   It was earlier this year.  And it was, I**
9  **believe, the day that it was filed, because we hadn't**
10  **even been served before the news van showed up at our**
11  **office.**
12  Q   Okay.  Now --
13       MS. GINAPP:  Just to clarify for the record,
14  they were never served with the Charge of
15  Discrimination.
16       MS. BARRAZA:  Okay.  Got it.
17       THE WITNESS:  Oh.
18  BY MS. BARRAZA:
19  Q   Has Real Water ever seen the Charge of
20  Discrimination that Grecia filled out with the Nevada
21  Equal Rights Commission?
22  **A   I believe somebody has reviewed that, yes.**
23       MS. BARRAZA:  We'll mark this Exhibit 12.
24       (Exhibit 12 marked)
25       (Discussion off the record)

1       (Recess)
2  BY MS. BARRAZA:
3  Q   I've just handed you Exhibit 12.  Have you
4  ever seen this document?
5  **A   I think -- yeah, I think I've seen it before.**
6  Q   When was the first time that you saw it?
7  **A   In preparation for this, maybe within a last**
8  **month or so.**
9  Q   It looks like this document is filled out by
10  Grecia.  Is that your understanding?
11  **A   Looks like it, yeah, because she signed it at**
12  **the bottom.**
13  Q   Looks like it's dated December 15, 2015.  Is
14  that your understanding?
15  **A   Looks like it.**
16  Q   It states within, "The Particulars:  I had to
17  watch videos during orientation and then take a test
18  afterwards.  However, the videos I had to watch were
19  based upon L. Ron Hubbard and Scientology."
20       Now, does Real Water agree or disagree with
21  that statement?
22  **A   Disagree.**
23  Q   Okay.
24  **A   Because in order for it to be a test, there is**
25  **some grading system involved.  It was solely a review**

1  **that was not graded, so it could not be or understood**
2  **as a test.  And the videos and mention, which we've**
3  **gone over today, are secular and don't have anything to**
4  **do with Scientology.  Some of them don't even have**
5  **anything to do with L. Ron Hubbard.**
6  Q   What about her statement that she had to watch
7  the videos?  Does Real Water agree or disagree with
8  that?
9  **A   Well, I'm glad you brought that up because,**
10  **obviously, it's -- the hiring procedure is presented in**
11  **a fashion of steps to do.  For instance, have the**
12  **person fill out an application.  You know, make sure**
13  **it's correct, et cetera.  Do the employment agreement.**
14  **Do other employment forms.  Have them watch this video.**
15  **Have them watch that video.  Take them around the**
16  **office to introduce them to the people in their work**
17  **areas.  You know, et cetera, step-by-step procedure.**
18       **So the person administering the checklist will**
19  **basically go through and administer the checklist, and**
20  **approach the individual, the new hire, and say, "Okay,**
21  **the next thing we're going to do is watch this video."**
22  **If they object -- which I can't think of a time anybody**
23  **did object, you know, and really didn't want to watch**
24  **them -- then it would be fine.  But it's by no means**
25  **enforced, or made, or pushed on someone that they have**

1  to watch them.
2      Q   Does Real Water have any kind of policy
3  insofar as making sure that its supervisors are writing
4  down any instance or reporting any instance where an
5  employee does indicate that he or she doesn't want to
6  watch any of the orientation videos or participate in
7  any of the optional courses?
8      A   Did you ask if there's a written policy or
9  procedure?
10     Q   Right.  Is there a written policy or
11 procedure?
12     A   I don't believe we have one.  But as a general
13 sort of understanding, you know, the employee files
14 there is a documented record of that person's
15 employment history.  And if someone did, then I could
16 see how someone would interpret that purpose of those
17 employment files that they would write a note saying
18 they didn't want to watch this, or what have you, maybe
19 on the checklist itself and say, oh, they refused to
20 watch this.
21     Q   Have you ever seen any of those notations
22 being made?
23     A   No.
24     Q   Let's go to the next page of this exhibit.  At
25 the top, it says, "In order to get a 25-cent raise, I

1  had to read a Scientology book and answer questions to
2  Clare."
3          It goes on:  "I never felt comfortable reading
4  books pertaining to religion in order to get a raise.
5  However, Brand Ambassador Bonnie Mercado was persistent
6  that I read these books pertaining to Scientology.  I
7  complained to Ms. Mercado on more than one occasion
8  that I did not see the purpose of religion being the
9  primary reason I do and/or do not get a raise."
10         Now, does Real Water agree or disagree with
11 those statements?
12         MS. GINAPP:  Objection.  Form.  Foundation.
13         THE WITNESS:  I was unable to find any proof
14 that she actually did one of the courses.
15 BY MS. BARRAZA:
16     Q   You're talking about the optional courses?
17     A   Correct, regarding to the 25-cent raise.
18         I was never able to find any documentation
19 proving that she did do any of those courses.  So I
20 object to that based on the -- you know, that there's
21 no documentation showing that.  And she's not
22 required -- was never required to do it, even if she
23 did.  And as she acknowledged in the employment
24 agreement, the proper procedure, if she did have a
25 complaint, was to put it in writing, which was never

1  done.
2      Q   Does Real Water have any reason to believe
3  that Grecia's statement that she complained to
4  Ms. Mercado on more than one occasion about the courses
5  is inaccurate?
6          MS. GINAPP:  Objection.  Form.
7          THE WITNESS:  Ask that again, please.
8  BY MS. BARRAZA:
9      Q   Does Real Water have any reason to believe
10 that when Grecia states that she complained to
11 Ms. Mercado on more than one occasion about the
12 Real Water courses, that that statement is not the
13 truth?
14     A   Yes and no.  Yes, because based on, of how she
15 acknowledged in the employment agreement, the proper
16 procedure for lodging a complaint is to put it in
17 writing.  No document was -- has been found to that
18 nature.  However, I don't personally know Grecia, so I
19 couldn't be a good judge of her character.
20     Q   Okay.  Just to clarify:  Real Water never
21 received notice of this Exhibit 12 until when?
22     A   I don't know the exact date when we received
23 this.  I would imagine, because I'm -- at least from my
24 experience in the past, when something is filed with a
25 government agency, it's then mailed out after its

1  processing to the person it's being filed against, that
2  we did get a copy, and then sent it to the TotalSource,
3  which dealt with our employment insurance, et cetera.
4      Q   Does Real Water have any knowledge of
5  TotalSource conducting any kind of investigation into
6  the allegations of this charge?
7      A   Yeah, I believe that they did.
8      Q   What were their findings?
9      A   That she had prior instances of Workers' Comp
10 claims, et cetera, et cetera, and different things, and
11 that this is something that they would cover with the
12 insurance.
13     Q   Now, I want to go back to when you mentioned
14 that approximately earlier this year the press showed
15 up at Real Water's building and started asking
16 questions about this lawsuit; is that correct?
17     A   Uh-huh.
18     Q   At that point, did anybody from Real Water
19 speak to the press?
20     A   I don't think so.
21     Q   Has anybody from Real Water ever spoken to the
22 press about this lawsuit?
23     A   Yeah.  They reached out to us to comment, of
24 course.  And we set up an interview with Channel 13, I
25 think it was.  And an interview of Brent Jones was

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

1  **conducted at our office by Channel 13.**
2     Q    What knowledge of this case did Brent Jones
3  talk about at the interview?
4        MS. GINAPP:  I'll object.  Outside the scope
5  of the Rule 30(b)(6) deposition notice.
6        THE WITNESS:  His belief of the reasoning why
7  it was filed and made sensationalized.
8  BY MS. BARRAZA:
9     Q    Did Brent Jones do any other interviews, aside
10  from that Channel 13 interview you just mentioned,
11  regarding this lawsuit?
12    **A    I'm sure he -- I can't speak specifically.  I**
13  **don't know if he did or not.  I can't recall if he did**
14  **or not other than that one.**
15    Q    Okay.  Was that one -- would that be
16  considered an interview on behalf of Real Water or on
17  behalf of himself?
18    **A    Both.**
19    Q    What about any other interviews he's
20  potentially done, would that be both on behalf of
21  himself and Real Water?
22    **A    I can't speak to those interviews because I**
23  **don't know the record of them.**
24    Q    Besides Brent Jones doing the Channel 13
25  interview, have you personally done any interviews with

1  the press regarding this lawsuit?
2     **A    No.**
3     Q    What about any other individuals?
4     **A    Interviews?**
5     Q    Interviews, or anything of this sort that
6  would be a communication with the press?
7     **A    No.**
8     Q    What about Bonnie Mercado?
9     **A    She did, I believe -- oh, no -- we -- I don't**
10  **believe she did.  I don't believe she did.  We offered**
11  **Channel 13 if they wanted to interview her, and I don't**
12  **think they did, if I remember correctly.  At least, it**
13  **wasn't aired.**
14    Q    Now, what knowledge does Real Water have, did
15  Real Water have back in 2015, about Grecia's medical
16  situation?
17        MS. GINAPP:  Objection.  Form.  Foundation.
18        THE WITNESS:  The only knowledge we have was
19  the results of, obviously, the accident that she got
20  herself into in a company vehicle twice; and then
21  subsequent doctor's reports, et cetera, et cetera; and
22  the ongoing investigation to the validity of the
23  continued condition with the Workers' Comp claim.
24  BY MS. BARRAZA:
25    Q    So when was her first accident with the

1  company vehicle?
2        MS. GINAPP:  I'm going to object to this line
3  of questioning as being outside the scope of the Rule
4  30(b)(6) notice.
5        THE WITNESS:  I don't recall the specific
6  date, but I believe it was a month or there she had
7  started, somewhere in that range.  But I could be
8  wrong, but somewhere in the first half of her
9  employment.
10  BY MS. BARRAZA:
11    Q    Is it Real Water's position that Grecia's
12  accidents and her subsequent Workers' Compensation
13  claims had anything to do with her termination?
14    **A    No.  We actually adopted a new position for**
15  **her because of her requests to not have to drive as**
16  **much as she -- as the position entailed when she was**
17  **originally hired and agreed to.  Originally, she was**
18  **hired and agreed to the position of traveling out of**
19  **town by means of car.  And she, you know, after the**
20  **accident, said she didn't want to do that anymore.  And**
21  **we said, "Okay, we will change the position structure**
22  **to meet your needs."**
23    Q    When did that change in Grecia's position take
24  place?
25    **A    Well, she got into the accident, and then she**

1  **had some time off, if I remember correctly, medical**
2  **leave, what have you.  And then when she came back to**
3  **work -- I think she was gone for -- I don't remember if**
4  **it was two, four weeks, or something.  I'm not sure.**
5     Q    Do you know approximately what month that
6  would have been in 2015?
7     **A    The first half of her employment, somewhere in**
8  **that range.**
9     Q    Okay.  Is Real Water aware of any other kind
10  of medical conditions whatsoever that Grecia had aside
11  from any kind of injury she might have incurred?
12    **A    Of course not.  It's not a policy that we ask**
13  **people about their personal medical history.**
14    Q    Now, does Real Water have a policy insofar as
15  talking to the media about an employee or a former
16  employee's medical condition?
17        MS. GINAPP:  I'm going to object.  Outside the
18  scope of the Rule 30(b)(6) deposition notice.
19        THE WITNESS:  Ask the question again.
20  BY MS. BARRAZA:
21    Q    Does Real Water have a policy about employees
22  talking to the media about a former Real Water employee
23  or a current Real Water employee's medical condition?
24        MS. GINAPP:  Same objection.
25        THE WITNESS:  No, there's no written policy or

1  procedure about an employee talking to the press about
2  an ex-employee or current employee's medical history.
3  BY MS. BARRAZA:
4     Q   Would that be considered appropriate behavior
5  by Real Water?
6        MS. GINAPP:  Objection.  Calls for
7  speculation.
8        THE WITNESS:  Not necessarily, no.  I mean, I
9  think it would kind of depend on the medical problem,
10  or what have you.  But I don't see how that ever really
11  come up very much.  I mean, we're not a huge company
12  that people want to know why the CEO -- whatever -- you
13  know what I mean?  But, generally, no, it's not
14  something that, you know, we would go talking about to
15  individuals about someone's personal information or
16  history.
17  BY MS. BARRAZA:
18     Q   All right.  Is it Real Water's position that
19  all of the policies and procedures regarding religious
20  discrimination were properly followed in this case?
21     A   As far as I can see, yes, because there was
22  never an official complaint per the policy and
23  procedure that Grecia said she would follow, and if she
24  was to encounter any sort of discrimination, religious
25  or other kind.  And, you know, so we weren't aware of

1  any of these feelings if she had them at the time,
2  until now.
3     Q   Who was responsible in 2015 for ensuring that
4  employees follow all the policies and procedures as it
5  relates to religious discrimination?
6     A   The first line would be the individual
7  employees themselves, of course.  And then the next
8  person that would potentially get involved would be
9  their seniors of that specific employee in a specific
10  instance, or human resources division.  And then
11  ultimately, you know, it flows up the corporate
12  structure from there.
13     Q   Would it go all the way to the top, to Brent
14  Jones?
15     A   Of course, because it encompasses the entire
16  company.  And it's everybody's responsibility to make
17  sure that they're not discriminating or being
18  discriminated against.
19     Q   How many employees did Real Water have?  Would
20  you say it was less than 50 in 2015?
21     A   Yes.
22     Q   Does that include -- are there any employees
23  outside of Las Vegas, Nevada?
24     A   No, not at Affinitylifestyles.com, Inc.
25     Q   Okay.

1     A   Actually, I take that back.  There is one now
2  currently.  At the time, no, but one now.  Tony Hart is
3  his name.  He's a salesman in California.
4     Q   We just talked about people responsible for
5  ensuring employees follow policies and procedures
6  regarding religious discrimination.  What steps does
7  Real Water take as a company to ensure that those
8  policies and procedures are being followed?  Is there
9  any kind of special training courses that take place?
10     A   They're educated as far as the policy and
11  procedure of handling any instance where they feel
12  they're religiously discriminated against when they
13  review and sign their employment agreement.  It's very
14  clear on the procedure.  And then we have in the past
15  had our human resources individuals do seminars, or
16  different types of things, in not just specifically
17  religious discrimination, but HR topics in general,
18  which I'm sure religious discrimination is one that has
19  come up, as well as sexual, and racial, and all the
20  other types.
21     Q   Are there any kind of group training
22  activities that take place?
23     A   We've done some, not as, like, a standard,
24  like, we do this every year at this date.  But we've
25  done some.  I've administered some.  And it kind of

1  just depends, you know, if there's a trouble area, if
2  we have some people complaining about a certain aspect,
3  not religious discrimination specifically, but, you
4  know, people not getting along, or people saying
5  they're not getting along with this person, or
6  whatever.  You know, I've pulled some people aside in a
7  given area and say, "Hey, look, you know, we're all on
8  the same team" -- et cetera, et cetera -- "We need to
9  all get along and treat each other with respect."  So
10  we've done that time and time as needed when a
11  situation arises.
12     Q   Can you think of a specific instance of
13  training involving religious discrimination
14  specifically from 2015?
15     A   No --
16     Q   Okay.
17     A   -- not of the one we discussed, other than the
18  training that goes involved with the procedure that
19  they acknowledge to follow in the employment agreement.
20     Q   Now, in addition to the employment agreement,
21  is there also an employee handbook?
22     A   Yes.
23     Q   Is that also given out and reviewed upon hire?
24     A   Yes.
25     Q   Are employees given a copy of that employee

Electronically signed by Mary Cox Daniel (101-361-287-3117)     c773ac71-bef8-43c9-b345-181b55e3b981

1  handbook?
2  **A   Yes.**
3  Q   For them to keep for their own records?
4  **A   If they wish to keep it, yes.**
5  Q   Okay.
6  **A   More often, people don't really care, and they**
7  **throw it away, unfortunately.  But I can't force people**
8  **to do something that they don't want to do.**
9      MS. BARRAZA:  Let's mark this last exhibit.
10         (Exhibit 13 marked)
11  BY MS. BARRAZA:
12  Q   I have just handed you certain pages from what
13  has been produced by Real Water as the employee
14  handbook.
15  **A   Uh-huh.**
16  Q   Okay.  Let go to page RW-127.
17  **A   Okay.**
18  Q   You'll see there's Section 3.1 on
19  non-discrimination.  Am I correct that it does mention
20  religion in here?
21  **A   I see "religion" in the paragraph; correct.**
22  Q   Now, there's no mention in this section about
23  L. Ron Hubbard and his teachings; is that correct?
24  **A   In this specific section right here, I do not**
25  **see it, no --**

1  Q   Okay.
2  **A   -- because --**
3      MS. GINAPP:  Just answer the question she
4  asked.
5      THE WITNESS:  Yeah.
6  BY MS. BARRAZA:
7  Q   If I told you that Real Water has not produced
8  a signed version of the employee handbook signed by
9  Grecia, would that be out of the ordinary?
10  **A   No.**
11  Q   Do employees have to sign off on the employee
12  handbook?
13  **A   No.**
14  Q   Are they just given a copy for their own
15  records?
16  **A   Yes.**
17  Q   Looking at this section on non-discrimination,
18  if you look at the last paragraph, it says:
19      "Employees with questions or concerns about
20  discrimination in the workplace are to bring these
21  issues to the attention of the personnel department.
22  Employees can raise concerns and make reports without
23  fear of reprisal."
24      Now, where in there does it clarify that these
25  concerns need to be raised in writing?

1  **A   "Reports."**
2  Q   So it's Real Water's contention that the word
3  "reports" necessarily means that it needs to be in
4  writing?
5  **A   I think generally.  But there is obviously a**
6  **bit of ambiguity to that term that it could be verbal.**
7  **But that's why we explain it more -- better in the**
8  **employment agreement.**
9  Q   So if a Real Water employee were to give a
10  verbal complaint to a manager, that manager would still
11  be required to respond to that; right?
12  **A   Absolutely.**
13  Q   They wouldn't say, "Well, you didn't put this
14  in writing, so I'm not going to even address this"?
15  **A   No.**
16  Q   Okay.
17  **A   If it was egregious enough, and if the person**
18  **was upset enough, they would probably be encouraged to**
19  **put it in writing so it could actually be acted upon.**
20  **Because, you know, when things are brought up casually**
21  **in a verbal setting, it's not always organized,**
22  **remembered, thought of, taken care of to the best of a**
23  **person's ability, or what have you.  So that's the**
24  **whole purpose of having it in writing, so we have, you**
25  **know, proof that people are going to be held**

1  **accountable to make sure that something is investigated**
2  **properly and resolved.**
3  Q   Now, what is Real Water's knowledge of any
4  prior claims of religious discrimination that has been
5  made against Real Water?
6  **A   Can you define "claim"?  Because that could be**
7  **someone saying something, it could be something filed**
8  **like this.**
9  Q   Okay.  Let's just say any kind of complaint at
10  all, even if it's not a formal lawsuit, any kind of
11  complaint that was made about religious discrimination
12  taking place at Real Water.
13  **A   I'm not aware of one.**
14  Q   Okay.  Is Real Water aware of any other former
15  lawsuits?
16  **A   There's, you know, been threats made by other**
17  **people and demands for payment.**
18  Q   Who else has made threats to Real Water?
19  **A   Lisa Marie Bailey and Matthew Nappi.**
20  Q   Is Real Water aware of any kind of religious
21  discrimination that took place regarding those two
22  individuals?
23      MS. GINAPP:  I'm going to just enter an
24  objection right now that, of course, we can't stop you
25  from asking questions about those lawsuits.  But please

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

1  be aware that, to the extent that you ask in-depth
2  questions about it, we will seek a protective order
3  against further questioning of my client regarding
4  those matters and subsequent litigation.
5       THE WITNESS:  I'm not aware of any claims,
6  written or verbal, brought up at the time of those two
7  employees' employment.
8  BY MS. BARRAZA:
9   Q   What about besides Lisa Marie Bailey and
10  Matthew Nappi, anybody else make any threats to
11  Real Water?
12   **A   I'm not aware of it.**
13   Q   What about subsequent to Grecia's termination,
14  have there been any subsequent complaints about
15  religious discrimination at Real Water?
16   **A   Nothing that we haven't already addressed.**
17   Q   Now, that employee handbook we've been looking
18  at --
19       MS. GINAPP:  Exhibit 13?
20  BY MS. BARRAZA:
21   Q   -- Exhibit 13, has that been given to ADP?
22  Are they aware of that employee handbook?
23   **A   I believe so, yes.**
24   Q   Okay.  Did ADP ever provide any kind of
25  feedback, or want Real Water to make any kind of

1  changes to its employee handbook?
2   **A   There was -- obviously, something like this**
3  **can go through revisions as laws change, state and**
4  **federal.  You know, we do live in a fluid society in**
5  **that regard, so there are revisions that are made.**
6  **This specific exact one, I can't tell you if there's**
7  **ever been any changes made without going through and**
8  **reviewing, you know, all of them.**
9   Q   Okay.
10   **A   But I do know that this was, you know, sent**
11  **over to ADP TotalSource, and I'm sure they reviewed it.**
12  **And nothing is perfect, so I'm sure they had some**
13  **suggestions on certain things, or what have you.  But**
14  **for the most part, there was nothing that bad with it,**
15  **if I remember correctly.**
16   Q   Let me just make sure, as we're beginning to
17  wrap up, is there anything that we've covered that you
18  think you need to clarify for the record?
19   **A   The only thing, which we kind of already**
20  **touched on it a bit, but we can just go over it again,**
21  **is, the requirement or option to view the videos.  You**
22  **know, my definition of "require" would mean that if a**
23  **person doesn't choose to watch the videos, then they're**
24  **fired immediately.  We don't do that.  If -- again,**
25  **it's in the hiring checklist as a step-by-step**

1  **procedure of what someone does and goes through to hire**
2  **an employee -- it's in the paperwork, and then**
3  **obviously the videos.  So it's not proposed to the**
4  **individual as, "Here's this video, you have the option**
5  **to watch it or not."  It's, "Okay, the next thing we're**
6  **going to do is we're going to watch these videos."  And**
7  **they sit down, and they watch them, or they -- if they**
8  **really have an issue -- which I can't recall a time**
9  **that anybody ever has -- they say, "No, I don't want to**
10  **watch this, I really don't want to watch this," okay,**
11  **then it's not going to -- we're not going to force them**
12  **into the chair and hold their eyelids open to watch the**
13  **video.**
14   Q   Then why hasn't Real Water ever put anything
15  in writing, you know, telling the employees, "Hey,
16  these orientation videos aren't required, required,"
17  meaning you're not going to get fired if you don't want
18  to do these videos?
19       MS. GINAPP:  Objection.  Argumentative.
20       THE WITNESS:  It's never been an issue.  No
21  one has ever objected to it.
22  BY MS. BARRAZA:
23   Q   Okay.  After we go off the record after your
24  counsel has gone over any of her questions, I'm going
25  to ask you to provide --

1       THE WITNESS:  Now I have to answer your
2  questions?
3  BY MS. BARRAZA:
4   Q   -- I'm going to ask you to provide me with the
5  contact information you have in your phone for Melissa
6  Nava, Christian Pantelakis, and Clare LaHara.
7       MS. GINAPP:  I'm sorry.  Did you testify that
8  you have their information in your phone?
9       THE WITNESS:  I don't think I do, no.
10  BY MS. BARRAZA:
11   Q   Okay.  You do have their contact information?
12   **A   I have what was on file when they were**
13  **employed.**
14   Q   Okay.  So I'll ask you to look through that
15  and produce that information to us in our discovery
16  process.
17       MS. BARRAZA:  I'll pass the witness.
18       MS. GINAPP:  Okay.  Would you mark that?
19       (Exhibit 14 marked)
20            EXAMINATION
21  BY MS. GINAPP:
22   Q   Will you please take a look at what has been
23  marked as Exhibit 14?  When you're ready to answers
24  questions about it, let me know.
25   **A   Okay.**

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981

Page 209

1  Q   Okay.  Do you recognize this document?
2  **A   Yes.**
3  Q   What do you recognize it to be?
4  **A   The Basic Study Manual Course check sheet and**
5  **pages to write the answers to the different questions,**
6  **and what have you, throughout the course, and the one**
7  **that we use at Real Water.**
8  Q   The one that you use at Real Water?
9  **A   Yes.**
10  Q   The one that you use with your employees for
11  the coursework?
12  **A   Correct.**
13  Q   How do you know that this document is that?
14  **A   Because it's been secularized.  There's no**
15  **mention of Scientology.  There's none of that.**
16  Q   Are you familiar with the copy that you use --
17  **A   Yes.**
18  Q   -- that Real Water uses?
19  **A   Yes.**
20  Q   Is this a copy of that document that
21  Real Water uses for its employees?
22  **A   Yes.**
23  Q   Is it a complete copy of that document that
24  Real Water uses for its employees?
25  **A   Seems to be.**

Page 210

1  Q   What do you base that belief upon?
2  **A   It's got the check sheet form.  It's got all**
3  **these other pages for the essays, and that type of**
4  **thing.  And then it has the final essay question at the**
5  **end, which is the one I generally look at when I'm**
6  **reviewing these types of courses.**
7  Q   All right.  That's all the questions I have on
8  that.
9      Real quick, regarding handbooks, was
10  Real Water provided with a handbook from ADP?
11  **A   They gave us some suggestions and things to be**
12  **able to, you know, have an adequate handbook.  And we**
13  **together came up with the final version of it.  But**
14  **they did provide us with, you know, one that they kind**
15  **of used as a template for other companies, and that**
16  **type of thing.**
17  Q   Have you ever used it -- handed out that
18  handbook to your employees?
19  **A   The final version that we kind of together**
20  **came to consensus of, yes.**
21  Q   Is Exhibit 13 at least portions of the final
22  version that you handed out?
23  **A   Yeah, it looks like it's at least some of it.**
24  **Again, I don't know these handbooks word-for-word.**
25  Q   Okay.  But it looks like the one that you --

Page 211

1  **A   Yeah, exactly, at least part of it because**
2  **it's not full.**
3      MS. GINAPP:  Okay.  Those are all the
4  questions I have.
5      MS. BARRAZA:  I don't have anything.
6  (Thereupon, the deposition concluded at 5:00 p.m.)

Page 212

1      CERTIFICATE OF WITNESS
2  PAGE   LINE   CHANGE          REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18      * * * * *
19      I, BLAIN JONES, witness herein, do
hereby certify and declare under penalty of perjury the
20  within and foregoing transcription to be my deposition
in said action; that I have read, corrected and do
21  hereby affix my signature to said deposition.
22
23  _____
24      BLAIN JONES  DATE
25

Electronically signed by Mary Cox Daniel (101-361-287-3117)     c773ac71-bef8-43c9-b345-181b55e3b981

Page 213

```
 1          CERTIFICATE OF REPORTER
 2  STATE OF NEVADA )
                    ) ss:
 3  COUNTY OF CLARK )
 4          I, Mary Cox Daniel, a Certified Court
    Reporter licensed by the State of Nevada, do hereby
 5  certify:
 6          That I reported the deposition of BLAIN
    JONES, commencing on Thursday, October 20, 2016, at
 7  9:58 a.m.
 8          That prior to being examined, the
    witness first duly swore or affirmed to testify to the
 9  truth, the whole truth, and nothing but the truth; that
    I thereafter transcribed my said shorthand notes into
10  typewriting and that the typewritten transcript is a
    complete, true and accurate record of testimony
11  provided by the witness at said time.
12          I further certify (1) that I am not a
    relative or employee of an attorney or counsel of any
13  of the parties, nor a relative or employee of any
    attorney or counsel involved in said action, nor a
14  person financially interested in the action, and (2)
    that pursuant to Rule 30(e), transcript review by the
15  witness was requested.
16          IN WITNESS WHEREOF, I have hereunto set
    my hand in my office in the County of Clark, State of
17  Nevada, this 26th day of October, 2016.
18
19  _____
20          MARY COX DANIEL, CCR 710, FAPR, RDR, CRR
21
22
23
24
25
```

Electronically signed by Mary Cox Daniel (101-361-287-3117)                    c773ac71-bef8-43c9-b345-181b55e3b981